# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA GOTLIB,<br><br>                              *Plaintiff*,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION as RECEIVER FOR SIGNATURE BANK, N.A., SIGNATURE BRIDGE BANK, N.A.<br><br>                              *Defendant*. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff Joshua Gotlib, through his attorneys, Patterson Belknap Webb & Tyler LLP, for his complaint against Defendant the Federal Deposit Insurance Corporation ("FDIC"), directly and as receiver for Signature Bank, N.A. ("Signature Bank") and Signature Bridge Bank, N.A. ("Signature Bridge Bank"), alleges as follows:

## NATURE OF ACTION

1.      This claim arises from the FDIC's blatant breach of contractual right of first refusal ("ROFR") provisions that Plaintiff secured through acquiring and providing guarantees on numerous Signature Bank loans (the "Loans"). Pursuant to the ROFR terms of each Loan note, Plaintiff was required to be given notice of—and the opportunity to meet the terms of—any sale, assignment, transfer, or negotiation of the Loans. After the entry of Signature Bank into receivership, these terms remained binding on Signature Bridge Bank and the FDIC as receiver for Signature Bank and Signature Bridge Bank.

2.      The FDIC had full knowledge of Plaintiff's ROFR on each Loan but refused to honor these contractual rights. Instead, the FDIC materially breached each of the

underlying contracts by transferring the Loans to a new entity and selling equity and other rights to third parties at a substantial discount—without regard to Plaintiff's ROFR.

3.      The FDIC's conduct here is particularly egregious in view of the context in which Plaintiff first obtained these ROFRs.  As set forth more fully below, Plaintiff (through various entities) began to acquire the underlying properties and the Signature Bank loans at issue starting in the fall of 2020, during the height of the Covid-19 pandemic in New York City.  At the time, the real estate market was in steep decline, the properties faced mounting rent delinquencies, and most of the preexisting Signature Bank loans on the properties were already in default.

4.      Notwithstanding these circumstances, Plaintiff worked with Signature Bank and its borrowers to not only acquire the underlying properties, but also to assume dozens of existing Signature Bank loans—including loans already in default—at full value. Plaintiff also provided a limited guarantee for each Loan and committed to undertake onerous and costly efforts towards converting *over 60* of the underlying properties to affordable housing.

5.      In exchange, and to induce Plaintiff into this series of transactions, Signature Bank agreed to afford Plaintiff a ROFR on each Loan such that Plaintiff would have an opportunity to meet the terms of any subsequent sale or other transfer of any of the Loans. This represented a critical and material inducement of Plaintiff's agreement to assume numerous Signature Bank loans at face value despite existing defaults, and to undertake significant time, effort, and expense to rehabilitate the related properties.

6.      Plaintiff thereafter upheld his end of the bargain.  As of the time that Signature Bank entered receivership, Plaintiff had already converted 50 of the underlying

properties into affordable housing and had applications pending on another 14 properties.
Moreover, through the fruits of Plaintiff's active and effective management, each of the
subject Loans that was previously in default had returned to full performance.  All the
while, Plaintiff had contractual assurance that Signature Bank could not sell or otherwise
transfer any of the Loans—and the hard-earned gains secured by Plaintiff—without first
offering the same terms to Plaintiff.

7.      Yet this is precisely what happened when the FDIC assumed control of
Signature Bank.  Shortly after taking over as receiver, the FDIC first transferred the Loans
from Signature Bank to Signature Bridge Bank.  The FDIC then announced an "upcoming
sale" of the Loans (together with other Signature Bank assets) and hired a broker to
administer and market that sale.[1]

8.      Upon learning of the FDIC's plans, Plaintiff contacted the FDIC to ensure
that it was on notice of Plaintiff's contractual ROFR on each Loan and to ask that the FDIC
honor those rights in connection with the forthcoming sale of the Loans.  The FDIC refused
to do so.  In an initial response, the FDIC told Plaintiff that, notwithstanding Plaintiff's
contractual rights, the FDIC purportedly had "statutory authority to ***sell the relevant loans***
and is ***proceeding with the sale***."  (Emphasis added.)  Plaintiff then wrote to the FDIC
again, through counsel, to reiterate the existence and import of these contractual rights in
connection with any sale of the Loans.  The FDIC still refused to honor Plaintiff's rights—

---

[1] *See*, *e.g.*, FDIC Announces Upcoming Sale of the Loan Portfolio from the Former Signature
Bank, New York, New York (April 3, 2023), *available at* https://www.fdic.gov/news/press-
releases/2023/pr23026.html; FDIC Announces Start of Marketing Process for $33 Billion
Commercial Real Estate Loan Portfolio of Former Signature Bank, New York (September 5,
2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23071.html.

and this time in response declared that the FDIC's forthcoming sale of the Loans was in fact "NOT a sale." (Capitalization in original.)

9.     The FDIC then proceeded with its auction and sale of Plaintiff's Loans, in violation of Plaintiff's contractual rights. On or around December 15, 2023, the FDIC closed a transaction with third-party Community Preservation Corporation ("CPC") and its partners Related Fund Management ("Related") and Neighborhood Restore HDFC.[2] Under the terms of the sale, the Loans were transferred to yet another entity, SIG RCRS C MF 2023 Venture LLC (the "Venture"), and equity and other interests in the Loans were sold to CPC and a Related private equity fund at a significant discount of ***nearly 40% of outstanding principal balance***.

10.     In various public reports at the time, the FDIC promoted its sale of the Loans (and other Signature Bank assets) as furthering the interests of affordable housing. The FDIC reportedly even used this factor to defend its selection of the winning bid by CPC/Related over alternative bids that had offered a higher (*i.e.*, less discounted) price for the Loans.[3] The substantially lower bid of CPC/Related was also buoyed by New York City officials, who submitted a letter to the FDIC in support of the CPC/Related bid.

11.     Yet contrary to the FDIC's lofty public representations concerning its purported interest in advancing affordable housing, the FDIC's knowing and intentional breach of Plaintiff's ROFRs caused significant harm to a party that has expended

---

[2] *See, e.g.*, FDIC Signature Bridge Bank Receivership Sells Five Percent Equity Interest in Entities Holding $5.8 Billion of Rent-Stabilized / Rent-Controlled Multifamily Loans (December 15, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23106.html; Related-Backed Bid Wins Stake in Signature Bank's Loan Book (December 15, 2023), *available at* https://www.bloomberg.com/news/articles/2023-12-15/related-backed-nonprofit-bid-wins-stake-in-signature-loan-book.
[3] *See infra* ¶¶ 77-78.

considerable time and effort to convert numerous properties—including many of those underlying the Loans—into affordable housing in the first place.

12.    Following the FDIC's breach, Plaintiff filed a timely claim with the FDIC on March 11, 2024, in accordance with 12 U.S.C. § 1821(d).  Plaintiff's Proof of Claim detailed the history of the Loans, the relevant agreements and contractual provisions, and the conduct of the FDIC that gave rise to Plaintiff's claims.  Plaintiff also attached to its Proof of Claim copies of the relevant Loan documents.

13.    By statute, the FDIC had 180 days to respond to Plaintiff's Proof of Claim. On day 172, barely a week before the statutory deadline expired, the FDIC rejected Plaintiff's claim in a ***single sentence***: "Your claim is disallowed as not proven to the satisfaction of the Receiver."  The FDIC provided no further reasoning for its decision or any explanation whatsoever as to what more Plaintiff could have done to "satisf[y]" the Receiver as to the legitimacy of Plaintiff's claim.

14.    Moreover, while Plaintiff's administrative claim languished before the FDIC, the third-party purchasers of Plaintiff's Loans enriched themselves at Plaintiff's expense. Mere months after the FDIC sold the Loans at just 60% of book value without honoring Plaintiff's contractual ROFR, CPC/Related turned around and sold a quarter of their acquired interest to a New York City pension fund, at an elevated valuation of approximately 83% of the book value, based on public reports.  Notably, the increased valuation for this subsequent transaction was on par with higher bids for the underlying sale that the FDIC had rejected in favor of CPC/Related—at the urging of New York City officials.  This subsequent transaction only further crystalized the harm caused to Plaintiff by the FDIC's refusal to honor Plaintiff's contractual ROFRs.

15.     The unredressed material breach of Plaintiff's contractual rights has caused significant harm to Plaintiff.  As a result of the conduct set forth herein, Plaintiff is entitled to an award of at least **$160,751,508**, plus interest and any and all other available remedies.

## PARTIES

16.     Plaintiff Joshua Gotlib is a citizen and resident of New York, New York. Plaintiff is the principal and sole owner of Black Spruce Management LLC ("Black Spruce"), a New York Limited Liability Company headquartered in New York, New York.

17.     The FDIC is a United States federal agency headquartered in Washington, D.C.  On or about March 12, 2023, the FDIC was appointed the Receiver of Signature Bank, a New York chartered bank that was closed by the New York State Department of Financial Services ("DFS").  The FDIC thereafter transferred all the deposits and substantially all the assets of Signature Bank to Signature Bridge Bank.[4]  On or about March 20, 2023, Signature Bridge Bank was closed by the Office of the Comptroller of the Currency, and the FDIC was appointed as receiver for Signature Bridge Bank.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 12 U.S.C. § 1821(d)(6)(A) as this suit against the FDIC arises out of the FDIC's disallowance of a claim in its role as receiver of Signature Bank and Signature Bridge Bank.

19.     Venue is appropriate in this District under 12 U.S.C. § 1821(d)(6)(A) since Signature Bank and Signature Bridge Bank are headquartered, *i.e.*, have their principal place of business, in this District.

---

[4] *See* FDIC Establishes Signature Bridge Bank, N.A., as Successor to Signature Bank, New York, NY (March 12, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23018.html.

## FACTUAL ALLEGATIONS

**A.    Plaintiff's Acquisition of Non-Performing Signature Bank Loans**

20.    In mid-2020, during the height of the Covid-19 pandemic in New York City, Signature Bank encountered a wave of defaults in its multi-family housing loan portfolio as property values declined and many tenants and borrowers alike faced financial difficulties. These increasing defaults threatened Signature Bank's business, and introduced risks of foreclosures or other remedial actions that could impact underlying tenants at a perilous time.

21.    In the face of these difficulties, Plaintiff stepped in and not only facilitated the purchase of dozens of properties that were underwater on existing Signature Bank loans, but also agreed to assume those existing Signature Bank loans at full value.

22.    Specifically, in or around the fall of 2020, Plaintiff worked with Signature Bank and its existing borrowers to purchase 48 properties on the Upper West Side of New York City that had fallen into default on Signature Bank loans.  As part of these transactions, Plaintiff agreed to have the acquiring entities assume the 35 preexisting Signature Bank loans on those properties at face value, despite existing defaults.

23.    The following year, in or around the fall of 2021, Plaintiff facilitated the purchase of an additional 14 properties on the Upper West Side of New York City that also were subject to Signature Bank loans that had fallen into default.  Once again, Plaintiff agreed to have the acquiring entities assume all 13 of the associated Signature Bank loans on those properties at face value, despite existing defaults.

24.    Plaintiff also committed to undertake efforts to convert each of the 62 Upper West Side properties acquired through the above transactions into affordable housing.

25.     In addition to those transactions, Plaintiff also acquired two Signature Bank Loans for an existing affordable housing property in Queens, as well as a Signature Bank Loan for a residential property in Brooklyn.

26.     Attached as Exhibit A to this Complaint is a table listing, for each Loan, the name of the borrower entity and address of the underlying subject property (or properties).

**B.     Contractual ROFR Provisions**

27.     In conjunction with the above acquisitions, Plaintiff also became a Guarantor as to each of the Loans by executing a limited guarantee for the benefit of Signature Bank.

28.     As an additional material component of these transactions—including to induce the guaranty by Plaintiff and the assumption of numerous preexisting Signature Bank loans at full value despite existing defaults—Signature Bank agreed to give Plaintiff a ROFR on each Loan, should Signature Bank ever sell or otherwise transfer any of the Loans.

29.     Specifically, the operative note for each Loan contains the following ROFR provision (or substantially similar language):

> Notwithstanding anything contained herein or in the other Loan Documents, in the event that the Bank elects to sell, assign, transfer or negotiate this Note and the Loan Documents to a bona fide third party unrelated and unaffiliated with Bank (hereinafter, a "Sale") by its acceptance of this Note the Bank agrees to provide the Guarantor (or its affiliated entity) a right of first option by providing the Guarantor with notice of the intended Sale which states the material terms and conditions upon which the Bank has agreed to accept for the Sale (the "ROFR Notice"). The Guarantor shall notify the Bank within three (3) Business Days of receipt of said ROFR Notice, that he (or his affiliated entity) will meet the terms of the Sale and purchase the Note and Loan Documents on the same terms contained therein, provided that the Guarantor shall have at least thirty (30) days to close upon the Sale. If the Bank has not received notice within said three (3) Business Days that the Guarantor (or his affiliated entity) will enter into the Sale, the Bank will have no further obligation to enter into any Sale with the Guarantor (or his affiliated entity). In addition, if the Guarantor (or his affiliated entity) has notified the Bank within said three (3) Business Day period that it intends to enter into said Sale and such Sale is not consummated in

8

accordance with said thirty (30) days, the Bank will have no further obligation to enter into the Sale with the Guarantor (or its affiliate). In the event that the Guarantor declines to enter into the proposed Sale and the Bank attempts to proceed with the Sale to a third party but prior to closing the Sale the proposed purchase price is reduced by greater than five percent (5%) from that price proposed in said ROFR Notice, then, in such event, the Bank will be required to provide the Guarantor with a new ROFR Notice and opportunity to exercise the Guarantor's rights hereunder. The term "Sale" shall not include any transfer or assignment of this Note due to the sale of the Bank or merger of the Bank with another financial institution.[5]

30.    The operative note for each Loan further provides that "[a]ny purchaser, assignee, transferee or participant shall have the same rights, benefits ***and obligations*** under this Note as it would have if it were the Bank."[6]

31.    As evidenced by its plain terms, the ROFR provision in the notes required Signature Bank to afford Plaintiff (as Guarantor) a right of first refusal upon any sale, assignment, transfer, or negotiation of any of the subject Loans.  Signature Bank was required to provide Plaintiff with notice of any such transaction, and an opportunity to meet its terms.

32.    These ROFR provisions were a significant inducement and material to Plaintiff's agreement to enter into these transactions with Signature Bank.  Since Plaintiff agreed to assume dozens of impaired Loans at full value and to undertake efforts to rehabilitate them, these critical ROFR terms ensured that Signature Bank could not turn around and sell the Loans off to another party at a reduced value without giving Plaintiff that same opportunity.

---

[5] *See*, *e.g.*, Amended, Consolidated and Restated Mortgage Note, dated October 13, 2021, by 105TH Morningside Holdings LLC, in respect to 120 West 105th Street a/k/a 112/138 West 105th Street, New York, New York (Exhibit B), § 4(c).
[6] *See*, *e.g.*, Ex. B § 4(b) (emphasis added).

**C.    Plaintiff's Rehabilitation of the Loans and Conversion of Properties into Affordable Housing**

33.    Plaintiff upheld his end of the bargain with Signature Bank.

34.    After acquiring the subject properties, Plaintiff and related parties worked to convert the defaulted loans into performing loans through a series of initiatives.  Among other things, this included forgiving hundreds of thousands of dollars in tenant rent arrears that had accumulated through the height of the Covid-19 pandemic, as well as reducing the rent for hundreds of units, to help restore tenants to active payment status.

35.    Plaintiff also directed millions of dollars in repairs and capital improvements in the underlying properties, including upgrades to improve energy efficiency as well as to repair mechanical systems, heat transfer systems, lights fixtures, windows, and facades. These property acquisitions, and Plaintiff's subsequent efforts, provided significant value not only to Signature Bank but also to the tenants of the underlying properties.

36.    Plaintiff also undertook efforts to qualify the Upper West Side and Queens properties for affordable housing government incentives, and is in the process of securing additional regulatory agreements to increase affordability.

37.    As of the time that Signature Bank entered into receivership, Plaintiff had already successfully qualified 50 of the purchased properties for affordable housing and was in the process of extending the same affordability benefits to another 14 purchased properties.  Plaintiff has since continued to advance these efforts, such that the remaining 14 properties should qualify for affordable housing by the end of this year.

38.    Plaintiff's efforts and significant investments with respect to these properties—and others—have directly benefited tenants and furthered affordable housing initiatives in New York City.

39.     Plaintiff's efforts also provided significant value to Signature Bank by
sparing Signature Bank from needing to take other recourse on the dozens of loans that had
fallen into default prior to acquisition, and by then turning those defaulted loans into
performing loans.  Importantly, all of this was done by Plaintiff in reliance on the
contractual ROFR protections that Plaintiff secured in its agreements with Signature Bank.

**D.      Signature Bank Enters Receivership**

40.     On or around March 12, 2023, Signature Bank was closed by the New York
State Department of Financial Services and placed into Receivership, with the FDIC
appointed as Receiver.  The FDIC then created Signature Bridge Bank and transferred to it
substantially all of Signature Bank's assets, including the Loans.[7]

41.     On or around March 20, 2023, Signature Bridge Bank was closed by the
Office of the Comptroller of the Currency and placed into Receivership, with the FDIC
again appointed as Receiver.  The FDIC then entered into a purchase and assumption
agreement with Flagstar Bank, N.A., for substantially all deposits and certain loan
portfolios of Signature Bridge Bank, N.A.[8]   However, the FDIC retained in the
Receivership approximately $60 billion in loans from Signature's Bank's portfolio,
including the Loans at issue here.[9]

---

[7] *See* FDIC Establishes Signature Bridge Bank, N.A., as Successor to Signature Bank, New York, NY (March 12, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23018.html.
[8] *See* Failed Bank Information for Signature Bank, New York, NY (as of October 28, 2024), *available at* https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/signature-ny.html.
[9] *See* Subsidiary of New York Community Bancorp, Inc., to Assume Deposits of Signature Bridge Bank, N.A., From the FDIC (March 19, 2023, last updated March 20, 2023), https://www.fdic.gov/news/press-releases/2023/pr23021.html.

42.     As the FDIC itself has conceded, the FDIC remained obligated to honor the terms of the loan agreements with borrowers for those loans that remained under its control as part of the receivership.

43.     For example, in a page on the FDIC's website titled, "Multifamily Loan Portfolio Frequently Asked Questions," the FDIC stated that its "role is that of the lender (not as owner of the properties), *per the terms of contractual loan agreements with borrowers*."[10]

44.     On the same "FAQ" website, the FDIC acknowledged that, "[i]f borrowers perform under the terms of their loans, *FDIC-R must honor those terms*, and *cannot unilaterally change the terms of such loan agreements*."[11]

**E.     FDIC Markets its Sale of the Loans**

45.     In the spring of 2023, the FDIC announced its intention to sell the remaining loans that it still held as receiver for Signature Bridge Bank (and that were previously held by Signature Bank).

46.     For example, an April 3, 2023 press release heralded: "FDIC Announces Upcoming Sale of the Loan Portfolio from the Former Signature Bank, New York, New York."[12]   The press release went on to state that "[t]he FDIC expects to begin its marketing of the retained loan portfolio of the former Signature Bank later this summer," that "[t]he FDIC has retained Newmark & Company Real Estate, Inc. (Newmark) as an advisor on *this*

---

[10] *See* Multifamily Loan Portfolio Frequently Asked Questions (last updated July 13, 2023), *available at* https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/signature-ny-multifamily-faq.html (emphasis added).
[11] *Id*. (emphasis added).
[12] FDIC Announces Upcoming Sale of the Loan Portfolio from the Former Signature Bank, New York, New York (April 3, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23026.html.

*sale*," and that interested parties should contact Newmark "to obtain further information about *the sale*."[13]

47.     The FDIC's July 2023 "FAQ" concerning Signature Bank's Multifamily Loan Portfolio similarly conveyed that, the "FDIC-R *plans to sell loans* retained in the Signature failure, *including the Rent Stabilized Multifamily portfolio,*" and that the "FDIC-R expects to announce the start of the Signature Multifamily *loan sale* by the end of September 2023."[14]

48.     On or around September 5, 2023, the FDIC officially launched the marketing process for Signature Bank's $33 billion Commercial Real Estate loan portfolio.  The FDIC published to its website a "Sealed Bid Sale Announcement," which stated that:  "The Federal Deposit Insurance Corporation (FDIC) in its capacity as Receiver for Signature Bridge Bank, N.A. is conducting a *competitive sealed-bid sale* comprised of 5,137 commercial real estate loans having an unpaid principal balance (UPB) of approximately $33.22 billion.  The loans will be offered in 14 pools: 12 joint venture pools ranging from $267.54 million to $5.92 billion and 2 all-cash pools at $309.26 million and $899.06 million."[15]

49.     In a press release announcing the commencement of this sales process, the FDIC noted that nearly $15 billion of the portfolio was secured by multifamily residences that were rent stabilized or rent controlled, and claimed that it had a "statutory obligation,

---

[13] *Id*. (emphasis added).
[14] Multifamily Loan Portfolio Frequently Asked Questions, *available at* https://www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/signature-ny-multifamily-faq.html (last updated July 13, 2023) (emphasis added).
[15] Sealed Bid Sale Announcement (Sept. 5, 2023) (emphasis added).

among other factors, to maximize the preservation of the availability and affordability of residential real property for low- and moderate-income individuals."[16]

50.    The FDIC further announced that rent stabilized or rent controlled loans— including the Loans at issue here—would be sold pursuant to a joint venture structure. Pursuant to this structure, the loans would be transferred to a new joint venture holding company, and a portion of the equity (initially 5%) would be transferred to the winning bidders.  In addition to obtaining equity rights, the winning bidders would "act as the managing member of the joint venture and … be responsible for the management, servicing and ultimate disposition of the loans."[17]

**F.    FDIC Refuses to Honor Plaintiff's ROFR and Sells the Loans in Violation of Plaintiff's Contractual Rights**

51.    On or around November 21, 2023, press reports emerged suggesting that the FDIC had selected a winning bidder for its sale of a portfolio of loans that included the Loans at issue here.

52.    In view of these reports, and to ensure that the FDIC was on notice of and would respect Plaintiff's material contractual rights, Plaintiff wrote a letter to Signature Bank (then under FDIC receivership) and Flagstar Bank, N.A. on November 27, 2023. (Exhibit C, excluding attachments.)  Plaintiff's letter detailed the circumstances of how the Loans at issue had been acquired, and the ROFR that Plaintiff held as Guarantor with respect to each of the Loans.

---

[16] *See* FDIC Announces Start of Marketing Process for $33 Billion Commercial Real Estate Loan Portfolio of Former Signature Bank, New York (Sept. 5, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23071.html.
[17] *Id.*

53.     This letter to the FDIC made clear, in no uncertain terms, that Plaintiff expected to receive a ROFR Notice in accordance with the governing agreements and remained willing and able to exercise these bargained-for rights.  The letter emphasized that Plaintiff had "not waived and does not intend to waive Guarantor's ROFR, as it was a significant inducement to enter into the Loans" and demanded that Signature Bank and the FDIC provide Plaintiff with "a ROFR Notice before proceeding with any Sale."  (Ex. C, at 3; *see also id*. ("Before Seller proceeds with any Sale of any Note(s) or Loan Document(s), Guarantor demands that Seller comply with Guarantor's ROFR.").

54.     In a terse response on November 30, 2023, the FDIC refused to honor Plaintiff's ROFR on each Loan.  The FDIC instead declared that "it has statutory authority *to sell the relevant loans* and is *proceeding with the sale*."  (Emphasis added.)  The FDIC's November 30, 2023 email is attached as Exhibit D to this Complaint.

55.     Meanwhile, additional press coverage emerged that identified Related, CPC, and Neighborhood Restore as those behind the winning bid selected by the FDIC with respect to the portfolio containing the Loans.  According to these reports, CPC and its partners had not even submitted the highest bid; nevertheless, the FDIC purportedly selected this partnership based on a claim that doing so would advance the interests of affordable housing.[18]

---

[18] *See, e.g.*, Inside the bidding war for Signature's loans (November 21, 2023, updated November 27, 2023), https://therealdeal.com/new-york/2023/11/21/inside-the-bidding-war-for-failed-banks-real-estate-loans/.

56.    According to other reporting at the time, New York City officials also wrote a letter in support of the joint bid by Related, CPC, and Neighborhood Restore.[19]  This support was again grounded in a purported furtherance of affordable housing.

57.    In view of these reports and the FDIC's initial curt dismissal of Plaintiff's contractual rights, counsel for Plaintiff wrote to the FDIC (as well as Related, CPC, and Neighborhood Restore) on December 1, 2023.  This letter reenforced Plaintiff's expectation that the FDIC should honor Plaintiff's ROFR on each loan—and advised all parties of Plaintiff's intent to enforce these rights.  A copy of this letter (excluding attachments) is attached as Exhibit E.

58.    In a December 13, 2023 response, counsel for the FDIC contended that Plaintiff's ROFR would not be "triggered" by the contemplated transaction. Notwithstanding the FDIC's numerous public statements and other representations to the contrary, the FDIC's counsel now emphatically claimed that the Loans were "NOT being sold." (Capitalization in original.)  The FDIC's letter (attached as Exhibit F) nevertheless conceded that the Loans would be transferred to a new joint venture entity, that an equity stake in that entity would be sold to third parties, and that those third parties would also be afforded rights to "service, manage, and liquidate the Venture's assets."  *See* Ex. F.

59.    Two days later, on December 15, 2023, the FDIC announced that it had closed the transaction with CPC, Related, and Neighborhood Restore.  Pursuant to the transaction, and in violation of Plaintiff's ROFR on each Loan, the FDIC transferred

---

[19] *See* City Hall backs Related's bid for Signature Bank's loans (November 29, 2023), https://therealdeal.com/new-york/2023/11/29/adams-administration-backs-related-signature-bank-bid/.

Plaintiff's Loans to a newly-formed joint venture vehicle—SIG RCRS C MF 2023 Venture LLC (the "Venture")—and sold a 5% stake therein to CPC and its partners.[20]

60.    A press release issued by CPC the same day similarly announced that a "partnership led by The Community Preservation Corporation (CPC), with Neighborhood Restore HDFC, and Related Fund Management (RFM) as partners," had closed on the transaction with the FDIC.  CPC's press release identified Related as a "strategic investor in the partnership," and Neighborhood Restore HDFC as a "strategic asset manager."[21]

61.    According to the FDIC's website, the FDIC sold an equity stake in the Loans (and other collateral) at an implied value of **60.1%**.[22]  In other words, CPC and its partners acquired an equity stake in the Loans and other collateral underlying the Venture at a discount of **nearly 40%** off the outstanding principal balance.

62.    The FDIC's press announcement further confirmed that, through this transaction, the FDIC transferred substantial authority to CPC for the "management, servicing and liquidation of each Ventures' respective assets"—including the Loans.[23]  In return for these services, CPC and its partners receive management fees drawn from the

---

[20] FDIC Signature Bridge Bank Receivership Sells Five Percent Equity Interest in Entities Holding $5.8 Billion of Rent-Stabilized / Rent-Controlled Multifamily Loans (December 15, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23106.html.

[21] The Community Preservation Corporation Closes On Transaction With FDIC To Service Signature Bank's Rent-Stabilized Loan Portfolio (Dec. 15, 2023), *available at* https://communityp.com/news-cpc/fdic-signature/.

[22] *See* Joint Venture Transactions (as of October 28, 2024), *available at* https://www.fdic.gov/asset-sales/joint-venture-transactions.

[23] FDIC Signature Bridge Bank Receivership Sells Five Percent Equity Interest in Entities Holding $5.8 Billion of Rent-Stabilized / Rent-Controlled Multifamily Loans (December 15, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23106.html.

cash flows of the underlying assets—as well as the equity share of remaining cashflows after deducting such fees.[24]

63.    In its announcement, the FDIC again claimed that it had acted to further "the preservation of the availability and affordability of residential real property for low- and moderate-income individuals."[25]

64.    After closing, the FDIC listed its transaction with CPC/Related on an FDIC webpage titled "Structure Transaction Joint Venture Sales."  According to the FDIC at the time, "these transactions"—including those involving Plaintiffs' Loans—represented "the *sale of assets* through the use of private/public partnership transactions."[26]  This FDIC webpage further described such transactions as "joint venture *sales*."[27]

65.    Notably, after the FDIC's breach and after Plaintiff filed an administrative claim quoting this language from the FDIC website, the FDIC revised this webpage in order to scrub earlier admissions that such transactions constituted a "sale of assets."[28]

---

[24] *See* FDIC, Asset Sales (Joint Venture Transaction) (last updated June 7, 2024), *available at* https://www.fdic.gov/buying/financial/index.html ("Cash flow from the assets, after deducting the monthly management fee, asset-related expenses, and other eligible expenses, are allocated first to pay off any notes issued by the LLC to the receiver in a leveraged transaction and any other debt outstanding to the receiver and, then, to the receiver and the private owner, in accordance with their percentage interests.").

[25] FDIC Signature Bridge Bank Receivership Sells Five Percent Equity Interest in Entities Holding $5.8 Billion of Rent-Stabilized / Rent-Controlled Multifamily Loans (December 15, 2023), *available at* https://www.fdic.gov/news/press-releases/2023/pr23106.html.

[26] *See* Exhibit P, Structured Transaction Joint Venture Sales, https://www.fdic.gov/buying/historical/structured/index.html (last updated January 31, 2024) (as of February 26, 2024) (emphasis added).

[27] *Id*. (emphasis added).

[28] As of this filing, the prior website address for "Structured Transaction Joint Venture Sales," now redirects to a new webpage titled "Joint Venture Transactions," available at https://www.fdic.gov/asset-sales/joint-venture-transactions (as of October 28, 2024).  This new webpage is substantially the same as the earlier webpage but removed language describing such transactions as a "sale of assets."

66.     Nevertheless, the transaction closing documents, which were publicly posted to the FDIC's website subsequent to the submission of Plaintiff's administrative claim, only further confirm that the FDIC in fact disposed of the Loans via a "sale."

67.     For example, the December 15, 2023 Asset Transfer Agreement (Exhibit G) transfers ownership of associated Assets (including the Loans at issue here) from the FDIC (as Receiver) to the Venture.  Among other things, the Asset Transfer Agreement recites that the FDIC as Receiver "has determined to liquidate the Assets" and "desires to transfer the Assets to the [Venture] as a capital contribution."  Ex. G, at 1 (Recitals).  Pursuant to this Agreement, the FDIC transferred to the Venture "all right, title, and interest of the [FDIC] in and to" the Loans, "all amounts payable to the [FDIC] . . . and all obligations owed to the [FDIC] in connection with" the Loans (Ex. G, § 2.1(a)-(b)), as well as "all rights, obligations, liabilities and responsibilities with respect to the servicing" of the Loans (*id*., § 3.3).

68.     The Asset Transfer Agreement further provides that the FDIC "will sell and transfer" to the "Private Owner" an ownership stake in the Venture.  Ex. G, at 1 (Recitals).

69.     Accordingly, pursuant to the December 15, 2023 Private Owner Sale and Assignment Agreement ("Private Owner Sale Agreement") (Exhibit H), the FDIC then "s[old] to the Private Owner . . . all of the [FDIC's] right, title and interest in and to" the partial ownership stake transferred through the sale.  Ex. H, § 1(a).

70.     The "Private Owner" is a Delaware limited liability company known as SIG-23 Private Owner LLC.  *See id*. at 1.

71.     The "Specified Parent" of the "Private Owner" is defined in the Agreement of Common Terms and Definitions (Exhibit I) as "each of The Community Preservation

Corporation, a New York not-for-profit corporation, and Related Real Estate Fund III, L.P,

a Delaware limited partnership," as well as "any additional or substitute Person or Persons

owning, directly or indirectly, more than 25% in value of all of the Ownership Interests in

the Private Owner as the Initial Member may approve (in its sole discretion) in writing

from time to time after the Closing Date." Ex. I, § 1.1 (definition of "Specified Parent").

72.    Related Real Estate Fund III, L.P. ("Related Fund III") is a private equity

fund managed and controlled by Related.[29]  According to the latest Form ADV filed by

Related with the United States Securities and Exchange Commission (Exhibit J), Related

Fund III has over $2.2 billion in assets and a $10 million minimum investment

commitment.  *See* Ex. J, at 124-33.  According to this filing, which was submitted

following the FDIC transaction, Related Fund III had 105 beneficial owners, with 38% of

the partnership held by owners outside of the United States.

73.    The final sale documents also reinforce that CPC and Related now

substantially control the management of the Venture and the underlying assets, including

the Loans.

74.    The December 15, 2023 Amended and Restated Limited Liability Operating

Agreement ("Amended LLC Agreement") (Exhibit K) signed by the FDIC appoints the

Private Owner (*i.e.*, the entity owned and controlled by CPC and Related) as the "Manager"

of the Venture, and vests the Manager with "full and exclusive power and discretion to . . .

manage the business and affairs of the Venture."  Ex. K, § 3.1(a).[30]

---

[29] *See* Ex. I, § 1.1 ("'Ultimate Parent Entity' means . . . in relation to Related Real Estate Fund III, L.P., Related Fund Management, LLC, a Delaware limited liability company.").

[30] Indeed, the Amended LLC Agreement even designates CPC's own office location as the Venture's "Chief Executive Office."  Ex. K, § 2.4 ("The chief executive office of the [Venture]

75.    Moreover, pursuant to the Amended LLC Agreement, the Manager entity owned and controlled by CPC and Related is also given "full authority and responsibility" with respect to the servicing of the Loans.  *Id.* § 12.

**G.    Winning Bidders Secure Quick Profit in New York City Transaction**

76.    While Plaintiff's administrative Proof of Claim was pending with the FDIC, CPC and Related already recognized a profit from their heavily-discounted transaction with the FDIC by turning around and selling a 25% stake in their Private Owner entity for $60 million—reflecting an increased valuation compared to the underlying FDIC transaction.

77.    As discussed above, in December 2023, the FDIC selected CPC/Related as the winning bidder for the Signature Bank sale transaction involving Plaintiff's Loans (Pool C), at an implied price of 60.1% of book value—*i.e.*, a nearly **40%** discount.  At the same time, the FDIC also selected CPC/Related as the winning bidder for a second pool of Signature Bank affordable housing loans (Pool D), at an implied price of 56.0% of book value—*i.e.*, a discount of **44%**.[31]  According to reports at the time, the CPC/Related bids were not the highest bids for either pool, but were buoyed by a letter of support submitted to the FDIC by New York City officials.

78.    The FDIC has since published more detailed information on the competing bids received for each loan pool.  According to the FDIC, for Pool C, the CPC/Related bid was the *fourth highest* bid for the full pool.[32]  The highest bid offered an implied price of

---

will be located at 220 East 42nd Street, 16th Floor, New York, New York 10017…."); *see also* Ex. I, Schedule I-2 (providing that the notice address will transfer from the FDIC's address before closing, to CPC's address after closing).

[31] Joint Venture Transactions (as of October 28, 2024), *available at* https://www.fdic.gov/asset-sales/joint-venture-transactions.

[32] Bid Summary, SIG RCRS C MF VENTURE LLC (as of October 28, 2024), *available at* https://www.fdic.gov/resources/resolutions/asset-sales/historical-sales/joint-venture-

81.1% of book value, followed closely by the second highest bid at 80.2%. Both were rejected in favor of the 60.1% CPC/Related bid. Similarly, for Pool D, CPC/Related was the *sixth highest* bid for the full pool.[33] The highest bid offered an implied price of 86.5%, followed by a second highest bid of 80.2%. Again, those bids (and four other higher bids) were rejected in favor of the 56.0% CPC/Related bid.

79.     Less than six months later, the CPC/Related partnership turned a quick profit on these FDIC transactions through a new deal with New York City.

80.     On May 21, 2024, CPC announced that the New York City Employees' Retirement System ("NYCERS") pension fund would acquire a 25% stake in the CPC/Related entity that transacted with the FDIC, through an investment of up to $60 million.[34] While CPC and Related had acquired their stake in the Signature Bank loans at weighted average book value of approximately 59%, this $60 million investment by NYCERS suggests a weighted average book value closer to 83%—on par with the bids previously rejected by the FDIC in favor of the lower Related/CPC bids for each pool.

81.     New York City Comptroller Brad Lander commented that NYCERS's investment was meant to "[p]rotect[] and expand[] our affordable housing supply" by "collaborat[ing] with the Community Preservation Corporation, Related Fund Management

---

transactions/joint-venture-transactions-documents/sig-rcrs-c-mf-2023-venture-llc-bid-summary.html.

[33] Bid Summary, SIG RCRS D MF VENTURE LLC (as of October 28, 2024), *available at* https://www.fdic.gov/resources/resolutions/asset-sales/historical-sales/joint-venture-transactions/joint-venture-transactions-documents/sig-rcrcs-d-mf-2023-venture-llc-bid-summary.html.

[34] Community Preservation Corporation, NYC Comptroller Lander, Mayor Adams, Public Advocate Williams, NYCERS Pension Trustees, and Partners Celebrate $60 Million Investment in Loan Portfolio That Will Preserve Nearly 35,000 Rental Units (as of October 28, 2024), https://communityp.com/news-cpc/nycers-csp-investment/.

and Neighborhood Restore."[35] CPC claimed that the transaction would "preserve rent-stabilized housing units impacted by the sudden collapse of Signature Bank last spring."[36]

82.    Contrary to these lofty declarations, this transaction only further enriched those who have profited off the breach of Plaintiff's contractual rights—even though it was Plaintiff who, in the wake of the Covid-19 pandemic, actually worked to create and preserve hundreds of the underlying affordable housing units.

## H.    Violation of Contractual ROFR Terms

83.    As set forth above, Plaintiff bargained for and received a broad ROFR in connection each of the Signature Bank Loans at issue.

84.    As the FDIC has conceded, Plaintiff's contractual rights—including these ROFR provisions—remained in effect and binding on the FDIC following Signature Bank's entry into receivership.

85.    The transactions set forth above plainly triggered Plaintiff's rights.  Through a series of transactions directed and effectuated by the FDIC, the Loans moved from Signature Bank to Signature Bridge Bank, and then again to the newly-formed Venture entity—at which point both equity and management rights in the Loans were sold to unaffiliated third parties at a significant discount.

86.    Nevertheless, the FDIC now claims that the Loans were "NOT sold" and that the Loans were instead transferred to a new joint venture vehicle (created for the sole purpose of holding such loans), and what was sold to third parties was merely an equity interest in the Venture itself and not the underlying Loans.

---

[35] *Id.*
[36] *Id.*

87.    Such semantic defenses fail to overcome the fundamental reality of the transactions—through which the FDIC transferred the Loans to a new entity, unaffiliated with Signature Bank, and CPC and its partners obtained both equity interests and management rights in the Loans.

88.    The FDIC's post-hoc wordplay also contradicts myriad earlier public statements in which the FDIC repeatedly characterized and promoted such transactions as *sales*, as well as closing documents that memorialize a "sale" and "transfer" of assets, including Plaintiff's Loans.  In any event, the FDIC also ignores that Plaintiff's ROFR is triggered not only by a "sale" but also a transfer or other negotiation of the Loans, as plainly occurred here.

89.    At the end of the day, the FDIC must concede that the Loans are no longer held by Signature Bank, and instead now reside in a new entity partially owned and substantially controlled by unaffiliated third parties.

90.    Indeed, while Plaintiff's Proof of Claim was pending before the FDIC, the FDIC proceeded to record the Loan sales with New York City's Office of the City Register. These documents, which assign Plaintiff's Loans to a new entity, further undermine the FDIC's claims concerning the nature of these transactions.

91.    For example, in its Assignment of the Mortgage securing 202/204 and 206/208 West 109th Street (one of the Loans at issue here) (Exhibit L), the FDIC recited that "for value received," the FDIC "does by these presents *grant, bargain, sell, assign, transfer, and set over* . . . all right, title, and interest in and to" the Loan to the Venture. Ex. L, at Recitals.  As set forth above, the FDIC then transferred to CPC and a Related

private equity fund not only an ownership interest in the Venture, but also substantially all management rights as to both the Venture and the underlying Loans.

92.    To the extent that the FDIC might claim that it could not have honored Plaintiff's ROFRs because the Loans were transferred as part of a larger set of loans not limited to Plaintiff's Loans, or that only a fractional portion of the Loans could be sold at the discounted price, such arguments also fail.

93.    For example, pursuant to the FDIC's bid instructions, the winning bidder of a joint venture transaction could not hold an interest in any borrower or obligor of the loan assets underlying the joint venture once the transaction closed (absent consent from the FDIC).  As such, in the event the winning bidder or its affiliates held such an interest in any of the loan assets prior to closing, those loans would need to be removed prior to closing.  The FDIC's bid instructions further provide that the "payoff amount" for any such loans removed prior to closing would be "no less than" the unpaid balance of the subject loan(s) multiplied by the discount percentage of the bid for the entire loan pool at issue, plus any accrued and unpaid interest as of closing.[37]

94.    In other words, to the extent a member or affiliate of the CPC/Related partnership held any interest in loans underlying one of the awarded joint venture transactions, such loans could have been paid off in full at a discount of approximately 40% of unpaid principal balance, without becoming part of the joint venture structure.

---

[37] *See* Commercial Real Estate Loan Portfolio SIGCRE-23 Sale Bid Instructions, attached as Exhibit M at 8-9 ("Each Loan that is removed must be paid off at or prior to the Closing of the Joint Venture Transaction, with the payoff amount equal to no less than (A)(i) a fraction, the numerator of which is the Bid Amount and the denominator of which is the UPB as of the Cut-Off Date of the Pool containing the Loan, multiplied by (ii) the UPB of the Loan as of the Cut-Off Date, plus (B) interest accrued and unpaid to (but not including) the payoff date.").

95.     On information and belief, Related (and/or affiliates thereof) held interests in one or more loans underlying the joint venture transactions that were awarded to the CPC/Related partnership.  On information and belief, Related (and/or an affiliate thereof) was permitted to remove these loans from the joint venture structure and to fully pay them off at a significant discount to the remaining unpaid principal balance of the loans— reaping millions of dollars in benefits.

96.     At the same time, the FDIC refused to honor the terms of Plaintiff's ROFR, thereby materially breaching these contracts and further enriching Related and its partners to Plaintiff's detriment.

97.     The FDIC's conduct is particularly egregious here given the FDIC's claims that it acted in the interest of promoting and advancing affordable housing.  In fact, the FDIC's steadfast refusal to honor Plaintiff's ROFR further enriched one of the largest real estate firms in the country and its private equity investors, while directly harming the party that actually converted many of the underlying properties to affordable housing.

## I.     Exhaustion of FDIC Claim Procedure

98.     Plaintiff's claim did not fully ripen until December 2023, when the FDIC closed a transaction involving the Loans without providing Plaintiff with the requisite ROFR Notice and an opportunity for Plaintiff to exercise each ROFR prior to closing.

99.     On December 20, 2023, shortly after the December 15, 2023 closing of the transaction, the FDIC sent counsel for Plaintiff and Black Spruce an Amended Notice of Discovered Creditor (Exhibit N).  The FDIC's letter advised that Plaintiff had until March 12, 2024, to submit an Administrative Claim to the FDIC in this case.[38]  *See* Ex. N.

---

[38] While the original Claims Bar Date was July 17, 2023, Plaintiff could not have filed a claim by that date since events giving rise to Plaintiff's claim had not yet occurred.

100.    Plaintiff's Statement of Claim was timely submitted in advance of the March 12, 2024 deadline set by the FDIC.  In connection with its claim, Plaintiff submitted a Proof of Claim that included a detailed narrative of the FDIC's breaches and dozens of exhibits documenting the Loans and attendant ROFRs.

101.    On August 30, 2024, only days before the expiration of the 180-day period for the FDIC's review, the FDIC sent Plaintiff a letter that bluntly disallowed Plaintiff's claim in a single sentence:   "Your claim is disallowed as not proven to the satisfaction of the Receiver."  *See* Exhibit O.  While 12 U.S.C. § 1821(d)(5)(iv)(I) requires the FDIC to provide a "statement of each reason for the disallowance," the FDIC's letter failed to provide any explanation whatsoever as to its reasoning or what further proof was required.

102.    Consistent with 12 U.S.C. § 1821(d)(6), Plaintiff is filing this complaint within 60 days of the FDIC's Notice of Disallowance.  This Court's review of Plaintiff's claim is *de novo* and owes no deference to the FDIC's determination.  *See City of New York v. F.D.I.C.*, 40 F. Supp. 2d 153, 160 (S.D.N.Y. 1999) (acknowledging that "*de novo* judicial review [of a claim submitted to the FDIC as receiver] is . . . available to a diligent claimant") (quoting *Betancourt v. F.D.I.C.*, 851 F. Supp. 126, 130 (S.D.N.Y. 1994)).

### FIRST CAUSE OF ACTION
**Breach of Contract**

103.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 102 above.

104.    As set forth above, Plaintiff's contracts with Signature Bank, which remained valid and enforceable following Signature Bank's entry into receivership, afforded Plaintiff a ROFR to meet the terms of any sale, transfer, or other negotiation of any of the Loans.

105.    In material breach of these contractual rights, the FDIC (as Receiver to Signature Bank and Signature Bridge Bank) effectuated a series of transactions that transferred the Loans to third parties at a significant discount, without providing Plaintiff with the requisite ROFR Notice and opportunity to meet the terms of such a transaction.

106.    As a result, Plaintiff has been harmed in an amount of at least $160,751,508, excluding interest and other amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor, and further enter an order:

a.  awarding Plaintiff compensatory damages, including but not limited to lost profits damages, and any and all other damages actually and proximately caused by Defendant's breaches of Plaintiff's contractual rights, plus interest;

b.  awarding Plaintiff any and all other damages to which Plaintiff is entitled under New York law, plus interest, in an amount to be determined at trial;

c.  awarding Plaintiff his costs of suit, including attorneys' fees and costs; and

d.  awarding such other and further relief as the Court may deem just and proper.

Dated: October 28, 2024

Respectfully submitted,

/s/ *Jason Vitullo*
Jason Vitullo
Peter W. Tomlinson
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone:      (212) 336-2000
Fax:               (212) 336-2222
Email:            jvitullo@pbwt.com
                     pwtomlinson@pbwt.com

*Attorneys for Plaintiff Joshua Gotlib*