# Exhibit H

**Execution Version**

**PRIVATE OWNER INTEREST**

**SALE AND ASSIGNMENT AGREEMENT**

**by and among**

**SIG-23 PRIVATE OWNER LLC,**

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**in its capacity as Receiver,**

**and**

**SIG RCRS C MF 2023 Venture LLC**

Dated as of December 15, 2023

TABLE OF CONTENTS

RECITALS ....................................................................................................................1

1.   Sale and Assignment; Purchase Price; Funding of Working Capital Reserve and
     Capital Improvement Fund; Account Closing ..................................................2

2.   LLC Operating Agreement ........................................................................3

3.   Additional Security ..................................................................................4

4.   PO Owner Undertaking; LPOA Letter ........................................................4

5.   Representations and Warranties of Private Owner ........................................4

6.   Exclusivity of Representations .................................................................5

7.   Assignment .............................................................................................5

8.   Beneficiaries ...........................................................................................5

9.   Waivers and Amendments .......................................................................5

10.  Common Terms ......................................................................................5

**Exhibit A**    Form of LLC Operating Agreement
**Exhibit B**    Private Owner Interest Asset Value Schedule
**Exhibit C**    Form of Transferee Acknowledgment And Certification
**Exhibit D**    Form of Joinder And Consent Agreement
**Exhibit E**    Form of PO Owner Undertaking
**Exhibit F**    Form of Letter Designating Individuals For Limited Power of Attorney

## PRIVATE OWNER INTEREST
## SALE AND ASSIGNMENT AGREEMENT

THIS PRIVATE OWNER INTEREST SALE AND ASSIGNMENT AGREEMENT (this "**Agreement**") is made as of December 15, 2023, by and among SIG-23 Private Owner LLC, a Delaware limited liability company (the "**Private Owner**"), the Federal Deposit Insurance Corporation in its capacity as Receiver (the "Initial Member"), and SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**Company**"). For purposes of this Agreement, all terms used in this Agreement (including in the preamble and recitals hereto) that are defined in, or by reference in, that certain Agreement of Common Terms and Definitions dated as of the date hereof among the parties hereto and certain others (as the same may be amended from time to time in accordance with the terms thereof) (the "**Agreement of Common Terms and Definitions**"), and are not otherwise defined herein, have the meanings and definitions given, or referred to, in the Agreement of Common Terms and Definitions.

## RECITALS

WHEREAS, the Initial Member formed the Company by causing the Certificate of Formation of the Company to be filed with the Secretary of State of the State of Delaware on December 4, 2023, holds the sole limited liability company interest in the Company, and has entered into the Original LLC Operating Agreement;

WHEREAS, pursuant to the Transfer Agreement, the Initial Member has contributed to the Company all of the Initial Member's right, title and interest in and to the Assets;

WHEREAS, after conducting a sealed bid sale for a five percent (5%) limited liability company interest in the Company (the "**Private Owner Interest**"), the FDIC selected The Community Preservation Corporation, a New York corporation (the "**Winning Bidder**"), as the successful bidder pursuant to the bid form submitted by it (the "**Bid Form**") and, in accordance with the instructions governing the sealed bid sale, the Winning Bidder has, in respect of its purchase of the Private Owner Interest hereunder, deposited $250,000.00 with its bid and an additional $12,829,797.95 after its bid was selected (collectively, the "**Earnest Money Deposit**") with the FDIC;

WHEREAS, following its selection as the successful bidder, the Winning Bidder formed the Private Owner as a Qualified Transferee;

WHEREAS, the Initial Member desires to transfer the Private Owner Interest to the Private Owner (and the Initial Member will retain a ninety-five percent (95%) limited liability company interest in the Company) and enter into the LLC Operating Agreement in the form attached hereto as Exhibit A, and the Private Owner desires to acquire the Private Owner Interest and enter into the LLC Operating Agreement;

WHEREAS, the Initial Member and the Private Owner desire, as capital contributions to the Company pro rata in accordance with their proportionate limited liability company interests in

the Company (after giving effect to the transfer of the Private Owner Interest) to fund the Working Capital Reserve Account with an aggregate amount of $215,252,522.13 (such sum, the "**WCR Account Deposit**");

WHEREAS, the Initial Member's pro rata share of such WCR Account Deposit is $204,489,896.02 (the "**Initial Member WCR Account Deposit"**) and the Private Owner's pro rata share of such WCR Account Deposit is $10,762,626.11(the "**Private Owner WCR Account Deposit**");

WHEREAS, the Initial Member and the Private Owner desire, as capital contributions to the Company pro rata in accordance with their proportionate limited liability company interests in the Company (after giving effect to the transfer of the Private Owner Interest), to fund the Capital Improvement Account with an aggregate amount of $430,505,044.26 (such sum, the "**Capital Improvement Account Deposit**"); and

WHEREAS, the Initial Member's pro rata share of such Capital Improvement Account Deposit is $408,979,792.05 (the "**Initial Member Capital Improvement Account Deposit"**) and the Private Owner's pro rata share of such Capital Improvement Account Deposit is $21,525,252.21 (the "**Private Owner Capital Improvement Account Deposit**");

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Initial Member, the Private Owner and the Company hereby agree as follows:

1.    **Sale and Assignment; Purchase Price; Funding of Working Capital Reserve and Capital Improvement Fund; Account Closing**.

(a)    <u>Sale and Assignment</u>.    Subject to the terms and conditions of this Agreement, the Initial Member hereby sells to the Private Owner, and the Private Owner hereby purchases from the Initial Member, all of the Initial Member's right, title and interest in and to the Private Owner Interest for a purchase price of $129,263,835.10 (the "**Private Owner Interest Sale Price**").  On the date hereof, in satisfaction of its obligation to pay the Private Owner Interest Sale Price, the Private Owner will:

(i)    remit to the Initial Member, by wire transfer of immediately available funds, to such account as the Initial Member may direct in writing, an amount (the "**Purchase Price Payment**") equal to the positive difference (if any) between (x) the Private Owner Interest Sale Price and (y) the Earnest Money Deposit; and

(ii)    (x) remit by wire transfer of immediately available funds, an amount equal to the Private Owner WCR Account Deposit to the Paying Agent for credit to the Working Capital Reserve Account, and (y) remit by wire transfer of immediately available funds, an amount equal to the Private Owner Capital Improvement Account Deposit to the Paying Agent for credit to the Capital Improvement Account.  Upon, and subject to, receipt by the Initial Member of the Purchase Price Payment and confirmation by the Paying Agent of its receipt of the Private Owner

2

WCR Account Deposit and the Private Owner Capital Improvement Account Deposit, the Initial Member will (x) remit by wire transfer of immediately available funds, an amount equal to the Initial Member WCR Account Deposit to the Paying Agent for credit to the Working Capital Reserve Account and (y) remit by wire transfer of immediately available funds, an amount equal to the Initial Member Capital Improvement Account Deposit to the Paying Agent for credit to the Capital Improvement Account.

(b)    Closing Procedure.  The sale and assignment of the Private Owner Interest to the Private Owner and the closing of the other transactions contemplated hereby (collectively, the "**Closing**") will be effective upon:

(i)    the receipt by the Initial Member of (x) the Purchase Price Payment, (y) evidence of the establishment of the Working Capital Reserve Account in accordance with the provisions of Section 3.6 of the Custodial and Paying Agency Agreement and the Capital Improvement Account in accordance with Section 3.5 of the Custodial and Paying Agency Agreement, and (z) confirmation of receipt by the Paying Agent of each of the Initial Member WCR Account Deposit, the Private Owner WCR Account Deposit, the Initial Member Capital Improvement Account Deposit and the Private Owner Capital Improvement Account Deposit;

(ii)    the delivery of the executed LLC Operating Agreement by the parties thereto (as required by Section 2);

(iii)    the delivery of the Additional Security (as required by Section 3);

(iv)    the delivery by each Person specified in Section 4(a) of a PO Owner Undertaking, together with any initial process agent acceptance required pursuant to such PO Owner Undertaking;

(v)    the delivery by the Private Owner of the letter described in Section 4(b);

(vi)    the delivery of the completed Private Owner Interest Asset Value Schedule, in the form attached hereto as Exhibit B, allocating the Private Owner Interest Sale Price among the Assets (the "**Private Owner Interest Asset Value Schedule**"), which will be appended to the Transfer Agreement as the Private Owner Interest Asset Value Schedule thereunder;

(vii)    the delivery of the executed Transferee Acknowledgment and Certification, in the form attached hereto as Exhibit C; and

(viii)    the delivery of the executed Joinder and Consent Agreement, in the form attached hereto as Exhibit D.

2.    **LLC Operating Agreement.**  Contemporaneously with the execution and delivery of this Agreement, the Private Owner must execute and deliver to the Company and the Initial Member the LLC Operating Agreement.

3

3.      **Additional Security**.  Contemporaneously with the execution of this Agreement and the LLC Operating Agreement, the Private Owner must (i) pursuant to the applicable provisions in the LLC Operating Agreement and the Custodial and Paying Agency Agreement, establish the Private Owner Pledged Account and (ii) deliver (or cause to be delivered) to the Paying Agent the Additional Security (which, if in the form of Qualifying Cash Collateral, must be remitted for deposit into the Private Owner Pledged Account).

4.      **PO Owner Undertaking; LPOA Letter**.

(a)      Contemporaneously with the execution of this Agreement, the Private Owner will cause to be delivered to the Initial Member an instrument in the form attached hereto as <u>Exhibit E</u> (a "<u>PO Owner Undertaking</u>"), executed by each PO Owner.  Each Person required pursuant to the preceding sentence to deliver a PO Owner Undertaking must execute and deliver a separate PO Owner Undertaking.

(b)      Contemporaneously with the execution of this Agreement, the Private Owner must execute and deliver to the Receiver a letter in the form attached hereto as <u>Exhibit F</u>, appropriately completed.

5.      **Representations and Warranties of Private Owner**.  The Private Owner hereby represents and warrants separately to each of the Initial Member and the Company as follows:

(a)      The Private Owner is a "Qualified Transferee," and, as such, represents and warrants that each item included in such definition is true and correct in all respects as of the date hereof as if set forth herein.

(b)      All information and documents provided to the Initial Member or its agents by or on behalf of the Private Owner or any Affiliate thereof (or by or on behalf of any Specified Parent of the Private Owner or any Affiliate thereof) in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, the "Purchaser Eligibility Certification," the "Bid Certification," the "Qualification Request," the "Bidder Qualification Application," the "Bid Form" and the "Confidentiality Agreement," are true and correct in all respects as of the date hereof and do not fail to state any fact necessary to make the information contained therein not misleading.

(c)      As of the date hereof, (i) the only PO Owners are CPC SIG-23 LLC, a Delaware limited liability company and F3 SIGCRE23 LLC, a Delaware limited liability company, (ii) the Persons designated in the Agreement of Common Terms and Definitions as the Private Owner's Specified Parents are  Related Real Estate Fund III, L.P., a Delaware limited partnership, The Community Preservation Corporation, a New York Corporation, as the Lead Bidder and all Persons directly or indirectly holding twenty five percent or greater in value of the Ownership Interests in the Private Owner, and (iii) for each such Specified Parent, the Person(s) designated in the Agreement of Common Terms and Definitions as its Ultimate Parent Entity(ies) are the ultimate controlling entity(ies) of such Specified Parent.

6.      **Exclusivity of Representations.**  THE PRIVATE OWNER INTEREST IS SOLD "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY OR RECOURSE WHATSOEVER, INCLUDING AS TO ITS VALUE (OR THE VALUE, COLLECTABILITY OR CONDITION OF THE ASSETS HELD BY THE COMPANY OR ANY OF THE COLLATERAL FOR ANY SUCH ASSETS), FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, FITNESS FOR A SPECIFIC PURPOSE OR ANY OTHER MATTER, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW OR OTHERWISE, AND THE INITIAL MEMBER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PRIVATE OWNER INTEREST, THE ASSETS, OR THE COLLATERAL SECURING THE ASSETS.

7.      **Assignment**.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs (in the case of any individual), successors and permitted assigns; provided, however, that the Private Owner may not assign this Agreement or any of its rights, interests or obligations hereunder.  Any purported assignment or delegation in violation of this Agreement will be null and void *ab initio*.

8.      **Beneficiaries**.  This Agreement will inure to the benefit of, and may be enforced by, the Initial Member, the Private Owner and the Company and their respective successors and assigns.  Except for the FDIC (in its corporate capacity), which will be considered a third party beneficiary to this Agreement, there will be no other third party beneficiaries hereunder.

9.      **Waivers and Amendments**.  No amendment or waiver of any provision of this Agreement will be effective unless the same is in writing and executed by the Initial Member, the Private Owner, the Company and the FDIC (in its corporate capacity).

10.     **Common Terms**.  The Common Terms apply to this Agreement, except that (a) Sections 2.1(d) (Binding Effect; Assignment), 2.1(i) (Entire Agreement), 2.1(k) (Amendments and Waivers) and 2.1(p) (Third Party Beneficiaries) of such Common Terms do not apply to this Agreement, and (b) in the event of a conflict between any provision of the Common Terms and any provision in this Agreement, the terms of this Agreement will prevail.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

**PRIVATE OWNER:**

**SIG-23 PRIVATE OWNER LLC**

By: _____

Name: Rafael E. Cestero
Title: Authorized Signatory

**INITIAL MEMBER:**

**FEDERAL DEPOSIT INSURANCE CORPORATION** in its capacity as Receiver for Signature Bridge Bank, N.A.

By: _____

Name: Colette Campagna
Title:   Senior Asset Marketing Specialist

**COMPANY:**

**SIG RCRS C MF 2023 Venture LLC**

By: Federal Deposit Insurance Corporation in its capacity as Receiver for Signature Bridge Bank, N.A., as Sole Member and Manager

By: _____

Name: Colette Campagna
Title:   Senior Asset Marketing Specialist

[Signature Page to Private Owner Interest Sale and Assignment Agreement]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

**PRIVATE OWNER:**

**SIG-23 PRIVATE OWNER LLC**

By:_____
Name: Rafael E. Cestero
Title: Authorized Signatory

**INITIAL MEMBER**:

**FEDERAL DEPOSIT INSURANCE CORPORATION** in its capacity as Receiver for Signature Bridge Bank, N.A.

By:_____
Name: Colette Campagna
Title:   Senior Asset Marketing Specialist

**COMPANY:**

**SIG RCRS C MF 2023 Venture LLC**

By: Federal Deposit Insurance Corporation in its capacity as Receiver for Signature Bridge Bank, N.A., as Sole Member and Manager

By:_____
Name: Colette Campagna
Title:   Senior Asset Marketing Specialist

[Signature Page to Private Owner Interest Sale and Assignment Agreement]

**Exhibit A**
**FORM OF LLC OPERATING AGREEMENT**

[see attached]

**Execution Version**

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## SIG RCRS C MF 2023 VENTURE LLC

**Dated as of December 15, 2023**

TABLE OF CONTENTS

Page

ARTICLE I        Certain Definitions..................................................................................2
    1.1.        Definitions.................................................................................................2
    1.2.        Construction ..............................................................................................2

ARTICLE II        Organization of the Company .................................................................2
    2.1.        Formation; Continuation and Admission of Members ...........................2
    2.2.        Name ..........................................................................................................2
    2.3.        Organizational Contributions and Related Actions ...............................3
    2.4.        Registered Office; Chief Executive Office ............................................3
    2.5.        Purpose; Duration .....................................................................................3
    2.6.        Special Purpose Entity; Limitations on Company's Activities..............3
    2.7.        Ratification of Certain Actions ................................................................6

ARTICLE III        Management and Operations of the Company..........................................6
    3.1.        Management of the Company's Affairs...................................................6
    3.2.        Removal of Manager.................................................................................8
    3.3.        Employees and Services ...........................................................................8
    3.4.        Restrictions on Manager and Private Owner ..........................................9
    3.5.        Related Party Agreements ......................................................................12
    3.6.        Real Property ..........................................................................................12
    3.7.        Custodian and Paying Agent..................................................................12
    3.8.        Relationships with Borrowers, etc ........................................................13
    3.9.        No Conflicting Obligations ....................................................................13
    3.10.        Compliance with Law ............................................................................13
    3.11.        No Bankruptcy Filing .............................................................................14
    3.12.        No Liens...................................................................................................14
    3.13.        Remedies Upon a Default or Event of Default; Security Interest........14
    3.14.        Put/Call Right of Initial Member ..........................................................22
    3.15.        No ERISA Plan Assets...........................................................................24

ARTICLE IV        Membership Interests; Rights and Duties of, and Restrictions on,
                  Members..................................................................................................24
    4.1.        General.....................................................................................................24
    4.2.        LLC Interests...........................................................................................24
    4.3.        Filings; Duty of Members to Cooperate ................................................25
    4.4.        Certain Restrictions and Requirements..................................................26
    4.5.        No Fiduciary Duties or Liability of Initial Member .............................26
    4.6.        Indemnification .......................................................................................27

ARTICLE V        Capital Contributions; Excess Working Capital Advances ................31
    5.1.        Initial Capital Contributions ..................................................................31

i

# **TABLE OF CONTENTS**
## **(Continued)**

**Page**

5.2.    Capital Contributions for Working Capital Reserve Account ...............................32
5.3.    Capital Contributions for Capital Improvement Account.....................................32
5.4.    [Intentionally Omitted] ..........................................................................................32
5.5.    Excess Working Capital Advances ........................................................................32

ARTICLE VI    Capital Accounts; Allocations; Priority of Payments; Distributions .................33
6.1.    Capital Accounts....................................................................................................33
6.2.    Allocations to Capital Accounts ............................................................................33
6.3.    Tax Allocations......................................................................................................35
6.4.    Determinations by Tax Representative ..................................................................36
6.5.    Priority of Payments ..............................................................................................36
6.6.    Distributions...........................................................................................................37

ARTICLE VII    Accounting, Reporting, Taxation, Business Plans and Verification..................38
7.1.    Fiscal Year .............................................................................................................38
7.2.    Maintenance of Books and Records ......................................................................38
7.3.    Financial Statements ..............................................................................................38
7.4.    Additional Reporting and Notice Requirements; Audits .......................................38
7.5.    Designation of Tax Representative........................................................................39
7.6.    Tax Information ......................................................................................................39
7.7.    Business Plans........................................................................................................40
7.8.    Supplemental Plans for Risk Category C/D Loans (Strategic Plan
        Reports and Critical Strategy Resolution Business Plans) ....................................43
7.9.    Changes to Business Plans and Supplemental Plans .............................................44
7.10.   Initial Member Engagement of Contractors .........................................................44

ARTICLE VIII    Restrictions on Disposition of Private Owner Interest .......................................44
8.1.    Limitations on Disposition of Private Owner Interest ..........................................44
8.2.    Change of Control..................................................................................................45
8.3.    Additional Provisions Relating to Permitted Dispositions ...................................45
8.4.    Effect of Permitted Dispositions...........................................................................46
8.5.    Effect of Prohibited Dispositions..........................................................................47
8.6.    Distributions After Disposition..............................................................................47
8.7.    Transfers by Initial Member ..................................................................................47
8.8.    Resignation; Dissolution .......................................................................................48
8.9.    Applicable Law Withdrawal ..................................................................................48

ARTICLE IX    Dissolution and Winding-Up of the Company ....................................................49
9.1.    Dissolution .............................................................................................................49
9.2.    Winding-Up Procedures.........................................................................................49
9.3.    Termination of the Company .................................................................................52

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

# TABLE OF CONTENTS
## (Continued)

Page

9.4.  Post-Termination Matters ...................................................................52

ARTICLE X    Qualified Transferees..............................................................53
10.1.  Qualified Transferees ...................................................................53

ARTICLE XI    Manager Liability....................................................................57
11.1.  Liability of Manager ....................................................................57

ARTICLE XII    Servicing of Assets .................................................................57
12.1.  Servicing ......................................................................................57
12.2.  [Intentionally Omitted] ...............................................................58
12.3.  Servicing of Assets .....................................................................58
12.4.  Removal of Servicer, Subservicers and JDC Contractors ...................60
12.5.  Interim Management Fee and Interim Servicing Fee; Management Fee..............64
12.6.  Working Capital Expenses ..........................................................66
12.7.  Deposit and Use of Asset Proceeds .............................................67
12.8.  Collection Account ......................................................................68
12.9.  Distribution Account.....................................................................68
12.10.  [Intentionally Omitted] ...............................................................68
12.11.  Working Capital Reserve Account .............................................68
12.12.  [Intentionally Omitted] ...............................................................70
12.13.  Capital Improvement Account ...................................................70
12.14.  Uses of Company Funds; Development ......................................70
12.15.  Certain Servicing and Asset Administration Decisions...................70
12.16.  Management and Disposition of Collateral ................................71
12.17.  [Intentionally Omitted] ...............................................................71
12.18.  [Intentionally Omitted] ...............................................................71
12.19.  Releases of Collateral .................................................................71
12.20.  Clean-Up Call Rights .................................................................71
12.21.  Certain Transfer Obligations......................................................72
12.22.  Seller Financing ..........................................................................72
12.23.  Use of the FDIC's Name and FDIC Legal Powers .......................72

ARTICLE XIII  Miscellaneous ..........................................................................73
13.1.  Common Terms ...........................................................................73
13.2.  Waiver of Rights of Partition and Dissolution.............................74
13.3.  Entire Agreement; Other Agreements..........................................74
13.4.  Third Party Beneficiaries ............................................................74
13.5.  Expenses .....................................................................................75
13.6.  Waivers and Amendments ..........................................................75
13.7.  Successors and Assigns................................................................76

iii

# TABLE OF CONTENTS
## (Continued)

**Page**

13.8.   Power of Attorney......................................................................................76

13.9.   Governing Law ..........................................................................................76

13.10.  Jurisdiction; Venue and Service...............................................................77

13.11.  Private Owner Acknowledgement ............................................................77

iv

ANNEX I          Member Schedule ...................................................................I-1

ANNEX II         Reporting and Access Schedule......................................................II-1

ANNEX III        Insurance Schedule ................................................................. III-1

ANNEX IV         Servicing Addendum ...............................................................IV-1

ANNEX V          Permitted Capital Improvement Addendum ..................................... V-1


EXHIBIT A        Certificate of Formation............................................................ A-1

EXHIBIT B        Form of Monthly Report.............................................................B-1

EXHIBIT C        Form of Assignment and Assumption Agreement ..........................C-1

EXHIBIT D        Form of Letter of Credit............................................................ D-1

EXHIBIT E        Form of Assignment of JDC Agreement ........................................E-1

EXHIBIT F        Form of Cash Flow Projections ...................................................F-1

EXHIBIT G        Form of Post-Termination LPOA ................................................ G-1

EXHIBIT H        Form of Loan Performance Report................................................ H-1

EXHIBIT I        Loan Criteria Matrix ................................................................I-1

EXHIBIT J        Form of Strategic Plan Report ....................................................J-1

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

## SIG RCRS C MF 2023 VENTURE LLC
## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (as the same may be amended or modified from time to time in accordance with the terms hereof, this "**Agreement**"), is made and entered into as of the 15th day of December, 2023, by and among the Federal Deposit Insurance Corporation in its capacity as the Receiver (the "**Initial Member**"), Sig-23 Private Owner LLC, a Delaware limited liability company (the "**Private Owner**"), and SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**Company**").

WHEREAS, on December 4, 2023, the Initial Member formed the Company as a Delaware limited liability company and was admitted as its initial, and sole, member (owning a 100.0% limited liability company interest), and the Initial Member and the Company entered into the Original LLC Operating Agreement;

WHEREAS, pursuant to the Transfer Agreement, the Initial Member (as the Transferor) has contributed to the Company, and the Company accepted such contribution from the Initial Member, all of the Initial Member's right, title and interest in and to the Assets, and assumed the Obligations;

WHEREAS, following the execution of the Original LLC Operating Agreement and the closing of the transactions contemplated by the Transfer Agreement, the Initial Member agreed, pursuant to the terms of the Private Owner Interest Sale Agreement, to sell to the Private Owner, effective as of the Closing Date, an LLC Interest representing a 5.0% equity interest in the Company;

WHEREAS, after giving effect to the transactions contemplated by the Private Owner Interest Sale Agreement, as of the Closing Date the Initial Member and the Private Owner will own all the issued and outstanding limited liability company interests in the Company;

WHEREAS, the Manager has agreed to cause the Company to establish the Working Capital Reserve Account to provide the Company with capital to fund Working Capital Expenses, and the Private Owner and the Initial Member have agreed to initially fund the Working Capital Reserve Account;

WHEREAS, the Manager has agreed to cause the Company to establish the Capital Improvement Account for purposes of holding funds for Permitted Capital Improvements, and the Private Owner and the Initial Member have agreed to initially fund the Capital Improvement Account; and

WHEREAS, the parties desire to amend and restate the Original LLC Operating Agreement in its entirety in order to reflect the admission of the Private Owner as a member of the Company and to set forth the terms and conditions on which the Company will be owned and operated;

1

NOW, THEREFORE, in consideration of the premises and the other covenants and conditions contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**Certain Definitions**

1.1.    Definitions.  This Agreement constitutes the "limited liability company agreement" (as such term is defined in the Act) of the Company.  For purposes of this Agreement, all terms used in this Agreement (including in the preamble and recitals hereto), that are defined in, or by reference in, that certain Agreement of Common Terms and Definitions dated as of the date hereof among the parties hereto and certain others (as the same may be amended from time to time) (the "**Agreement of Common Terms and Definitions**"), and are not otherwise defined herein, have the meanings and definitions given, or referred to, in the Agreement of Common Terms and Definitions.

1.2.    Construction.  The Rules of Construction apply to this Agreement.

**ARTICLE II**
**Organization of the Company**

2.1.    Formation; Continuation and Admission of Members.

(a)    On December 4, 2023, the Receiver caused the Certificate of Formation of the Company, in the form attached as Exhibit A hereto (the "**Certificate**"), to be filed in the office of the Secretary of State of the State of Delaware.  The Certificate may not be amended except to change the registered agent or office of the Company.

(b)    The Company will continue as a limited liability company under the Act and in accordance with the further terms and provisions of this Agreement.

(c)    The Initial Member previously was, and the Private Owner hereby agrees to be, and is, admitted as a member of the Company such that, as of the Closing Date, the Initial Member and the Private Owner are the only members of the Company.  Until the Company is dissolved pursuant to Section 9.1, and subject to the rights of the Initial Member under Section 13.6(c), the Company must at all times have two, and only two, members.

2.2.    Name.

(a)    The name of the Company is SIG RCRS C MF 2023 Venture LLC.

(b)    The Business will be conducted only under the name of the Company or such other name or names that comply with applicable Law as the Members may select from time to time.

2

2.3.    <u>Organizational Contributions and Related Actions</u>.

(a)    Prior to the execution of this Agreement, pursuant to, and as set forth in, the Transfer Agreement, the Initial Member (as the Transferor) made a Capital Contribution to the Company in the form of an undivided interest in each Asset (the "**Initial Member Capital Contribution**").

(b)    Contemporaneously with the execution of this Agreement, pursuant to the terms of the Private Owner Interest Sale Agreement, the Private Owner is acquiring from the Initial Member a 5.0% limited liability company interest in the Company for the Private Owner Interest Sale Price in accordance with the terms thereof.

(c)    Upon the consummation of the transactions contemplated in <u>Sections 2.3(a)</u> and <u>(b)</u>, the Private Owner will own a 5.0% limited liability company interest in the Company and the Initial Member will own a 95.0% limited liability company interest in the Company.

2.4.    <u>Registered Office; Chief Executive Office</u>.    The Company must maintain a registered office and registered agent in Delaware to the extent required by the Act, which office and agent will be as determined by the Manager from time to time and which will be set forth in the Certificate.  Initially (and until otherwise determined by the Manager), the registered office in Delaware will be, and the name and address of the Company's registered agent in Delaware will be, as specified in the Certificate as originally filed, which may be amended by the Manager from time to time as necessary to correctly reflect the name and address of the Company's registered agent.  The chief executive office of the Company will be located at 220 East 42nd Street, 16th Floor, New York, New York 10017, or such other place in the continental United States as may be determined by the Manager from time to time.

2.5.    <u>Purpose; Duration</u>.

(a)    The sole purpose of the Company is to engage in and conduct the Business, directly or, to the extent specifically authorized in this Agreement, indirectly through other Persons.  The Company shall not form or have any Subsidiaries other than Ownership Entities or as otherwise authorized in this Agreement.  The Company will have all powers necessary, desirable or convenient, or which the Manager deems necessary, desirable or convenient, and may engage in any and all activities necessary, desirable or convenient, or which the Manager deems necessary, desirable or convenient, in each case to accomplish the purposes of the Company or consistent with the furtherance thereof.

(b)    Subject to <u>Section 9.1</u>, the Company will continue in existence perpetually.

2.6.    <u>Special Purpose Entity; Limitations on Company's Activities</u>.  Except to the extent expressly permitted by this Agreement or the other Transaction Documents, the following will govern for so long as the Company is in existence:

3

(a)    Subject to Section 9.1, the Manager must cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, and the Manager also must cause the Company to:

(i)    maintain financial statements separate from any Affiliate; provided, however, that each Ownership Entity and TRS Entity will be consolidated in the financial statements of the Company; and provided, further, that the assets, liabilities and results of operations of the Company may be included in the consolidated financial statements of its parent or ultimate parent in accordance with GAAP;

(ii)    at all times hold itself out to the public as a legal entity separate from the Members and any other Person;

(iii)    file its own Tax returns, as may be required under applicable Law, and pay any Taxes so required to be paid under applicable Law;

(iv)    pay its own liabilities only out of its own funds;

(v)    allocate, fairly and reasonably, shared expenses, including any overhead for shared office space;

(vi)    use separate stationery, invoices and checks;

(vii)    correct any known misunderstanding regarding its separate identity;

(viii)    maintain adequate capital in light of its contemplated business purpose, transactions and liabilities, if any; and

(ix)    at all times constitute a Special Purpose Entity.

(b)    Neither the Manager nor the Private Owner may cause or permit a Dissolution Event or an Insolvency Event to occur with respect to the Company or any of its Subsidiaries to which the Initial Member has not provided its prior written consent, and neither the Manager nor the Private Owner may, without the prior written consent of the Initial Member, cause or permit the Company or any of its Subsidiaries to:

(i)    except as contemplated hereby or by the other Transaction Documents, hold out its credit or assets as being available to satisfy the obligations of others, or become bound by any Guarantee of, or otherwise obligate itself with respect to, the Debts of any other Person, including any Affiliate; provided, that, where reasonably required in the best interest of the Company (and consistent with the Servicing Standard), the Manager may cause the Company to Guarantee obligations of any Ownership Entity and any Ownership Entity to Guarantee obligations of a TRS Entity, so long as the Manager delivers to the Initial Member both (x) prior written notice setting forth in reasonable detail the proposed Guarantee and reasons for the same and (y) a copy of such Guarantee promptly following the same being granted;

4

(ii)    except as contemplated hereby or by the other Transaction Documents, pledge its assets for the benefit of any other Person, make any loans or advances to any other Person, or encumber or permit any Lien (other than Permitted Liens) to be placed on the Assets, the Collateral, or the proceeds therefrom; provided that, the Company may (x) invest its funds in interest bearing accounts held by any bank that is not its Affiliate and otherwise in accordance with the terms of this Agreement and the Custodial and Paying Agency Agreement and (y) make advances in accordance with Article XII (and, as applicable, the Servicing Addendum and the Permitted Capital Improvement Addendum);

(iii)    own any assets, or engage in any business, unrelated to the Business;

(iv)    incur, create or assume any Debt other than any Excess Working Capital Advance or as otherwise expressly permitted hereby or by the other Transaction Documents to which the Initial Member is a party;

(v)    make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person (other than an Ownership Entity or, subject to Section 5.2(g) of the Servicing Addendum, a TRS Entity), except that the Company may invest in those investments permitted under the Transaction Documents and may make any advance required or expressly permitted to be made pursuant to any provisions of this Agreement (including Article XII, the Servicing Addendum and the Permitted Capital Improvement Addendum) or the other Transaction Documents and permit the same to remain outstanding in accordance with such provisions;

(vi)    acquire any LLC Interest (or any portion of any LLC Interest);

(vii)    consolidate or merge with or into any other Person, convert into any other type of Person (including into a limited liability company organized under the Laws of a jurisdiction other than the State of Delaware), transfer, domesticate or continue the Company or any Subsidiary of the Company pursuant to § 18-213 of the Act, or take any other action for which the consent of some or all of the members of a limited liability company is (unless otherwise provided in the limited liability company agreement of such limited liability company) required by the Act;

(viii)    convey or transfer its properties and assets as an entirety or substantially as an entirety to any Person, transfer its ownership interests, or engage in any dissolution or liquidation, except in each case to the extent such activities are expressly permitted pursuant to any provision of this Agreement or the other Transaction Documents (and subject to obtaining any approvals required hereunder or thereunder, as applicable);

(ix)    except as contemplated or permitted by this Agreement, form, acquire or hold any Subsidiary other than an Ownership Entity or TRS Entity or form any trust for the purpose of holding Assets for the benefit of the Company;

(x)     enter into any Modification of, or breach or violate any representation, warranty, covenant or agreement contained in, any Transaction Document; or

(xi)     take or fail to take any other action under the Transaction Documents requiring written consent of the Initial Member without obtaining such prior written consent.

(c)     The failure of the Company, any Member or the Manager to comply with any of the foregoing covenants or any other covenants contained in this Agreement will not affect the status of the Company as a separate legal entity or the limited liability of the Members.

2.7.    <u>Ratification of Certain Actions</u>.  Prior to the Closing Date, the Company previously approved (i) each of the Transaction Documents, (ii) the issuance of the LLC Interests, and (iii) the taking of all action reasonably necessary to effect the foregoing approvals, including the execution and performance of this Agreement and the other Transaction Documents (the "**Previously Approved Matters**").  The Previously Approved Matters, and all actions taken by the Company in furtherance of the Previously Approved Matters, are hereby ratified, approved and confirmed in their entirety by each Member and the Manager is hereby authorized and directed to execute and deliver, for and on behalf of the Company, any and all documents as may now or hereafter be reasonably required in order to effect the Previously Approved Matters.

## ARTICLE III
## Management and Operations of the Company

3.1.    <u>Management of the Company's Affairs</u>.

(a)     Subject to the terms and conditions of this Agreement, the management of the Company will be vested exclusively in the Person appointed from time to time hereunder as the "Manager" of the Company (the "**Manager**"), which Manager may, but is not required to, be a Member.  Effective as of the Closing Date, the Private Owner is hereby appointed as the Manager.  Subject to the terms and conditions of this Agreement, the Manager will have full and exclusive power and discretion to, and will, manage the business and affairs of the Company in accordance with this Agreement.  The Private Owner may not resign as the Manager, may not Dispose of or delegate, in whole or in part, its rights, responsibilities or duties as the Manager to any other Person, and will serve as Manager until such time as (i) the Private Owner Interest is Disposed of in accordance with the terms of this Agreement and the transferee is admitted as a member of the Company and Successor to the Private Owner, in which case the transferee Member will, effective upon such Disposition, be appointed as the "Manager" to the extent the Private Owner held such role immediately prior to such Disposition; (ii) the Private Owner is removed as Manager by the Initial Member and replaced in accordance with <u>Section 3.2</u> or <u>Section 12.4</u> below; or (iii) the Company is dissolved, and the business and affairs of the Company are wound up, in accordance with the terms of this Agreement, with the Manager having fully and finally performed its obligations in relation thereto.  The Manager must devote such time to the affairs of the Company as is necessary to manage the Company as set forth in this Agreement.  Without limitation of the foregoing, the Manager must cooperate with the Tax Representative in all respects

6

as reasonably requested by the Tax Representative from time to time, in connection with the Tax Representative's performance of its obligations under this Agreement. The Private Owner hereby expressly acknowledges that (x) as it relates to its role as the Manager, this Agreement constitutes a personal services contract between the Private Owner and the Company, and (y) except as may otherwise be expressly specified herein, it will not be entitled to any salary, fees, reimbursement of costs or expenses, or other compensation with respect to its service as the Manager hereunder (including with respect to the Manager's Servicing obligations under Article XII (and the Servicing Addendum)).

(b)     Except as otherwise specifically provided in this Agreement and without limitation of the authority, duties (including fiduciary duties) and functions of the Manager expressly specified under any other provision of this Agreement, the authority, duties (including fiduciary duties) and functions of the Manager will be identical to the authority, duties (including fiduciary duties) and functions of the board of directors and the officers of a corporation organized under the Delaware General Corporation Law (and not electing to be governed by subchapter XIV thereof). The Manager will have no authority to take or authorize the taking of any action in contravention of any express term of this Agreement.

(c)     No Person dealing with the Company or the Manager will be required to determine, and any such Person may conclusively assume and rely upon, the authority of the Manager to execute any instrument or make any undertaking on behalf of the Company. No Person dealing with the Company or the Manager will be required to determine any facts or circumstances bearing upon the existence of such authority. Without limitation of the foregoing, any Person dealing with the Company or the Manager is entitled to rely upon a certificate signed by the Manager as to:

(i)      the identity of the Members;

(ii)     the existence or non-existence of any fact or facts that constitute a condition precedent to acts by the Manager or are in any other manner germane to the affairs of the Company;

(iii)    the identity of Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(iv)    any act or failure to act by the Company or any other matter whatsoever involving the Company or the Members.

(d)     Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that:

(i)      nothing contained in this Agreement creates any fiduciary duty or similar obligation owed by or on behalf of the Initial Member;

7

(ii)    each of the Private Owner and the Company hereby expressly waives any fiduciary duties that may otherwise be deemed to be owed by the Initial Member to the Private Owner or the Company; and

(iii)    the Initial Member will be entitled to act and exercise any right of approval or consent that it has under this Agreement in its interest, in its sole and absolute discretion, without regard to and against the interests of the Private Owner or the Company.

(e)    Unless and to the extent reimbursement is due under an express provision hereof or of another Transaction Document or pursuant to a Related Party Agreement permitted pursuant to Section 3.5, the Company will not be liable for, and the Manager, the Private Owner and their respective Affiliates shall not seek reimbursement from the Company or any Member (other than, as to any such Member that is an Affiliate of the Person so seeking reimbursement, as may separately be agreed by such Member, without recourse to or reimbursement from the Company) for, any expenses or costs incurred after the formation of the Company by the Manager, the Private Owner or their respective Affiliates on behalf of or for the benefit of the Company.

(f)    This Section 3.1 is subject to any express requirement of direct Initial Member consent set forth elsewhere in this Agreement, including in Sections 2.6, 3.4, 3.8, 3.13, 5.2, 5.3, 5.5, 8.1, 8.2, 8.8(a), 9.1, 12.1, 12.7(d), 12.11(b), 12.13, 12.14, 12.22, 13.6, and 13.10 hereof, and Sections 2.2, 2.5, 4 and 5.4 of the Servicing Addendum.  Any purported action by the Company or the Manager requiring the consent of the Initial Member under this Agreement will be null and void *ab initio* unless and until the Initial Member's prior written consent is obtained.

3.2.    Removal of Manager.  Upon an Event of Default (and so long as the Private Owner is then the Manager), the Initial Member may remove the Private Owner as the Manager and appoint a successor Manager in its sole discretion in accordance with Section 12.4, whereupon such successor Manager will immediately succeed to all, or such portion as the Initial Member and successor Manager agree, of the rights, powers, duties and obligations of the "Manager" hereunder, and the predecessor Manager must promptly take such actions as may be reasonably requested by the Initial Member to facilitate the transition to such successor Manager.

3.3.    Employees and Services.  After the Closing Date, the Manager must cause to be made available to the Company, from time to time, employees, facilities and support services in a manner and to an extent reasonably required for it to fulfill its duties and obligations as the Manager and for the day-to-day operation of the Business.  If necessary to meet the foregoing requirements, the Manager must enter into contractual arrangements to secure employees, facilities and support services from third parties (including its Affiliates); provided, however, that the Manager must at all times provide for the Servicing (other than Asset Management retained by the Manager in accordance with Section 12.3(b) or engagement of a JDC Contractor in accordance with Section 12.3(c)) to be conducted through the Servicer under contract with the Manager (in its individual capacity) in accordance with Article XII and the Servicing Addendum and the safekeeping of the Notes and other Asset Documents by a Custodian under contract with the Company in accordance with the provisions of Section 3.7 below.  Notwithstanding anything to the contrary contained in this Section 3.3, (i) the Company shall not have any employees, (ii) no

8

employees of the Manager or any third party (including any Affiliate of the Manager) will be deemed to be employees of the Company, (iii) any contractual relationships entered into by the Manager to provide employees, facilities or support services to the Company shall be relationships between the third parties (or Affiliates and the Manager) and the Manager (and not the Company) and shall not relieve the Manager of its obligations or any liability hereunder, and (iv) no expenses incurred to secure or maintain employees (or independent contractors performing relevant services for the day-to-day operation of the Company in lieu of performance of the same by such employees), facilities or support services will be an expense of the Company unless the same is expressly reimbursable by the Company pursuant to the provisions of Article XII (and the Servicing Addendum) or is otherwise expressly set forth in this Agreement or in any other Transaction Documents to be an expense of the Company.

3.4. <u>Restrictions on Manager and Private Owner</u>. Neither the Private Owner nor, notwithstanding any delegation of authority to it hereunder, the Manager may or will in any event (x) do, or cause the Company to do, any act or take, or cause the Company to take, any action in contravention of any Law, or (y) take any of the following actions on behalf of, or with respect to, the Company, or otherwise cause the Company to take any of the following actions (or, as to <u>clause (xvi)</u> below, take, or permit or suffer any other applicable Person to take, any action set forth therein), in the case of all of the foregoing without the prior written approval of the Initial Member, which approval may be withheld or conditioned in the sole and absolute discretion of the Initial Member:

(i)    admitting additional or substitute members of the Company, except in accordance with Article VIII;

(ii)    changing the legal form of the Company to other than a limited liability company;

(iii)    taking any action that would cause the Company to be treated as other than a partnership for federal income tax purposes;

(iv)    taking any action that would make it impossible to carry on the ordinary business of the Company;

(v)    selling or otherwise transferring (or permitting a Borrower or Obligor to sell or otherwise transfer) to any Person that is not a Permitted Buyer, (A) during a period of 2 years from the Closing Date, any Loan, or (B) during a period of 5 years from the Closing Date, (1) any Loan that, as of the date of such sale or transfer or at any time during the preceding two year period, is or was classified either as Risk Category C or D Loan, or (2) any Risk Category C or D Acquired REO Property, <u>provided</u>, that the restriction contained in this <u>clause (B)</u> will, as to any such Risk Category C or D Acquired REO Property, cease to apply (in advance of the expiration of such 5 year period) if (and only when) (x) a Capital Improvement Plan with respect to such Acquired REO Property is approved and the corresponding Permitted Capital Improvements contemplated in such Capital Improvement Plan are completed or (y) the Manager determines that the relevant deficiencies that resulted in such Acquired REO Property

9

failing to have a Risk Category A/B can be corrected or resolved with the permitted use of Servicing Expenses, and thereafter all work and/or actions are completed (with the use of Servicing Expenses) in a manner determined by the Manager, in accordance with the Servicing Standard, to be sufficient to correct or resolve such deficiencies;

(vi)    incurring any liability on behalf of the Company (other than liabilities to trade creditors in the ordinary course of the Business and such other liabilities as may be permitted by this Agreement or any other Transaction Document);

(vii)    possessing or transferring Company Property for other than Company purposes;

(viii)    taking any action that would require (or refusing to take any action where the result of such refusal would so require) the Company to register as an "investment company" (as defined in the Investment Company Act);

(ix)    selling or otherwise transferring (or permitting the sale or other transfer by a Borrower or Obligor of) any Asset, Collateral or Acquired Property (or any portion thereof) to the Manager, the Private Owner, the Servicer, any Subservicer or any Affiliate (other than the Company or an Ownership Entity) of any of the foregoing or of the Company;

(x)    except as expressly permitted pursuant to <u>Section 12.22</u>, financing (or accepting consideration other than cash payable in full, subject to customary post-closing purchase price adjustments and prorations, at the closing of) the sale or other transfer of any Asset, Collateral or Acquired Property (or any portion thereof);

(xi)    selling any Asset, Collateral or Acquired Property (or any portion thereof) in a transaction that provides for any recourse against the Company, the Initial Member or the FDIC, in any capacity, or against the LLC Interest held by the Initial Member or any share of the Asset Proceeds allocable to the Initial Member, other than contractual obligations solely of the Company with respect to customary post-closing purchase price adjustments and prorations;

(xii)    disbursing, or causing the disbursement of, funds from the Collection Account, the Distribution Account, the Working Capital Reserve Account, the Capital Improvement Account or other accounts created under this Agreement, the Custodial and Paying Agency Agreement or any Servicing Agreement other than in accordance with (and without violation of any requirement contained in) the provisions of this Agreement, the Custodial and Paying Agency Agreement, and the applicable Servicing Agreement;

(xiii)    advancing additional funds that would increase the Unpaid Principal Balance of any Asset other than (A) Required Funding Draws, (B) Permitted Capital Improvement Expenses, or (C) Servicing Expenses to the extent that capitalizing such Servicing Expenses is permitted (or with respect to Acquired Property would have been permitted prior to the conversion of the Loan to Acquired Property) under the applicable Asset Documents;

(xiv)   reimbursing the Manager for any expense or cost incurred by (or paid by) any Affiliate of any of the Company, the Private Owner or the Manager, the Servicer or any Subservicer (provided that this clause (xiv) does not prohibit reimbursing the Manager for Servicing Expenses or Pre-Approved Charges solely as a result of the Manager being an Affiliate of the Company, the Servicer or any Subservicer);

(xv)   taking any action or omitting to take any action that causes the Company to breach any representation, warranty, covenant or other agreement contained herein or in any other Transaction Document (for avoidance of doubt, nothing in this clause (xv) will require the Private Owner or the Manager to make any capital contribution or advances which are not otherwise required of it under the express terms of this Agreement or any other Transaction Document);

(xvi)   other than through the Company (and the Ownership Entities), acquiring (or permitting or suffering any Specified Parent, or any Affiliate of any of the Company, the Manager, the Private Owner or any Specified Parent to acquire) any interest whatsoever in or relating to any Asset or Collateral (including, in the case of any Loan Participation, any interest in the underlying loan or collateral with respect thereto);

(xvii)   taking any action for which the consent of some or all of the members of a limited liability company is (unless otherwise provided in the limited liability company agreement of such limited liability company) required by the Act;

(xviii)   accepting any assets (including any additional collateral) other than cash and Permitted Investments as payment or consideration for any amendment, compromise, settlement, partial payment or payment in full of any Loan or other payment obligation owing to the Company or any Ownership Entity in respect of the Assets;

(xix)   opening or maintaining (for the Company or any Ownership Entity) any bank account other than (A) the Accounts required or expressly permitted to be maintained with the Paying Agent pursuant to terms of this Agreement and the Paying Agency Agreement, (B) the Ownership Entity Accounts in accordance with Section 5 of the Servicing Addendum, (C) applicable Escrow Accounts as required or permitted pursuant to Transaction Documents, and (D) subject to compliance with the requirements in the proviso below, accounts (1) acquired by an applicable Ownership Entity in connection with the foreclosure or other exercise of remedies with respect to Collateral, and (2) that are local operating accounts opened in the name of the Ownership Entity that will contain only funds derived from the Acquired Property held by such Ownership Entity to the extent reasonably determined by the Manager to be necessary, in accordance with the Servicing Standard, and in the best interests of the Company; provided, that for any account opened or acquired pursuant to the forgoing clause (D) (and as a condition to the same being permitted thereunder), (1) the Manager must provide notice to the Initial Member promptly upon acquiring or opening such account including the purpose of the account, (2) the Manager must provide monthly statements with respect to such account so long as such account remains open, (3) all Asset Proceeds in such account must be remitted to the Collection Account in accordance with

11

Section 12.7, and (4) if and when reasonably practicable, the Manager must replace such account with an Ownership Entity Account; or

(xx)    during a period of 5 years after the Closing Date, offering or agreeing to any principal forgiveness (including any discounted payoff) in connection with any Risk Category C or D Loan, other than pursuant to the Loan Modification Program.

3.5.    Related Party Agreements.  Neither the Company nor any of its Subsidiaries shall enter into any Related Party Agreement, except as may otherwise be expressly provided herein or in any other Transaction Document to which the Initial Member is a party or as may be approved by both Members.

3.6.    Real Property.  The Company shall not take title in its own name to any Acquired REO Property, and any acquisition or ownership of any such Acquired REO Property will be subject to Section 5 of the Servicing Addendum and the relevant terms of the Servicing Agreement.

3.7.    Custodian and Paying Agent.  The Manager must cause the Company to retain and enter into and, at all times, be a party to a written custodial agreement with a Custodian (as selected by the Company in accordance herewith), and such Custodian will at all times have custody and possession of the Notes and other Custodial Documents (subject to the applicable provisions herein and in such custodial agreement with respect to the release thereof).  The Manager must also cause the Company to retain and enter into and, at all times, be a party to a written paying agency agreement with a Paying Agent (as selected by the Company in accordance herewith), which Paying Agent will receive and distribute Asset Proceeds in accordance with such paying agency agreement.  Such Custodian and Paying Agent must be (and remain) a Qualified Custodian and Paying Agent acceptable to and approved by the Initial Member, such approval not to be unreasonably withheld, delayed or conditioned.  Except as may be determined by the Initial Member in connection with an exercise of its rights under Section 13.6 below, the Custodian and the Paying Agent shall be a single (and the same) Person; and the custodial and paying agency functions shall be performed on the terms set forth in the Custodial and Paying Agency Agreement (which shall be in a form acceptable to the Initial Member).  At no time shall the Company have more than one Custodian or one Paying Agent, who may be (and, to the extent specified in the preceding sentence, shall be) the same Person.  The fees and expenses paid to the Custodian and Paying Agent shall be no more than market rates and the Custodian and Paying Agent may be terminated by the Company upon no more than thirty days notice provided to such Custodian and Paying Agent, without cause under the Custodial and Paying Agency Agreement.  For purposes of clarification, the parties acknowledge that, as of the Closing Date, the Custodial and Paying Agency Agreement delivered on the Closing Date is acceptable to the Initial Member, including as to the fees and expenses expressly set forth therein.  In the event that the Manager removes, or causes the Company (or the Servicer or any Subservicer) to remove, any Notes or other Custodial Documents from the possession of the Custodian (which may be done only in accordance with the relevant Custodial and Paying Agency Agreement), (i) any loss or destruction of or damage to such Notes or Custodial Documents will be the personal liability of the Manager (who, along with the relevant Servicer or Subservicer(s), will be responsible for safeguarding such Notes and Custodial Documents when not in possession of the Custodian), and (ii) such Notes must be

12

returned to the Custodian within the time provided under the applicable Uniform Commercial Code to maintain the perfection of the secured party's security interest therein by possession. If any Notes or other Custodial Documents are removed in connection with the modification, restructuring or foreclosure of a Loan, the modified or restructured Notes and other Custodial Documents removed in connection therewith must be returned to the Custodian as soon as possible following the completion of the restructuring, modification or foreclosure (and, in any event, in accordance with <u>clause (ii)</u> of the immediately preceding sentence). Notwithstanding the foregoing, if any Notes or other Custodial Documents are retained by the applicable court, the Manager must request that the court return (and must cause to be so returned) such Notes and other Custodial Documents to the Custodian as soon as possible after they are released by such court. The Manager must (i) ensure that the Initial Member receives a copy of each demand, notice or other communication given by the Manager (including by the Manager on behalf of the Company) under the Custodial and Paying Agency Agreement at the time that such notice or other communication is given thereunder and (ii) require that a copy of each demand, notice or other communication given to the Manager (including to the Manager as the manager of the Company) under the Custodial and Paying Agency Agreement is to be given to the Initial Member at the time that such notice or other communication is given thereunder.

3.8.    <u>Relationships with Borrowers, etc.</u> Except as otherwise expressly consented to in writing by the Initial Member (and subject in such case to the terms and conditions of any such express consent), none of the Private Owner, the Manager or any Affiliate of either shall, at any time, (i) be an Affiliate of or a partner or joint venturer with any Borrower or Obligor, (ii) be an agent of any Borrower or Obligor, or allow any Borrower or Obligor to be an agent of the Manager or the Company, or (iii) except as is otherwise contemplated by the Company's ownership of the Assets and its right to hold (including through Ownership Entities) Acquired Property, have any interest whatsoever in any Borrower, Obligor or other obligor with respect to any Asset or any of the Collateral. If at any time any relationship or interest described in the foregoing sentence exists with respect to any Loan (or related Collateral) or Acquired Property, then, except as otherwise expressly provided in the applicable Initial Member consent (if any) and without limitation of any other rights or remedies of the Initial Member if such consent was not obtained, the Initial Member will have the right, in its sole discretion, to (a) in the case of a Loan, require the Private Owner to cause (and make or cause to be made available to the applicable Borrower sufficient funds for) such Loan to be repaid in full in cash, without discount, waiver or use of Asset Proceeds or Company funds, within thirty days after the date on which the Initial Member provides written notice to the Private Owner requiring such repayment, and/or (b) in the case of a Loan or Acquired Property, impose such restrictions on authority of the Manager, the Servicer or any Subservicer with respect to such Asset as may be determined appropriate by the Initial Member.

3.9.    <u>No Conflicting Obligations.</u> The Manager must cause the Company to comply with the Transaction Documents in accordance with their terms, and shall not, at any time, enter into or become a party to any agreement that would conflict with the terms of this Agreement.

3.10.    <u>Compliance with Law.</u> The Manager must, and must cause the Company to, at all times, (i) comply with applicable Law in connection with the performance or exercise of its rights,

13

powers, duties or obligations under this Agreement, and (ii) without limiting the generality of clause (i) and subject to Section 4.3, be duly authorized and qualified to transact any and all business to be conducted by it in any state in which an Asset is located and comply with the doing business Laws of any such state, in each case described in this clause (ii) to the extent necessary to ensure its ability to manage the Assets in accordance with the terms of this Agreement and to perform any of its other obligations under this Agreement in accordance with the terms hereof.

3.11.    No Bankruptcy Filing.  Neither the Manager nor the Private Owner may cause or permit the Company to: (i) file a voluntary petition for bankruptcy, (ii) file a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, receivership or similar relief under any Law, (iii) make an assignment for the benefit of creditors, (iv) seek, consent or acquiesce in the appointment of a trustee, receiver or liquidator of all or any substantial part of its properties, (v) file an answer or other pleading admitting or failing to contest the material allegations of (x) a petition filed against it in any proceeding described in clauses (i) through (iv), or (y) any order adjudging it bankrupt or insolvent or for relief against it in any bankruptcy or Insolvency Proceeding, (vi) allow itself to become unable to pay its obligations as they become due, or (vii) institute any proceedings to set aside or void any transfer of an interest in property (or to recover the value thereof) or other transaction on the grounds that such transfer or other transaction constituted a fraudulent conveyance or a preferential transfer (or on similar grounds).

3.12.    No Liens.  The Manager shall not (i) cause the Company to place or (ii) permit (voluntarily or involuntarily) to be placed, or to exist, any Lien on any of the Assets, the Collateral, the Asset Documents, or the Asset Proceeds, except for Permitted Liens.

3.13.    Remedies Upon a Default or Event of Default; Security Interest.

(a)    Upon the occurrence of an Event of Default, in addition to all other remedies available hereunder or under the other Transaction Documents upon such an Event of Default, the Initial Member is entitled to (in each case as determined by the Initial Member in its sole and absolute discretion):

(i)    remove the Private Owner as the Manager or Servicer (and exercise other remedies with respect to the Servicing Agreement, any Subservicing Agreement and any JDC Agreement) pursuant to Sections 3.2 and 12.4;

(ii)    remove the Private Owner as a Member, subject, if applicable, to Section 8.4;

(iii)    purchase (or cause a designee to purchase) the Private Owner Interest pursuant to Section 3.14;

(iv)    cause the Private Owner to purchase the Initial Member Interest pursuant to Section 3.14;

14

(v)    designate itself or any applicable transferee Member as the Manager hereunder; and/or

(vi)    with or without notice to or demand upon the Private Owner (except as may be required by Law), exercise any or all rights and remedies with respect to the Secured Assets and any Qualifying Letter of Credit as may be available under the Transaction Documents, applicable Law (including the UCC) or otherwise, specifically including the right (A) to foreclose on the Private Owner Interest and transfer such Private Owner Interest to a third party (it being agreed that none of the Private Owner, the Manager or any of their Affiliates are permitted to participate in any sale of the Private Owner Interest without the prior written consent of the Initial Member), (B) to draw upon any Qualifying Letter of Credit, by presenting to the applicable Issuing Bank one or more drafts or demands and any other necessary documents, and to receive (in a lump sum or in several sums from time to time at the sole discretion of the Initial Member) any or all amounts available for drawing under such Qualifying Letter of Credit, (C) to exercise any rights under the Private Owner Pledged Account Control Agreement, including the right to assume exclusive control over the Private Owner Pledged Account and to cause the funds therein to be remitted (in a lump sum or in several sums from time to time at the sole discretion of the Initial Member) to or at the direction of the Initial Member, or (D) to cause any or all distributions (or other amounts) payable to the Private Owner (including as Manager) pursuant to the Transaction Documents to be suspended or remitted to or otherwise at the direction of the Initial Member (and deliver to the Paying Agent one or more PO/Manager Distribution Instructions with respect thereto).

(b)    Furthermore, upon the occurrence of any Default, whether or not the same constitutes an Event of Default, the Initial Member is entitled to (as determined by the Initial Member in its sole and absolute discretion) cause any or all distributions (or other amounts) payable to the Private Owner (including as Manager) pursuant to the Transaction Documents to be suspended or remitted to or otherwise at the direction of the Initial Member for payment of (or to be held pending such payment of) Private Owner Obligations pursuant to the terms hereof (and the Initial Member has the right to deliver to the Paying Agent one or more PO/Manager Distribution Instructions with respect thereto).

(c)    The Initial Member has the right to apply any or all proceeds of the Secured Assets or any Qualifying Letter of Credit to payment of the Private Owner Obligations in such order, and with such priority, as the Initial Member may determine in its sole discretion. For the avoidance of doubt, in the event that the Initial Member determines to exercise its remedies against any Secured Assets or any Qualifying Letter of Credit, it will have the absolute right to deduct from the proceeds of such exercise of remedies (including proceeds of any foreclosure sale with respect to the Private Owner Interest, any drawing on a Qualifying Letter of Credit and any receipt of funds from the Private Owner Pledged Account), (i) any Losses arising out of or resulting from any Default or Event of Default incurred by the Indemnified Parties, together with all costs and expenses (including attorneys' fees and disbursements) incurred by the Initial Member in connection with enforcing its rights and remedies hereunder and under the other Transaction Documents, and (ii) any Private Owner Obligations then due and payable (all of the foregoing in

15

each case in such order as the Initial Member may determine in its sole discretion); <u>provided</u> that the Initial Member may, in its sole discretion, hold any such proceeds as additional security for any existing or future (including contingent) Private Owner Obligations. Without limitation of the foregoing, in no event will the Initial Member have any obligation (but it will at all times have the right in its sole discretion) to use or apply any proceeds of the Secured Assets toward payment of any Private Owner Obligations owing to the Company or any Indemnified Party other than the Initial Member (whether or not the same are due and payable), and the Private Owner will remain fully obligated to pay and perform all such Private Owner Obligations owing to the Company and each such Indemnified Party notwithstanding any such election by the Initial Member to so refrain from applying such proceeds toward payment of the same; and, in the event that, for any reasons any such proceeds of the Secured Assets are used for payment of any Private Owner Obligations owing to the Company, any and all rights of the Private Owner to payments, reimbursements or distributions from the Company on account of any such payment to the Company (including rights to any repayment of any deemed Excess Working Capital Advances, to the extent any such proceeds are used to fund the same), will be considered as part of the Secured Assets and will, to the extent paid or payable by the Company, be paid directly to the Initial Member (and the Initial Member will have the right to direct the Paying Agent to so remit to the Initial Member any applicable distributions or payments by the Paying Agent with respect thereto) to be held and applied by the Initial Member as part of the proceeds of the Secured Assets (as collateral for the Private Owner Obligations). Any Secured Assets or proceeds thereof as held by the Initial Member may be commingled with the Initial Member's own funds, without any need to pay interest or income thereon. Any remaining unapplied proceeds (from an exercise of remedies by the Initial Member against the rights of the Private Owner to the Secured Assets or any Qualifying Letter of Credit) so held by the Initial Member will be released in accordance with <u>Section 3.13(i)</u> below. In any event, the Private Owner will remain liable for any deficiency in payment of the Private Owner Obligations.

(d)    This Agreement constitutes a security agreement under applicable Law for the benefit of the Initial Member and, in furtherance thereof, the Private Owner (in all of its capacities) and the Company (as applicable) will be deemed to have granted, and each does hereby grant, to the Initial Member, for itself (and its assignees) and for the further benefit of the Indemnified Parties, a valid and continuing first priority Lien on and security interest in all of the Private Owner's right, title and interest, whether now owned or existing, or hereafter acquired or arising, in, to or under the Secured Assets, as security for the payment and performance (when due) by the Private Owner (including in its roles as the Manager and the Tax Representative) of the Private Owner Obligations. For the avoidance of doubt, the parties acknowledge that the Secured Assets are not, pursuant to the foregoing, collateral for the separate payment obligations of the Company except to the extent that, pursuant to this Agreement or the other Transaction Documents, the Private Owner, in any capacity, is required to pay (or advance applicable funds to pay) or otherwise bear such obligations (and in such case, such Secured Assets secure such separate obligations of the Private Owner). The Private Owner represents, warrants and covenants that it owns, and will at all times own, the Secured Assets free and clear of any Liens (other than the Lien created hereby), and, upon the filing of a UCC financing statement with respect thereto, as applicable, the Initial Member will have a perfected and continuing first priority Lien on and

16

security interest in the Secured Assets (whether now owned or existing, or hereafter acquired or arising), as security for the payment and performance (when due) by the Private Owner (including in its roles as the Manager and the Tax Representative) of the Private Owner Obligations.

(e)    As additional security for the Private Owner Obligations (and, as applicable, as part of the Secured Assets), the Private Owner must deliver on the Closing Date, and at all times thereafter cause to be maintained, the Additional Security. In the event that the Private Owner determines to fulfill its obligation, either in part or in whole, to provide the Additional Security by issuance of a Qualifying Letter of Credit, the Private Owner must cause the issuance and delivery to the Initial Member, on the Closing Date, of a single Qualifying Letter of Credit. The Private Owner may, on one occasion (and only on one occasion, except as otherwise expressly permitted in the definition of LC Reissuance/Extension Failure under the circumstances specified therein), make a one-time substitution of either of the forms (whether it be Cash Collateral or a Qualifying Letter of Credit) of the Additional Security by substituting, as the case may be, either (x) a Qualifying Letter of Credit for Qualifying Cash Collateral, or (y) Qualifying Cash Collateral for a Qualifying Letter of Credit; provided, however, that at all times the amount of the Additional Security is equal to or greater than the Private Owner Pledged Amount; and provided, further, however, the Private Owner must pay to the Initial Member the Additional Security Substitution Fee (as a condition to the exercise of such right to make such substitution) and will further solely be responsible for any incurred costs of the Initial Member or the Company associated with any such substitution of the form of the Additional Security as referenced in this sentence. The Initial Member will have the unilateral right to draw on any such Qualifying Letter of Credit and to provide instructions to the Paying Agent for the disposition of any Qualifying Cash Collateral, in each case without any requirement for any further consent, confirmation or instructions from the Private Owner; provided, however, that as between the Initial Member and the Private Owner (and without creating any right or obligation of the Paying Agent or any Issuing Bank to refuse to honor, or inquire as to the accuracy or sufficiency of, any applicable instructions from the Initial Member), the Initial Member agrees that (i) it will not exercise such rights to so draw on any such Qualifying Letter of Credit unless there shall have occurred an Event of Default (whether or not relating to any Qualifying Letter of Credit) or an LC Reissuance/Extension Failure (with respect to such Qualifying Letter of Credit), and (ii) it will not exercise such rights to so unilaterally direct the disposition of the Qualifying Cash Collateral from the Private Owner Pledged Account unless there shall have occurred an Event of Default.

(f)    On the Closing Date (and whether or not the Private Owner has elected to provide the Additional Security in the form of Qualifying Cash Collateral), the Private Owner must establish the Private Owner Pledged Account with the Paying Agent for the exclusive purpose of holding Qualifying Cash Collateral (including in the form of any proceeds from a drawing on a Qualifying Letter of Credit at any time deposited in the Private Owner Pledged Account in accordance herewith). The Private Owner Pledged Account (and all funds and financial assets therein) will be subject to the security interest granted herein for the benefit of the Initial Member pursuant to the terms of this Agreement, the Custodial and Paying Agency Agreement and the Private Owner Pledged Account Control Agreement. Funds in the Private Owner Pledged Account may be invested at the direction of the Private Owner from time to time in Permitted Investments

17

in accordance with the Custodial and Paying Agency Agreement; provided, however, that the Private Owner is authorized to instruct the Custodian and Paying Agent to release to the Private Owner that portion of the proceeds in the Private Owner Pledged Account which exceeds the required Private Owner Pledged Amount, all in accordance with Section 3.9(b) of the Custodial and Paying Agency Agreement.  Conversely, it is understood and agreed that, pursuant to the first sentence of Section 3.13(e), if, at any time, the sum of (x) the aggregate undrawn (and available) amounts under the Qualifying Letter of Credit, if any, plus (y) the balance, if any, of the Qualifying Cash Collateral, is less than the Private Owner Pledged Amount, an Event of Default shall exist and (without limitation of the foregoing) the Private Owner immediately must cure such Event of Default by depositing with the Paying Agent Qualifying Cash Collateral in the amount of the difference between the Private Owner Pledged Amount and the sum of (x) and (y).

(g)    Upon the occurrence of any LC Reissuance/Extension Failure, the Initial Member will have the right (but not the obligation) to draw on all or any part of the undrawn amount of the Qualifying Letter of Credit subject to such LC Reissuance/Extension Failure; and the funds received by the Initial Member as a result of any such draw will be deposited in the Private Owner Pledged Account (and thereby will become Qualifying Cash Collateral) and such LC Reissuance/Extension Failure will not be deemed an Event of Default hereunder, in each case only so long as (i) there shall not have occurred any Event of Default (other than such LC Reissuance/Extension Failure), (ii) the Private Owner Pledged Account shall then be and remain open and subject to the Private Owner Pledged Account Control Agreement, (iii) upon such deposit in the Private Owner Pledged Account (of the funds received by the Initial Member from such draw), the aggregate amount of the Additional Security (disregarding such Qualifying Letter of Credit) shall be in an amount not less than the Private Owner Pledged Amount, and (iv) the Private Owner shall have paid to the Initial Member the Additional Security Substitution Fee in connection with the resulting substitution of such Qualifying Letter of Credit (or applicable undrawn amounts thereunder) with Qualifying Cash Collateral (which Additional Security Substitution Fee will be deemed due and payable upon the occurrence of such LC Reissuance/Extension Failure), it being understood that, in the event the foregoing conditions are not satisfied, the Initial Member will have the right to hold and apply such funds pursuant to Section 3.13(c) above.

(h)    The Private Owner hereby authorizes the filing by the Initial Member and its assignees of such UCC financing or continuation statements in such jurisdictions as the Initial Member or its assignees deem appropriate (in their sole and absolute discretion) to perfect and continue their first priority Lien and security interest with respect to the Secured Assets.  The Private Owner must deliver to the Initial Member an assignment and assumption agreement with respect to the Private Owner Interest, in the form attached hereto as Exhibit C, endorsed in blank, and executed by the Private Owner.  The Initial Member may use the assignment and assumption agreement to effect the assignment of the Private Owner Interest at any time if an Event of Default occurs and is continuing.

(i)    After the later to occur of (i) the third anniversary following the Final Distribution, and (ii) the final resolution of any claims asserted prior to such third anniversary following the Final Distribution, with indefeasible payment and performance of all of the

18

obligations secured by the Additional Security and any other Secured Assets to the satisfaction of the Initial Member, the Initial Member will, upon the request and at the expense of the Private Owner, (w) release the security interest granted hereunder in the Secured Assets (and consent to the filing of any applicable UCC terminations), (x) release any then outstanding Qualifying Letter of Credit, (y) consent to the termination of the Private Owner Pledged Account Control Agreement, and (z) release to the Private Owner (or such other Person as may have applicable rights therein in accordance with applicable Law) any remaining unapplied proceeds then held by the Initial Member pursuant to Section 3.13(c) above. In no event will any such release of the security interest in the Secured Assets operate to release the Private Owner from any of its continuing obligations (including in respect of continuing indemnities) under the Transaction Documents.

(j)     The Initial Member's rights and remedies under this Agreement, any other Transaction Document or otherwise are cumulative and may be exercised singularly (and in such order as the Initial Member may determine in its sole discretion) or concurrently. Neither any failure nor delay on the part of the Initial Member to exercise any other right or remedy will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof or of any other right or remedy howsoever arising. In no event will the Initial Member have any obligation to seek or exhaust any particular remedy prior to exercising any other remedy, and the Private Owner hereby waives any and all right to require the marshaling of assets in connection with any exercise by the Initial Member of its remedies hereunder or under any other Transaction Document. Under no circumstances will the Initial Member be deemed or construed to have waived its right to draw upon any Qualifying Letter of Credit, to proceed against the Private Owner Pledged Account, to foreclose upon the Private Owner Interest or to exercise any of its other rights or remedies unless such waiver is in writing and executed by a duly authorized representative of the Initial Member. A waiver of any right or remedy on any one occasion will not operate as a waiver of such right or remedy on any future occasion or as a waiver of any other right or remedy.

(k)     As used herein, "Event of Default" means any one of the following events (whatever the reason for such Event of Default and whether it is voluntary or involuntary or effected by operation of Law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)     [intentionally omitted];

(ii)     the occurrence of any Insolvency Event (without any cure period other than as may be provided for in the definition of Insolvency Event): (A) with respect to the Company, the Private Owner, any Specified Parent of the Private Owner or any Person that Controls, or any Person directly or indirectly holding any Ownership Interest in (or otherwise Controlling) the Private Owner that is Controlled by, any Specified Parent of the Private Owner; or (B) with respect to the Servicer (or any Subservicer or JDC Contractor); provided that, if such Servicer (or Subservicer or JDC Contractor) is not an Affiliate of the Private Owner, then such Insolvency Event pursuant to this clause (B) will not be an Event of Default hereunder so long as the Manager shall have fully replaced (or caused the replacement of) such affected Servicer (or

19

Subservicer or JDC Contractor) within thirty days after the occurrence of such Insolvency Event; or

        (iii)    the occurrence of any Dissolution Event with respect to (A) the Private Owner or (B) with respect to the Servicer (or any Subservicer or JDC Contractor); <u>provided</u> that, if such Servicer (or Subservicer or JDC Contractor) is not an Affiliate of the Private Owner, then such Dissolution Event under this <u>clause (B)</u>, will not be an Event of Default hereunder so long as the Manager shall have fully replaced (or caused the replacement of) such affected Servicer (or Subservicer or JDC Contractor) within thirty days after the occurrence of such Dissolution Event; or

        (iv)    any failure of the Company to pay any Working Capital Expense when due in accordance with <u>Section 12.6</u> of this Agreement, which failure continues unremedied for a period of thirty days after the date on which written notice of such failure requiring the same to be remedied shall have been given by the Initial Member to the Company; or

        (v)    any failure in any material respect of the Company or the Private Owner (in any capacity, including as a Member or as the Manager) to perform any of its obligations under, or otherwise to comply with and observe any provision of, this Agreement or any other Transaction Document, in each case which continues unremedied for a period of thirty days after the date on which written notice of such failure requiring the same to be remedied shall have been given by the Initial Member (or the FDIC, in any applicable capacity), the Custodian or the Paying Agent, as applicable, to the Company or the Private Owner (in any capacity), as applicable; or

        (vi)    the occurrence of either (x) any failure in any material respect by the Servicer, any Rated Subservicer or any JDC Contractor to perform any of its obligations under, or otherwise to comply with and observe any provision of, the Servicing Agreement, applicable Subservicing Agreement or applicable Assignment of JDC Agreement, as the case may be, which continues unremedied for a period of thirty days after the date on which written notice of such failure requiring the same to be remedied shall have been given by the Initial Member or the Manager to the Servicer, Rated Subservicer or JDC Contractor, or (y) a failure by the Manager (in its individual capacity) to replace (or, as applicable, cause the replacement of) the Servicer, any Rated Subservicer or any JDC Contractor upon the occurrence of a material breach by the Servicer, such Rated Subservicer or such JDC Contractor of, or an occurrence of a "Default" under (and as defined in), the Servicing Agreement, applicable Subservicing Agreement or applicable Assignment of JDC Agreement, which continues unremedied for a period of thirty days after the date on which written notice of such failure requiring the same to be remedied shall have been given by the Initial Member to the Manager (in any capacity); or

        (vii)    any representation, warranty, certification or other written statement of fact made by or on behalf of the Private Owner (in any capacity, including as a Member or as the Manager) in any Transaction Document or in any written statement or certificate at any time delivered pursuant to or in connection with any Transaction Document (including any reporting pursuant to the Reporting and Access Schedule), shall be false or incorrect in any material respect when made and such state of facts remains unremedied for a period of thirty days or more after the

20

date on which written notice of such state of facts requiring the same to be remedied shall have been given to the Private Owner (in any capacity); or

(viii)    there shall be any breach (or, for the avoidance of doubt, any attempted or purported Disposition that, but for <u>Section 8.5</u> of this Agreement, would have constituted a breach) of <u>Section 8.1</u> or <u>8.2</u> or any Restricted Servicer Change of Control; <u>provided</u>, that, if the applicable Servicer (or Subservicer) is not an Affiliate of the Private Owner, then such Restricted Servicer Change of Control shall not be an Event of Default hereunder (but will in all events be an event of default under the applicable Servicing Agreement (or Subservicing Agreement)) so long as the Manager shall have fully replaced (or caused the replacement of) such affected Servicer (or Subservicer) within thirty days after the occurrence of such Restricted Servicer Change of Control; or

(ix)    any failure of the Company to remit or cause to be remitted all Asset Proceeds to the Paying Agent (or to the applicable Company Account maintained with the Paying Agent) as and when required; or

(x)    at any time, there shall exist any PO Owner that has not executed and delivered (to each of the "Beneficiaries" named therein) a PO Owner Undertaking; or

(xi)    [intentionally omitted]; or

(xii)    (A) the failure, of the Private Owner, at any time, for any reason or to any extent, to maintain in full the Additional Security (other than the as a result of the Issuing Bank ceasing to be a Qualified Issuer), (B) the occurrence of any LC Reissuance/Extension Failure or (C) if applicable, any failure, at any time, for any reason or to any extent, by an Issuing Bank to comply with any terms, agreements or conditions of any Qualifying Letter of Credit; or

(xiii)    any breach of <u>Section 10.1(s)</u> of this Agreement, which breach continues unremedied for a period of thirty days or more after the date on which written notice of such breach requiring the same to be remedied shall have been given by the Initial Member to the Private Owner or otherwise shall have been given to the Private Owner; or

(xiv)    [intentionally omitted];

(xv)    any failure, in any respect, on the part of the Company (or any Ownership Entity or TRS Entity), the Manager, the Servicer or any Subservicer to (A) obtain or maintain in effect any insurance policy or fidelity bond required pursuant to the Insurance Schedule; or (B) deliver copies of the initial insurance policies and fidelity bonds or thereafter complete any applicable Insurance Modifications identified in an Insurance Deficiency Notice, in each case within the applicable time frames specified in the Insurance Schedule; or

(xvi)    any failure by the Company (or the Manager on behalf of the Company) to liquidate the Assets by the due date specified in an applicable notice provided by the

21

Initial Member pursuant to Section 12.20(b) in connection with an exercise of the Clean-Up Call; or

(xvii)  any failure in any material respect of the Company or the Private Owner (in any capacity, including as a Member or as the Manager) to perform any of its obligations under, or otherwise to comply with and observe any provision of, Article IX hereof.

3.14.  Put/Call Right of Initial Member.  Without prejudice to the rights of the Initial Member to foreclose on the Private Owner Interest in accordance with Section 3.13(a)(vi):

(a)  Upon the occurrence of an Event of Default, the Initial Member may at any time, by notice to the Private Owner (a "**Put/Call Notice**"), elect to (x) purchase (or cause one or more designees to purchase) the Private Owner Interest ("**Call Event**") or (y) cause the Private Owner to purchase the Initial Member Interest ("**Put Event**"), for an amount, payable in cash, equal to:

(i)  with respect to a Call Event, (x) the fair market value of such Private Owner Interest (determined, if necessary, in accordance with Section 3.14(b)(iv)), less (y) any amounts owed by the Private Owner pursuant to Section 3.14(b)(v), and less (or plus) (z) the excess (or deficiency), for the period between the date of the Put/Call Notice and the consummation of the Put/Call Closing, of (A) all distributions paid by the Company to or for the account of the Private Owner, including distributions pursuant to Section 6.6 and principal payments received by or on behalf of the Private Owner in respect of Excess Working Capital Advances, over (or below) (B) all Excess Working Capital Advances made by or on behalf of the Private Owner; and

(ii)  with respect to a Put Event, (x) the fair market value of such Initial Member Interest (determined, if necessary, in accordance with Section 3.14(b)(iv)), plus (y) any amounts owed by the Private Owner pursuant to Section 3.14(b)(v), and less (or plus) (z) the excess (or deficiency), for the period between the date of the Put/Call Notice and the consummation of the Put/Call Closing, of all distributions paid by the Company to or for the account of the Initial Member, including distributions pursuant to Section 6.6.

(b)  The closing of a Put Event or a Call Event (the "**Put/Call Closing**") will occur on a date selected by the Initial Member in its discretion that is no less than ten (10) and no more than thirty days after the earlier of the Members (i) reaching agreement on the value of the Private Owner Interest and the Initial Member Interest, and (ii) the Initial Member delivery to the Private Owner of a copy of the valuation report that determines the fair market value of the Private Owner Interest and the Initial Member Interest pursuant to the Valuation Procedure (the "**Put/Call Closing Date**").  Simultaneously with (or in lieu of, in the case of a termination of the Put/Call Notice) the delivery of the valuation report, the Initial Member will notify the Private Owner of the Initial Member's election, in its sole discretion, to consummate a Put Event or a Call Event, or to terminate the Put/Call Notice.  The Put/Call Closing will occur as follows:

(i)  The Put/Call Closing will be held at the principal offices of the Company on the Put/Call Closing Date.

22

(ii)     On such Put/Call Closing Date:

(A)     with respect to a Call Event, the Initial Member must purchase (or cause one or more designees to purchase in the aggregate) all of the of the Private Owner Interest for the consideration set forth in Section 3.14(a)(i), and upon delivery of such consideration, the Private Owner must deliver all such documents and instruments as are reasonably necessary to transfer to the Initial Member (or its designee(s)) all right, title and interest of the Private Owner in and to the entire Private Owner Interest, free and clear of all Liens other than those created by this Agreement and the Transaction Documents; and

(B)     with respect to a Put Event, the Private Owner must purchase all of the Initial Member Interest for the consideration set forth in Section 3.14(a)(ii), and upon delivery of such consideration, the Initial Member will deliver all such documents and instruments as are reasonably necessary to transfer to the Private Owner all right, title and interest of the Initial Member in and to the entire Initial Member Interest.

(iii)     The Private Owner must obtain all material consents, approvals or waivers (including expiration or termination of a specified waiting period) of any Governmental Authority or Person that may be required in connection with the purchase and sale of the Private Owner Interest or the Initial Member Interest, as applicable, (other than any such consent, approval or waiver which has, if permitted by Law, been waived by the Initial Member).

(iv)     In the event of the delivery of a Put/Call Notice, the Members will attempt to agree on the fair market value of the Private Owner Interest and the Initial Member Interest, as applicable, as of the date of the Put/Call Notice. If the Members are unable to agree on such value within fifteen days after the date of delivery of the Put/Call Notice, then such value will be determined immediately thereafter in accordance with the Valuation Procedure, and, if applicable, the Put/Call Closing Date will be delayed until such date (after completion of the applicable valuation) as may be selected by the Initial Member.

(v)     All out-of-pocket costs and expenses incurred by the Initial Member and the Company in connection with the exercise of the Initial Member's rights under this Section 3.14 and the sale of the Private Owner Interest by the Private Owner or the Initial Member Interest by the Initial Member, as applicable, (including any legal fees and expenses incurred in connection with obtaining any necessary consents, approvals or waivers (including expiration or termination of a specified waiting period) of Governmental Authorities) will be borne by the Private Owner and, in the event of a Put/Call Closing, will (x) with respect to a Call Event, be deducted from the purchase price otherwise payable by the Initial Member (or its designee(s)) for the Private Owner Interest and (y) with respect to a Put Event, be added to the purchase price otherwise payable to the Initial Member for the Initial Member Interest; provided, however, that the Company will pay the fees and expenses incurred for the independent appraiser retained in connection with the Valuation Procedure. The Private Owner will pay all such costs and expenses to be borne by the Private Owner pursuant to the foregoing even if the Initial Member elects to terminate the Put/Call Notice instead of proceeding with the Put/Call Closing.

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

(c)     The failure of the Initial Member to exercise its rights under this <u>Section 3.14</u> in connection with any Event of Default in no way affects or limits the exercise of such rights in connection with any other Event of Default by the Private Owner.

(d)     Without limitation of the rights of the Initial Member under <u>Section 3.13</u>, the Initial Member may, in connection with any such Call Event or Put Event, also cause (and instruct the Paying Agent to so cause) any distributions payable by the Company to the Private Owner to be paid to and held by the Initial Member (or, if permitted by the Paying Agent, held by the Paying Agent in the Distribution Account) and applied to amounts owing by the Private Owner hereunder. At the Put/Call Closing or a reasonable time thereafter, and so long as the Private Owner has duly paid and performed all its obligations with respect thereto and has paid all other outstanding Private Owner Obligations, any remaining such withheld distributions (not otherwise applied to amounts owing by the Private Owner) will be released to the Private Owner. For the avoidance of doubt, neither the Initial Member nor the Paying Agent will have any obligation to segregate, or pay interest or other income in respect of, any sums held pursuant to this <u>Section 3.14(d)</u>.

3.15.     <u>No ERISA Plan Assets</u>.  The Manager must use its best efforts to ensure that the Company's assets are not deemed to be ERISA Plan Assets.

## ARTICLE IV
## <u>Membership Interests; Rights and Duties of, and Restrictions on, Members</u>

4.1.     <u>General</u>.  The membership of the Company will consist of the Members listed from time to time in the schedule attached hereto as <u>Annex I</u> (which is hereby incorporated in this Agreement), as amended, restated, supplemented or otherwise modified from time to time as in accordance herewith (the "**Member Schedule**").  The Manager must cause the Member Schedule to be amended from time to time to reflect (to the extent relevant, in accordance with the terms hereof) the admission of any additional or substitute Members, additional Capital Contributions of the Members, the issuance of additional limited liability company interests, transfers of limited liability company interests in the Company, repurchases, redemptions or cancellations of limited liability company interests in the Company, the cessation or withdrawal of a Member for any reason or the receipt by the Company of notice of any change of name or address of a Member.

4.2.     <u>LLC Interests</u>.

(a)     <u>Creation and Issuance</u>.  The Company is only authorized to issue the limited liability company interests that exist as of the date hereof, and the Company may not hereafter create or issue any additional limited liability company interest; <u>provided</u>, that nothing in this sentence restricts the Disposition of any outstanding LLC Interest by any Member (which matter is governed by <u>Article VIII</u>).  The Company's LLC Interests will be uncertificated.  As of the Closing Date, the limited liability company interests in the Company are owned by the Initial Member and the Private Owner, as set forth in the Member Schedule.

24

(b)     Distributions.  Subject to Section 6.6, distributions to the holders of limited liability company interests in the Company shall be made as provided in Sections 6.6(b) and 9.2.

(c)     No Retirement Fund or Conversion.  The limited liability company interests in the Company will not be subject to the operation of a retirement or sinking fund to be applied to the purchase or redemption thereof for retirement and will not be convertible into any other class of limited liability company interests.

(d)     Voting Rights.  Except to the extent otherwise required by the Act or expressly provided in this Agreement, the holders of the limited liability company interests in the Company will be entitled to vote on all matters upon which the Members have the right to vote as set forth in this Agreement or provided in the Act.  Except as expressly set forth elsewhere in this Agreement (including Sections 3.1 and 3.4), the voting rights of each holder of a limited liability company interest in the Company will be based on such holder's Percentage Interest.

4.3.    Filings; Duty of Members to Cooperate.  The Manager must promptly cause to be executed, delivered, filed, recorded or published, as appropriate, and the Private Owner will, as requested by the Manager from time to time, execute and deliver, (i) all certificates, documents and other instruments that the Manager deems necessary or appropriate to form, qualify or continue the existence or qualification of the Company as a limited liability company in the State of Delaware or as a foreign limited liability company in all other jurisdictions in which the Company may, or may desire to, conduct business or own Company Property, and to form, qualify or continue the existence or qualification of each Ownership Entity in each applicable jurisdiction where it so may, or may desire to, conduct business or own its applicable Acquired Property, (ii) any amendment to the Certificate or any instrument described in clause (i) required because of, or in order to effectuate, an amendment to this Agreement, or any change in the membership of the Company or any Ownership Entity, in accordance with the terms hereof, (iii) all certificates, documents and other instruments (including conveyances and a certificate of cancellation) that the Manager deems necessary or appropriate to reflect the dissolution and liquidation of the Company and the Ownership Entities pursuant to the terms of this Agreement, and (iv) such other certificates, documents and other instruments as are required by Law or by any Governmental Authority to be executed by them in connection with the Business as conducted or proposed to be conducted by the Company and any Ownership Entity from time to time.  As soon as reasonably practicable after the date hereof (and as to any applicable Ownership Entity, as soon as reasonably practicable following formation thereof, and in all events in accordance with applicable Law), the Manager must cause the Company and each Ownership Entity to apply for, and thereafter use its best efforts to obtain, as quickly as possible, and maintain, all such licenses as are required to conduct the Business as conducted by the Company or such Ownership Entity, including qualifications to conduct business in jurisdictions other than Delaware and licenses to purchase, own or manage the Assets (so purchased, owned, operated or managed by the Company or such Ownership Entity), if the failure to so obtain such licenses would reasonably be expected to (a) result in the imposition of fines, penalties or other liabilities on the Company or any such Ownership Entity, (b) result in claims and defenses being asserted against the Company or any such Ownership Entity (including counterclaims and defenses asserted by any Borrower under the

25

Assets), or (c) materially adversely affect the Company or any such Ownership Entity, the ability of the Company or any such Ownership Entity to foreclose on the Collateral securing any Loan or the ability of the Company or any such Ownership Entity to otherwise realize the full value of any Asset or Acquired Property.

4.4.    Certain Restrictions and Requirements.

(a)    No Member may use or possess Company Property other than for a Company purpose, except as provided under license or other contractual arrangements. No Member will have authority to bind, or otherwise to act on behalf of, the Company except pursuant to authority expressly granted herein or pursuant to authority granted by the Manager in accordance with the terms hereof.

(b)    From and after the Closing Date, no Person may or will be admitted as a member of the Company except pursuant to and in accordance with Article VIII hereof.

(c)    Each Member, other than the Initial Member (and its Related Persons), must at all times meet the qualifications of a Qualified Transferee.

4.5.    No Fiduciary Duties or Liability of Initial Member. Nothing in this Agreement is intended to create, or creates, any fiduciary duty of the Initial Member (or any other Initial Member Related Person) to the Company or the Private Owner (and, without limitation of the foregoing, to the extent that, but for this sentence, any such fiduciary duty otherwise would exist (including by operation of Law), the Company and the Private Owner irrevocably and unconditionally waive any such fiduciary duty). In furtherance and not in limitation of the preceding sentence, neither the Initial Member nor any other Initial Member Related Person will be liable, responsible or accountable, whether directly or indirectly, in contract or tort or otherwise, to the Company, any other Person in which the Company has a direct or indirect interest or any Member (or any Affiliate of any of the foregoing), for any Losses asserted against, suffered or incurred by the Company, any Person in which the Company has a direct or indirect interest or any Member (or any Affiliate of any of the foregoing) arising out of, relating to or in connection with this Agreement or any act or failure to act pursuant to this Agreement, or otherwise with respect to:

(i)    the management or conduct of the business and affairs of the Company or any Person in which the Company has a direct or indirect interest or any of their respective Affiliates (including actions taken or not taken by any Initial Member Related Person as an officer or director of any Person in which the Company has a direct or indirect interest or any Affiliates of such Person);

(ii)    the offer and sale of limited liability company interests in the Company (including the LLC Interests); or

(iii)    the management or conduct of the business and affairs of any Initial Member Related Person insofar as such business or affairs relate to the Company or any Person in

26

which the Company has a direct or indirect interest or to any Member (or any of its Affiliates), including all:

> (x)     activities in the conduct of the Business, and

> (y)     activities in the conduct of other business engaged in by any Initial Member Related Person which might involve a conflict of interest vis-à-vis the Company or any Person in which the Company has a direct or indirect interest or any Member (or any of their respective Affiliates) or in which any Initial Member Related Person realizes a profit or has an interest;

except, in each case, that this sentence does not apply to Losses resulting from acts or omissions of such Initial Member Related Person which were taken or omitted which constituted fraud, gross negligence, willful misconduct, or an intentional material breach of this Agreement or any other Transaction Document.

4.6.    <u>Indemnification</u>.

(a)     The Private Owner must indemnify and hold harmless the Initial Member, the Transferor and the FDIC, and their respective Related Persons (all of the foregoing, collectively, the "**<u>Indemnified Parties</u>**"), from and against any and all Losses whatsoever directly or indirectly resulting from, connected with, arising out of or related to (i) any breach of or inaccuracy in any of the representations or warranties of the Private Owner (in any capacity, including as the Manager) contained in this Agreement or any other Transaction Document, (ii) any failure, by (x) the Company (during any period when the Private Owner is the Manager, and subject to the clarification set forth below in this <u>Section 4.6(a)</u>), the Private Owner (in any capacity, including as the Manager) or any of their respective Affiliates or (y) any Related Person of any Person described in <u>sub-clause (x)</u>, to perform the obligations of the Company or the Private Owner (in any capacity, including as the Manager) under, or otherwise to comply with and observe the provisions of, this Agreement or any other Transaction Document (including Losses relating to (1) the Company's obligations under <u>Section 4.5</u> of the Transfer Agreement to the extent provided therein, (2) the Company's obligations under <u>Sections 3.1</u> and <u>3.2</u> of the Transfer Agreement (including all costs and expenses of the Receiver in completing any applicable transfers pursuant to exercise of rights under such section), (3) any claim asserted by the Initial Member against the Company or the Private Owner (in any capacity, including as the Manager) to enforce its rights hereunder, or (4) any claim against, or liability of, the Company or any Ownership Entity arising following the dissolution and termination of the Company), or any third party allegation or claim based upon facts alleged that, if true, would constitute such a failure, (iii) any gross negligence, bad faith or willful misconduct (including any act or omission constituting theft, embezzlement, breach of trust or violation of any Law) on the part of any Person listed or described in <u>sub-clause (ii)(x)</u> or <u>(ii)(y)</u>, (iv) any Losses with respect to which the Receiver was released, or with respect to which the Company should have obtained a release from the applicable Borrowers or other Obligors, in accordance with <u>Section 4.17</u> of the Transfer Agreement, (v) with respect to any period when the Private Owner is the Manager, the events and circumstances (and Losses) described in <u>clauses (iii)</u> and <u>(iv)</u> of <u>Section 7.5(a)</u> of the Transfer Agreement, (vi) any Obligations

27

attributable to acts or omissions of the Private Owner (or any of its Related Persons) occurring prior to the Closing Date to the extent such actions or omissions would have subjected the Private Owner to the indemnification provisions herein had the same occurred on or after the Closing Date, or (vii) any failure, at any time, of the Company, any Ownership Entity, the Manager, the Servicer or any Subservicer to obtain and maintain applicable insurance in accordance with the Insurance Schedule, including any such Losses that would have been covered by applicable required insurance had the same been in place in accordance with such Insurance Schedule. The Private Owner's obligation under this Section 4.6(a) shall survive the termination of this Agreement and, with respect to any Indemnified Party, such Indemnified Party otherwise ceasing to constitute a party to or third party beneficiary of this Agreement. Each Indemnified Party must deliver notice, of any claim or demand made by any Person against such Indemnified Party for which such Indemnified Party may seek indemnification under this Section 4.6(a) (a "**Third Party Claim**"), to the Private Owner promptly after receipt by such Indemnified Party of written notice of the Third Party Claim, describing such Third Party Claim in reasonable detail. The failure or delay to provide such notice, however, will not release the Private Owner from any of its obligations under this Section 4.6 except to the extent that it is materially prejudiced by such failure or delay.

The Private Owner acknowledges and agrees that it will have no recourse (including on account of the provisions of Section 7.5 of the Transfer Agreement) against the Company for any amounts the Private Owner is required to pay pursuant to this Section 4.6. For the purposes of this Section 4.6, the term "Initial Member" will be deemed to include any Person at any time constituting the "Initial Member" under this Agreement (even if such Person has ceased to be the "Initial Member" under this Agreement) and (without limitation of the foregoing) any Person at any time holding all or any portion of the LLC Interest initially held by the Initial Member immediately after the Closing, in each case even if such Person has since ceased to be a member of the Company or to hold any limited liability company interest in the Company.

For purposes of clarification, with respect solely to the obligations of the Private Owner under this Section 4.6(a) in connection with a breach by the Company (during any period when the Private Owner is the Manager), the Private Owner will not be responsible for any Losses arising out of or resulting from any failure by the Company to pay its separate payment obligations, to the extent that all of the following are satisfied: (1) such failure is the result of the Company having insufficient available funds notwithstanding the Servicing and the management of the Company by the Manager (and, as applicable, the Servicer and any Subservicers) in accordance with this Agreement and the other Transaction Documents (including through exercise of any discretionary authority with respect to incurrence of payment obligations and maintenance and application of applicable reserves in a manner so as to reasonably avoid any such breach), (2) such failure and resulting Losses are not attributable in whole or in part to any breach (or other action or omission in violation of the Servicing Standard or any provision of this Agreement or any other Transaction Document) by the Private Owner (in any capacity, including as Manager) or any of its Affiliates (other than the Company), or by any of the respective Related Persons of any of the foregoing, and (3) the Private Owner (in any capacity) is not required to pay (or advance applicable funds to the Company for payment of) or otherwise bear such payment obligations pursuant to the terms of this Agreement or any other Transaction Document.

28

(b)    If for any reason the indemnification provided for herein is unavailable or insufficient to hold harmless the Indemnified Parties, the Private Owner must contribute to the amount paid or payable by the Indemnified Parties as a result of the Losses of the Indemnified Parties in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties, on the one hand, and the Private Owner (in any capacity, including as the Manager) and its Affiliates (other than the Company), and the respective Related Persons of any of the foregoing, on the other hand, in connection with the matters that are the subject of such Losses.

(c)    If the Private Owner confirms in writing to the Indemnified Party within fifteen days after receipt of a Third Party Claim the Private Owner's responsibility to indemnify and hold harmless the Indemnified Party therefor, the Private Owner may elect to assume control over the compromise or defense of such Third Party Claim at the Private Owner's sole expense and with counsel selected by the Private Owner, which counsel must be reasonably satisfactory to the Indemnified Party, provided that (i) the Indemnified Party may, if such Indemnified Party so desires, employ counsel at such Indemnified Party's own expense to assist in the handling (but not control the defense) of any Third Party Claim; (ii) the Private Owner must keep the Indemnified Party advised of all material events with respect to any Third Party Claim; (iii) the Private Owner must obtain the prior written approval of the Indemnified Party before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Indemnified Party or any of its Affiliates; and (iv) the Private Owner will not, without the prior written consent of the Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened action in respect of which indemnification may be sought hereunder (whether or not any such Indemnified Party is a party to such action), unless such settlement, compromise or consent by its terms obligates the Private Owner to satisfy the full amount of the liability in connection with such Third Party Claim and includes an unconditional release of such Indemnified Party from all liability arising out of such Third Party Claim.

(d)    Notwithstanding anything contained herein to the contrary, the Private Owner will not be entitled to control (and if the Indemnified Party so desires, it will have sole control over) the defense, settlement, adjustment or compromise of (but the Private Owner will nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such defense, settlement or compromise): (i) any Third Party Claim that seeks an order, injunction or other equitable relief against the Indemnified Party or any of its Affiliates; (ii) any action in which both the Private Owner (in any capacity, including as the Manager) or any Affiliate of the Private Owner, on one hand, and the Indemnified Party, on the other hand, are named as parties and either the Private Owner (or such Affiliate) or the Indemnified Party determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party or that a conflict of interest between such parties may exist in respect of such action; and (iii) any matter that raises or implicates any issue relating to any power, right or obligation of the FDIC under any Law.  In addition to the foregoing, if the Private Owner elects not to assume the compromise or defense of any Third Party Claim, fails to timely and properly notify the Indemnified Party of its election as herein provided, or, at any time after assuming such defense, fails to diligently defend against such Third Party Claim in good

29

faith, the Indemnified Party may pay, settle, compromise or defend against such Third Party Claim (but the Private Owner will nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such payment, settlement, compromise or defense). In connection with any defense of a Third Party Claim (whether by the Private Owner or the Indemnified Party), all of the parties hereto must, and must cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

(e)     In the event the Company is reimbursed for or uses the Working Capital Reserve or Excess Working Capital Advances to pay costs or expenses of the type referred to in clause (d) or (e) of the definition of Servicing Expenses and it is subsequently determined that the Company was not entitled to reimbursement for (or to use the Working Capital Reserve or Excess Working Capital Advances to pay) all or any portion of such costs and expenses because the Company did not satisfy the requirements of such clause (d) or clause (e), as applicable, of the definition of Servicing Expenses (such costs and expenses, the "**Unreimbursable Expenses**"), the Manager must, in addition to any other Losses for which the Manager may be liable with respect to the claim to which such costs and expenses relate, reimburse the cost of such Unreimbursable Expenses to each Member based on such Member's Percentage Interest as set forth below, except to the extent such Unreimbursable Expenses were funded through Excess Working Capital Advances that remain outstanding (in which case the portion of any such outstanding Excess Working Capital Advance that was so used for Unreimbursable Expenses will itself become unreimbursable and be deemed forgiven with no further right of the Manager to collect or receive the same). Any such reimbursement by the Manager pursuant to the foregoing will be as follows: within ten Business Days after written demand therefor from either Member, the Manager will pay each Member by wire transfer of immediately available funds to an account specified by each Member an amount equal to such Member's Percentage Interest (as of the later of (x) the date of such demand or (y) the date of such payment) multiplied by the amount of all such Unreimbursable Expenses.

(f)     The Company must indemnify and hold harmless each Member and each Member's respective officers, directors, employees and members (all of the foregoing collectively, the "**Covered Persons**") for any Losses incurred by such Covered Person by reason of a third party claim against such Covered Person (other than, for the avoidance of doubt, a claim by a Related Person of such Covered Person (or, if such Covered Person is other than a Member, by a Related Person of the Member in respect of which such Covered Person constitutes a Covered Person)) relating to any act or omission by or of such Covered Person in connection with the exercise or performance of the rights, powers, responsibilities and obligations of such Covered Person (or, if such Covered Person is other than a Member, of the Member in respect of which such Covered Person so constitutes a Covered Person) regarding the Company except for (i) any such third party claim, or Loss, resulting from fraud, gross negligence, willful misconduct or an intentional breach of this Agreement or any other Transaction Document by such Covered Person (or if such Covered Person is other than a Member, by the Member in respect of which such Covered Person so constitutes a Covered Person), and (ii) in the case of the Private Owner (in any

30

capacity, including as the Manager), (x) any claim or demand by the Servicer or Subservicer (or, for the avoidance of doubt, any Losses arising out of or related to such claim or demand) and (y) any such third party claim, or Loss, that, in whole or in part and directly or indirectly, results from, is connected with, arises out of or relates to any of the matters described in <u>clauses (i)</u> through <u>(vii)</u> of <u>Section 4.6(a)</u>.

(g)    <u>Tax Liability of Ownership Entity</u>.    Notwithstanding anything to the contrary contained herein, if any Ownership Entity other than a TRS Entity is not a pass-through entity with no entity-level income tax obligations, distributions to the Initial Member pursuant to <u>Section 6.6</u> (including for the purposes of <u>Section 9.2(c)</u>) will be allocated before accrual or payment of any income tax payable by such Ownership Entity, the amount of such accrual or payment shall be deemed distributed to the Private Owner pursuant to <u>Section 6.6</u>, and the Private Owner (or its successors or assigns) must indemnify and hold harmless the Initial Member from and against any liability for any income taxes payable by the Ownership Entity; <u>provided</u>, <u>however</u>, that the foregoing special allocation and indemnity will not apply if (i) the Private Owner (and each of its successors and assigns) has taken all steps necessary to secure pass-through treatment of the Ownership Entity and (ii) the liability for income taxes payable by the Ownership Entity arises solely as a result of a change in Law applicable to pass-through entities occurring after the date hereof and not as a result of action (or inaction) by the Private Owner (or its successors or assigns).

(h)    <u>Offsets</u>.    Without limiting any other rights of the Initial Member hereunder, in the event the Initial Member exercises any rights or remedies as a result of or in connection with a breach hereunder or the occurrence of a Default or Event of Default (including relating to a breach of <u>Section 4.6</u>), all costs and expenses (including reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any claim) incurred by the Initial Member with respect thereto may be recovered by the Initial Member by the turnover to the Initial Member of an equal amount of any payment or distribution otherwise payable to the Private Owner (including any Interim Management Fee or the Management Fee), whether in its capacity as a Member or as the Manager (in each case except to the extent such breach or Event of Default is attributable exclusively to a Manager having been appointed by the Initial Member following removal of the Private Owner in such capacity, or to any applicable Servicer (and any of its Subservicers) having been engaged by the Initial Member, the Company or the applicable replacement Manager following such removal of the Private Owner as the Manager, in each case that is not an Affiliate of the Private Owner).    The Private Owner and the Company must cooperate with the Initial Member to effect any such turnover.

### ARTICLE V
### Capital Contributions; Excess Working Capital Advances

5.1.    <u>Initial Capital Contributions</u>.    Pursuant to the Transfer Agreement, the Initial Member (as the Transferor) made a Capital Contribution to the Company in an amount equal to the Initial Member Capital Contribution.    In connection with the Private Owner Interest Sale Agreement, the Private Owner acquired from the Initial Member the Private Owner Interest

31

representing a 5% equity interest in the Company in exchange for the Private Owner Interest Sale Price. After giving effect to the foregoing transactions, (and to the Capital Contributions referenced in Section 5.2 below), the respective Capital Accounts of the Initial Member and the Private Owner as of the Closing Date are as set forth in Annex I (the Member Schedule). From and after the Closing Date (and except as provided in Sections 5.2 and 5.3 below), the Members will have no obligation to make any additional Capital Contributions to the Company.

5.2. Capital Contributions for Working Capital Reserve Account. On the Closing Date, the Initial Member and the Private Owner must fund, as Capital Contributions to the Company, the Working Capital Reserve Account in accordance with the provisions of Section 12.11 hereof and Section 1 of the Private Owner Interest Sale Agreement, which funds will be used for payment of Working Capital Expenses in accordance with such Section 12.11 and as otherwise permitted pursuant to the Custodial and Paying Agency Agreement.

5.3. Capital Contributions for Capital Improvement Account. Capital Contributions by the Members in connection with the funding of the Capital Contribution Account on the Closing Date are as set forth in Section 2(b) of the Permitted Capital Improvement Addendum attached hereto as Annex V (and references in the Transaction Documents to this Section 5.3 will be deemed to include such Section 2(b) of the Permitted Capital Improvement Addendum).

5.4. [Intentionally Omitted].

5.5. Excess Working Capital Advances. In the event that there are insufficient funds in the Collection Account, and insufficient available funds in the Working Capital Reserve Account (including, as applicable, by a permitted release of such funds to the Collection Account or as otherwise permitted in the Custodial and Paying Agency Agreement) to pay any Working Capital Expenses, then the Manager must, except as otherwise provided in Section 12.6, make an advance of its own funds to the Company to be used by the Company for payment of such permitted (or required, as applicable) Working Capital Expenses (any such advance to the Company, an "**Excess Working Capital Advance**"). No Excess Working Capital Advance will accrue any interest thereon. Excess Working Capital Advances will be repaid in accordance with Section 5.1 of the Custodial and Paying Agency Agreement. To the extent multiple Working Capital Expenses (payment of which is permitted to be made using such Excess Working Capital Advance) are outstanding, any funding or use by the Manager of Excess Working Capital Advances for payment of all or any of the same will follow the relevant priorities (as among such Working Capital Expenses) as set forth, first, in Section 3.1(b)(i) of the Custodial and Paying Agency Agreement, and, second, in the Priority of Payments, as applicable. All Excess Working Capital Advances, together with a detailed statement of the sources and uses thereof (which will be broken out by the reimbursable and unreimbursable portions thereof), must be reflected in the Monthly Report with respect to the Due Period during which (or, as applicable, the Distribution Date for which) the relevant Excess Working Capital Advance was made. The Manager may not Dispose of its interest in any Excess Working Capital Advances without the consent of the Initial Member. Excess Working Capital Advances will not be regarded as additional Capital Contributions.

## ARTICLE VI
## Capital Accounts; Allocations; Priority of Payments; Distributions

6.1.    Capital Accounts.  A Capital Account will be established and maintained for each Member to which will be credited the Capital Contributions made by such Member and such Member's allocable share of Net Income (and items thereof), and from which will be deducted distributions to such Member of cash or other Company Property and such Member's allocable share of Net Loss (and items thereof).  As to the Private Owner, the initial Capital Account will correspond to that portion of the Capital Account of the Initial Member that is attributable to the Private Owner Interest acquired by the Private Owner pursuant to the Private Owner Interest Sale Agreement, together with the Private Owner WCR Account Deposit made pursuant to the Private Owner Interest Sale Agreement.  A Member's Capital Account also will be adjusted for items specially allocated to such Member under this Article VI.  The Capital Accounts of the Members generally will be adjusted and maintained in accordance with Treasury Regulations § 1.704-1(b)(2)(iv); provided, however, that such adjustments to, and maintenance of, the Capital Accounts will not adversely affect the manner in which distributions are to be made to the Members under Section 6.6.

6.2.    Allocations to Capital Accounts.  Allocation of Net Income and Net Loss will be made as provided in this Article VI.

(a)    General Allocation Rules.  Except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of the Company will be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.2(b), the Capital Account balance of each Member, immediately after making such allocation, is, as nearly as possible, equal to (i) the distributions that would be made to such Member pursuant to Section 6.6 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the tax basis of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 9.2(c), to the Members immediately after making such allocation, minus (ii) such Member's share of "partnership minimum gain" and "partner nonrecourse debt minimum gain" (as such terms are used in Treasury Regulations § 1.704-2), computed immediately prior to the hypothetical sale of assets.

(b)    Allocations in Special Circumstances.  The following special allocations will be made in the following order:

(i)    *Minimum Gain Chargeback*.  Notwithstanding any other provision of this Article VI, if there is a net decrease in minimum gain (as it corresponds to the definition of "partnership minimum gain" in Treasury Regulations §§ 1.704-2(b)(2) and (d)) during any Fiscal Year, the Members will be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in minimum gain, determined in accordance with Treasury Regulations §§ 1.704-2(f) and (g). This Section 6.2(b)(i) is intended to comply with the "minimum

33

gain chargeback" requirement in such section of the Treasury Regulations and will be interpreted consistently therewith.

(ii)    *Member Minimum Gain Chargeback*.  Notwithstanding any other provision of this <u>Article VI</u> other than <u>Section 6.2(b)(i)</u>, if there is a net decrease in minimum gain attributable to a Member nonrecourse debt (as it corresponds to the definition of "partnership nonrecourse debt minimum gain" in Treasury Regulations § 1.704-2(i)) during any Fiscal Year, each Member will be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in such minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations § 1.704-2(i).  This <u>Section 6.2(b)(ii)</u> is intended to comply with the "partner minimum gain chargeback" requirement in such section of the Treasury Regulations and will be interpreted consistently therewith.

(iii)    *Qualified Income Offset*.  In the event any Member, for any reason, whether expected or not, has an Adjusted Capital Account Deficit, items of Company income and gain will be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Adjusted Capital Account Deficit as quickly as possible, <u>provided</u> that an allocation pursuant to this <u>Section 6.2(b)(iii)</u> will be made only if and to the extent that such Member would have such Adjusted Capital Account Deficit after all other allocations provided for in this <u>Section 6.2</u> have been tentatively made as if this <u>Section 6.2(b)(iii)</u> were not in this Agreement. This <u>Section 6.2(b)(iii)</u> is intended to comply with the "qualified income offset" provisions in Treasury Regulations § 1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(iv)    *Nonrecourse Deductions*.  Any nonrecourse deductions attributable to a Member nonrecourse debt (as described in Treasury Regulations § 1.704-2(i)) will be allocated to the Member who bears the economic risk of loss with respect to such nonrecourse debt. Otherwise, nonrecourse deductions will be allocable in accordance with the Members' respective Percentage Interests.

(v)    *Loss Allocation Limitation*.  No allocation of Net Loss (or any item thereof) may be made to any Member to the extent that such allocation would create or increase a Member's Adjusted Capital Account Deficit.  If, in the allocation of Net Loss (or any item thereof), less than all Members would have an Adjusted Capital Account Deficit as a result of such allocation, then any Net Loss (or item thereof) not allocable to any such Member(s) as a result of such limitation will be allocated (subject to such limitation) to the other Member so as to allocate the maximum permissible Net Loss to each Member under Treasury Regulation § 1.704-1(b)(2)(ii)(d).

(vi)    *Curative Allocations.*    The allocation provisions of this <u>Section 6.2(b)</u> are intended to comply with certain requirements of the Treasury Regulations. Notwithstanding any other provisions of this <u>Article VI</u>, any allocation effected pursuant to this <u>Section 6.2(b)</u> shall be taken into account in allocating Net Income and Net Loss among the Members such that the cumulative effect of all such allocations achieves the fundamental purpose

34

of <u>Section 6.2(a)</u>, so that the Capital Account balances correspond to the amounts distributable to the Members.

(c)    <u>Allocations in the Event of Disallowed Deductions</u>.  In the event that any fees, interest or other amounts paid to a Member or an Affiliate of a Member pursuant to this Agreement or any other agreement between the Company and such Member or Affiliate providing for the payment of such amounts, and deducted by the Company, whether in reliance upon §§ 162, 163, 707(a) or 707(c) of the Code or otherwise, are disallowed as deductions to the Company on its federal income tax return for the fiscal year in or with respect to which such amounts are paid and are treated instead as Company distributions, then:

(i)    the Net Income or Net Loss, as the case may be, for the fiscal year in or with respect to which such fees, interest or other amounts were paid will be increased or decreased, as the case may be, by the amount of such fees, interest or other amounts that are disallowed and treated as Company distributions; and

(ii)    there will be allocated to the Member who received (or whose Affiliate received) such payments an amount of gross income for the fiscal year in or with respect to which such fees, interest or other amounts were paid an amount equal to such fees, interest or other amounts that are so disallowed and treated as Company distributions.

(d)    <u>Transfer of or Change in LLC Interests</u>.  The Tax Representative is authorized to adopt any convention or combination of conventions likely to be upheld for federal income tax purposes regarding the allocation of items of Company income, gain, loss, deduction and expense with respect to a transferred LLC Interest.  A transferee of an LLC Interest in the Company will succeed to the Capital Account of the transferor Member to the extent it relates to the transferred LLC Interest.

6.3.    <u>Tax Allocations</u>.

(a)    <u>General Rules</u>.  Except as otherwise provided in <u>Section 6.3(b)</u>, for each Fiscal Year, items of Company income, gain, loss, deduction and expense will be allocated, for federal, state and local income tax purposes among the Members in the same manner as the Net Income (and items thereof) or Net Loss (and items thereof) of which such items are components were allocated pursuant to <u>Section 6.2</u>.

(b)    <u>§ 704(c) of the Code</u>.  Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company will, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the Company's adjusted basis of such property, with respect to each member of the Company, for federal income tax purposes and its Fair Market Value at the time of the contribution or deemed contribution in accordance with § 704(c) of the Code and the Treasury Regulations promulgated thereunder. Such allocations will be made in such manner and utilizing such permissible tax elections as determined in good faith by the Tax Representative following consultation with the Initial Member.  In the event of a revaluation of Company Property pursuant

35

to the definition of Book Value, subsequent allocations of income, gains, losses or deductions with respect to such Company Property will take account of any variation between the Book Value and Fair Market Value of such Company Property, as so determined from time to time, in accordance with § 704(c) of the Code and the Treasury Regulations promulgated thereunder. Such allocations will be made in such manner and utilizing such permissible tax elections as determined in good faith by the Tax Representative following consultation with the Initial Member.

(c) __§ 707(b) of the Code__. Any losses realized by the Initial Member (including as the Transferor) with respect to any property (other than cash) sold or deemed sold to the Company at Closing pursuant to the Transfer Agreement and that are deferred pursuant to § 707(b)(1) or § 267(a) of the Code may be allocated and used by the Company in accordance with applicable tax rules upon its subsequent disposition of such property.

(d) __Capital Accounts Not Affected__. Allocations pursuant to this __Section 6.3__ are solely for federal, state and local tax purposes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or allocable share of Net Income (or items thereof) or Net Loss (or items thereof).

(e) __Tax Allocations Binding__. The Members acknowledge that they are aware of the tax consequences of the allocations made by this __Section 6.3__ and hereby agree to be bound by the provisions of this __Section 6.3__ in reporting their respective shares of items of Company income, gain, loss, deduction and expense, unless otherwise required by a final "determination" (within the meaning of Section 1313(a) of the Code).

6.4. __Determinations by Tax Representative__. All matters concerning the computation of the Capital Accounts, the allocation of items of Company income, gain, loss, deduction and expense and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement will be determined by the Tax Representative in good faith, following consultation with the Initial Member. Following such consultation, such determinations will be final and conclusive as to all the Members. Without in any way limiting the scope of the foregoing, if and to the extent that, for income tax purposes, any contribution to or distribution by the Company or any payment by any Member or by the Company is recharacterized, the Tax Representative may, in good faith following consultation with the Initial Member, specially allocate items of Company income, gain, loss, deduction or expense and make correlative adjustments to the Capital Accounts of the Members in a manner so that the net amount of income, gain, loss, deduction and expense realized by each relevant party (after taking into account such special allocations) and the net Capital Account balances of the Members (after taking into account such special allocations and adjustments) will, as nearly as possible, achieve the fundamental purpose of __Section 6.2(a)__, such that the Capital Account balances correspond to the amounts distributable to the Members, as if such recharacterization had not occurred.

6.5. __Priority of Payments__. On each Distribution Date the amounts deposited in the Distribution Account under the Custodial and Paying Agency Agreement (or, following the Final Monthly Distribution, applicable amounts from the Working Capital Reserve) will be distributed by the Paying Agent in the order of the Priority of Payments; __provided__, however, that for the

36

avoidance of doubt, to the extent amounts are available for distribution to the Members with respect to their respective LLC Interests (such available amounts, the "Distributable Cash"), such Distributable Cash will be distributed to the Members in accordance with Section 6.6 below.

6.6.    Distributions.

(a)    No Right to Withdraw.  No Member will have the right to withdraw capital or demand or receive distributions or other returns of any amount in its Capital Account, except as expressly provided in this Agreement.

(b)    Ordinary Distributions.

(i)    *Timing*.  Distributable Cash, if any, will be distributed to the Members on each Distribution Date by the Paying Agent in the manner set forth in the Custodial and Paying Agency Agreement; provided, however, that the Manager must instruct the Paying Agent as to how such distributions are to be allocated as between the Initial Member and the Private Owner based on Section 6.6(b)(ii) below (which instructions will be included in one or more reports to be provided to Paying Agent in accordance with Section 7.4 (and Section 3(b) of the Reporting and Access Schedule).

(ii)    *Distributions of Distributable Cash*.  Each distribution of Distributable Cash will be made to the Members as follows:  95.0% to the Initial Member and 5.0% to the Private Owner.

(c)    [Intentionally Omitted].

(d)    Restrictions on Distributions.  The foregoing provisions of this Article VI to the contrary notwithstanding, the Company will not make (and the Manager will not make or permit) any distribution in violation of any contract or agreement to which the Company is then a party, any Law or any directive of any Governmental Authority, and by providing the relevant instructions to the Paying Agent for each distribution, the Manager will be deemed to have certified to each of the Paying Agent and the Initial Member that such distribution complies with the foregoing.

(e)    Withholding.  Notwithstanding any other provision of this Agreement, the Manager is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any foreign or United States federal, state or local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person or transfer of an LLC Interest.  All amounts so withheld will be treated as distributions to the applicable Members under the applicable provisions of this Agreement.  If any such withholding requirement with respect to any Member exceeds the amount distributable to such Member under the applicable provisions of this Agreement, or if any such withholding requirement was not satisfied with respect to any amount previously allocated or distributed to such Member, such Member and any successor or assignee with respect to such Member's LLC

37

Interest hereby agrees to indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.

(f)     <u>Record Holders</u>.  Any distribution of Company Property, whether pursuant to this <u>Article VI</u> or otherwise, will be made only to Persons that, according to the books and records of the Company, were the holders of record of LLC Interests on the date determined by the Manager as of which the Members are entitled to any such distribution.

(g)     <u>Liquidation Distributions</u>.  The Final Monthly Distribution and all further distributions through and including the Final Distribution will be made in accordance with the provisions of <u>Section 9.2</u>.

**ARTICLE VII**
**<u>Accounting, Reporting, Taxation, Business Plans and Verification</u>**

7.1.    <u>Fiscal Year</u>.  The books and records of the Company shall be kept on an accrual basis and the fiscal year of the Company will commence on January 1 and end on December 31 of each year; <u>provided</u> that (x) the first fiscal year of the Company will begin on the date of the formation of the Company and end on December 31, 2023, and (y) the last fiscal year of the Company will end on the date the Company is dissolved pursuant to <u>Section 9.1</u>.

7.2.    <u>Maintenance of Books and Records</u>.  The Manager must cause the Company to maintain, retain, and allow access to books and records in accordance with, and must otherwise comply with the provisions set forth in, <u>Section 1</u> of the Reporting and Access Schedule, which <u>Section 1</u> is hereby incorporated by reference.

7.3.    <u>Financial Statements</u>.  The Manager must prepare and deliver (or cause applicable preparation and delivery of) the financial statements and other items required by, and must otherwise comply with the provisions set forth in, <u>Section 2</u> of the Reporting and Access Schedule, which <u>Section 2</u> is hereby incorporated by reference.

7.4.    <u>Additional Reporting and Notice Requirements; Audits</u>.  The Manager must prepare and deliver (or cause applicable preparation and delivery of) the reports, certificates, notices, and other information required by, must, and must cause the Servicer, each Subservicer and each JDC Contractor to, grant to the Initial Member (and other applicable Persons) the audit and inspection rights in accordance with, and must otherwise comply with the provisions set forth in, <u>Section 3</u> of the Reporting and Access Schedule, which <u>Section 3</u> is hereby incorporated by reference.  In addition to the foregoing, the Manager must provide or cause to be provided to the Initial Member, all reports, information (financial or otherwise), certificates and other documents required to be provided by the Servicer under the Servicing Agreement.  All rights of the Initial Member pursuant to the foregoing are in addition to, and not in limitation of, the rights of the Members under § 18-305(a) of the Act.  § 18-305(c) of the Act will not apply in relation to the Initial Member.

38

7.5.    Designation of Tax Representative.  The Private Owner is hereby designated as the partnership representative (the "**Tax Representative**") under § 6223(a) of the Code and under other similar Laws of other relevant jurisdictions, to manage, in consultation with the Initial Member, administrative tax proceedings conducted at the Company level by the Internal Revenue Service or other Tax authorities with respect to Company matters.  Each Member expressly consents to such designation and agrees that, upon the request of the Tax Representative, it will execute, acknowledge, deliver, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.  Except as otherwise provided herein, the Tax Representative is specifically directed and authorized to take whatever steps the Tax Representative in its sole and absolute discretion deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service (or other Tax authorities) and taking such other action as may from time to time be required under the Code, Treasury Regulations or other Laws.  The Tax Representative must keep the Members fully informed as to any Tax audits of the Company, including promptly providing the Members with copies of any correspondence from any Taxing authority, providing the Members with a reasonable opportunity to review and comment on any written submission to be provided to a Tax authority in connection with any audit, examination or other administrative or judicial proceeding, and permitting the Members to participate in any conferences or meetings with any Taxing authority and in any subsequent administrative or judicial proceedings.  Except as otherwise provided herein, the Tax Representative will have the authority, following consultation with the Initial Member, to make any Tax elections on behalf of the Company permitted to be made, including the election pursuant to § 754, under any section of the Code or the Treasury Regulations promulgated thereunder or under other Laws.  In the event the Company is eligible under § 6221(b) to elect out of the partnership level audit rules, the Tax Representative must make such election and take such further action as may be required to avoid application of the partnership level audit rules under Subchapter C of Chapter 63 of the Code.  If the Company is not eligible to elect out of the partnership level audit rules, then, unless the Initial Member and the Private Owner mutually agree otherwise in writing, the Tax Representative must timely elect under Code § 6226(a) to issue to each Member, former Member and the IRS a statement of any adjustments to the Company's income, gain, loss, deduction or credit allocable to such Member or former Member and no liability arising out of any adjustment will be paid by the Company.  The Initial Member may, at any time following the occurrence and during the continuation of an Event of Default, remove the Private Owner as the Tax Representative, appoint itself (or any other willing Member at the time) as the Tax Representative, and serve (or cause such other Member to so serve) in such capacity; provided that such removal will not relieve the Private Owner as Tax Representative of any obligations or liabilities under this Agreement or any other Transaction Document arising out of, relating to, occurring in connection with, or required to have been paid or performed by, the Private Owner as the Tax Representative in its capacity as such.

7.6.    Tax Information.

(a)    Within ninety days after the end of each Fiscal Year, the Tax Representative must send, or cause to be sent to, each Person who was a Member at any time during the Fiscal Year then ended a Schedule K-1 and such Company tax information as the Tax Representative

39

reasonably believes will be necessary for the preparation by such Person of its United States federal, state and local tax returns in accordance with any Law. Such information will include a statement showing such Person's share of distributions, income, gain, loss, deductions and expenses and other relevant items of the Company for such Fiscal Year. Promptly upon the request of any Member (or any former Member, for tax years during which such Person was a Member), the Tax Representative will furnish to such Member (or former Member):

(i)    United States federal, state and local income tax returns or information returns, if any, filed by the Company; and

(ii)    at the sole cost and expense of the requesting Member, such other information as such Member may reasonably request for the purpose of applying for refunds of withholding taxes.

(b)    The Manager must prepare and deliver, or cause the Company to prepare and deliver, together with delivery to the Initial Member of the annual financial statements pursuant to Section 7.3 (and Section 2(a) of the Reporting and Access Schedule), a report which specifies, for each Due Period and for such annual reporting period, the information with respect to each Asset that is sold or otherwise disposed of by the Company so as to enable the Company (and each Member) to comply with allocation provisions of § 704(c) of the Code, as determined as of the close of business on the applicable Determination Date and certified by an authorized representative (who must be the chief financial officer (or an equivalent officer)) of the Company.

7.7.    Business Plans. As promptly as possible, but in no event later than the time periods set forth herein (and, as applicable, with current information as of the month most recently ended prior to delivery thereof) the Manager must deliver to the Initial Member written plans detailing the strategy to be used by it in managing and disposing of the Assets (and the Ownership Entities) for achieving the Company's purposes with respect thereto, in conformance with the Servicing Standard, based, to the extent appropriate, on information gathered by the Company with respect to the Assets (each, together with any updates thereto, a "**Business Plan**"), which will include (i) individual Business Plans (each, a "**Borrower-Business Relationship Business Plan**") for each of the five largest Borrower-business relationships based on their Unpaid Principal Balance as of the Cut-Off Date (determined by aggregating the Loans of Borrower and Obligors under common Control or that otherwise are Affiliates of each other), and (ii) a consolidated Business Plan covering all Assets (with the Borrower-Business Relationship Business Plans being integrated therein) (a "**Consolidated Business Plan**"). Such initial Borrower-Business Relationship Business Plans must be delivered not more than one hundred eighty days after the Closing Date, and such initial Consolidated Business Plan must be delivered not more than one hundred eighty days after the Closing Date. With respect to the first such Borrower-Business Relationship Business Plans and Consolidated Business Plan, the Manager must meet with the Initial Member as reasonably requested by the Initial Member from time to time during the thirty Business Days following the Initial Member's receipt of the same, or such later date as requested by the Initial Member, to review and discuss such Borrower-Business Relationship Business Plans and Consolidated Business Plan, including changes thereto suggested by the Initial Member. Within thirty Business Days following expiration of such review period, the Manager will deliver

40

to the Initial Member a final version of such Borrower-Business Relationship Business Plans and Consolidated Business Plan reflecting such changes as the Manager considers to be appropriate in light of its discussions with the Initial Member during such review period. The Manager must thereafter review and revise each Business Plan as the circumstances may require, and in any event provide periodic updates to such Business Plans (and for each such update to the Borrower-Business Relationship Business Plans, the same must cover the five largest Borrower-business relationships based on their Unpaid Principal Balance as of the time of such update) to the Initial Member, in January (current as of December 31 of the immediately preceding year) and July (current as of June 30 of such year) of each year, commencing in January of 2025 and continuing until Final Monthly Distribution, with each such periodic update to be delivered as part of the Monthly Reports due at such time pursuant to Section 7.4 (and Section 3(b) of the Reporting and Access Schedule). In connection with and following the Final Monthly Distribution, each Monthly Report will include an applicable update as to any relevant information that would otherwise be included in an update to the Consolidated Business Plan (and no separate update to the Consolidated Business Plan will be required). With respect to each such Business Plan (including any update thereto or to relevant information therein pursuant to any Monthly Report), upon reasonable notice by the Initial Member, the Company must make its personnel who are familiar with such Business Plans available during normal business hours for the purposes of discussing such Business Plans with representatives of the Initial Member and responding to questions therefrom (and, as applicable, revising the same to reflect such changes as the Manager considers to be appropriate in light of such discussions with the Initial Member).

(a)    Each Business Plan (including any update thereto) will set forth a strategy (consistent with any restrictions set forth in this Agreement and the other Transaction Documents, except to the extent that this Agreement or any such other Transaction Document, as the case may be, expressly contemplates that such Business Plan (including any update thereto) may propose deviations from any such restriction) for the disposition of the Assets addressed thereby which strategy may consist of one or more of the following: (i) the permitted pay-off of Assets at a discount; (ii) modifications of the related note or mortgage, including reductions in the mortgage loan interest rate, reductions in the principal balance and rescheduling principal payments; (iii) foreclosure upon the related Collateral (or acquisition thereof by deed in lieu of foreclosure) and subsequent sale thereof; (iv) assumptions of Assets by new borrowers; (v) repairs to and, if applicable, completion of construction of the related Collateral, with a view towards selling such Collateral or the Asset secured thereby; (vi) sale of an Asset, either singly or in pools, before or after restructuring; and (vii) any other method of work-out, rehabilitation and disposition consistent with the Servicing Standard and other general duties of the Manager specified in this Agreement. For any Loan for which a Strategic Plan Report is required, such strategy must include a detailed description of contemplated or proposed steps to improve the Risk Category of such Loan pursuant to the Loan Criteria Matrix.

(b)    Each Business Plan (including any update thereto) will set forth a strategy (consistent with any restrictions set forth in this Agreement and the other Transaction Documents, except to the extent that this Agreement or any such other Transaction Document, as the case may be, expressly contemplates that such Business Plan (including any update thereto) may propose

41

deviations from any such restriction) for the disposition of each related Acquired Property which strategy may consist of one or more of the following:  (i) the sale or leasing of the Acquired Property in whole or in parts, or in pools; (ii) making repairs to, the rehabilitation or improvement of, and, if applicable, the completion of construction of, the Acquired Property, or making changes to the Acquired Property so that it may be used for uses other than its current use, with a view toward selling the Acquired Property; (iii) continued leasing or sales activity with respect to the Acquired Property available for leasing or sale (in whole or in part) at the time it is transferred to an Ownership Entity; and (iv) maintenance, landscaping and general upkeep of the Acquired Property.  To the extent any such Business Plan (and related strategy) includes any permitted construction or development to be funded by the Company (other than pursuant to Required Funding Draws) (including, if applicable, through Permitted Capital Improvement Expenses, such Business Plan (and any update thereto) must include a description of such construction or development in reasonable detail (including the related budget and timeline).  For avoidance of doubt, in no event will delivery of any information pursuant to a Business Plan, Strategic Plan Reports or Critical Strategy Resolution Business Plan (or any update to any of the foregoing) be deemed to constitute delivery or approval with respect to any Capital Improvement Plan.

(c)     Each Business Plan (including any update thereto) must contain the Company's estimate (or determination, as applicable) of (i) the gross and net amount that is recoverable with respect to each related Asset (including, with respect to all related Acquired Property, the then Net Fair Value thereof), (ii) with respect to all Acquired Property and Mortgaged Property included in any Asset covered by such Business Plan, in the event such Acquired Property or Mortgaged Property includes more than one parcel of real property (or would otherwise potentially be sold by the Company in severable parts), the then projected Release Price for each such parcel (or other severable part) of such Acquired Property and Mortgaged Property, and (iii) projected Working Capital Expenses, Permitted Capital Improvement Expenses and any other permitted expenditures or contingent liabilities with respect to each such Asset (including any Acquired Property), and, in each case including in reasonable detail the manner of calculation of each of the foregoing.  The Consolidated Business Plan (including any update thereto) must include projected financials including statements of income, assets, and cash flows for the Company (and, for purposes of clarification, the information required pursuant to the immediately preceding sentence both with respect to each Asset (on an Asset-by-Asset basis) and with respect to all Assets on a consolidated basis).  Such cash flow projections must, for the Consolidated Business Plan and each update thereto, include an Excel model of projected cash flows (in the form set forth in Exhibit F hereto, and as may be updated from time to time pursuant to Section 7.7(f) of this Agreement), as of June 30 and December 31 of each year (or, in the case of the initial Consolidated Business Plan, as of the date of preparation and delivery thereof) and covering the period through the fifth anniversary of the Closing Date (or with respect to any update thereto, any later date representing  the Manager's then reasonably expected projection as to the date upon which the Final Distribution will occur), on a monthly basis for the upcoming twenty-four months and not less than a quarterly basis thereafter, including projected cash inflows (including projected Asset Proceeds and Excess Working Capital Advances), projected cash outflows (including projected Servicing Expenses, Required Funding Draws and other Working Capital Expenses, Capital Improvement Advances and other Permitted Capital Improvement Expenses (and related

42

drawings from the Capital Improvement Account)), projected Working Capital Reserve levels, projected Capital Improvement Fund levels, and the amount and allocation of any projected distributions to the Initial Member and the Private Owner.

(d)     Each update to a Business Plan must include descriptions and explanations for the largest variances to the previously reported corresponding Business Plan.  Variance explanations must include changes in capital expenditures for Acquired Property, protective advances, internal rates of return, strategy for the disposition of the Assets, actual principal and interest income and other collection proceeds, cash flows, projected distributions to the Members, and other changes in strategy or other relevant matters as compared to the previously reported corresponding Business Plan.

(e)     Each Business Plan (including any update thereto) will set forth the policies, practices and guidelines with respect to when (including how frequently) site inspections (of Mortgaged Property and Acquired REO Property) will be conducted, the procedures to be followed in conducting site inspections and the manner in which the results of site inspections are to be documented (including standard forms to be used in connection with such documentation).

(f)     Each Business Plan (including any update thereto) will set forth (i) the organizational structure of the Manager and its Affiliates, and (ii) the policies and procedures of the Manager and its Affiliates regarding the manner in which the strategies set forth in the Business Plan, and the determinations described in <u>Section 1(a)(ii)</u> of the Reporting and Access Schedule, are determined, made, internally approved and implemented.

7.8.     <u>Supplemental Plans for Risk Category C/D Loans (Strategic Plan Reports and Critical Strategy Resolution Business Plans)</u>.

(a)     For any Loan that, as of any date of required delivery of Business Plans (or any update thereto) has either a C or a D Risk Category, the Manager must deliver to the Initial Member, together with the delivery of the Business Plans (and each update thereto) as set forth in <u>Section 7.7</u> above, a written report (or update, as the case may be) for such Loan (each one, a "**Strategic Plan Report**"), in the form attached hereto as <u>Exhibit J</u>, describing, among other matters, strategies to improve the Risk Category of such Loan pursuant to the Loan Criteria Matrix, which strategies may include, among others, loan modifications pursuant to the Loan Modification Program and Capital Improvement Advances.

(b)     For any Loan that is (as of the Closing Date) or becomes (after the Closing Date) a Risk Category D Loan and thereafter continues to have such D Risk Category for a period of 12 months or more, the Manager must deliver, no later than 60 days following the expiration of such 12 month period, and thereafter (for so long as it is a D Asset) semiannually together with (or as a separate part of) the updated Business Plans, a specific plan ("**Critical Strategy Resolution Business Plan**") for such D Loan containing detailed strategies and actions to be adopted by the Manager to enhance the performance and/or maximize the value of such Loan (which may include the sale of such Loan to a Permitted Buyer in accordance with the Transaction Documents).

43

7.9.   <u>Changes to Business Plans and Supplemental Plans</u>.  The Initial Member has the right from time to time after the Closing Date to prescribe a form, or to update (and otherwise modify) the form, of any component of (or information to be included in) the Business Plan (including the form of cash flow projections attached hereto as <u>Exhibit F</u>), Strategic Plan Report and Critical Strategy Resolution Business Plan in such manner as determined appropriate by the Initial Member in its sole discretion, in each case by delivery of written notice to the Manager including or attaching the applicable form (new, updated or otherwise modified) or other changes (or otherwise setting forth a link to the applicable website including such form (new, updated or otherwise modified) or changes, or with respect to the cash flow projections, indicating that the same is available at the applicable website specified in or pursuant to <u>Exhibit F</u> hereto, or in any such case making the same available by such other means as may be applicable in connection with engagement or use of a Reporting Service pursuant to <u>Section 6</u> of the Reporting and Access Schedule), at least three months prior to the effective date (as selected by the Initial Member) of such update (or modification).

7.10.   <u>Initial Member Engagement of Contractors</u>.  The Initial Member retains the right, in its sole discretion, to engage any one or more (a) Verification Contractors in accordance with the terms set forth in <u>Section 5</u> of the Permitted Capital Improvement Addendum, (b) Reporting Services in accordance with the terms set forth in <u>Section 6</u> of the Reporting and Access Schedule, and (c) additional third party contractors to assist the Initial Member in the exercise of its rights (including oversight of the Private Owner and the Manager in performance of their respective obligations) and performance of its obligations under the Transaction Documents.  Each of the Company, the Manager and the Private Owner will, to the extent set forth, and subject to any limitations on authority so set forth, by the Initial Member in its sole discretion in an applicable notice identifying any such contractor and its applicable authority, cooperate with such contractor (as a representative and designee of the Initial Member), including in granting to such contractor all access and rights to copies available to the Initial Member (and any representative or designee thereof) under the Reporting and Access Schedule and any other applicable provisions of the Transaction Documents.  Allocation of costs and expenses (and any reimbursement or indemnity in respect thereof) in connection with any such engagement by the Initial Member and cooperation by the Company, the Private Owner and the Manager as applicable will be based on the provisions of the Transaction Documents applicable to the exercise by the Initial Member of the rights (or obligations, as the case may be) being performed with use of such contractor.

### ARTICLE VIII
### <u>Restrictions on Disposition of Private Owner Interest</u>

8.1.   <u>Limitations on Disposition of Private Owner Interest</u>.  Except as otherwise provided in this <u>Article VIII</u>, the Private Owner shall not, and may not, Dispose of all or any part of the Private Owner Interest; <u>provided</u>, however, that the Private Owner may (A) make a direct, outright transfer of its entire (but not less than its entire) Private Owner Interest if, and only if, (i) (x) the transferee is a single Person that is a Qualified Transferee, (y) such transferee delivers to the Initial Member a Purchaser Eligibility Certification and the representations and warranties made by such transferee therein shall be true and correct both before and after giving effect to such transfer of

44

the Private Owner Interest, and (z) the Private Owner first obtains the prior written consent of the Initial Member to such transfer, or (ii) such Disposition is done by or at the direction of the Initial Member pursuant to Section 3.13 or 3.14; provided, further, that it is understood that a direct or indirect Disposition of an interest of a third party in the Private Owner (i.e., as opposed to a Disposition of any nature by the Private Owner itself) does not violate this sentence (it being further understood that such transaction might nevertheless violate other provisions of the Transaction Document (such as for example Section 8.2 or 10.1 hereof), and (B) make a direct outright transfer of its right to receive the Interim Management Fee or Management Fee payments as set forth in (and subject to) Section 12.5.  Transfers of the entire Private Owner Interest satisfying the foregoing criteria/criteria set forth in clause (A) of the preceding sentence are hereinafter referred to as "**Permitted Dispositions**."

8.2.    Change of Control.  The Private Owner represents, warrants and covenants that no Change of Control will occur with respect to the Private Owner unless (i) it first obtains the prior written consent of the Initial Member, and (ii) following such Change of Control, the Private Owner would remain a Qualified Transferee.  Without limitation of the preceding sentence, the Private Owner will provide the Initial Member with immediate notice at the address specified in the Notice Schedule of the occurrence of any Change of Control with respect to the Private Owner.

8.3.    Additional Provisions Relating to Permitted Dispositions.  Except as otherwise expressly provided in this Section 8.3, the following provisions will apply to each Permitted Disposition:

(a)    In the event the Private Owner proposes to make a Permitted Disposition, the Private Owner will be required to pay any and all filing and recording fees, fees of counsel and accountants and other out-of-pocket costs and expenses reasonably incurred by the Initial Member and the Company in connection with such Permitted Disposition.

(b)    The transferee in a Permitted Disposition must deliver to the Company, with a copy to the Initial Member, an agreement, in form and substance reasonably satisfactory to the Initial Member, by which such transferee will (i) agree to become a party to and bound by each of this Agreement, the Custodial and Paying Agency Agreement, the Agreement of Common Terms and Definitions, the Servicing Agreement (if such transferee is also the Manager, and unless, in connection with such Permitted Disposition, the Servicing Agreement is terminated in accordance with its terms with a full release of claims by the Servicer and any terminating Subservicer and with execution of a replacement Servicing Agreement with such Servicer or a replacement Servicer in a manner acceptable to the Initial Member), and each other Transaction Document to which the Private Owner is a party (including, if the transferor Member, prior to such transfer, also was the Manager, to which it is a party in its capacity as the Manager (or in its individual capacity)) as the "Private Owner" (or as the "Manager" as applicable), (ii) agree (if the transferor Member, prior to such transfer, also was the Manager) to be appointed as the "Manager", and without limitation of the generality of the foregoing, agree to be bound by the other terms of Section 8.4 hereof, and (iii) assume and agree to perform when due all of the obligations of the "Private Owner" and (if the transferor Member, prior to such transfer, also was the Manager) the "Manager" under each of this Agreement, the Custodial and Paying Agency Agreement, the

45

Agreement of Common Terms and Definitions, the Servicing Agreement (or applicable replacement Servicing Agreement) and each other Transaction Document to which the Private Owner (including, if the transferor Member, prior to such transfer, also was the Manager, in its capacity as the Manager (or in its individual capacity)) is a party, and (iv) represent and warrant that it complies with the requirements set forth in <u>Article X</u> and make all the other representations and warranties as the "Private Owner" set forth in this Agreement.

(c)    In connection with each Permitted Disposition, the Private Owner and the transferee must deliver to the Company and the Initial Member such other documents and instruments as the Initial Member reasonably may request and which are required to effect the Permitted Disposition and substitute the transferee as a Member.

8.4.    <u>Effect of Permitted Dispositions</u>.

(a)    Upon consummation of any Permitted Disposition:

(i)    the transferee will be admitted as a member of the Company and be deemed to be a party to this Agreement as the "Private Owner" and, if the transferor Member, prior to such transfer, also was the Manager, such transferee will be appointed as the Manager (in the place of the transferor Member);

(ii)    the transferred LLC Interest will continue to be subject to all the provisions of this Agreement, and the transferee Member will have the same status as the Private Owner had at the time of consummation of such Permitted Disposition and, without limiting the generality of the foregoing, any outstanding breach, misrepresentation, violation or default (with respect to this Agreement or any other Transaction Document) by any direct or indirect predecessor to the transferee as the Member, or by any Affiliate of any such predecessor Member, will be deemed to constitute an outstanding breach, misrepresentation, violation or default as the case may be, by the transferee Member; and

(iii)    subject to <u>Section 8.4(b)</u> and the last sentence of <u>Section 13.7</u>, the transferor Member will cease to be a member of the Company (and accordingly, except as expressly otherwise provided in <u>Section 8.4(b)</u> or the last sentence of <u>Section 13.7</u>, will cease to be responsible for the payment or performance of any of the obligations or liabilities under this Agreement of the Private Owner, in any capacity hereunder)

(b)    No Permitted Disposition (and no resulting withdrawal or resignation of the transferor Member from the Company) will:

(i)    relieve the transferor Member of any of the obligations or liabilities of the transferor Member, in any capacity, under this Agreement or any other Transaction Document required to have been paid or performed prior to the consummation of such Permitted Disposition (or of any liability it may have arising out of any breach, misrepresentation, violation or default by the transferor Member prior to such consummation);

46

(ii) result in the termination of, relieve the transferor Member (or any of its Affiliates) of, or otherwise affect, any of the obligations or liabilities of the transferor Member, in any capacity, or its Affiliates under, any Related Party Agreement (such Related Party Agreements to continue in effect in accordance with their respective terms), except to the extent expressly provided in such Related Party Agreement;

(iii) dissolve the Company; or

(iv) relieve the transferor Member of any obligations, liabilities and indemnities required pursuant to Section 4.6 hereof.

(c) The Initial Member, in its discretion, can waive any provision of Section 8.3 or 8.4(a) in the context of a transfer of the Private Owner Interest pursuant to Section 3.13 or 3.14.

8.5.     Effect of Prohibited Dispositions.  Any attempted or purported Disposition of the Private Owner Interest (or any portion thereof) not strictly in accordance with the terms of this Agreement will be void ab initio and of no force or effect whatsoever.  The Private Owner will not be entitled, and hereby specifically waives any right, to receive Company distributions during (i) the period between any attempted or purported Disposition of the Private Owner Interest (or any portion thereof) not strictly in accordance with the terms of this Agreement and the express rescission of such attempted or purported Disposition by the Private Owner and (ii) any period when the Private Owner is in violation of Section 8.2, provided that all such omitted Company distributions will (subject to Section 8.6) be made to the Private Owner (without interest) forthwith after the end of the relevant suspension period.  The Initial Member will have the right to issue any applicable PO/Manager Distribution Instruction (and, in such case, will thereafter issue the applicable PO/Manager Distribution Reinstatement Notice following the end of the relevant suspension period) pursuant to Section 5.1(a) of the Custodial and Paying Agency Agreement in furtherance of the foregoing.

8.6.     Distributions After Disposition.  Distributions with respect to an LLC Interest (including pursuant to Section 8.5) made on or after the effective date of the Permitted Disposition of such LLC Interest will be made to the transferee Member with respect to such LLC Interest, regardless of when such distributions accrued on the books of the Company.

8.7.     Transfers by Initial Member.

(a) Notwithstanding anything to the contrary contained in this Agreement, except as provided by applicable Law, there will be no restriction on the Initial Member's ability to Dispose of the Initial Member Interest, directly or indirectly, to any Person and the Private Owner will have no right to purchase or right-of-first-refusal in connection with any such sale; provided, however, that, the Initial Member may not assign the consent and voting rights associated with the Initial Member Interest to more than one Person (for the avoidance of doubt, except as expressly provided above, the foregoing restriction will not otherwise limit the Initial Member's right to Dispose of any interest associated with the Initial Member Interest) and

47

provided, further, that in the event the Initial Member determines to sell the Initial Member Interest through an auction process, the Private Owner will be entitled to participate in such auction on the same terms that apply generally to other participants in the auction. At the election of the Person then constituting the "Initial Member" under this Agreement, the transferee in any direct Disposition of any portion of the Initial Member Interest will, upon delivery to the Company, with a copy to the Private Owner, of an agreement by which such transferee will agree to become a party to and be bound by this Agreement as the "Initial Member," be admitted as a member of the Company and be deemed to be a party to this Agreement as the "Initial Member", and thereupon, subject to last sentence of <u>Section 13.7</u>, the transferor Member will cease to be a member of the Company (and accordingly, except as expressly otherwise provided in last sentence of <u>Section 13.7</u>, will cease to be responsible for the payment or performance of any of the obligations or liabilities under this Agreement of the Initial Member).

(b)     [Intentionally Omitted].

(c)     Anything in this Agreement (including <u>Section 8.7(a)</u>) to the contrary notwithstanding from and after the acquisition by the FDIC in its corporate capacity of the assets of the receivership of the Failed Bank, the FDIC in its corporate capacity as successor to the FDIC in its capacity as the receiver under such receivership, automatically and without any further act of the parties, will succeed to all of the rights, duties and obligations of the "Initial Member" hereunder.

8.8.    <u>Resignation; Dissolution</u>.

(a)     The Private Owner may not withdraw or resign from the Company, except (i) in connection with a Permitted Disposition made in accordance with the applicable provisions of this <u>Article VIII</u> or (ii) with the prior written consent of the Initial Member.

(b)     The Private Owner covenants that it will not allow a Dissolution Event to occur with respect to itself.

(c)     § 18-304 of the Act will not apply to the Company. Nothing in this <u>Section 8.8(c)</u> will limit the terms of <u>Section 9.1</u> hereof.

(d)     Except as is otherwise expressly provided in this Agreement, no Member will be entitled to receive any payment pursuant to § 18-604 of the Act.

8.9.    <u>Applicable Law Withdrawal</u>. If, as a result of applicable Law, the ownership of an LLC Interest by a Member becomes illegal or is likely to become illegal or the applicable Law more likely than not requires divestiture of such Member's LLC Interest, or the applicable Law would require the Company to register as an investment company under the Investment Company Act, then the Manager and such Member must use their respective commercially reasonable efforts to avoid a violation of any such applicable Law by such Member or the need for the Company to register as an investment company. These steps may include, depending on the provisions of such applicable Law, (i) arranging for the sale of the Member's LLC Interest to a third party upon terms

48

reasonably satisfactory to the Member in a transaction that complies with <u>Articles VIII and X</u>, (ii) making any appropriate applications to the relevant Governmental Authority, (iii) prohibiting such Member from making further Capital Contributions, and converting its LLC Interest into a special interest with no voting or similar rights but with only an economic right (identical to its prior rights as a Member), or (iv) permitting the Member to withdraw from the Company in exchange for a "payment" to such Member equal to the value of its LLC Interest at the time of withdrawal, such value to be determined by a third party appraiser mutually agreeable to the Manager and all Members. The aforesaid "payment" must be made in cash unless the Manager determines that the payment in cash would be economically detrimental to the Company, in which case such payment may be made in kind, subject to the applicable Law. The timing of any such withdrawal must be mutually agreeable to the withdrawing Member and the Manager taking proper account of the effective date of the applicable Law or registration requirement that is the basis for the withdrawal or other remedy provided herein and the need of the Manager for a reasonable period of time to find a solution to the illegality or requirement for divestiture or renegotiation. Such illegality, divestiture or registration requirement must be established by (x) an opinion of counsel (which counsel must be reasonably satisfactory to the Manager and the Initial Member) substantially to the effect that the ownership of the LLC Interest more likely than not will result in such illegality or requirement for registration or divestiture or (y) a ruling or order from a Governmental Authority.

**ARTICLE IX**
**<u>Dissolution and Winding-Up of the Company</u>**

9.1.    <u>Dissolution</u>. A dissolution of the Company will take place upon (and only upon) the first to occur of the following:

(a)    the agreement by all Members to dissolve the Company (it being understood and agreed that neither Member, acting alone, will have the right unilaterally to dissolve the Company);

(b)    notice to such effect to the Private Owner from the Initial Member at any time after the occurrence of a Dissolution Event or an Insolvency Event with respect to the Private Owner or any Person that Controls the Private Owner; or

(c)    when determined appropriate by the Manager (in accordance with the Servicing Standard) after (i) the sale of substantially all the Company Property (other than cash and cash equivalents), or (ii) exercise of the Clean-Up Call and liquidation of all remaining Assets and Acquired Property of the Company in accordance with <u>Section 12.20</u>; <u>provided</u>, that, (x) at the time either of the events described in <u>clauses (i)</u> and <u>(ii)</u> occur, the Manager will, subject to applicable Law, immediately proceed with the winding-up procedures pursuant to <u>Section 9.2</u> below, and (y) such dissolution will occur prior to the Final Distribution.

9.2.    <u>Winding-Up Procedures</u>. If a dissolution of the Company pursuant to <u>Section 9.1</u> occurs (or to the extent otherwise required pursuant to <u>Section 9.1(c)</u>), subject to the Company's compliance with its obligation under the other agreements to which it is a party, the other terms

49

and conditions of this Agreement or the other Transaction Documents, the Manager must proceed as promptly as advisable to wind up the affairs of the Company in an orderly and businesslike manner.  The Manager will make a final accounting.  As part of the winding-up of the affairs of the Company, the following steps will be taken:

(a)     The Company must comply with § 18-804(b) of the Act. In connection therewith, (i) the Manager will deliver to the Initial Member a relevant liability and reserve analysis, including, where appropriate, qualified independent third party analysis with respect to potential liabilities, and (ii) the Manager will provide (or make provision) for potential liabilities (including further anticipated Working Capital Expenses in connection with the retention of the Working Capital Reserve and dissolution and termination of the Company) by setting aside applicable reserves in the Working Capital Reserve.

(b)     The Manager will liquidate all the Company Property and apply the proceeds of such liquidation in the manner set forth in Section 9.2(c) except as provided for in Section 9.2(d).  Any Ownership Entities not sold will be dissolved, wound up and terminated by the Manager as part of, and upon substantially the same terms as apply to, the dissolution, winding-up and termination of the Company, including as to provision (in accordance with, and subject to applicable Law for such Ownership Entity) for contingent liabilities by the setting aside of reserves in the Working Capital Reserve.  In connection with such liquidation, the Manager will fully and finally resolve all Loans and other Company Property, including (i) as to any Loan (and rights to any Deficiency Balance) that has not been so fully and finally resolved by way of a disposition or permitted distribution-in-kind, by completion of charge-offs (with issuance of any applicable IRS Form 1099), (ii) in respect of any recorded interests involving or otherwise running to the benefit of, or required pursuant to the Transaction Documents to have been transferred to, the Company or any Ownership Entity, with applicable duly recorded transfers, releases or terminations, as applicable, and (iii) closing of all Company Accounts (after all remaining funds therein have been liquidated), all in a manner that avoids any further obligations or required actions of the Company or any Ownership Entity following the termination of the Company pursuant to Section 9.3.

(c)     Distributions of the assets of the Company in connection with (or, as applicable pursuant to Section 9.1(c), in anticipation of) a dissolution of the Company will be conducted as follows:

(i)     first, to creditors, but excluding the Members who are creditors, to the extent otherwise permitted by Law (and, to the extent permitted, in accordance with the Priority of Payments), in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof);

(ii)     second, to the Members or former Members who are creditors, to the extent otherwise permitted by Law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to the Members and former Members under § 18-601 of the Act;

50

(iii)    third, to the Members and former Members in satisfaction of liabilities (if any) for distributions under § 18-601 of the Act; and

(iv)    finally, to the Members in the manner set forth in <u>Section 6.6(b)</u>.

(d)    In connection with such winding-up and liquidation of the Company Property, the Manager can request the consent of the Initial Member to distribute certain Company Property in-kind in lieu of liquidating such Company Property.  If the Initial Member consents to an in-kind distribution, the Manager will hire independent appraisers to appraise the value of Company Property that will be distributed in-kind to determine the Fair Market Value of such assets, and allocate any unrealized gain or loss determined by such appraisal to the Members' respective Capital Accounts as though the properties in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in the manner set forth in <u>Section 9.2(c)</u>.  If a Member, upon the advice of counsel (obtained at its own expense), determines that there is a reasonable likelihood that any distribution-in-kind of an asset would cause such Member to be in violation of any Law, such Member and the Manager will each use its best efforts to make alternative arrangements for the sale or transfer into an escrow account of any such distribution-in-kind on mutually agreeable terms.

(e)    The Final Monthly Distribution will occur following the winding-up and liquidation (or applicable permitted distribution) of all remaining Company Property other than any applicable reserves to be held in the Working Capital Reserve pursuant to <u>Section 9.2(a)</u>.  The Final Distribution will occur on or after such Final Monthly Distribution, subject to and following the completion of the dissolution of the Company and the determination by the Manager that no remaining reserves are required to be held in the Working Capital Reserve pursuant to <u>Section 9.2(a)</u>.  During the period following the Final Monthly Distribution and continuing until the Final Distribution, the Manager will, as and when appropriate as determined by the Manager in accordance with applicable Law, direct application of funds in the Working Capital Reserve (i) for payment of applicable amounts required to be paid by the Company, and (ii) to the extent of funds no longer required to be maintained in the Working Capital Reserve, for distributions, in each case in accordance with the priorities in <u>Section 9.2(c)</u>.

(f)    In connection with any such winding-up of the Company and the making of the Final Monthly Distribution and each further distribution through and including the Final Distribution, the Manager will provide applicable instructions to the Paying Agent in accordance with the Custodial and Paying Agency Agreement, including instructions for establishing any reserves in the Working Capital Reserve, for making the Final Monthly Distribution (and transferring applicable funds to the Collection Account pursuant <u>Section 3.6(d)</u> of the Custodial and Paying Agency Agreement in connection therewith), and for making all payments and further distributions from the Working Capital Reserve through and including the Final Distribution.

(g)    Concurrently with the making of each of the Final Monthly Distribution and the Final Distribution, the Manager will provide to the Members a certificate, signed by an appropriate authorized officer of the Manager, certifying that (i) all Company Property (including all Assets and Ownership Entities) has been sold (or otherwise disposed of) or distributed (and,

51

that, in connection therewith, all remaining rights to any Loans not so disposed or distributed have been charged off, with issuance of applicable IRS Form 1099s, and that all recorded interests involving the Company or any Ownership Entity or otherwise running to the benefit of, or required pursuant to the Transaction Documents to have been transferred to, the Company or any Ownership Entity, have been appropriately assigned, released or terminated, as applicable, such that no further action of the Company will be required in respect of any such Loans or other Company Assets following the termination of the Company pursuant to <u>Section 9.3</u>), (ii) all required reserves have been established, and all amounts (other than, in the case of the Final Monthly Distribution, amounts appropriately held in the Working Capital Reserve) have been distributed, in each case accordance with this <u>Article IX</u> and applicable Law (including that the Company has fully complied with § 18-804(b) of the Act), and (iii) no assets (other than, as applicable, the Working Capital Reserve) remain owned by, or otherwise titled to, the Company. If requested by the Initial Member, the Manager will provide final financial statements in accordance with <u>Section 2(c)</u> of the Reporting and Access Schedule.

9.3.    <u>Termination of the Company</u>.    Upon the dissolution of the Company and the completion of the winding-up process set forth in <u>Section 9.2</u> and the making of the Final Distribution (with release of all remaining reserves for contingent liabilities), the Manager (or such other Person or Persons as the Act may require or permit) will (a) cause, when appropriate to do so under Delaware law, the cancellation of the Certificate and any filings required by <u>clause (iii)</u> of <u>Section 4.3</u>, and take (or cause to be taken) such other actions as may be necessary to terminate the Company, and (b) promptly upon the same becoming available, obtain and deliver to each of the Initial Member and the FDIC applicable evidence of such cancellation and termination, including a certified (by the Delaware Secretary of State) copy of the filed Certificate of Cancellation.

9.4.    <u>Post-Termination Matters</u>.    Without limitation of the Manager's indemnity obligations under <u>Section 4.6</u>, the Manager, at its sole cost and expense, will be responsible for, and must promptly resolve, any further obligations of the Company or any Ownership Entity that may exist or arise following, and notwithstanding, the winding up and termination of the Company pursuant to the foregoing provisions of this <u>Article IX</u>; <u>provided</u>, <u>however</u>, that in no event will the Company be reconstituted or revived without the express prior written consent of the Initial Member.    In furtherance of and with respect to performance of its obligations under this <u>Section 9.4</u>, the Manager has caused the Company, in connection with execution and delivery of this Agreement, to appoint the Private Owner (including any applicable officer or agent thereof, with full power of substitution) as the Company's continuing representative for resolving any such post-termination matters and performing any such post-termination obligations pursuant to a power of attorney (the "**Post-Termination LPOA**"), which Post-Termination LPOA will be in the form attached to this Agreement as <u>Exhibit G</u> (or such other form as agreed by the Manager, the Private Owner, and the Initial Member), and which Post-Termination LPOA will be irrevocable and coupled with an interest and will survive the termination of the Company.

52

## ARTICLE X
## Qualified Transferees

10.1.    Qualified Transferees.  The Private Owner (including, for the avoidance of doubt, its Successors), certifies, represents and warrants as follows, and covenants that it will at all times be in compliance with, and (without limitation of the foregoing) will not enter into any transaction, or take (or omit to take) any other action, that would result in it ceasing to be in compliance with, the following (and any proposed transferee of the Private Owner Interest in compliance with the following will be deemed a "**Qualified Transferee**"):

(a)    Organization; Good Standing; Licenses.  Such Member (i) is a Special Purpose Entity duly organized, validly existing and in good standing under the Laws of the state of its organization, (ii) has qualified or will qualify to do business as a foreign corporation, partnership or other entity and will remain so qualified, and is and will remain in good standing, in each jurisdiction in which the character of its properties or the nature of its activities makes such qualification necessary and in which failure to so qualify would have a material adverse effect upon such Member or its ability to perform its obligations hereunder, (iii) has full power to own its property, to carry on its business as presently conducted, and to enter into and perform its obligations under this Agreement, and (iv) has all licenses or other governmental approvals necessary to perform its obligations hereunder.  As of the Closing Date (or, in the case of any Successor to the Private Owner, as of the date such Member first became a Member of the Company), such Member is in compliance with Section 8.2 hereof.

(b)    Authorization; No Violation.  The execution and delivery by such Member of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary action.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, (i) any of the provisions of any Law binding on such Member or its properties, (ii) the constituent documents of such Member, or (iii) any of the provisions of any indenture, mortgage, contract or other instrument to which such Member is a party or by which it is bound or result in the creation or imposition of any Lien upon any of its property pursuant to the terms of any such indenture, mortgage, contract or other instrument.

(c)    Governmental Approvals.  All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any Governmental Authority or agency that are necessary in connection with the execution and delivery by such Member of this Agreement and the consummation of the transactions contemplated hereby and the performance of its obligations hereunder, have been duly taken, given or obtained, as the case may be, are in full force and effect, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken.

53

(d)    <u>No Litigation</u>.  On the date such Member becomes a party to this Agreement, there is no action, suit, proceeding or investigation pending or threatened against such Member before any Governmental Authority.

(e)    <u>No Violation of Orders, Decrees, etc</u>.  Such Member is not in default with respect to any order or decree of any Governmental Authority or in violation of any Law.

(f)    <u>Third Party Consents</u>.  No consents, approvals, or waivers of, or notifications to, stockholders, creditors, lessors or other nongovernmental Persons are required to be obtained or made by such Member in connection with the execution and delivery of this Agreement and the consummation of all the transactions herein contemplated and the performance of its obligations hereunder.

(g)    <u>Owners Accredited Investors</u>.  All of the equity owners of such Member are "accredited investors," as that term is defined in Rule 501 under the Securities Act.

(h)    <u>Knowledge and Experience</u>.  Such Member, either by itself or through its advisors and principals, has such knowledge and experience in the origination, servicing, sale and/or purchase of performing and non-performing or distressed loans, including construction loans and loans secured by residential and commercial properties, as well as financial and business matters, as to enable such Member to utilize the information made available to it with respect to the LLC Interest acquired by it and the Assets to evaluate the merits and risks of a purchase of the Private Owner Interest and, indirectly, the Assets, and to make an informed decision with respect thereto.

(i)    <u>Economic Risks</u>.  Such Member acknowledges, understands and represents that it is able to bear the economic risks associated with the acquisition and ownership of the Private Owner Interest and, indirectly, the Assets, including the risk of a total loss of its investment in the Company and, indirectly, the Assets and the risk that it may be required to hold the Private Owner Interest and, indirectly, the Assets for an indefinite period of time.

(j)    <u>No Representations</u>.  Such Member hereby acknowledges that, except as is otherwise expressly provided in this Agreement, the Private Owner Interest Sale Agreement, or the Transfer Agreement, none of the Initial Member or the FDIC or any of their respective Related Persons, makes or has made any representation or warranty regarding the Company, the LLC Interests or the Assets or the value of any Collateral.

(k)    <u>Due Diligence</u>.  Such Member acknowledges and agrees that, whether or not information is available with respect to the LLC Interests or the Assets and whether or not it chooses to review any information that is or was made available to it regarding the LLC Interests or the Assets, such Member, by itself or through its advisors or principals, has the ability and is and will remain responsible for making its own independent investigation and evaluation of the LLC Interests and the Assets and the economic, credit or other risks involved in an acquisition of the Private Owner Interest and, indirectly, the Assets.  Except as is otherwise expressly provided in this Agreement, none of the Initial Member or the FDIC or any of their respective Related

54

Persons, makes or has made any representation or warranty as to the completeness or accuracy of any information provided.

(l)   No Securities.   Such Member acknowledges and agrees that (i)  the Private Owner Interest (and, indirectly, the Assets) is not intended to constitute and does not constitute a "security" within the meaning of the Securities Act, the Exchange Act, or any applicable federal or state securities Laws, (ii) no Private Owner Interest will be represented by any form of certificate or instrument, (iii) no Private Owner Interest will be redeemable, (iv) no Private Owner Interest is assignable or transferable except as expressly contemplated hereunder, (v) no inference that any of the LLC Interests or the Assets is a "security" under such federal or state securities Laws will be drawn from any of the certifications, representations or warranties made by any Person in this Agreement, (vi) it is not contemplated that any filing will be made with the Securities and Exchange Commission or pursuant to the "Blue Sky" or securities Laws of any jurisdiction, and (vii) if any of the LLC Interests or the Assets is deemed a security, such may not be resold or otherwise transferred by such Member except in accordance with any and all applicable securities and "Blue Sky" Laws.

(m)   Resales.   Such Member is acquiring the Private Owner Interest (and, indirectly, the Assets) for its own account and not with a view toward resale in a distribution within the meaning of the Securities Act.

(n)   Resales in Compliance with Law.   Such Member will not (i) offer, pledge, sell or otherwise Dispose of the Private Owner Interest (or any interest therein) or any Asset (or any interest therein or evidence thereof) to, (ii) solicit any offer to buy or accept a transfer, pledge or other Disposition of the Private Owner Interest (or any interest therein) or any Asset (or any interest therein or evidence thereof) from, or (iii) otherwise approach or negotiate with respect to the Private Owner Interest (or any interest therein) or any Asset (or any interest therein or evidence thereof) with, any Person in any manner, or take any other action, that would (A) not comply with Article VIII, or (B) render the transfer to such Member of the Private Owner Interest or any interest in any Asset a violation of any Law relating to the issuance, regulation, registration or disposition of securities, nor will it authorize any Person to so act, in any manner with respect to the Private Owner Interest (or any interest therein) or any Asset (or interest therein or evidence thereof).

(o)   Acquisition in Compliance with Law.   Such Member's acquisition of the Private Owner Interest and the resulting investment in the Assets will comply with all applicable Laws, including any and all Laws and restrictions imposed on resale of the Private Owner Interest and the Assets by federal and state securities or "Blue Sky" Laws.

(p)   Independent Evaluation.   Such Member has made an independent evaluation of the Company and its assets (including the Assets and related Asset Files and any electronic data made available to it pertaining to the Assets held by the Company).  Such Member also has conducted such other investigations as it deems appropriate, including searches of Uniform Commercial Code, title, court, bankruptcy, Tax, Lien and other public records.  Such Member agrees and represents that it is entering into this Agreement solely on the basis of its own investigations and its judgment as to the value of the Private Owner Interest and the nature,

55

validity, enforceability, collectability and value of the Assets and all other facts material to their ownership, including the legal matters and risks relating to collection and enforcement, and the performance of any obligations under any of the Assets in any jurisdiction. Such Member further acknowledges that no Related Person of the Initial Member, or the FDIC has been authorized to make any statements or representations other than those specifically contained in this Agreement or the Transfer Agreement. Such Member has consulted with its own counsel, accountants and other advisors as to the legal, tax, business, financial and related aspects of its ownership of the LLC Interest and no representation, warranty or advice has been provided as to such matters by the Initial Member, the FDIC or any of their Related Persons.

(q)     Embargoed Person.  (i) No consideration that such Member or any of its Affiliates contributes hereunder or under the other Transaction Documents in connection with any transaction regarding any assets has been derived from or related to any activity that is deemed criminal under United States Law; (ii) neither such Member nor any of its Affiliates or Direct Owners is an Embargoed Person; (iii) neither such Member nor any of its Affiliates or Direct Owners engages in any dealings or transactions, or is otherwise "associated with" (as defined in 31 C.F.R. 594.316), any Embargoed Person; and (iv) if and to the extent such Member or any of its Affiliates is required by Law to maintain an anti-money laundering compliance program under applicable anti-money laundering Laws and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), such compliance programs are currently being maintained. The foregoing certifications, representations and warranties are and will remain based upon a due inquiry and investigation; provided, however, that for purposes of determining whether any of the same with respect to indirect ownership are true, such Member will not be required to make an investigation into the ownership of publicly-traded securities (including securities of open-end investment companies registered under the Investment Company Act) or the ownership of assets by a collective investment fund that holds assets for employee benefit plans or retirement arrangements.

(r)     ERISA Plan Asset. The assets of such Member (including any successor to or transferee of such Member) are not deemed to be ERISA Plan Assets.

(s)     Purchaser Eligibility.  Each of such Member and any Person that, together with its Affiliates, directly or indirectly holds twenty-five percent or more of the equity interests of such Member is and remains capable of truthfully making the representations and warranties in the Purchaser Eligibility Certification.

(t)     Qualified Purchaser.  Such Member is a "qualified purchaser" within the meaning of § 3(c)(7) of the Investment Company Act.

56

## ARTICLE XI
## Manager Liability

11.1.    Liability of Manager.

(a)    Except as otherwise specifically provided in this Agreement (including in the other subsections of this Section 11.1), the duties (including fiduciary duties) and obligations owed to the Company and the Initial Member by the Manager are as provided in Section 3.1(b) hereof.

(b)    The Manager may rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(c)    The Manager may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and any act taken or omitted to be taken in reliance upon the opinion of such Persons as to matters that the Manager reasonably believes to be within such Person's professional or expert competence will be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

(d)    The Manager will not be liable to the Company or the Members for its good faith reliance on the provisions of this Agreement.

(e)    The limitations and exculpation afforded by each provision of this Section 11.1 are cumulative and not exclusive.  Nothing in this Section 11.1 is intended, or will be deemed, to permit conduct that would otherwise constitute misappropriation of a trade secret of the Company under applicable Law or conduct that, even disregarding the terms hereof, otherwise would be actionable by the Company or any Member.

## ARTICLE XII
## Servicing of Assets

12.1.    Servicing.

(a)    Appointment and Acceptance as Servicer.  Effective as of the Closing Date, but subject to Section 3.3 of the Transfer Agreement (with which the Manager agrees to comply) and the further obligations hereunder with respect to retention of the Servicer, the Manager is hereby appointed (and hereby accepts the appointment) with full authority and responsibility, in its own name, to act as the servicer for the Assets and any Collateral.  Until such time as the Company is wound up pursuant to Section 9.2, and except as otherwise provided in Section 12.4 and subject to the interim servicing being provided by or on behalf of the Initial Member (as the Transferor) pursuant to Section 3.3 of the Transfer Agreement, the Manager will, with respect to each Asset or Group of Assets, from and after the Closing Date, be responsible for (and hereby

57

assumes responsibility for) Servicing in accordance with the standards (collectively, the "**Servicing Standard**") set forth in <u>Section 1</u> of the Servicing Addendum attached hereto as <u>Annex IV</u> (and references in the Transaction Documents to this <u>Article XII</u> will be deemed to include such Servicing Addendum) and the terms set forth in <u>Section 2</u> of the Servicing Addendum and elsewhere in this <u>Article XII</u> (such obligations in respect of Servicing referred to collectively herein as the "**Servicing Obligations**"). Without in any way limiting the foregoing, but subject to <u>Section 3.3</u> of the Transfer Agreement and applicable rights of the Manager to perform Asset Management pursuant to <u>Section 12.3(a)</u> and engage a JDC Contractor pursuant to <u>Section 12.3(c)</u>, the Manager must cause the Assets (including, for all purposes under this <u>Article XII</u>, the related Collateral) to be serviced as follows: (i) such Asset will, from and after the applicable Servicing Transfer Date (and continuing until the winding-up of the Company pursuant to <u>Section 9.2</u>), and except as provided in the immediately following <u>clause (ii)</u> or as otherwise expressly permitted by the Initial Member, be Serviced by or through the Servicer appointed in accordance with <u>Section 12.3</u> below, and (ii) following the replacement of the Servicer as a result of an Event of Default, the Assets will be serviced by or through the Servicer appointed by the Initial Member in accordance with <u>Section 12.4</u> below. All Servicing following the Closing Date must be performed in accordance with the terms of the Transfer Agreement and this <u>Article XII</u>.

        (b)     [Intentionally Omitted].

12.2.   [Intentionally Omitted].

12.3.   <u>Servicing of Assets</u>.

        (a)     <u>Appointment of Servicer</u>. The Manager (in its individual capacity) has entered into a Servicing Agreement dated the date hereof to provide for the Servicing by the Servicer named therein. Each Servicer, at all times during which it acts as Servicer, must satisfy (and continue to satisfy) the definition of Qualified Servicer. Subject to <u>Section 12.3(b)</u> below (as to Asset Management), <u>Section 12.3(c)</u> below (as to engagement of a JDC Contractor) and <u>Section 3.3</u> of the Transfer Agreement (with respect to the Interim Servicing Period), each Asset must at all times be Serviced, and the Servicing Obligations must be performed, by or through the Servicer (including any Subservicers engaged by the Servicer as permitted hereunder). Subject to the other terms and conditions of this Agreement, the Servicer may be an Affiliate of the Private Owner or of the Manager. The Servicer may engage or retain one or more Subservicers (and any Rated Subservicer may further engage or retain one or more Subservicers), including Affiliates of the Private Owner or of the Manager, to perform certain of its duties under the Servicing Agreement (or applicable Subservicing Agreement), as it may deem necessary and appropriate, by entering into a Subservicing Agreement with each such Subservicer, <u>provided</u> that any Subservicer meets (and at all times continues to meet) the requirements set forth in the definition of Qualified Servicer and the terms of the applicable Subservicing Agreement comply with the terms of the Servicing Agreement and this Agreement. The Servicing Agreement and each Subservicing Agreement must at all times meet the requirements set forth in <u>Section 3</u> of the Servicing Addendum. The costs and fees of the Servicer (and any Subservicers) will be borne exclusively by the Manager in its individual capacity without any right of reimbursement from the Company or the Initial Member (it being understood that the Manager will have the applicable rights to receive, or, if applicable,

58

direct payment of, the Interim Management Fee and Management Fee in accordance with <u>Section 12.5</u> hereof).  Except as expressly permitted with respect to direction of payment of the Interim Management Fee and the Management Fee to the Servicer pursuant to <u>Section 12.5</u>, under no circumstances shall the Manager transfer, or permit to be transferred, to the Servicer or any other Person any ownership interest in any Servicing rights or any right to transfer or sell any Servicing rights, and no Servicer will be permitted to assign, pledge or otherwise transfer to any Subservicer or other Person or purport to assign, pledge or otherwise transfer any interest in any Servicing rights, and any purported assignment, pledge or other transfer in violation of this provision will be void *ab initio* and of no effect.

(b)    <u>Manager Right to Conduct Asset Management</u>.  Notwithstanding the obligation to generally cause all Servicing to be performed by (or through) the Servicer, the Manager will have the right to retain (and not delegate to the Servicer) any or all Asset Management functions by expressly retaining such applicable Asset Management functions pursuant to the Servicing Agreement (including <u>Schedule 2</u> thereto), with all Servicing other than such retained Asset Management being conducted by or through the Servicer.  Any such Servicing (comprised entirely of Asset Management) not so delegated to the Servicer in accordance with the foregoing must be duly performed by the Manager itself (without further delegation, <u>provided</u> that an Affiliate of Manager may perform such functions on behalf of the Manager pursuant to arrangements consistent with the requirements of <u>Section 3.3</u>) in accordance with the Servicing Standard and the provisions herein and in the other Transaction Documents, with the Manager having all obligations (and with the same rights, benefits and protections to the Company, the Initial Member and any third party beneficiary hereof) as though the same were being conducted by the Servicer, such that the Manager, in performance of such Servicing must meet and comply with all qualifications (including qualification as a Qualified Servicer), requirements (including as to insurance) and obligations of the Servicer hereunder (including as to reporting and audit requirements), in all cases without any additional expense to the Company (including as to any applicable insurance, certifications or licenses so required to be obtained or maintained by the Manager as a result of the foregoing).

(c)    <u>Right to Engage JDC Contractors</u>.  Notwithstanding the limitations herein with respect to Servicing being conducted by or through the Servicer, servicing of JDC Loans may be conducted through use of a JDC Contractor to the extent expressly permitted in <u>Section 4</u> of the Servicing Addendum.

(d)    <u>Manager Liable for Servicer, Subservicers and JDC Contractors</u>.  Notwithstanding anything to the contrary contained herein, the use of the Servicer (or any Subservicer or any JDC Contractor) will not release the Manager from any of its Servicing Obligations or other obligations under this Agreement, and the Manager will remain responsible and liable for all acts and omissions of the Servicer (and each Subservicer and JDC Contractor) as fully as if such acts and omissions were those of the Manager.  All actions of the Servicer (or any Subservicer or JDC Contractor) performed pursuant to the Servicing Agreement (or any Subservicing Agreement or relevant subcontract with a JDC Contractor) will be performed as an agent of the Manager (and, as applicable with respect to any Subservicer or JDC Contractor not

59

engaged by the Manager, the Servicer or Subservicer having engaged such Subservicer or JDC Contractor).

(e)    <u>Copies of Servicing and Subservicing Agreements</u>.  Copies of all fully executed Servicing Agreements and Subservicing Agreements, including all supplements and amendments thereto, must be provided to the Initial Member.

(f)    [<u>Intentionally Omitted</u>].

(g)    <u>Servicer and Subservicer Fees</u>.  No Servicer or Subservicer shall be paid any fees or indemnified out of any Asset Proceeds (or funds in any Company Account), it being understood that all fees and related costs or liabilities of the Servicer and Subservicers will be the sole responsibility of the Manager (in its individual capacity), without any right of reimbursement from the Company or the Initial Member (<u>provided</u> that this <u>clause (g)</u> does not prohibit reimbursement to the Manager (in its individual capacity) for Servicing Expenses or Pre-Approved Charges incurred by the Servicer or any Subservicer on behalf of the Manager (in its individual capacity), or payments of Servicing Expenses directly from Asset Proceeds to the extent expressly permitted pursuant to <u>Section 12.7</u>).

(h)    <u>Insurance</u>.  The Servicer and each Subservicer must maintain (and, to the extent the Manager performs any Servicing functions pursuant to <u>Section 12.3(b)</u>, the Manager must, at its sole cost and expense, itself maintain) applicable insurance as required pursuant to (and the Manager must otherwise comply, and cause the Company, each Ownership Entity, each Servicer and each Subservicer to comply, with applicable obligations set forth in) the Insurance Schedule (attached hereto as <u>Annex III</u>).

12.4.    <u>Removal of Servicer, Subservicers and JDC Contractors</u>.

(a)    <u>Removal of Servicer, Subservicers or JDC Contractors</u>.  Upon the occurrence of an Event of Default, in addition to any other rights it may have pursuant to this Agreement, any other Transaction Document or applicable Law (including the Uniform Commercial Code), whether at Law or in equity and whether pursuant to statute or regulation or otherwise, the Initial Member will have the right to take, at the Initial Member's option and the Manager's expense, one or more of the following actions: (i) upon notice in writing to the Manager (effective at such time as is specified in such notice), to act on behalf of the Manager (in its individual capacity) to terminate the existing Servicer (and any Subservicers) and to cause the Manager (in its individual capacity) to enter into a new Servicing Agreement with a servicer (as a successor Servicer) selected by the Initial Member (in its sole and absolute discretion, and whether or not the same qualifies as a Qualified Servicer), (ii) upon notice in writing to the Manager (effective at such time as is specified in such notice), to remove the Private Owner as the Manager and appoint a successor Manager (which successor Manager may be the Initial Member) in the sole discretion of the Initial Member, whereupon (without limitation of <u>Section 13.6</u>), such successor Manager will immediately succeed to all, or such portion as the Initial Member and successor Manager agree, of the rights and obligations of the Private Owner as the Manager of the Company, and, in such case, the Initial Member will further have the right (A) to terminate the

Servicer and any or all Subservicers (in its sole and absolute discretion), and cause or permit the successor Manager selected by the Initial Member (and/or the Company directly, as determined by the Initial Member in its sole discretion) to enter into a Servicing Agreement with a successor Servicer, such Servicing Agreement to be between the applicable successor Manager (and/or the Company) and the successor Servicer chosen by the Initial Member, or (B) to retain the existing Servicer and cause or permit the successor Manager (and/or the Company directly, as determined by the Initial Member in its sole discretion) to enter into a new Servicing Agreement between such successor Manager (and/or the Company) and the Servicer (or to effect an assignment of the existing Servicing Agreement from the existing Manager (in its individual capacity) to such successor Manager (and/or the Company), and (iii) terminate any JDC Contractor and otherwise exercise any applicable rights and remedies under any Assignment of JDC Agreement.  None of the Initial Member, any successor Manager or the Company will have any obligation to assume any obligations or liabilities of the removed Manager, Servicer or JDC Contractor under or in connection with any Servicing Agreement, Subservicing Agreement or JDC Agreement. Notwithstanding the foregoing, the Initial Member will not exercise its right to terminate the Servicer (including Subservicers and JDC Contractors engaged by or through such Servicer) or a JDC Contractor engaged by the Manager, in each case that is not an Affiliate of the Manager or of the Private Owner, in the absence of (1) an Event of Default attributable in whole or in part to the failure by the Servicer (or any Subservicer or JDC Contractor engaged by or through such Servicer) or such JDC Contractor engaged by the Manager, as applicable, to perform any material obligation under its applicable Servicing Agreement, Subservicing Agreement or JDC Agreement, (2) an Event of Default as described in any of clauses (ii), (iii) or (viii) of the definition thereof with respect to the Servicer (or, as applicable, any Subservicer or JDC Contractor engaged by or through the Servicer) or such JDC Contractor engaged by the Manager, (3) an Event of Default resulting from the failure of the Servicer or any of its Subservicers at any time to meet the criteria of a Qualified Servicer (it being understood that this clause (3) does not apply to JDC Contractors engaged by the Manager), (4) a Event of Default as described in clause (vi) of the definition thereof, to the extent relating to the Servicer (or any Subservicer or JDC Contractor engaged by or through the Servicer) or such JDC Contractor engaged by the Manager, (5) any other Event of Default that consists of a breach of a Servicing obligation under this Agreement, or (6) with respect to any JDC Contractor, in addition to the foregoing, any breach or default by such JDC Contractor under the applicable Assignment of JDC Agreement.  Subject to the foregoing, the Manager hereby consents to the immediate termination of the Servicer, any Subservicer and any JDC Contractor upon the occurrence of any Event of Default.  For the avoidance of doubt, the rights of the Initial Member in this Section 12.4 are in addition to, and can be exercised independently of the rights of the Initial Member in Sections 3.2, 3.13, and 3.14; and in any event all rights and remedies of the Initial Member under this Agreement with respect to or following an Event of Default are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any other remedies available to the Initial Member, whether under this Agreement, any other Transaction Document or otherwise.

        (b)        Appointment of Successor Servicer.  If the Initial Member exercises its right to act on behalf of the Manager (in its individual capacity) to appoint a successor Servicer, the costs and expenses associated with such successor Servicer (including any Servicing fees) will be

borne by the Manager (in its individual capacity) (and not the Company or the Initial Member), and no termination or other fee will be due to the Manager (in any capacity) or the Servicer or any Subservicer or JDC Contractor in connection with or as a result of any such action; provided, however, that, if the Initial Member has also exercised its right to remove the Manager (such that such removed Manager no longer has rights to the Management Fee), then, with respect to Servicing fees of such successor Servicer (but not costs and expenses in connection with the replacement of the Servicer with such successor Servicer) such removed Manager will be responsible (in any capacity) only for the portion of such fees that, as of any particular Distribution Date, are in excess of the Management Fee payable to the successor Manager on such Distribution Date.

(c)  Removal of Manager; Management Fee.  If the Initial Member exercises its right pursuant to this Section 12.4 to remove the Private Owner as the Manager and appoint a successor Manager, (i) the successor Manager selected by the Initial Member will immediately succeed to all, or such portion as the Initial Member and successor Manager agree, of the rights and obligations of the Private Owner as the Manager of the Company, and all references in this Agreement to the Private Owner, in its capacity as Manager of the Company, will be deemed to be references to the successor Manager so appointed by the Initial Member, (ii) without limitation of Section 13.6, the Initial Member will have the right to determine, in its sole discretion, the extent, terms and conditions of the appointment of any such successor Manager, including as to compensation (whether from the Initial Member or the Company), indemnification by the Company, term of appointment and removal rights, in each case without the necessity for any consent from the Private Owner or any other Person, and (iii) the successor Manager appointed by the Initial Member will be entitled to be paid the Interim Management Fee or Management Fee (or, in each case, such portion thereof as the Initial Member and the successor Manager agree) in accordance with the terms of this Agreement and the Custodial and Paying Agency Agreement. The removal of the Private Owner as the Manager will not relieve the Private Owner of (x) any of the liabilities or obligations of the Private Owner as Manager to the extent required under the terms of this Agreement to have been paid or performed prior to such removal or (y) any liability the Private Owner may have arising out of any act or omission by the Private Owner as Manager.  No successor to the Private Owner as Manager will have any liability or obligation for any of the matters described in clause (x) or (y) of the preceding sentence, except as may be otherwise specified pursuant to any modification to this Agreement pursuant to Section 13.6.  In connection with any such removal of the Manager, the Initial Member and any successor Manager selected by the Initial Member are each hereby authorized and empowered, as attorney-in-fact or otherwise, to execute and deliver, on behalf of and at the expense of the removed Manager (in its individual capacity), any and all documents and other instruments and to do or take any and all acts necessary or appropriate to effect the termination and replacement of such Manager and the Servicer and, in the event the Initial Member decides to retain a new Servicer, to enter into a new Servicing Agreement between the successor Manager (and/or the Company) and the Servicer or to effect an assignment of the existing Servicing Agreement from the removed Manager (in its individual capacity) to the successor Manager (and/or the Company).

(d)     _Cooperation to Facilitate Transfer_.  In the event any of the Manager, the Servicer or a Subservicer is terminated pursuant to the provisions of this Article XII, the Manager (in its individual capacity) must, and must cause the Servicer (and any Subservicer) to, provide the Initial Member and any successor Manager or Servicer in a timely manner with all documents, records and data (including electronic documents, records and data) requested by the Initial Member or any successor Manager or Servicer to enable such Person to assume the responsibilities as Manager under this Agreement and any applicable Servicing Agreement, and to cooperate with the Initial Member in effecting the termination of the Servicer (or any Subservicer) or the Manager's rights as "Manager" under this Agreement, including, in each case subject to applicable requirements in the Custodial and Paying Agency Agreement, (x) the transfer within one Business Day to such account as the Initial Member may specify of all cash amounts which, at the time, are or should have been credited to the Collection Account or are thereafter received with respect to any Assets or Acquired Property, and (y) the transfer of all lockbox accounts with respect to which payments or other amounts with respect to the Assets are directed or the redirection of all such payments and other amounts to such account as the Initial Member may specify, and (z) the assignment to the Initial Member (or the applicable successor Manager or Servicer as indicated by the Initial Member) of the right to access all such lockbox accounts, the Collection Account and any other account into which Asset Proceeds or Borrower escrow payments are deposited or held. The Manager (in its individual capacity) will be liable for all costs and expenses incurred by the Initial Member or the Company (x) associated with the complete transfer of the Servicing data, (y) associated with the completion, correction or manipulation of Servicing data as may be required to correct errors or insufficiencies in the Servicing data to enable the Initial Member and any successor Manager and successor Servicer (and Subservicers) to service the Assets and Acquired Property properly and effectively, and (z) to retain and maintain the services of a successor Manager or successor Servicer (and any Subservicers), it being understood that, as to the compensation to be paid to the successor Manager (and Servicing fees due and payable to the Servicer or any Subservicer engaged by or through such successor Manager), the removed Manager will be responsible only for the portion of such compensation and fees that, as of any particular Distribution Date, are in excess of the Management Fee payable to the successor Manager on such Distribution Date.  Within a reasonable time after receipt of a written request of the Manager (in its individual capacity) for the same, the Initial Member will provide reasonable documentation evidencing such costs and expenses, but the Initial Member's right to reimbursement of such costs and expenses (and to exercise offset rights under Section 4.6(h) on account thereof) will not be subject to or contingent upon the provision of such documentation.

(e)     [_Intentionally Omitted_.]

(f)     _Power of Attorney_.  The Company hereby irrevocably constitutes and appoints the Initial Member and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact for the purposes of this Agreement and allowing the Initial Member to perfect, preserve the validity, perfection and priority of, and enforce any Lien granted by this Agreement and, after the occurrence and during the continuance of any Event of Default or any default under any other Transaction Document, to exercise its rights, remedies and powers and privileges under this Agreement. This appointment as attorney-in-fact is irrevocable and

coupled with an interest until this Agreement is terminated and the security interests created hereby are released. Without limiting the generality of the foregoing, the Initial Member will be entitled under this Section 12.4(f) to do any of the following if an Event of Default has occurred and is continuing: (i) ask, demand, collect, sue for, recover, receive and give receipt and discharge for amounts due and to become due under and in respect of any or all of the Assets; (ii) file any claims or take any action or proceeding in any court of law or equity that the Initial Member may reasonably deem necessary or advisable for the collection or other enforcement of all or any part of the Assets, defend any suit, action or proceeding brought against the Company with respect to any Asset, and settle, compromise or adjust any such suit, action or proceeding; (iii) execute, in connection with any sale or disposition of the Assets, any endorsements, assignments, deeds, bills of sale or other instruments of conveyance or transfer with respect to all or any part of the Assets; (iv) enforce the rights of the Company under any provision of any Servicing Agreement to the extent permitted thereunder and under the terms of this Agreement; (v) pay or discharge Taxes and Liens levied or placed on the Assets; (vi) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Assets as fully and completely as though the Initial Member were the absolute owner thereof for all purposes; and (vii) do, at the Initial Member's option and the Company's expense, at any time and from time to time, all acts and things that the Initial Member reasonably deems necessary to protect, preserve, or realize upon the Assets and the Initial Member's security interests in any Secured Assets and to effect the intent of this Agreement, all as fully and effectively as the Company might do. Anything in this Section 12.4(f) to the contrary notwithstanding, the Initial Member agrees that it will not exercise any right under the power of attorney provided for in this Section 12.4(f) unless an Event of Default has occurred and is continuing.

12.5.    Interim Management Fee and Interim Servicing Fee; Management Fee.

(a)    Calculation and Payment. For each Due Period ending prior to the Final Monthly Distribution (and as determined separately for each Group of Assets), (i) with respect to any Group of Assets for which the Servicing Transfer Date has not occurred as of the first day of such Due Period, the Company will pay the Interim Management Fee to the Manager and the Interim Servicing Fee to the Initial Member, and (ii) for each Group of Assets for which the Servicing Transfer Date has occurred as of (or occurs on) the first day of such Due Period, the Company will pay the Management Fee to the Manager. Each such payment of any Interim Servicing Fee, Interim Management Fee and Management Fee will be made in the manner described in the Custodial and Paying Agency Agreement (and, as applicable, on the Distribution Date with respect to the applicable Due Period, provided, that to the extent there are insufficient funds in the Distribution Account to pay any applicable Management Fee or Interim Management Fee then payable (including on account of any prior deferred amounts), the amount of such deficiency will be added to the Management Fee or Interim Management Fee, as applicable, that is due on the next succeeding Distribution Date, without the accrual of interest and without the Company being deemed to be in breach of any obligation to pay any such Management Fee or Interim Management Fee, until all such fees so deferred and unpaid have been paid in full).

64

(b)    <u>Manager Right to Direct Payments; Removal of Manager</u>.  Subject to the foregoing requirements (and to all limitations on payments to the Manager, and rights of the Initial Member, as set forth in each of the Transaction Documents), the Manager may, by delivery of written notice to the Paying Agent (with a copy to the Initial Member) direct payment of all or any portion of the Interim Management Fee and the Management Fee to the Servicer if, and only for so long as, (i) there shall not have occurred and be continuing any Event of Default, or any Insolvency Event with respect to the Servicer, (ii) such Servicer is and remains an Affiliate of the Manager, (iii) such assignment is on fair terms and would not result in the Private Owner being in violation of any of its obligations under the Transaction Documents (including the obligation to be and remain a Special Purpose Entity), and (iv) such Servicer has no right (and expressly disclaims any such right) to enforce against the Paying Agent or the Company (or any Person other than the Manager) any such right granted by the Manager for the Servicer to so receive such payment of all or any portion of the Interim Management Fee or the Management Fee. Notwithstanding the foregoing, in the event the Manager is removed and replaced by the Initial Member in accordance with <u>Section 12.4</u> above, the Management Fee and Interim Management Fee will thereafter be payable to the Initial Member or successor Manager, as determined by the Initial Member pursuant to such <u>Section 12.4</u>.

(c)    <u>Sole Compensation of Manager</u>.  For avoidance of doubt (and without limitation of Servicing Expenses and Pre-Approved Charges expressly reimbursable pursuant to the Transaction Documents), the Management Fee and Interim Management Fee (to the extent that applicable duties are not performed by the Transferor during the Interim Servicing Period), as applicable, will be the exclusive compensation from the Company to the Manager for performance of all obligations of the Manager in connection with the administration and management of the Company, the Servicing of the Assets, and performance of Asset Management, including for (i) at the Manager's own cost and expense (other than as to Reimbursable Company Administrative Expenses expressly payable to the Manager pursuant to the Transaction Documents and, for purposes of <u>item (E)</u> below, costs and expenses expressly payable by an applicable Beneficiary pursuant to the Reporting and Access Schedule), (A) making available to the Company applicable employees and other personnel, facilities, office equipment and support services pursuant to <u>Section 3.3</u> hereof (including engaging any other Person for providing the same to the Company), (B) obtaining and maintaining all licenses and registrations, and taking all other required actions, with respect to the good standing, continuation and eventual dissolution of Company and each Ownership Entity pursuant to <u>Section 4.3</u> and <u>Article IX</u> hereof, (C) with respect to any Manager that is also the Tax Representative, performing all obligations as such Tax Representative (it being understood that in no event will the Private Owner or any Manager receive any separate compensation for serving as the Tax Representative), (D) developing and updating all Business Plans, Capital Improvement Plans, Strategic Plan Reports, and Critical Strategy Resolution Business Plans, and otherwise monitoring the Assets (and monitoring any construction, renovation, development, exercise of remedies, foreclosure, disposition or other actions or events with respect to any Asset), and (E) complying with the Reporting and Access Schedule and all other reporting, accounting, audit and record maintenance requirements pursuant to the Transaction Documents, (ii) engaging and maintaining the Servicer, and paying or causing to be paid, at no cost to the Company or the Initial Member (and without any reimbursement from the

65

Company, the Initial Member or otherwise out of Asset Proceeds), all fees or other compensation payable to the Servicer or any Subservicer, (iii) obtaining and maintaining (or, as applicable, causing each Servicer and Subservicer to obtain and maintain), at no cost to the Company or the Initial Member (and without any reimbursement from the Company, the Initial Member or otherwise out of Asset Proceeds), all insurance required pursuant to <u>Section</u> 1 of the Insurance Schedule, (iv) performing (or causing to be performed) all Servicing and Asset Management required to be performed pursuant to this <u>Article XII</u> and other applicable provisions of the Transaction Documents, and (v) paying or causing to be paid, at no cost to the Company or the Initial Member (and without any reimbursement from the Company, the Initial Member or otherwise out of Asset Proceeds), all Excluded Expenses incurred by or through the Manager, the Private Owner, the Servicer, or any Subservicer or any JDC Contractor (including on behalf of the Company).

    12.6.   <u>Working Capital Expenses</u>.  Subject to <u>Section 3.3</u> of the Transfer Agreement (with respect to the Interim Servicing Period, including as to any Interim Servicing Expenses), from and after the Closing Date (and, with respect to each Asset, from and after the Servicing Transfer Date with respect thereto), the Manager must cause the Company to pay, from available Company funds (in the Collection Account, the Working Capital Reserve Account or any other applicable Company Account the funds of which may expressly be used for such purpose, or otherwise through Excess Working Capital Advances funded by the Manager) all amounts due as Servicing Expenses (or, as applicable, Pre-Approved Charges), Required Funding Draws and other Working Capital Expenses in a timely manner, and in each case in accordance with applicable requirements set forth in the Custodial and Paying Agency Agreement (and, as applicable, the Transfer Agreement); <u>provided</u>, <u>however</u>, that anything to the contrary herein or in any other Transaction Document notwithstanding, the Manager will not have an obligation to fund Excess Working Capital Advances for purposes of the payment by the Company of (i) any Pre-Approved Charges, (ii) any Servicing Expenses (or Interim Servicing Expenses) consisting of amounts required for the Company to discharge the Obligations as they become due, or to make applicable indemnification or reimbursement payments owing by the Company to the Initial Member, the Transferor or any other Indemnified Party under the Transaction Documents, in each case to the extent such amounts would not constitute Servicing Expenses (or Interim Servicing Expenses) but for application of <u>clause (f)</u> of the definition of Servicing Expenses (or <u>clause (f)</u> of the definition of Interim Servicing Expenses), or (iii) any specific Servicing Expense relating to an Asset to the extent that the Manager has reasonably determined in accordance with the Servicing Standard that such Servicing Expense, if so paid, when combined with all unreimbursed previous Servicing Expenses, Permitted Capital Improvement Expenses, Required Funding Draws and Pre-Approved Charges with respect to such Asset (and any remaining Interim Servicing Expenses or other amounts owing to the Initial Member (including as Transferor) with respect to its Servicing of such Assets during the Interim Servicing Period pursuant to <u>Sections 2.3, 2.4, 3.1</u> and <u>3.3</u> of the Transfer Agreement), would not ultimately be recoverable from the Asset Proceeds for such Asset. All Working Capital Expenses (and Excess Working Capital Advances for the funding of the same) will be reimbursed in accordance with the Custodial and Paying Agency Agreement.

12.7.    Deposit and Use of Asset Proceeds.

(a)    Deposit Into Collection Account; Netting.  The Manager will cause all Asset Proceeds to be deposited into the Collection Account  within two Business Days of receipt (by or on behalf of the Company, the Manager, the Servicer, any Subservicer or any JDC Contractor), without reduction or setoff; provided, that, (i) the Manager may permit monthly deposits and netting of Asset Proceeds for payment of Servicing Expenses to the extent expressly allowed pursuant to Section 12.7(b) below, and (ii) the Manager, the Servicer and each Subservicer acting in accordance with the Servicing Standard may use Asset Proceeds (or permit such Asset Proceeds to be so used) prior to (or without, as applicable) the deposit of such amounts to the Collection Account (A) in the case of insurance or disposition proceeds relating to specific Collateral for a Loan, for the repair, restoration or replacement of such Collateral by the applicable Borrower or Obligor in accordance with the Asset Documents with respect to such Loan, and (B) in connection with a sale or other disposition of an Asset or an Ownership Entity, for payment of broker fees, escrow fees and other similar closing costs which are Servicing Expenses or Interim Servicing Expenses and appear on the HUD-1 settlement statement (or equivalent closing statement) for such specific sale or other disposition.

(b)    Monthly Deposit Into Collection Account.  In connection with an Asset that is (i) Acquired REO Property with third party property management (engaged, as a Subservicer, in accordance with the Transaction Documents), (ii) Acquired Property leased to and operated by a TRS Entity, or (iii) a JDC Loan for which a JDC Contractor has been engaged, the Manager may, for that specific Asset and to the extent it determines that the same would be in the best interests of the Company in accordance with the Servicing Standard (and taking into account market practice), permit (x) the Asset Proceeds of such specific Asset to be deposited into the Collection Account within one month of the Manager's, the Servicer's, the Subservicer's or the JDC Contractor's receipt thereof, and (y) Servicing Expenses then due and payable with respect to such specific Asset to be paid directly from such Asset Proceeds by the Manager, the Servicer, the Subservicer or the JDC Contractor prior to remittance to the Collection Account (without any such Asset Proceeds being held longer than otherwise expressly permitted herein).

(c)    Reporting of Collection Account Remittance Exceptions.  The Manager will provide written notice to the Initial Member each time the Manager permits a monthly deposit cycle pursuant to Section 12.7(b) above or the Manager (or the Servicer or any Subservicer) otherwise uses (or permits use of) Asset Proceeds pursuant to the proviso to Section 12.7(a) above, in each case setting forth the details thereof, and the Manager will certify that the Manager is and will remain in compliance with all reporting requirements with respect to all such Asset Proceeds. In addition, the Manager will include auditable details of any netting and use of Asset Proceeds under this Section 12.7 in the reporting provided pursuant to the Reporting and Access Schedule.

(d)    Costs That Are Not Reimbursable.  Notwithstanding anything else to the contrary contained in any Transaction Document, without the prior written consent of the Initial Member (which may be withheld, conditioned or delayed in the Initial Member's sole and absolute discretion), in no event may the Manager deduct from the Asset Proceeds, or otherwise use Asset Proceeds (or Company funds) to reimburse itself, the Servicer, any Subservicer or any JDC

67

Contractor or pay for, any Excluded Expenses (all of which must be borne by the Manager in its individual capacity).

12.8.     Collection Account.  On the Closing Date, the Manager must cause the Company to establish the Collection Account with the Paying Agent in accordance with the Custodial and Paying Agency Agreement.  Amounts in the Collection Account will be utilized only as expressly permitted or required herein or in the Custodial and Paying Agency Agreement.

12.9.     Distribution Account.  On the Closing Date, the Manager must cause the Company to establish the Distribution Account with the Paying Agent in accordance with the Custodial and Paying Agency Agreement.

12.10.     [Intentionally Omitted].

12.11.     Working Capital Reserve Account.

(a)     Establishment of Working Capital Reserve Account.  On the Closing Date, the Manager must cause the Company to establish the Working Capital Reserve Account with the Paying Agent for the exclusive purpose of holding the Working Capital Reserve to cover (and maintain applicable reserves for payment of) Working Capital Expenses to the same extent, and in the same order of priority, as are applicable to Asset Proceeds in accordance with the terms hereof and the Custodial and Paying Agency Agreement (and, as of any date of determination, the amount of the Working Capital Reserve will be deemed to be the amount of the funds in such Working Capital Reserve Account).

(b)     Funding Working Capital Reserve.  On the Closing Date, the Initial Member and the Private Owner will fund the Working Capital Reserve in an initial principal amount of the WCR Account Deposit as follows: the Initial Member will deposit cash in the amount of the Initial Member WCR Account Deposit, and the Private Owner will deposit cash in the amount of the Private Owner WCR Account Deposit, which deposits will be made in accordance with the applicable provisions of the Private Owner Interest Sale Agreement.  On each Distribution Date following the Closing Date, the Company will, subject to the terms hereof and of the Custodial and Paying Agency Agreement, fund (or replenish, as applicable) the Working Capital Reserve to the extent of available Asset Proceeds (pursuant to the Priority of Payments and based on the then applicable Working Capital Reserve Target) so as to maintain appropriate Working Capital Reserve levels in accordance herewith.  The Manager, in the exercise of its reasonable discretion and in accordance with the Servicing Standard and requirements in the Transaction Documents (including as to any then applicable Working Capital Reserve Floor), will determine the Working Capital Reserve Target from time to time (taking into account projected Working Capital Expenses, including reasonably required reserves for applicable contingent liabilities as to which applicable reserves should be maintained).  From time to time, the Manager may, and must if required in accordance with the Servicing Standard (including for purposes of maintaining applicable reserves in compliance with Delaware law), submit to the Initial Member a written request for a change (either as a  temporary or permanent increase or reduction) to the amount of the Working Capital Reserve Floor so as to permit the Company to maintain appropriate

levels for the Working Capital Reserve, taking into account the projected (or otherwise reasonably anticipated) Working Capital Expenses (including contingent liabilities as to which, in accordance with the Servicing Standard (including Delaware law), applicable reserves should be maintained). In connection with any such requested change to the Working Capital Reserve Floor, the Initial Member will have the right to receive (and the Manager must promptly comply with any reasonable request for) any additional relevant information as it may deem necessary or advisable for evaluating such request and related Working Capital Reserve levels (and compliance thereof with the requirements herein). Any such requested change to the Working Capital Reserve Floor shall be effective upon, and subject to, receipt by the Manager of an applicable express approval in writing from the Initial Member. The Working Capital Reserve Target shall be specified in each Monthly Report. In the case of each Monthly Report for all Due Periods ending prior to or during the calendar month in which the final Servicing Transfer Date occurs, the Manager shall inform the Initial Member, not later than the third Business Day prior to the Distribution Date in respect of such Due Period, of the Working Capital Reserve Target that should be specified in such Monthly Report.

(c)    Use of Working Capital Reserve. The Manager or (in relation to its interim Servicing rights or obligations) the Initial Member (including as Transferor) may direct the Company to withdraw funds from the Working Capital Reserve Account (including, as applicable, through release of such funds into the Collection Account) only to cover Working Capital Expenses in accordance with Section 3.6 of the Custodial and Paying Agency Agreement. The Manager shall not permit withdrawals from the Working Capital Reserve Account for any other purpose; provided, that, to the extent expressly permitted in the Custodial and Paying Agency Agreement or as otherwise required pursuant to Section 9.2 hereof, the Manager may or will, as applicable, cause the release of funds from the Working Capital Reserve Account (including for purposes of distributions to the Members) in accordance with, and subject to, the terms of the Custodial and Paying Agency Agreement and, as applicable, Section 9.2. With respect to any Group of Assets, on the Servicing Transfer Date, the Initial Member will be reimbursed from the Working Capital Reserve Account (including, as applicable, through release of such funds into the Collection Account) for an amount equal to all Working Capital Expenses paid by it (including as the Transferor) with respect to such Group of Assets at any time after the Cut-Off Date and on or before such Servicing Transfer Date (to the extent the same have not been otherwise reimbursed pursuant to the Transfer Agreement or Custodial and Paying Agency Agreement).

(d)    Changes Following Final Monthly Distribution. In connection with the Final Monthly Distribution, the Working Capital Reserve Target will be the amount determined by the Manager as the applicable amount to be maintained in the Working Capital Reserve pursuant to Section 9.2, and any excess amounts in the Working Capital Reserve will, prior to such Final Monthly Distribution, be transferred to the Collection Account pursuant to Section 3.6 of the Custodial and Paying Agency Agreement. Following the Final Monthly Distribution and continuing until the release of all remaining funds in the Working Capital Reserve and completion of the Final Distribution (if any), the Manager will, in connection with each Monthly Report (as the same may be adjusted for purposes of such period), set forth therein the applicable remaining

69

amount in the Working Capital Reserve, and all distributions and payments made from the Working Capital Reserve.

(e)    Permitted Investments.  The Working Capital Reserve will be invested in Permitted Investments in accordance with the Custodial and Paying Agency Agreement.

12.12.  [Intentionally Omitted].

12.13.  Capital Improvement Account.  The Company Accounts will include a Capital Improvement Account, as further described and governed by the terms set forth in Section 2 of the Permitted Capital Improvement Addendum attached hereto as Annex V (and references in the Transaction Documents to this Section 12.13 will be deemed to include such Section 2 of the Permitted Capital Improvement Addendum).

12.14.  Uses of Company Funds; Development.  Subject to the terms and conditions herein and in the other Transaction Documents, the Company must use Asset Proceeds, Excess Working Capital Advances, and funds in the Capital Improvement Account, the Working Capital Reserve Account, the Collection Account or any other Company Account solely for such purposes as are expressly permitted herein, in the Custodial and Paying Agency Agreement and in the other applicable Transaction Documents.  Accordingly, except as may be required in connection with Required Funding Draws (and subject, as to Servicing Expenses, to clause (x) of the proviso appearing as the last paragraph of the definition of such term), Development of or with respect to any Asset (including by the Company, or by any Borrower using Funding Draws other than Required Funding Draws) with use of Company funds is limited to Permitted Capital Improvements, if any, expressly permitted and funded in accordance with the Permitted Capital Improvements Addendum attached hereto as Annex V (and references in the Transaction Documents to this Section 12.14 will be deemed to include such Permitted Capital Improvements Addendum).  Any further Development with use of Company funds (including by the Company, or by any Borrower using Funding Draws other than Required Funding Draws) not expressly permitted pursuant to the foregoing will require the express prior written approval of the Initial Member (which approval may be granted or withheld in the sole discretion of the Initial Member), following a specific request from the Manager with respect thereto (which request must specify in reasonable detail the applicable requested expenses (including an applicable budget and timeline with respect thereto) and requested sources (including any applicable use of funds in the Collection Account, the Working Capital Reserve Account, the Capital Improvement Fund and any right or obligation to make Excess Working Capital Advances with respect thereto), and any such requested expenses and sources will be permitted only to the extent expressly set forth in the applicable written approval, if any, by the Initial Member.

12.15.  Certain Servicing and Asset Administration Decisions.  The Manager will have full power and authority, acting alone or through the Servicer or any Subservicer or JDC Contractor, to cause to be done any and all things in connection with the Servicing that the Manager may deem necessary or desirable, and cause to be made all Servicing decisions in its reasonable discretion, subject to its obligation to comply with the Servicing Standard and other applicable provisions herein and in the other Transaction Documents.

70

12.16.  <u>Management and Disposition of Collateral</u>.  Subject to the other terms and conditions of this Agreement (including the Servicing Standard), the Manager will have full power and authority, acting alone or through the Servicer and any Subservicer, to cause to be done any and all things in connection with the Manager's management of any Collateral or Acquired Property, that the Manager may deem necessary or desirable, and cause to be made all asset management decisions in its reasonable discretion.  The acquisition, ownership, management and disposition of any such Acquired Property is subject to the terms set forth in <u>Section 5</u> of the Servicing Addendum.

12.17.  [<u>Intentionally Omitted</u>].

12.18.  [<u>Intentionally Omitted</u>].

12.19.  <u>Releases of Collateral</u>.  The Manager is authorized to cause the release or assignment of any Lien granted to or held by the Company on any Collateral upon payment of any Loan in full and satisfaction in full of all of the secured obligations with respect to a Loan, upon receipt of a permitted discounted payoff as payment in full of a Loan, or upon a sale of the Loan to any Person, in each case as and to the extent permitted hereunder.

12.20.  <u>Clean-Up Call Rights</u>.

(a)    The Initial Member will have the right, exercisable in its sole and absolute discretion, to require the liquidation and sale, for cash consideration, of any remaining Assets held by the Company or any Ownership Entity at any time after the earlier to occur of (i) the tenth anniversary of the Closing Date and (ii) the date on which the then Unpaid Principal Balance is 10.0% or less of the Unpaid Principal Balance as of the Cut-Off Date as set forth on the Asset Schedule (such right to cause such liquidation and sale at such time, the "**Clean-Up Call**").

(b)    In order to exercise its rights under this <u>Section 12.20</u>, the Initial Member must give notice in writing to the Manager, setting forth the date by which the remaining Assets are to be liquidated by the Company, which date must be no less than one hundred and fifty calendar days after the date of such notice.  At its option, at any time in connection with or following the issuance of the Clean-Up Call Notice, and without limiting the exercise of the Initial Member's rights under <u>Section 3.13</u> following any Default or Event of Default (including the right to direct remittance of distributions to the Private Owner, whether or not the same have otherwise been withheld pursuant to this <u>Section 12.20(b)</u>), the Initial Member has the right to suspend or withhold any further distributions (and to notify the Paying Agent to suspend or withhold such distributions pursuant to <u>Section 5.1(d)</u> of the Custodial and Paying Agency Agreement) to the Members with respect to their respective LLC Interests (without affecting any distributions for payment or repayment, as applicable, of the Management Fee or Excess Working Capital Advances) until the Final Monthly Distribution or such earlier date as permitted by the Initial Member in its sole discretion.

(c)    The Manager will expeditiously cause the Company to sell or otherwise liquidate the remaining Assets.

71

12.21.  Certain Transfer Obligations.  Without limitation of other obligations of the Manager with respect to the Transfer Agreement, the Manager agrees to cause the Company to comply with its obligations under the Transfer Agreement with respect to preparing, furnishing, executing and recording transfer documents with respect to the Assets (including special warranty deeds to convey the real property subject to any contract for deed and any Acquired Property to the Company).  Any title curative work with respect to such Assets will be at the Company's sole expense, provided that, as set forth in Section 4.10 of the Transfer Agreement, such expense will constitute a Pre-Approved Charge.

12.22.  Seller Financing.  Section 3.4(x) of this Agreement prohibits the extension by the Company, directly or indirectly, of seller financed loans (i.e., the seller accepts a secured promissory note in lieu of cash in payment of all or a portion of the sales price of Acquired Property) ("**Seller Financed Loans**") to purchasers of any Asset, Collateral or Acquired Property (or any portion thereof) without the express prior written consent of the Initial Member, to be granted, withheld or conditioned it its sole and absolute discretion.  Any request by the Manager for any such consent must identify all material terms and conditions of the proposed Seller Financed Loan, provide the form of Seller Financed Loan documents, and  identify any other term or condition that the Initial Member may determine in its reasonable discretion is necessary for it to consider whether to approve such proposed Seller Financed Loan.  Upon the provision of any Seller Financed Loan, the Manager must, or must cause the Company to, promptly deliver each original promissory note (with each Seller Financed Loan being duly evidenced by one or more original promissory notes) and the other original Seller Financed Loan documents to the Custodian.  In the event the Company provides any Seller Financed Loans (or other financing) in violation of this Agreement (including the restriction in Section 3.4(x)), then, in addition to and without any limitation of any of the indemnification obligations under Section 4.6 or any of the other rights or remedies of the Initial Member, the Manager will be required to indemnify and make whole the Company and each Ownership Entity (and, without duplication, each Indemnified Party) for any Losses (including lost profits) they may incur in connection with such Seller Financed Loans (or other financing) or any failure of any borrower or other obligor to comply with any of its obligations thereunder, including any failure to pay principal or interest payable thereunder.

12.23.  Use of the FDIC's Name and FDIC Legal Powers.  The Company must comply with, and the Manager must cause the Company to comply with, the following (with any failure to comply being subject to Section 7.4 of the Transfer Agreement, as if fully set forth herein, *mutatis mutandis*):

(a)    The Company will not use, or permit the use by its agents, successors or assigns or any Ownership Entity of, any name or combination of letters that is similar to "FDIC" or "Federal Deposit Insurance Corporation."  The Company will not represent or imply, and will ensure that no Ownership Entity represents or implies, that it is affiliated with, authorized by or in any way related to the FDIC except that (i) the Company may reference the FDIC (including in litigation) in connection with ownership issues regarding the Company's acquisition, or the FDIC's

72

retention of assets or liabilities, and (ii) for so long as the FDIC is a Member of the Company, the Company may represent that fact.

(b)    (i)    Subject to the terms of Section 12.23(b)(ii), the Company will not in any manner assert, plead, use or refer to or describe, and will ensure that no Ownership Entity, in any manner asserts, pleads, or uses, refers to or describes any FDIC Legal Power in any Action or in writing to any third party; provided, however, that this Section 12.23 does not preclude the assertion of, and the Company and the Ownership Entities may assert and claim the benefit of, the statute of limitations established under 12 U.S.C. §1821(d)(14) or any jurisdictional defect or lack of jurisdiction (including under 12 U.S.C. §1821(d)(13)(D)).

(ii)    The Company will not make, and will ensure that no Ownership Entity makes, any Interpretive Statement except in strict accordance with this Section 12.23(b). If the Company or any Ownership Entity desires to make an Interpretive Statement, the Company agrees that any such Interpretative Statement may be made only (A) upon (1) delivery of written notice of its desire to make such Interpretative Statement, including in such notice a draft of the Interpretative Statement and a corresponding legal analysis supporting the interpretations therein, to the FDIC no less than ten Business Days prior to the date upon which the Company proposes to make such Interpretative Statement, and (2) the receipt, prior to the Company or any Ownership Entity making such proposed Interpretive Statement, by the Company of the FDIC's written consent thereto, which consent will not be withheld so long as the interpretation set forth in the proposed Interpretive Statement is, in the FDIC's sole and absolute discretion, consistent with the FDIC's interpretation, and (B) under the oversight, and at the direction of, the FDIC.

(iii)    The Company must, and must cause each Ownership Entity and counsel to the Company and or any Ownership Entity to: (A) comply in all respects with (1) all of the FDIC's directions regarding any Interpretive Statement, and (2) all protocols, directives or interpretive memoranda issued from time to time by the FDIC, (and any amendment, modification or replacement thereof or successor thereto) that the FDIC has notified the Company in writing that must be complied with in connection with making an Interpretive Statement; and (B) with respect to any Action in which the Company or any Ownership Entity has made an Interpretive Statement, notify the FDIC (1) immediately of any judgment or significant order issued therein and (2) upon the FDIC's request, of the status thereof.

(c)    For so long as the FDIC (in any capacity) is Initial Member, any notice to or consent by the FDIC pursuant to this Section 12.23 may be sent to and provided by, as applicable, the Initial Member.

## ARTICLE XIII
## Miscellaneous

13.1.    Common Terms.  The Common Terms apply to this Agreement, except that (a) Sections 2.1(c) (Expenses), 2.1(d) (Binding Effect; Assignment), 2.1(i) (Entire Agreement), 2.1(k) (Amendments and Waivers) and 2.1(m) (Governing Law) of such Common Terms do not apply to

73

this Agreement, and (b) in the event of a conflict between any provision of the Common Terms and any provision in this Agreement, the terms of this Agreement will prevail.

13.2.    <u>Waiver of Rights of Partition and Dissolution</u>.  Each Member (other than the Initial Member) hereby irrevocably waives all rights it may have at any time to maintain any action for division or sale of the Company Property as now or hereafter permitted under any applicable Law. Each Member (other than the Initial Member) hereby waives and renounces its rights to seek a court decree of dissolution or to seek the appointment of a court receiver for the Company as now or hereafter permitted under any applicable Law.

13.3.    <u>Entire Agreement; Other Agreements</u>.

(a)    This Agreement, together with the Annexes and Exhibits hereto and the other Transaction Documents (and any other agreements expressly contemplated hereby or thereby), constitutes the entire agreement and understanding, and supersedes all other prior agreements and understandings, both written and oral, between the Members or their respective Affiliates or any of them and the Company with respect to the subject matter hereof; <u>provided</u>, <u>however</u>, that any confidentiality agreement between the FDIC and the Private Owner or any Affiliates of the Private Owner (including by way of joinder) with respect to the transaction that is the subject of this Agreement and the other Transaction Documents (including each Confidentiality Agreement) will remain in full force and effect to the extent provided therein.  The Members acknowledge that certain agreements or other instruments are being (or were) executed by the Company, the Members and/or Affiliates of the Members simultaneously or otherwise in connection with the execution of this Agreement and that notwithstanding anything to the contrary contained in the foregoing sentence of this <u>Section 13.3</u>, such agreements will be effective and binding on the parties thereto in accordance with the terms thereof.

(b)    By executing this Agreement, the Manager agrees to be bound by the terms of the Transaction Documents pursuant to which the Manager is expressly required to take or omit from taking certain actions, as in each case, with the same effect as if the Manager were a party to such Transaction Document.

13.4.    <u>Third Party Beneficiaries</u>.  Each of the FDIC and the Receiver is hereby constituted an express third party beneficiary of this Agreement with respect to those provisions of this Agreement which expressly grant rights or benefits to such Person in accordance with <u>Section 2.1(p)</u> of the Common Terms.  Each Person ceasing to constitute the "Initial Member" under this Agreement (as a result of a Disposition of its LLC Interest) will remain a third party beneficiary of this Agreement with respect to <u>Section 4.6</u> and, as such is entitled to enforce <u>Section 4.6</u> as if such Person remained a party hereto.  For the avoidance of doubt, in furtherance and without limitation of the preceding sentence, each Person comprising the "Initial Member" pursuant to the last sentence of the second paragraph of <u>Section 4.6(a)</u>, and each other Indemnified Party (other than a Person that is an Indemnified Party solely by being a Related Person of another Indemnified Party), may enforce the provisions of <u>Section 4.6</u> with respect to any Related Person in relation to itself (in its own name or in the name of or otherwise on behalf of such other Related Person). Subject to <u>Section 11.1</u> and to the preceding provisions of this <u>Section 13.4</u>, (A) this Agreement is

74

for the benefit solely of, and will inure solely to the benefit of, the Members and the Company, and (B) this Agreement is not enforceable by any Person (including any creditor of the Company or of any Member) other than the Members and the Company.

13.5. <u>Expenses</u>. Except as may otherwise be expressly provided herein or in any other Transaction Document, each Member will pay its own expenses (including legal, accounting investment banker, broker or finder's fees) incident to the negotiation and execution of this Agreement and the other Transaction Documents, the consummation of the transactions contemplated by <u>Section 2.3</u> hereof and the performance of its obligations hereunder.

13.6. <u>Waivers and Amendments</u>.

(a) This Agreement may be amended or modified, and the terms hereof may be waived, only by a written instrument signed by all Members; <u>provided</u>, <u>however</u>, that, following an Event of Default, from time to time this Agreement may be amended or modified, or the terms hereof may be waived, in each case, by a written instrument signed only by the Initial Member as long as such amendment, modification or waiver would not (i) adversely affect the Private Owner's or the Company's limited liability status; (ii) adversely affect the Private Owner's share of the Company's distributions, income, gains or losses; (iii) impose on the Private Owner any additional obligations or (iv) amend <u>Section 3.13</u> or this <u>Section 13.6</u>; <u>provided further</u>, that in no event will any amendment, modification or waiver, limit or otherwise adversely affect the rights or benefits expressly granted in this Agreement to (x) any Person comprising the "Initial Member" pursuant to the last sentence of the second paragraph of <u>Section 4.6(a)</u> (or any other Related Persons in relation to such Person) without the express written consent of such Person so comprising the "Initial Member" or (y) a third party beneficiary of this Agreement (to the extent such third party beneficiary is, and remains, a third party beneficiary pursuant to <u>Section 13.4</u> above and, as applicable, <u>Section 2.1(p)</u> of the Common Terms), or any Related Person in relation to such third party beneficiary, without the express written consent of such third party beneficiary. Except where a specific period for action or inaction is provided herein, no failure on the part of a Person to exercise, and no delay on the part of a Person in exercising, any right, power or privilege hereunder will operate as a waiver thereof; nor will any waiver on the part of such Person of any such right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(b) [Intentionally Omitted.]

(c) Notwithstanding anything to the contrary contained elsewhere in this Agreement (including the foregoing <u>Section 13.6(a)</u>) or in any other Transaction Document), this Agreement may be amended or modified by a written instrument signed only by the Initial Member to the extent determined by the Initial Member in good faith to be necessary or desirable in order to facilitate any Disposition by the Initial Member of only a portion of the Initial Member Interest, or a Disposition by the Initial Member of the entire Initial Member Interest to more than one Person, including to provide for more than two Persons being members of the Company, <u>provided</u> that no such amendment or modification shall (i) adversely affect the Private Owner's or the

75

Company's limited liability status; (ii) adversely affect the Private Owner's share of the Company's distributions, income, gains or losses; (iii) impose on the Private Owner any additional obligations or (iv) amend Section 3.13 (other than to the extent that such amendment or modification amends or modifies which member or members of the Company constitute the "Initial Member" hereunder) or this Section 13.6.

13.7.    Successors and Assigns.    Except as otherwise specifically provided in this Agreement (including in Article VIII), this Agreement will be binding upon and inure to the benefit of the Members and the Company and their respective Successors and assigns.  Without limitation of Section 8.4, this Agreement, as in effect on the date that any particular Person ceases to be Member, will continue to bind such Person in relation to the period during which it was Member.

13.8.    Power of Attorney.

(a)    The Private Owner does hereby constitute and appoint the Manager as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, deliver or file any certificate, document or other instrument that the Private Owner is required to execute and deliver pursuant to clauses (i), (ii), (iii) or (iv) of Section 4.3 hereof.  The foregoing notwithstanding, the Manager does not have any right, power or authority to amend or modify this Agreement.  The power of attorney granted hereby is coupled with an interest and will, unless revoked pursuant to Section 13.8(c), (i) survive and not be affected by the subsequent death, incapacity, disability, dissolution, termination or bankruptcy of the Private Owner granting the same or the transfer of all or any portion of the Private Owner Interest and (ii) extend to the Private Owner's Successors, assigns and legal representatives.

(b)    The Company hereby grants to the Manager a limited power of attorney to execute all documents on its behalf in accordance with the Servicing Standard set forth above and as may be necessary to effectuate the Manager's obligations under Article XII until such time as the Company revokes said limited power of attorney.

(c)    Revocation of any power of attorney granted pursuant to Section 13.8(a) or limited power of attorney granted pursuant to Section 13.8(b) will occur in the event of, and take effect upon, (i) the receipt by the Manager of written notice thereof from the Initial Member, or (ii) removal of the Manager in accordance with the terms of this Agreement; provided, however, in the event of such removal, any such power of attorney will thereafter automatically be vested in the successor or replacement Manager appointed in accordance with this Agreement.

13.9.    Governing Law.  THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAWS OF ANOTHER JURISDICTION, AND EACH PARTY TO THIS AGREEMENT UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAWS OF ANY OTHER JURISDICTION GOVERN THIS AGREEMENT.  In the event

of a direct conflict between the provisions of this Agreement and any mandatory, non-waivable provision of the Act, such provision of the Act will control to the extent necessary to eliminate such direct conflict.  Nothing in this Agreement will require any unlawful action or inaction by any Person.

13.10.  <u>Jurisdiction; Venue and Service</u>.  Section 2.1(l) (Jurisdiction and Venue) of the Common Terms is hereby incorporated by reference; provided, that for purposes of this Agreement, all references to the "Supreme Court of the State of New York" or "Supreme Court of the State of New York, County of New York" appearing in <u>clauses (ii), (ii)(B), (ii)(C) and (iv)</u> thereof will mean and refer to the "Chancery Court of the State of Delaware".

13.11.  <u>Private Owner Acknowledgement</u>.  Without in any way creating any enforceable right for the Private Owner (with any such right being expressly waived) or any other Person, the Private Owner hereby acknowledges that the Initial Member, in making determinations pursuant to or in connection with this Agreement and the other Transaction Documents, including as to exercising discretion or providing (or withholding) consents, may take into account such criteria and objectives as it determines in its sole discretion as relevant for its purposes, which may include maximizing Asset value, maximizing the preservation of the availability and affordability of residential real property for low-and-moderate-income individuals, and/or such other criteria as the Initial Member may so determine to be relevant.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

77

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or agents thereunto duly authorized on the date first above written.

**Initial Member**

**FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR SIGNATURE BRIDGE BANK, N.A.**

By:_____
Name: Colette Campagna
Title:  Senior Asset Marketing Specialist

**Company**

**SIG RCRS C MF 2023 VENTURE LLC**

By: Federal Deposit Insurance Corporation in its capacity as receiver for Signature Bridge Bank, N.A., as Sole Member and Manager

By:_____
Name: Colette Campagna
Title:  Senior Asset Marketing Specialist

[Signature Page to Amended and Restated Limited Liability Company Agreement - Page 1 of 2]

**<u>Private Owner</u>**

**SIG-23 PRIVATE OWNER LLC**


By: _____
Name: Rafael Cestero
Title:   Authorized Signatory

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

## **Annex I**

## **Member Schedule**

| Member | Percentage Interests | Capital Contributions to Working Capital Reserve Account | Capital Contributions to Capital Improvement Account |
|---|---|---|---|
| Initial Member | 95% | $204,489,896.02 | $408,979,792.05 |
| Private Owner | 5% | $10,762,626.11 | $21,525,252.21 |

I-1

**Annex II**

**Reporting and Access Schedule**

For purposes of the LLC Operating Agreement (and any incorporation of all or any portion of this Reporting and Access Schedule therein), references in this Annex II (i) to this "Agreement" mean and refer to the LLC Operating Agreement, (ii) to the "Applicable Agreements" mean and refer to the LLC Operating Agreement (or, as applicable, the Servicing Agreement or any Subservicing Agreement), (iii) to the "Beneficiaries" mean and refer to the Initial Member and the FDIC (and the term "Beneficiary" has a correlative meaning) or (iv) to an "Event of Default" mean and refer to an "Event of Default" as defined in the LLC Operating Agreement.

1.    Maintenance of Books and Records.

(a)    Maintenance of Books and Records. (i) At all times during the continuance of the Company (and thereafter, subject to Section 1(c) below), the Manager must cause to be kept and maintained in an accessible manner (including by the Servicer, any Subservicer, any JDC Contractor and any Ownership Entity and including records transferred by the Transferor to the Company in connection with its conveyance of the Assets to the Company under the Transfer Agreement), at all times, at the Company's chief executive office referred to in Section 2.4 of the LLC Operating Agreement, a complete and accurate set of files, books and records regarding the Assets and the Collateral, and the Company's and any Ownership Entity's interests in the Assets and the Collateral, including the Company's general ledger, records relating to each Company Account, the Escrow Accounts, the disbursement of all Asset Proceeds and all other amounts disbursed from any Company Account. This obligation to maintain a complete and accurate set of records encompasses all files in or subject to the Manager's or the Company's custody, possession or control pertaining to the Assets or the Collateral, including (except as required to be held by the Custodian pursuant to the Custodial and Paying Agency Agreement) all original and other documentation (or, to the extent any original documentation must be given to any other Person, copies of such original documentation) pertaining to the Assets, the Collateral, all documentation relating to items of income and expense pertaining to the Assets, or the Collateral, and all of the Manager's (and the Servicer's and any Subservicer's and any JDC Contractor's) internal memoranda pertaining to the Assets or the Collateral. The books of account must be maintained in a manner that, and the Manager must cause to be maintained a system of internal controls and procedures that, provides reasonable and sufficient assurance: (A) that transactions of the Company are executed in accordance with, and only in accordance with, the general or specific authorization of management of the Manager consistent with the provisions of the LLC Operating Agreement; (B) that transactions of the Company are recorded in such form and manner as will: (x) permit preparation of federal, state and local income and franchise tax returns and information returns in accordance with the LLC Operating Agreement and as required by Law; (y) permit preparation of the Company's financial statements in accordance with GAAP and as otherwise set forth herein and the provisions of the reports required to be provided hereunder; and (z) maintain accountability for the Company's assets, (C) regarding the prevention or timely detection of any unauthorized, and non-de minimis, acquisition, use or disposition of assets of the

II-1

Company or any Ownership Entity; and (D) that any material information regarding the business or affairs of the Company is accumulated, recorded, processed, summarized and reported to management of the Manager in a timely manner. For purposes of the preceding sentence "transactions of the Company" include (without limitation) all transfers of funds out of, into, or between, Accounts (to the extent that the Manager has discretion with respect thereto), including all determinations as to the amount of the Working Capital Reserve Target and Capital Improvement Fund Target, submissions of Capital Improvement Approval Requests, the making of any discretionary Excess Working Capital Advance, and the making of any sale or other Disposition of an Asset.

(ii)    Without limiting the generality of <u>Section 1(a)(i)</u> above, the obligation to cause to be kept and maintained a complete and accurate set of records as set forth in <u>Section 1(a)(i)</u> in any event will include the obligation to cause each of the following to be maintained (including by the Servicer or applicable Subservicers or JDC Contractors):  (A)(x) accurate records reflecting the status of ground rents, Taxes, assessments, water rates, sewer rents, and other charges which are or may become a Lien upon any Acquired Property or Mortgaged Property (or any other Collateral) and the status of fire and hazard insurance coverage and all bills for the payment of such charges (including renewal premiums), and (y) with respect to any such Mortgaged Property (or other Collateral), accurate records, in reasonable detail, of all determinations as to whether (or not) to pay any of the foregoing on behalf of any Borrower, and the basis (and back-up documentation) for such determinations, (B) accurate records, in reasonable detail, of the results of site inspections of any Mortgaged Property or Acquired REO Property, (C) accurate records, in reasonable detail, of all determinations as to whether (or not) to transfer (or cause to be transferred) funds out of, into, or between, Accounts (to the extent that the Manager has discretion with respect thereto), including all determinations as to the amount of the Working Capital Reserve Target (and applicable determinations with respect to contingent liabilities and other projected expenditures for which applicable reserves should be maintained in the Working Capital Reserve) and Capital Improvement Fund Target, to submit a Capital Improvement Approval Request, or to make any discretionary Excess Working Capital Advance, and the basis (and back-up documentation) for all such determinations, (D) accurate records, in reasonable detail, of all determinations as to whether (or not) to effect any proposed sale or other Disposition of an Asset, and the basis (and back-up documentation) of such determination, (E) accurate records, in reasonable detail, of any determination described in (x) <u>clause (ii)</u> of the penultimate sentence of <u>Section 5.3(b)</u> of the Servicing Addendum or (y) <u>Section 5.1(b)</u> of the Servicing Addendum, including of the basis of any such determination, and (F) accurate records, in reasonable detail, of all other determinations that are material to the Company.

(b)    <u>Retention of Books and Records</u>.  The Manager must cause all books and records required at any time to be kept or maintained pursuant to <u>Section 1(a)</u> above to be and remain property of the Company (and hereby acknowledges and agrees that the same will at all times be property of the Company), and to be maintained and retained until the date that is the later of six years after the Closing Date and three years after the Final Distribution.  All such books and records (including any such books and records maintained by a Servicer, any Subservicer or any JDC Contractor, and any such books and records held or maintained on any applicable servicing system maintained by any such Person), must be available during such period for inspection by

each Beneficiary or any of its representatives (including any Governmental Authority) and agents at the Company's chief executive office referred to in <u>Section 2.4</u> of the LLC Operating Agreement at all reasonable times during business hours on any Business Day (or, in the case of any such inspection after the term of this Agreement, at such other location as is provided by notice to the Beneficiaries), in each instance upon two Business Days' prior notice to the Manager.  Upon request by any Beneficiary, the Manager must promptly send copies (the number of copies of which must be reasonable) of such books and records to such requesting Person or its designee. The Manager must provide each Beneficiary with reasonable advance notice of the Manager's intention to destroy or dispose of any documents or files relating to the Assets and, upon the request of any Beneficiary, must allow such requesting Person to recover the same (or copies thereof) from the Company and in the case the FDIC (in any capacity) and any other Beneficiary (that is not the FDIC) so request the same, the FDIC will have the right to recover such documents or files, but any such other Beneficiary will have the right to make copies of such applicable documents or files so long as such copies are made while such documents or files remain with the Manager or the Company (and prior to recovery of the same by the FDIC).  Any expense incurred by a Beneficiary and any reasonable out-of-pocket expense incurred by the Company in connection with the exercise by such Beneficiary of its respective rights in this <u>Section 1(b)</u> to recover or make (or otherwise receive) copies of books, records, documents or files will be borne by such Person so exercising such rights; <u>provided</u>, <u>however</u>, that any expense incident to the exercise of such rights pursuant to this <u>Section 1(b)</u> as a result of or during the continuance of an Event of Default will in all cases be borne by the Private Owner (except to the extent such Event of Default is attributable exclusively to a Manager having been appointed by such Beneficiary (in any capacity) following removal of the Private Owner in such applicable capacity, or to any applicable Servicer (and any of its Subservicers) or JDC Contractor having been engaged by such Beneficiary (in any capacity), the Company or the applicable replacement Manager following such removal of the Private Owner as the Manager, in each case that is not an Affiliate of the Private Owner).

(c)     <u>Continuing Obligations Following Termination of the Company</u>.  The obligations in this <u>Section 1</u> will survive the dissolution and termination of the Company pursuant to <u>Article IX</u> of the LLC Operating Agreement, for the remainder, if any, of the period specified in the first sentence of <u>Section 1(b)</u> above; <u>provided</u> that, with respect to any such period following the dissolution and termination of the Company, (i) the Manager, as part of its continuing obligations pursuant to <u>Article IX</u> of the LLC Operating Agreement, will be responsible for all obligations of both the Manager and the Company under this <u>Section 1</u>, and (ii) all files, books and records required pursuant to this <u>Section 1</u> to be kept or maintained at the Company's chief executive office will be kept or maintained by the Manager (on behalf the Company as so dissolved and terminated) at a location of the Manager or an Affiliate thereof in the United States having been notified reasonably in advance in writing to the Beneficiaries.

2.     <u>Financial Statements</u>.

(a)     <u>Annual Financial Statements</u>.  As soon as practicable following, but no later than ninety  days immediately after, the end of each Fiscal Year (commencing with respect to the 2024 Fiscal Year), the Manager must prepare and deliver to each Beneficiary an audited consolidated balance sheet of the Company and the Ownership Entities as of the end of such Fiscal

Year, and audited consolidated statements of operations and cash flow of the Company and the Ownership Entities for such Fiscal Year, each prepared in accordance with GAAP and accompanied by the Accountants' report and opinion thereon, which report and opinion must be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit.  If not included in any such audited financial statements, the Manager must, together with the delivery of such audited financial statements, deliver to the Initial Member a separate schedule setting forth (separately) the value of each Loan and Acquired REO Property held by the Company or any Ownership Entity as of the end of the relevant Fiscal Year, in each case as reflected in (or otherwise consistent with) such audited financial statements.

(b)    <u>Mid-Year Financial Information</u>.  As soon as practicable following, but no later than forty-five days immediately after, the end of the second quarter of each Fiscal Year (commencing with the two-quarter period ending on or about June 30, 2024), the Manager must prepare and deliver to each Beneficiary the unaudited consolidated balance sheet of the Company and the Ownership Entities as of the end of such two-quarter period, and unaudited consolidated statements of operations and cash flow of the Company and the Ownership Entities for such two-quarter period (for the first such report, also covering the period from the Closing Date through the end of such second quarter), each prepared in accordance with GAAP.

(c)    <u>Final Audited Financial Statements</u>.  Upon request by the Initial Member in connection with the dissolution and termination of the Company pursuant to <u>Article IX</u> of the LLC Operating Agreement or any disposition by the Initial Member of its interests in the Company, the Manager will, within the applicable time frame requested by the Initial Member, prepare and deliver to the Initial Member, a final audited consolidated balance sheet of the Company and the Ownership Entities as of the applicable date selected by the Initial Member, and audited consolidated statements of operations and cash flow of the Company and the Ownership Entities for such period (without duplication of any period covered by any audited statements previously delivered pursuant to <u>Section 2(a)</u> above) requested by the Initial Member, each prepared in accordance with GAAP and accompanied by the Accountants' report and opinion thereon, which report and opinion will be prepared in accordance with generally accepted auditing standards and will not be subject to any qualification or exception as to the scope of such audit.

3.    <u>Additional Reporting and Notice Requirements</u>.

(a)    <u>Manager's Duty to Initial Member; Delivery of Certain Notices</u>.  In addition to such other reports and access to books, records and reports as are required to be provided under this Agreement, the Manager must cause to be delivered to each Beneficiary such information as is specified in <u>Exhibit B</u> to the LLC Operating Agreement (in addition to the Monthly Report) and such other information relating to the Assets, the Collateral, the Company, the Servicer, any Subservicers and any JDC Contractors as such Beneficiary may reasonably request from time to time and, in any case, must ensure that each Beneficiary is promptly advised, in writing, of any matter of which the Manager, the Servicer, any Subservicer or any JDC Contractor becomes aware relating to the Assets, the Collateral, each Company Account, the Escrow Accounts, or any Borrower or Obligor that materially and adversely affects the interests of the Initial Member under any Transaction Document.  Without limiting the generality of the foregoing, the Manager (i) must

cause to be delivered to each Beneficiary (w) information indicating any possible Environmental Hazards with respect to any Collateral, Acquired REO Property or other Assets, (x) information regarding any material contingent liability for which reserves should, in accordance with the Servicing Standard, be maintained by the Company or any Ownership Entity, (y) any notice or report provided to the Company or the Manager pursuant to Section 5.5 of the Servicing Agreement as in effect on the Closing Date (or pursuant to any other provision of the Servicing Agreement comparable to this Section 3(a)) and (z) such information and certificates (including officers' certificates of the Private Owner) regarding compliance of the Private Owner with the requirements of Sections 8.2 and 10.1 of the LLC Operating Agreement as such Beneficiary may request from time to time, and (ii) in any event must immediately notify each Beneficiary in writing of any failure or cessation of the Private Owner to satisfy the requirements of Sections 8.2 and 10.1 of the LLC Operating Agreement, provided that any failure of the Manager to so provide such immediate notice under this clause (ii) will not be deemed a breach of this Agreement so long as the relevant information with respect thereto is included in the applicable Monthly Report for the period including the date on which such failure occurred (so long as such Monthly Report is timely delivered in accordance herewith). To the extent that any Beneficiary requests information which is dependent upon obtaining such information from a Borrower, Obligor or other third party, the Manager must cause to be made commercially reasonable efforts to obtain such information but it will not be a breach by the Manager of this Agreement if the Manager fails to cause such information to be provided to such Beneficiary because a Borrower, Obligor or other Person has failed to provide such information after such efforts have been made.

(b)    Monthly Reports. On or prior to the day which is five Business Days prior to the Distribution Date for each month (or other applicable Due Period), commencing on the Distribution Date following the calendar month in which the Closing Date occurs, the Manager must deliver or cause the Company to deliver to the Paying Agent and to each Beneficiary the Monthly Report (in the form set forth in Exhibit B to the LLC Operating Agreement, and as may be updated from time to time in accordance herewith) with respect to the relevant Due Period, which Monthly Report must include the Cash Flow and Distribution Report specifying the amounts and recipients of all funds to be distributed by the Paying Agent on such Distribution Date; provided, however, that (unless the Company and the Initial Member agree otherwise) the Initial Member (including as Transferor) will prepare and deliver to the Initial Member and to the Paying Agent each such Monthly Report (including a Cash Flow and Distribution Report) on behalf of the Company for all Due Periods ending on or before the last occurring Servicing Transfer Date (provided, further, however, that with respect to each such Monthly Report, the Manager must (with respect to information relating to all Groups of Assets other than those for which the Interim Servicing Period has not ended) cooperate with the Initial Member in preparing such Monthly Report or will provide to the Initial Member on a timely basis information needed to enable the Initial Member to prepare the Monthly Report). The Manager also must cause each Beneficiary to be furnished with the Custodian and Paying Agent Report in accordance with the terms of the Custodial and Paying Agency Agreement. Each Monthly Report (including the Cash Flow and Distribution Report) prepared and delivered by the Manager must be certified by the chief financial officer (or an equivalent officer) of the Manager. Each Monthly Report prepared and delivered by the Manager must also include a certification of the Manager that all withdrawals by the Manager from the Collection Account (or, following the Final Monthly Distribution, the Working Capital

Reserve) during such Due Period were made in accordance with the terms of the LLC Operating Agreement and the Custodial and Paying Agency Agreement.

(c)    Annual Compliance Certificates.  The Manager must, and must cause the Servicer and any Subservicer to, deliver to each Beneficiary on or before March 15 of each year, commencing in the year 2025, an officer's certificate stating, as to the signer thereof, that (i) a review of such party's (in the case of the Manager, for the avoidance of doubt, in any capacity under this Agreement) activities during the preceding Fiscal Year (or other applicable period as set forth below in this Section 3(c)) and of its performance under the Applicable Agreements has been made under such officer's supervision, and (ii) to the best of such officer's knowledge and belief, based on such review, such party (in the case of the Manager, for the avoidance of doubt, in any capacity under this Agreement) has fulfilled all of its obligations under the Applicable Agreements in all material respects throughout such year (or other applicable period as set forth below in this Section 3(c)) or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure and the nature and status thereof.  The first such officer's certificate must cover the period commencing on the Closing Date (and with respect to each Asset, must include relevant information with respect thereto for the period commencing on the Servicing Transfer Date for such Asset) and continuing through the end of the 2024 Fiscal Year.  In the event the Servicer or any Subservicer was terminated, resigned or otherwise performed in such capacity for only part of a year (or other applicable period, as the case may be, with respect to the period commencing, with respect to any Asset, on the applicable Servicing Transfer Date through the end of the 2024 Fiscal Year), such party must provide an officer's certificate pursuant to this Section 3(c) with respect to such portion of the year (or other applicable period).

(d)    Annual Compliance Report.  On or before March 15 of each year, commencing in the year 2025, the Manager must (including by causing the Servicer and each Subservicer to) provide to each Beneficiary a report prepared by a nationally recognized firm of independent certified public accountants to the effect that, with respect to the prior Fiscal Year (or other applicable period as set forth below), such firm has examined certain records and documents relating to compliance with the servicing requirements in the LLC Operating Agreement and the Servicing Agreement and that, on the basis of such examination conducted substantially in compliance with either the Uniform Single Attestation Program for Mortgage Bankers or Item 1122 of Regulation AB, such firm is of the opinion that the Manager's or its Servicer's or Subservicers' activities have been conducted in compliance with the LLC Operating Agreement (including, to the extent applicable pursuant to Section 2.3 of the Servicing Addendum, Regulation AB) and the Servicing Agreement, or that such examination has disclosed no material items of noncompliance except for (i) such exceptions as such firm believes to be immaterial, and (ii) such other exceptions as are set forth in the report.  The first such reports must cover the period commencing on the Closing Date (and with respect to each Asset, must include the relevant information with respect thereto for the period from the applicable Servicing Transfer Date) and continuing through the end of the 2024 Fiscal Year.

(e)    Audits.  Until the later of the date that is six years after the Closing Date and the date that is three years after the Final Distribution, the Manager must, and must cause the

Servicer and each Subservicer and JDC Contractor to, (i) provide any representative of any Beneficiary (including any Governmental Authority), during normal business hours and on reasonable notice, with access to all of the books of account, reports and records relating to the Assets, any Collateral, the Servicing Obligations, the Company Accounts, the Escrow Accounts, disbursements under the Custodial and Paying Agency Agreement, distributions hereunder or any other matters relating to, or the rights or obligations pursuant to, this Agreement or the other Transaction Documents; (ii) permit such representatives to make copies of and extracts from the same, (iii) allow each Beneficiary to cause such books to be audited by accountants selected by such Beneficiary, and (iv) allow each Beneficiary's representatives to discuss the Company's, the Manager's the Servicer's, any Subservicer's and any JDC Contractor's affairs, finances and accounts, as they relate to the Assets, the Collateral, the Servicing Obligations, the Company Accounts, the Escrow Accounts, the Capital Improvement Account, or any other matters relating to this Agreement, the other Transaction Documents, or the rights or obligations hereunder or thereunder, with the Company's, the Manager's, the Servicer's, any Subservicer's and any JDC Contractor's officers, directors, employees, attorneys and accountants (and by this provision the Company and the Manager hereby irrevocably and unconditionally authorize the respective accountants of the Company, the Manager, the Servicer, any Subservicer and any JDC Contractor to discuss such affairs, finances and accounts with such representatives).  Any expense incurred by any Beneficiary and any reasonable out-of-pocket expense incurred by the Company in connection with the exercise by such Beneficiary of its rights in this <u>Section 3(e)</u> will be borne by such Beneficiary; <u>provided</u>, <u>however</u>, that any expense incident to the exercise of such rights pursuant to this <u>Section 3(e)</u> as a result of or during the continuance of an Event of Default will in all cases be borne by the Private Owner (except to the extent such Event of Default is attributable exclusively to a Manager having been appointed by such Beneficiary (in any capacity) following removal of the Private Owner in such applicable capacity, or to any applicable Servicer (and any of its Subservicers or any JDC Contractors) having been engaged by such Beneficiary (in any capacity), the Company or the applicable replacement Manager following such removal of the Private Owner as the Manager, in each case that is not an Affiliate of the Private Owner).

(f)     <u>Additional Periodic Reporting</u>.  The Manager and Private Owner, as applicable, will provide such further reports and information required pursuant to the Transaction Documents, including the following periodic reporting:

(i)     monthly statements with respect to bank accounts as required pursuant to <u>Section 3.4(xix)</u> of the LLC Operating Agreement;

(ii)     as the Tax Representative (as applicable), annual tax information and reporting required pursuant to <u>Section 7.6</u> of the LLC Operating Agreement;

(iii)     Business Plans and related information and reports required pursuant to <u>Section 7.7</u> of the LLC Operating Agreement;

(iv)     for all Due Periods ending prior to or during the calendar month in which the final Servicing Transfer Date occurs, Working Capital Reserve Target information required pursuant to the last sentence of <u>Section 12.11(b)</u> of the LLC Operating Agreement;

        (v)     reports and related information on the progress and status of the preparation, execution, recording and/or filing and delivery of the original documents to the Custodian, and of the resolution of (and measures being taken to resolve) any Exceptions identified by the Custodian in any Asset Schedule and Exception List pursuant to Section 3.1(d)(iii) of the Transfer Agreement;

        (vi)    Strategic Plan Reports and related information and reports required pursuant to Section 7.8(a) of the LLC Operating Agreement; and

        (vii)   Critical Strategy Resolution Business Plans and related information and reports required pursuant to Section 7.8(b) of the LLC Operating Agreement.

        (g)    Notice Information and Representatives. At all times until expiration of the period contemplated in the first sentence of Section 3(e) above and, if applicable, continuing thereafter until performance in full of all of its respective obligations under the Transaction Documents, each of the Manager and the Private Owner will (i) maintain an applicable address (including physical address, email address and phone contact information) for receipt of notices from, and authorized representatives available for discussions with and responses to notices and inquiries from, any Beneficiary, and (ii) promptly notify each Beneficiary of any changes to such notice address or authorized representatives.

        (h)    Loan Performance Reports. Concurrently with the delivery of each Monthly Report required to be delivered prior to occurrence of the Final Monthly Distribution, the Manager (or the Servicer on behalf thereof) must deliver to the Paying Agent and to each Beneficiary a Loan Performance Report covering all Loans (in the form set forth in Exhibit H of the LLC Operating Agreement, and as may be updated from time to time in accordance with Section 3(i) below), which Loan Performance Report must include (a) each of the most recent (as of last determination) and current Risk Category of each Loan, including as to each separate item, within the Loan Criteria Matrix, and (b) a determination for each Loan as to (i) its eligibility for potential sale or other transfer (without Initial Member consent) in accordance with Section 3.4(v) of the LLC Operating Agreement, and ▮▮▮▮▮▮▮▮▮▮

        (i)    Changes to Monthly Report and Loan Performance Report. The Initial Member will have the right from time to time after the Closing Date to update (and otherwise modify) the form of Monthly Report and Loan Performance Report (in such manner as determined appropriate by the Initial Member in its sole discretion), in each case by delivery of written notice to the Manager including or attaching the applicable updated (or otherwise modified) form (or otherwise setting forth a link to the applicable website including such updated (or otherwise modified) form, or indicating that the same is available at the applicable website specified in or pursuant to Exhibit B or Exhibit H, as applicable, to the LLC Operating Agreement, or making the same available by such other means as may be applicable in connection with engagement or use of a Reporting Service pursuant to Section 6 below), with any such update (or modification) becoming effective with respect to all periods from and after the third Due Period following the delivery of notice of such update.

4.    <u>No Duplicate Reports</u>.  Notwithstanding any provision in this <u>Annex II</u> to the contrary, the Manager will not be required to deliver duplicate copies of the reports as described in this <u>Annex II</u> to the FDIC (in any capacity as a Beneficiary), so long as the FDIC (including, as applicable, as Receiver) is acting in its capacity as any such Beneficiary, and during any such period will only be required to deliver one copy of any such report addressed to the FDIC (in any such applicable capacity) with a clearly visible notation that such report is being delivered to the FDIC in its capacity as each such applicable Beneficiary.

5.    <u>Changes Following Final Monthly Distribution</u>.  Notwithstanding anything to the contrary contained in this <u>Annex II</u>, for any period following the Final Monthly Distribution, the Initial Member, in its sole discretion, can waive any or all of the annual, semi-annual and quarterly reporting under <u>Section 2(a)</u>, <u>Section 2(b)</u>, <u>Section 3(c)</u> and <u>Section 3(d)</u> pursuant to such terms and conditions that may be established by the Initial Member.  Furthermore, connection with the Final Monthly Distribution and for purposes of all distributions thereafter, (i) the form of Monthly Report will be adjusted by, or in a manner satisfactory to, the Initial Member so as to remove items that are no longer relevant and to appropriately cover the Working Capital Reserve and all payments and distributions relating thereto (including updates to the reserve analysis provided pursuant to <u>Section 9.2(a)</u> of the LLC Operating Agreement and projected timing for payments and distributions of remaining funds in the Working Capital Reserve), and (ii) such Monthly Report will be delivered in connection with each Distribution Date selected by the Manager but no less frequently than once every three months; and, for such purpose, in the event any Due Period, as based on such Distribution Dates so selected by the Manager, would exceed three months, such Due Period will be divided into separate Due Periods of not more than three months each for purposes of delivery of such Monthly Report (without affecting the timing of distributions or the Cash Flow and Distribution Report to be included for purposes of each Distribution Date).

6.    <u>Reporting Service</u>.

(a)    <u>Engagement and Use of a Reporting Service</u>.  The Initial Member may, in its sole discretion, from time to time from and after the Closing Date engage, and thereafter continue to retain or replace, one or more Reporting Services selected by the Initial Member.  In connection with any such engagement, the Initial Member (and each other applicable Beneficiary) may require that any or all reports and other information or notices required to be delivered to it pursuant to this Reporting and Access Schedule or any other provision in the Transaction Documents (including by any of the Company, the Manager, the Servicer, any Subservicer or any JDC Contractor, in each case as determined by such Beneficiary in its sole discretion (the "**Applicable Reporting**"), be delivered to or through use of such Reporting Service.  Such engagement may further include (as determined by the Initial Member or such other Beneficiary) (i) use of a secure website, portal or other electronic means in connection with or for delivery of Applicable Reporting, (ii) use of specified software, formatting and procedures for gathering, organizing or transmitting Applicable Reporting, and (iii) subject to any applicable requirements in the Transaction Documents, changes to the form and content of any Applicable Reporting and means of delivery of notice of any such changes.

(b)    <u>Delivery through Reporting Service</u>.  As to any Beneficiary, delivery of Applicable Reporting to a Reporting Service (without separate delivery to such Beneficiary

pursuant to the Notice Schedule, taking into account any updated instructions delivered by such Beneficiary pursuant thereto) will be deemed delivery to such Beneficiary if, and only to the extent, expressly agreed or instructed in writing by such Beneficiary in connection with the engagement or use of such Reporting Service.

(c)    Costs for Use of Reporting Service.  The costs of the Initial Member for its engagement of a Reporting Service, including fees charged by such Reporting Service, will be borne by the Initial Member (without reimbursement from the Company); provided, however, that the Initial Member will have no obligation to reimburse the Company, the Manager, or any other Person for any costs and expenses in connection with the use of, or any transition to the use of, such Reporting Service.

**Annex III**

**Insurance Schedule**

1.      <u>General Insurance Coverages for Servicer, Subservicers and Manager</u>.

(a)      The Manager, the Servicer and each Subservicer must, in each case at no cost or expense to the Company, maintain each of the following types of insurance coverage having minimum limits (and other applicable provisions) as described below:

(i)      *Professional Liability*:  Professional Liability insurance policies (including Errors and Omissions/Miscellaneous Professional Liability/Bank Servicer Liability) covering all Servicing (and any other activities under the Transaction Documents) being conducted by such Person, including, as applicable, the management of the Company (or any Ownership Entity) and the Servicing of any Asset (including, in each case to the extent to be performed by such Person, record keeping, billing and disbursements of principal and interest, insurance premiums and taxes, determination of the depreciation amounts for leased property (but not for projections of or an appraisal for residual value of leased property) and any other professional loan services required to be performed under the Transaction Documents).  Professional Liability policies will be written with the following minimum limits:

o      $10,000,000 per occurrence and $10,000,000 in the aggregate.

In all events such Professional Liability insurance will, taking into account all insured party designations and exclusions, permit (or have the effect of permitting) each of the Company and the Initial Member to make claims thereunder on account of the Servicing covered thereby.

The Manager must, and must cause each Servicer and Subservicer, as applicable, to notify the Company and the Initial Member in the event such Person is made aware of any fact or circumstance which has given rise, or could give rise, to a potential Professional Liability claim with respect to any Servicing being performed by such Person.

The Manager and the Initial Member will each be notified immediately upon the reduction of or potential reduction of 50.0% of the limits, and each expressly reserves the right to require that the Servicer and each Subservicer (and the Manager, if applicable) purchase additional limits to equal or exceed the required limits as stated above.  "Potential reduction of 50.0%" will mean any knowledge by the Manager, the Servicer or such Subservicer, as applicable, that a claim or the sum of all claims, current or initiated after the effective date of the policy, would reduce the limits by 50.0%.

The limits required above are minimum limits and not intended to restrict the liability of the Manager, the Servicer or any Subservicer under any Transaction Document.

(ii)      *Directors and Officers Liability*:  Directors and Officers Liability coverage.  Such policies will cover acts of the applicable Person so obtaining such insurance (and all past, present, and future directors, officers and employees, including outside consultants,

III-1

leased, temporary and part time employees), and be available to respond to any claims which may arise under (and with respect to all activities performed under) the Transaction Documents (or any applicable Subservicing Agreement).  Such Directors and Officers Liability policies will be written with the following minimum limits:

> o     $10,000,000 per occurrence and $10,000,000 in the aggregate.

(iii)    *Crime Insurance/Fidelity Bond*: Crime Insurance or a Fidelity Bond in an amount of not less than $10,000,000 per claim and $10,000,000 in the aggregate, covering employee theft, forgery and alteration, wire/funds transfer, computer fraud and client coverage, all for on or off premises exposure.  Such coverage will insure all employees or any other Persons authorized to handle any funds, money, documents or papers relating to any Asset, and will protect against losses arising out of theft, embezzlement, fraud, misplacement, and other similar causes.  The  Company and the Manager (as to insurance obtained by the Servicer or any Subservicer), or the Company (as to insurance obtained by the Manager), shall each be named as either an additional insured or loss payee, as applicable, under any such Crime Insurance or Fidelity Bond with respect to claims arising out of the Assets (or, as applicable, the Assets subject to the applicable Servicing Agreement or Subservicing Agreement) and other applicable activities performed pursuant to the Transaction Documents.  Such coverage will be endorsed to protect the interests of the Company and the Manager (where applicable), in the form of a third party client coverage endorsement or equivalent.

(iv)    *Commercial General Liability*:    Commercial General Liability Insurance, including coverage for bodily injury (including coverage for death or mental anguish), Premises-Liability/Operations, Products-Completed Operations, Blanket Contractual Liability, Personal Injury and Broad form Property Damage, and including Cross Liability and Severability of Interests, with the following minimum limits:

> o     $1,000,000    Each Occurrence
>
> o     $2,000,000    General Aggregate
>
> o     $1,000,000    Personal and Advertising Injury
>
> o     $2,000,000    Products-Completed Operations Aggregate

Coverage will apply to all operations of the applicable insured.  The contractual liability insurance will include coverage sufficient to meet the indemnity obligations, where insurable, between all relevant parties.

The Company, the Initial Member, and all other parties as may from time to time be designated by the Company, the Manager or the Initial Member, will each be added as an additional insured.  Such Commercial General Liability Insurance will be primary and non-contributory with regard to any other insurance that may be available to the Company, the Manager or any such other additional insured.

III-2

(v)     *Auto*:  Auto Liability with a combined single limit of not less than $1,000,000 to provide coverage for any owned, hired, or non-owned vehicles.

(vi)     *Workers' Compensation*:     Workers' Compensation Insurance in compliance with statutory requirements of the state(s) in which applicable employees reside, are hired, and in which the services are being performed and will apply to all persons employed by such Servicer or Subservicer or, with respect to the Manager, all persons otherwise made available by the Manager for performance of its Servicing and other applicable obligations under the Transaction Documents, as applicable.

(vii)     *Employers Liability Insurance*:  Employer's Liability Insurance in an amount not less than $500,000 each accident for bodily injury by accident, $500,000 each employee for bodily injury by disease, and $500,000 policy limit for bodily injury by disease, or such greater amount as may be required by umbrella policy to effect umbrella coverage.

(viii)     *Employment Practices Liability*: Employment Practices Liability Insurance in an amount not less than $1,000,000 covering third party liability actions brought against the Manager, the Company, the Servicer and such Subservicer, as applicable.

(ix)     *Umbrella/Excess Liability*: Umbrella/Excess Liability Insurance on a follow form basis with a per occurrence and annual aggregate limit of not less than $10,000,000. Coverage will be excess of Commercial General Liability (including products and completed operations coverage), Employers Liability Insurance and Auto Liability with such coverage being concurrent with and not more restrictive than underlying insurance.

(x)     *Other Insurance*:  Such other insurance as it deems necessary for its own protection.  Each of the Manager and the Initial Member reserves the right to require, on not less than thirty days' prior notice (which notice will be deemed an Insurance Deficiency Notice), such other insurance or changes to existing insurance as may from time to time be reasonably prudent, taking into account the Servicing and other activities being performed and prudent market practices with respect to servicing of assets similar to the Assets and the performance of applicable activities (which other insurance or changes will be deemed required Insurance Modifications).

The limits required above in this Section 1 are minimum limits and are not intended to restrict the liability of the Manager, the Servicer or any Subservicer under any Transaction Document.

With respect to the Manager, all such insurance required herein will apply (and be required to be in place) for all Asset Management and other activities performed by the Manager under the Transaction Documents (including all activities in its role as "Manager" of the Company), and will cover all applicable Persons (including all directors, officers, employees or other personnel of any such Persons, as the case may be) performing such applicable Asset Management and other activities for or on behalf of the Manager.

III-3

Retroactive date on policies, if any, must be no later than the Closing Date (or as to any Servicing Agreement or Subservicing Agreement, the earlier of (x) the effective date of such Servicing Agreement or Subservicing Agreement, as applicable, and (y) the date of initiation of services).

All such policies and fidelity bonds (as applicable) required by this <u>Section 1</u> must in all events be in such amounts (not less than the respective minimum amounts specified in this <u>Section 1</u>), covering such risks and otherwise on such terms and conditions, as determined in the reasonable judgment of the Manager to be prudent and in the best interests of the Company (and the Members) in accordance with the Servicing Standard, in all cases in a manner reasonably satisfactory to the Initial Member.

Deductibles, if any, with respect to any such insurance policy or fidelity bond will be the sole responsibility of the insured (Manager, Servicer or Subservicer, or applicable other Person having obtained such insurance for the benefit of any of the foregoing, as the case may be). Without limitation of obligations (and liability) of the Manager, the Servicer or any Subservicer, the Manager (including the Private Owner, with respect to the period during which it is, or is required to be, the Manager) specifically agrees that it must pay, and cause each Servicer, Subservicer or other Person responsible for payment of any deductible with respect to any insurance or fidelity bond required to be maintained hereunder to so pay (and will otherwise itself timely pay in the event of a failure of the same to be paid by such Servicer, Subservicer or other Person), any applicable deductible under any such insurance or fidelity bond with respect to any claim asserted by or against (or Losses suffered by) any of the Company (including with respect to any Collateral) any Ownership Entity, the Initial Member or any other Indemnified Party (under the Transfer Agreement or the LLC Operating Agreement). For the avoidance of doubt, as to the Initial Member and the other Indemnified Parties under the LLC Operating Agreement, all such obligations of the Private Owner (including as Manager) are part of the Private Owner Obligations secured by the Secured Assets (and, in the event of any failure by the Private Owner (as Manager) to so timely pay, or cause to be paid, any such deductible, in addition to any other available remedy, the Initial Member will have the right, without notice, to pay (or cause to be paid) the same from the Secured Assets, including from any of the Additional Collateral or any distributions or other amounts payable to the Private Owner (including as Manager) with respect to the Private Owner Interest).

2.    <u>Insurance With Respect to Assets</u>.

(a)    From and after the Closing Date, the Company (and the Ownership Entities) must obtain and maintain (and the Manager must cause the Company and such Ownership Entities to obtain and maintain, including, as applicable, through the Servicer or applicable Subservicers) insurance covering the Loans and Collateral with respect to which any applicable Borrower or Obligor has failed to maintain applicable insurance (required under the applicable Asset Documents), in accordance with the further requirements herein.

(b)    From and after the Closing Date (and, as to any specific Acquired Property, the date the Company or an applicable Ownership Entity acquires title thereto), the Company (and

III-4

the Ownership Entities) must obtain and maintain (and the Manager must cause the Company and such Ownership Entities to obtain and maintain) insurance for Acquired Property, in accordance with the further requirements herein.

(c)     All such insurance pursuant to Sections 2(a) and 2(b) above will be in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as determined in the reasonable judgment of the Manager to be prudent and in the best interests of the Company (and the Members) in accordance with the Servicing Standard (and any additional requirements as may be set forth in the Transaction Documents) in all cases in a manner reasonably satisfactory to the Initial Member.  Without limitation of (and in each case determined in accordance with) the foregoing, such insurance will include, with respect to any such Acquired REO Property or real property Collateral, applicable commercial general liability insurance, property insurance, flood insurance, fire insurance, wind insurance, earthquake insurance, hazard insurance, terrorism insurance, boiler and machinery insurance, business interruption or rent insurance and other insurance, in each case as are customarily maintained by property owners for other real property and buildings similar to such Acquired REO Property or real property Collateral in the area in which such Acquired REO Property or real property collateral is located.

(d)     For any Acquired REO Property, such insurance will further include an owner's title insurance policy, on the 2006 ALTA form or such other form approved in writing by the Initial Member, (i) insuring the deed, (ii) naming the applicable Ownership Entity, as insured, (iii) in an amount equal to the Net Fair Value of the Acquired REO Property, (iv) dated as of the date that such Acquired REO Property became an Acquired REO Property or, for any for any property constituting Acquired REO Property as of the Closing Date, as of a date within thirty days after the Closing Date, and (v) with such endorsements as are reasonably customary attached thereto.

(e)     Any such insurance required pursuant to this Section 2 will name (and all applicable property and liability certificates with respect thereto must show) the Manager and the Company (where the applicable Ownership Entity is the named insured) as an additional insured or loss payee, as applicable, as its interest may appear.

3.     General Requirements; Notices; Delivery of Certificates and Policies.

(a)     Each insurance policy or fidelity bond required pursuant to Sections 1 and 2 above must (i) be written with carriers having a minimum insurer rating of A VIII from A.M. Best or A- from Standard & Poor's (including, with respect to a carrier organized outside of the United States, an equivalent rating from an applicable A.M. Best or Standard & Poor's affiliated entity having rated such insurance carrier), and, as to any such insurance under Section 2 above, with such carrier being authorized to do business in the state where the applicable property is located, (ii) provide (and the applicable certificate of insurance must so show) that it may not be cancelled or materially changed (other than to increase the coverage provided thereby) except upon thirty days' prior written notice (except as to cancellation for non-payment of premium whereby a ten day prior written notice of cancellation is acceptable) to the Company (or the Manager), and (iii) be continuously in effect (including by renewals prior to expiration of the then issued

III-5

insurance policy or fidelity bond) from the Closing Date (as to any such insurance policy or fidelity bond required to be in place on the Closing Date) or such later date of issuance or renewal in accordance herewith.

(b)    All insurance required herein may be issued as blanket or master insurance policies (including with the applicable insured party being added to such blanket or master policies of such insured party's Affiliates), in each case so long as at all times the coverages required herein (including taking into account any increases to limits as may be obtained from time to time for purposes of continued compliance) remain in place and reasonably available for purposes of the coverage required under this Insurance Schedule (taking into account the commensurate exposure under such policies and all claims thereunder that are not related to the Assets or applicable services being performed under the Transaction Documents), it being understood that dedicated limits will not be required.

(c)    All policies must be primary and without right of contribution from other insurance which may be available, must waive any right of set off, counterclaim or subrogation against the Manager (as to insurance obtained by any Person other than the Manager) and the Company (as to all such insurance), and must provide that the insurance will not be invalidated by any action or inaction by the applicable named insured(s) (including Manager, Servicer or any such Subservicer, as applicable).

(d)    The Manager must notify (or cause the Servicer and Subservicer to notify) the Initial Member immediately of the cancellation or material change, or the receipt of a notice of cancellation or material change, of any insurance policy or fidelity bond required to be maintained pursuant to this Insurance Schedule and the efforts made to obtain replacement coverage.

(e)    The Manager must, and must cause the Servicer and each Subservicer to (i) unless otherwise directed or consented to in writing by the Initial Member, pay or cause to be paid as they become due all premiums and related fees for the insurance required herein, and (ii) otherwise use commercially reasonable efforts to comply with all of the provisions of each such insurance policy affecting the Company or the Assets, and all of the requirements of the insurers thereunder applicable to the Company or the Assets.

4.    Delivery of Certificates and Policies; Corrections and Modifications.

(a)    Unless the Initial Member agrees to a different date, the Manager must provide (and cause the Servicer and any applicable Subservicer to provide) to the Initial Member, (i) on (or before) the Closing Date (and, with respect to each Asset, on or before the applicable Servicing Transfer Date with respect thereto, or as to any Collateral or any Acquired Property acquired by the Company or any Ownership Entity after the Closing Date, upon such insurance being obtained in accordance herewith), certificates evidencing all insurance policies and fidelity bonds required to be maintained pursuant to this Insurance Schedule, and (ii) within forty-five days after the Closing Date (or such other required date of initial delivery of such certificates), copies of all such insurance policies and fidelity bonds (or such other evidence of insurance

III-6

satisfactory the Initial Member), all of which certificates, policies and fidelity bonds must be in form and substance satisfactory to the Initial Member.

(b)     Following the Closing Date (or other date of delivery of initial certificates and copies of insurance policies and fidelity bonds pursuant to Section 4(a) above), the Manager must (i) provide to the Initial Member certificates evidencing all insurance policies and fidelity bonds required to be maintained pursuant to this Insurance Schedule on each anniversary of the Closing Date and otherwise upon request of the Initial Member, and (ii) cause copies of each insurance policy and fidelity bond required to be maintained pursuant to this Insurance Schedule to be made available (and delivered, if requested) to the Initial Member, or its representatives, upon request.

(c)     Without limitation of any obligation of the Manager, the Servicer or any Subservicer with respect to the insurance required hereunder, the Initial Member will have the right, by delivery of written notice to the Manager (any such notice, an "**Insurance Deficiency Notice**"), to require applicable changes, corrections or updates to any insurance policy or fidelity bond delivered or required under this Insurance Schedule (collectively, "**Insurance Modifications**"), in each case limited to applicable changes, corrections or updates based on (and as determined by the Initial Member so as to cause such insurance or fidelity bond to be in compliance with) the terms hereof and of the Transaction Documents; provided, that with respect to any initial insurance policy or fidelity bond delivered pursuant to Section 4(a) above, and subject to the express rights with respect to updates or changes, such policy or fidelity bond will be deemed acceptable to and approved by the Initial Member except to the extent of Insurance Modifications identified in any Insurance Deficiency Notice delivered to the Manager within thirty days after such policy or fidelity bond was delivered to the Initial Member.  With respect to any applicable Insurance Modification, the Manager must cause the same to be completed within thirty days following delivery to the Manager of the applicable Insurance Deficiency Notice first identifying such Insurance Modification (failure of which will be an Event of Default).

(d)     Without limitation of rights and remedies otherwise available under the Transaction Documents, in the event of any failure by the Manager to (i) complete (and cause the Servicer and any Subservicer to so complete) any applicable Insurance Modification, or (ii) deliver (and cause the Servicer and any Subservicer to so deliver) any applicable certificates or copies of any insurance policies or fidelity bond, in each case (for (i) and (ii) above) within the applicable time frame required pursuant to this Section 4, the Initial Member will have the right, by delivery of an applicable PO/Manager Distribution Instruction to the Paying Agent pursuant to Section 5.1(a) of the Custodial and Paying Agency Agreement, to cause any or all (as set forth in such PO/Manager Distribution Instruction) distributions to the Manager (and to the Private Owner, in the event that it is, or is required to be, the Manager at such time) pursuant to the Custodial and Paying Agency Agreement (and any applicable provisions of the LLC Operating Agreement) to be withheld (and to accumulate, without any interest or other return) until such time as the Initial Member delivers to the Paying Agent an applicable PO/Manager Distribution Reinstatement Notice pursuant to Section 5.1(a) of the Custodial and Paying Agency so permitting reinstatement of such distributions.  The Initial Member will have no obligation to deliver any such PO/Manager

III-7

Distribution Reinstatement Notice to the Paying Agent until all such Insurance Modifications have been completed or all such certificates or copies of insurance policies or fidelity bonds have been so delivered (and the same are deemed to comply with the applicable requirements with respect thereto, following review thereof and correction of any Insurance Modifications resulting from such review pursuant to <u>Section 4(c)</u> above), as the case may be, in each case to the satisfaction of the Initial Member.

III-8

## Annex IV

## Servicing Addendum

References in this Annex IV to this "Agreement" refer to the LLC Operating Agreement, and references herein to any specific section refer, unless otherwise specified, to such specific section of the LLC Operating Agreement.  For purposes of the Transaction Documents, this Annex IV will be deemed incorporated into and a part of Article XII of the LLC Operating Agreement.

1.     Servicing Standard.  The Manager must perform (or cause the performance of) the Servicing Obligations: (i) in the best interests and for the benefit of the Initial Member and the Company, (ii) subject to Section 5.4(h) of this Annex IV (to the extent applicable with respect to any Acquired REO Property), in accordance with the terms of the Assets (and related Asset Documents), (iii) in accordance with the terms of this Agreement and the other Transaction Documents, (iv) in accordance with all applicable Law, (v) with respect to potential principal reduction modifications to any Loan, taking into consideration (but without an obligation to implement) the Loan Modification Program (where applicable), and (vi) to the extent consistent with the foregoing terms, in the same manner in which a prudent servicer would service and administer similar loans and in which a prudent servicer would manage and administer similar properties for its own portfolio or for other Persons, whichever standard is higher, but using no less care and diligence than would be customarily employed by a prudent servicer following customary and usual standards of practice of prudent mortgage lenders, loan servicers and asset managers servicing, managing and administering similar loans and properties on an arms' length basis; provided, however, that, with respect to each Asset and related Collateral, in the absence of a customary and usual standard of practice, the Company must comply with the applicable Fannie Mae Guidelines, if any, with respect to similar loans and properties in similar situations.  The Manager must cause its Servicing Obligations with respect to the Assets and the Collateral to be performed without regard to (w) any relationship that the Company, the Manager the Servicer or any Subservicer, or any of their respective Affiliates, may have to any Borrower, Obligor or other obligor, or any of their respective Affiliates, including any other banking or lending relationship, (x) the obligations of any of the Company, the Manager, the Servicer or any Subservicer to make disbursements and advances with respect to the Assets and Collateral, (y) any relationship that the Servicer or any Subservicer may have to each other or to the Company, the Manager or any of their respective Affiliates, or any relationship that any of their respective Affiliates may have to the Company, the Manager or any of their respective Affiliates (other than the contractual relationship evidenced by this Agreement or the Servicing Agreement or any Subservicing Agreement), and (z) the right of any of the Manager, the Servicer or any Subservicer to receive compensation (including the Management Fee and any Interim Management Fee) for its services under this Agreement, the Servicing Agreement or any Subservicing Agreement.

2.     Servicing Obligations.

2.1.   Generally.  The Manager's Servicing Obligations include the following (together with the additional obligations of the Manager set forth in this Annex IV and elsewhere in the Transaction documents with respect to Servicing):

IV-1

(a)    discharging in a timely manner each and every obligation (i) which the Asset Documents provide is to be performed by the lender thereunder, on its own behalf and on behalf of the Company and the Initial Member and (ii) in the case of Acquired REO Property, which the Asset Documents that were applicable to the Collateral before it became Acquired REO Property provided were to be performed by the Borrower thereunder in respect of such Collateral (not including payment of debt service under the applicable Asset Documents and subject to the provisions of Section 5.4 of this Annex IV), in the case of each of (i) and (ii), together with such additional obligations as are required of the Company under this Agreement in respect of such Acquired REO Property;

(b)    incurring costs (including Servicing Expenses (or Interim Servicing Expenses) and Pre-Approved Charges) in accordance with (i) the provisions of the Asset Documents, or (ii) in the case of Acquired REO Property, the Asset Documents that were applicable to the Acquired REO Property before it became an Acquired REO Property (not including payment of debt service under the applicable Asset Documents and subject to the provisions of Section 5.4 of this Annex IV);

(c)    causing to be maintained with respect to the Assets (including any Collateral for which the Borrower has failed to maintain required insurance, and any Acquired Property), insurance as required under the Insurance Schedule;

(d)    diligently monitoring and seeking compliance with the terms and conditions of each insurer under any hazard policy and preparing and presenting claims under any policy in a timely fashion in accordance with the terms of the policy;

(e)    supervising and coordinating the construction, ownership, management, leasing and preservation of the Acquired Property as well as all other matters involved in the administration, preservation and ultimate disposition of the Acquired Property as would be taken by a prudent asset manager managing properties similar to the Acquired Property and as required of the Company under this Agreement;

(f)    administering the making of advances to Borrowers under Loans pursuant to and in accordance with the provisions herein and in the Custodial and Paying Agency Agreement governing the making of Funding Draws;

(g)    [intentionally omitted];

(h)    except as otherwise set forth in this Agreement, making decisions under, and enforcing and performing in accordance with, the Asset Documents all loan administration, inspections, review of financial data and other matters involved in the Servicing;

(i)    ensuring that all filings required to maintain perfection in any Collateral remain up to date and in force, including Uniform Commercial Code financing statements;

IV-2

(j)　　ensuring that each Borrower (or in the case of Acquired REO Property, the applicable Ownership Entity) is diligently performing all applicable construction or development work (including all applicable Permitted Capital Improvements, and all construction or development funded through Servicing Expenses in accordance with clause (x) of the proviso appearing as the last paragraph of the definition of "Servicing Expenses") using all commercially reasonable efforts in accordance with the requirements of the applicable Asset Documents and of this Agreement;

(k)　　providing the Servicer, any Subservicer and any JDC Contractor with copies of such Transaction Documents (or portions thereof) as are necessary for such Servicer, Subservicer or JDC Contractor to be familiar with in order to perform its respective obligations provided for in this Agreement, the Servicing Agreement, any Subservicing Agreement or any JDC Agreement (and related Assignment of JDC Agreement), as applicable; and

(l)　　filing, or causing to be filed, on behalf of the Company all relevant tax forms in connection with the Servicing of the Assets, including any required filing of IRS Form 1099-A (in connection with any applicable acquisition or abandonment of Collateral) and IRS Form 1099-C (in connection with any applicable cancellation of debt).

2.2.　　Responsibility for Enforcement Determinations.  Upon the occurrence of an event of default under any of the Asset Documents, but subject to the other terms and conditions of this Agreement (including the Servicing Standard and obligations with respect to releases pursuant to Section 2.6 of this Annex IV), the Manager will cause to be determined the response to such event of default and course of action with respect to such event of default, including (i) the selection of attorneys to be used in connection with any action, whether judicial or otherwise, to protect the interests of the Company in the Asset and the Collateral, (ii) the declaration and recording of a notice of such default and the acceleration of the maturity of the Asset, (iii) the institution of proceedings to foreclose under the Asset Documents securing the Asset pursuant to the power of sale contained therein or through a judicial action, or to appoint a receiver, (iv) the institution of proceedings against the Borrower or any Obligor, (v) the acceptance of a deed in lieu of foreclosure, (vi) the purchase of the real property Collateral at a foreclosure sale or trustee's sale or the purchase of the personal property Collateral at a Uniform Commercial Code sale, (vii) the institution or continuation of proceedings to obtain a deficiency judgment against such Borrower or any Obligor, and (ix) subject to the provisions herein, the engagement of any JDC Contractor to service a JDC Loan.  Notwithstanding any provision to the contrary herein, the Manager shall not, and shall not cause the Servicer, any Subservicer or any JDC Contractor to, take any action that is inconsistent with or prohibited by the terms of the Custodial and Paying Agency Agreement, in each case without the prior written consent of the Initial Member.

2.3.　　Regulation AB Requirements. The Manager must use commercially reasonable efforts to confirm, where applicable, that the Servicer (and any Subservicer) (i) has in place, policies and procedures instituted to monitor any performance or other triggers and events of default in accordance with the applicable Asset Documents and the Servicing Obligations (as generally required pursuant to §§ 1122(d)(1)(i) and (ii) of Regulation AB), and (ii) complies with

IV-3

§§ 1122(d)(2)(i) through (vii), and §§ 1122(d)(4)(i) through (xiv) of Regulation AB, it being understood that any such requirements of Regulation AB referenced herein will be deemed applicable to the Servicing conducted under the Servicing Agreement (and under any Subservicing Agreement) regardless of whether such requirements apply, by their terms, only to companies registered or required to file reports with the Securities and Exchange Commission.

2.4.    <u>Security of Customer Information</u>.  The Manager must comply, and ensure (or, as to any such Person that is not an Affiliate of the Manager or the Private Owner, use commercially reasonable efforts to ensure) that the Servicer, each Subservicer and each JDC Contractor comply, with all applicable Laws regarding the privacy and security of Customer Information. In furtherance of the foregoing, and in each case in accordance with applicable Law and prudent industry practices, the Manager must:

(i)    adopt, and ensure that the Servicer, each Subservicer and each JDC Contractor adopt reasonable and appropriate administrative, physical, and technical measures, to ensure and maintain the privacy and security of Customer Information;

(ii)    enter into and require the Servicer, each Subservicer and each JDC Contractor to enter into written obligations that ensure and maintain the privacy and security of Customer Information, including, at a minimum, that each Servicer, Subservicer or JDC Contractor maintain (A) a written information security program that includes appropriate policies, procedures and risk assessments that are reviewed at least annually, (B) appropriate security protections with respect to systems, servers, work stations, and mobile devices, including appropriate access controls that permit access to Customer Information only to authorized persons who reasonably require access for the performance of their applicable responsibilities, (C) appropriate policies, procedures, and employee training to protect against reasonably anticipated unauthorized uses and disclosures of Customer Information, (D) appropriate monitoring of systems and procedures to detect actual or attempted attacks on or intrusions into systems or servers containing Customer Information, including response programs that specify actions to be taken when unauthorized access to Customer Information is suspected or detected,  and (E) appropriate procedures for the secure disposal or destruction of Customer Information;

(iii)    ensure, in the event of a Computer Security Incident at or affecting Customer Information maintained by the Manager, the Company, the Servicer, a Subservicer or a JDC Contractor, that such Person (A) notifies the Company (except when such Person is the Company) and each of the Private Owner and the Initial Member, within thirty-six hours of becoming aware of such Computer Security Incident, (B) complies with applicable notification laws or requirements, (C) investigates the Computer Security Incident and takes appropriate remedial actions, and (D) coordinates and cooperates with the Company, the Private Owner and the Initial Member to the extent applicable (including if requested by any such Person);

(iv)    ensure that any Customer Information transmitted electronically by it (or by the Servicer, a Subservicer or a JDC Contractor) is appropriately encrypted; and

IV-4

(v)    promptly make available to the Initial Member information regarding the policies and procedures for protection of Customer Information described in this Section 2.4 as requested by either of them from time to time.

2.5.    [Intentionally Omitted].

2.6.    Required Releases as a Condition to Certain Actions.  The Manager will not (and will ensure that none of the Company, the Servicer, each Subservicer and each JDC Contractor, will), renew, extend, renegotiate, compromise, settle or release any Note or Asset or any right of the Company with respect to the Assets, except upon payment in full thereof, unless the Borrower and all Obligors on said Note or Asset first release and discharge each of the Company, the FDIC, the Receiver (including as the Initial Member hereunder and the Transferor under the Transfer Agreement) and the Failed Bank, and their respective predecessors-in-interest, agents and assigns, from all claims, demands and causes of action that any such Borrower or Obligor may have against any such Person arising out of or resulting from any act or omission occurring prior to the date of such release.

3.    Servicing and Subservicing Agreements.

3.1.    Requirements for Servicing and Subservicing Agreements.  Except as is otherwise agreed in writing by the Initial Member, each Servicing Agreement (and any Subservicing Agreement with any Subservicer) must, among other things,

(a)    provide for the Servicing by the Servicer (or any Subservicer) in accordance with the Servicing Standard and the other terms of this Agreement;

(b)    subject to clause (j) below with respect to immediate termination, be terminable upon no more than thirty days prior notice if an Event of Default or any default under the Servicing Agreement (or Subservicing Agreement) has occurred;

(c)    provide that the Manager (in its individual capacity) and the Initial Member (and, in the case of any Subservicing Agreement, the Servicer or applicable Subservicer having been engaged by the Servicer pursuant to a separate Subservicing Agreement, as the case may be) each will be entitled to exercise termination rights under the relevant Servicing Agreement or Subservicing Agreement (it being understood that the Initial Member may only exercise such termination rights as contemplated or permitted in this Agreement);

(d)    provide that the Servicer (or any Subservicer) and the Manager (in its individual capacity) acknowledge that the Servicing Agreement (or Subservicing Agreement) constitutes a personal services agreement between the Manager (in its individual capacity) and the Servicer (or between the Servicer or applicable Subservicer having been engaged by the Servicer pursuant to a separate Subservicing Agreement, as the case may be, and the Subservicer, as applicable);

IV-5

(e)        provide that (A) each of the Company and the FDIC are third party beneficiaries thereunder to the extent of any rights expressly granted to such Person under the Servicing Agreement or Subservicing Agreement and is entitled to enforce the Servicing Agreement or Subservicing Agreement, as applicable, with respect to such rights, and (B) the Initial Member and, in the case of any Subservicing Agreement, the Manager (in its individual capacity) is a third party beneficiary thereunder; and further provide that in no event will any amendment or waiver to any such Servicing Agreement or Subservicing Agreement limit or affect any rights of any such third party beneficiary thereunder without the express written consent of such third party beneficiary;

(f)        provide that (A) upon the removal of the Private Owner as the Manager or the occurrence of an Event of Default, the Initial Member (and any successor Manager) may exercise all of the rights of the Manager thereunder and cause the termination or assignment (from the Private Owner as the Manager) to any other Person of the same (or, in lieu of such assignment, and including in the event of any rejection by the Private Owner of the Servicing Agreement in connection with any Insolvency Proceeding, require the Servicer to enter into a new Servicing Agreement (on substantially the same terms and conditions as set forth in such Servicing Agreement) with such other Person), without penalty or payment of any fee, and (B) upon the occurrence of any "Default" under (and as defined in) the Servicing Agreement, the Initial Member (and any successor Manager) may exercise all of the rights of (1) the Manager (in its individual capacity) under such Servicing Agreement and cause the termination or assignment from the Manager (in its individual capacity) to any other Person of the same (or, in lieu of such assignment, and including in the event of any rejection by the Private Owner of the Servicing Agreement in connection with any Insolvency Proceeding, require the Servicer to enter into a new Servicing Agreement (on substantially the same terms and conditions as set forth in such Servicing Agreement) with such other Person), without penalty or payment of any fee, and (2) the Servicer under any Subservicing Agreement and cause the termination or assignment from the Servicer to any other Person of such Subservicing Agreement (or, in lieu of such assignment, and including in the event of any rejection by the Servicer of such Subservicing Agreement in connection with any Insolvency Proceeding, require the applicable Subservicer to enter into a new Subservicing Agreement (on substantially the same terms and conditions as set forth in such Subservicing Agreement) with such other Person), without penalty or payment of any fee (it being understood that the Initial Member may only exercise the foregoing rights as contemplated or permitted in this Agreement);

(g)        provide that the Initial Member, the Manager and the Company (and each of their respective representatives) will each have access to and the right to review, copy and audit the books and records of the Servicer and any Subservicers and that the Servicer and all Subservicers must make available their respective officers, directors, employees, accountants and attorneys to answer the Initial Member's, the Manager's and the Company's (and each of their respective representatives') questions or to discuss any matter relating to the Servicer's or Subservicer's affairs, finances and accounts, as they relate to the Assets, the Collateral, the Company Accounts or any other accounts established or maintained pursuant to this Agreement, the Custodial and Paying Agency Agreement, the Servicing Agreement or any Subservicing

IV-6

Agreement, or any matters relating to the Servicing Agreement or any Subservicing Agreement or the rights or obligations thereunder;

(h)    provide that all Asset Proceeds are to be deposited into the Collection Account in accordance with <u>Section 12.7</u> and that under no circumstances are funds, other than Asset Proceeds and interest and earnings thereon, transfers of funds from the Working Capital Reserve Account and the proceeds of Excess Working Capital Advances, to be commingled in the Collection Account;

(i)    provide that (A) the Servicer or any Subservicer shall not sell, transfer or assign its rights under the Servicing Agreement or Subservicing Agreement, as applicable, other than Servicer's rights to delegate to Subservicers (or applicable Subservicer's right to further delegate to another Subservicer) certain responsibilities thereunder and to engage (or permit Subservicers to engage) JDC Contractors, in each case as and to the extent permitted by this Agreement, and (B) any prohibited sale, transfer or assignment will be void *ab initio*;

(j)    provide that (A) the Servicer consents to the immediate termination of the Servicer upon the occurrence of any Insolvency Event with respect to the Servicer, (B) each Subservicer consents to the immediate termination of such Subservicer upon the occurrence of a termination event under the Servicing Agreement, and upon the occurrence of any Insolvency Event with respect to such Subservicer (or any Subservicer having been engaged by such Subservicer), (C) the occurrence of any Restricted Servicer Change of Control with respect to the Servicer (or any applicable Rated Subservicer) constitutes a default under the Servicing Agreement (and any applicable Subservicing Agreement with such Rated Subservicer) and (D) the occurrence of any Insolvency Event with respect to the Servicer or any Subservicer constitutes a default under the Servicing Agreement and the Subservicing Agreement, as applicable; <u>provided</u>, <u>however</u>, that, in the case of the Servicing Agreement, or a Subservicing Agreement with a Rated Subservicer, the occurrence of an Insolvency Event with respect to a Subservicer (which is not an Affiliate of the Servicer) may, at the election of the Manager, be subject to a cure period of not more than thirty days for replacement of the affected Subservicer (in a manner that will permit the Manager to comply with its obligations hereunder);

(k)    provide that, except as permitted by the Manager pursuant to <u>Section 12.7</u>, there will be no right of setoff on the part of the Servicer, any Subservicer or any JDC Contractor against the Asset Proceeds (or the Company);

(l)    provide for such other matters as are necessary or appropriate to ensure that the Servicer or any Subservicer is obligated to comply with the Servicing Obligations of the Manager hereunder;

(m)    provide a full release and discharge of each Prior Servicer from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that the Servicer (or any such Subservicer) had, has or might have in the future, whether known or unknown, which are related in any manner whatsoever to the Servicing by the Prior Servicers prior to the applicable Servicing

IV-7

Transfer Date (other than due to gross negligence, violation of Law or willful misconduct of such Prior Servicer);

(n)    [intentionally omitted];

(o)    provide that none of the Servicer, any Subservicer or any Affiliate of the Servicer or any Subservicer may at any time, (A) be or become a partner or joint venturer with any Borrower or Obligor, (B) be or become an agent of any Borrower or Obligor, or allow any Borrower or Obligor to be an agent of such Servicer or any Subservicer or of any Affiliate of the Servicer or any Subservicer, or (C) have any interest whatsoever in any Borrower or Obligor, and that the Servicer or Subservicer, as applicable, must immediately notify the Manager and the Initial Member upon becoming aware of the occurrence of any of the foregoing;

(p)    provide that the Servicer (and any Rated Subservicer) must immediately notify the Manager and the Initial Member of the occurrence of any Change of Control with respect to the Servicer (or any Rated Subservicer);

(q)    provide that, upon any sale of any Asset by the Company (including by the Servicer on behalf of the Manager on behalf of the Company) in accordance with the terms hereof, such Asset will prospectively cease to constitute an "Asset" for any purpose of the Servicing Agreement or Subservicing Agreement, as applicable, provided that the Servicer or Subservicer, as applicable, will not thereby be released from any liability or obligation thereunder with respect to such Asset in relation to the period prior to such sale;

(r)    not conflict with the Servicing Standard or any other terms or provisions of this Agreement, the Custodial and Paying Agency Agreement or any of the other Transaction Documents insofar as such other terms or provisions hereof or thereof are required to be imposed by the Manager (in its individual capacity) on the Servicer (or any Subservicers) in the Servicing Agreement (or Subservicing Agreements);

(s)    provide for protection of Customer Information consistent with prudent industry practices and the requirements of Section 2.4 of this Annex IV; and

(t)    in the event the Subservicer is a Rated Subservicer, include, for the benefit of the Manager and each third party beneficiary under the Servicing Agreement (including the Company and the Initial Member), an agreement of such Rated Subservicer to further comply with (and separately assume in favor of the Manager and each such third party beneficiary) all terms, conditions and obligations of the Servicer under the Servicing Agreement (including obligations in such Servicing Agreement with respect to maintenance of insurance, indemnity rights of the Indemnified Parties (as against such Rated Subservicer), and engagement of a Subservicer), in each case to the same extent as though such Rated Subservicer were executing the Servicing Agreement (as the "Servicer") directly with the Manager.

3.2.    Relation to Manager Obligations. Nothing contained in any Servicing Agreement or any Subservicing Agreement will alter any obligation of the Manager under this Agreement

IV-8

and, in the event of any inconsistency between the Servicing Agreement (or any Subservicing Agreement) and the terms of this Agreement, among the parties to this Agreement the terms of this Agreement will control.

4. <u>Engagement of JDC Contractors</u>.

4.1.    <u>Right to Engage JDC Contractors</u>.  The Manager may, to the extent it determines that an applicable engagement of a JDC Contractor is in the best interests of the Company and in accordance with the Servicing Standard, engage, or permit the Servicer or any Subservicer to so engage, a JDC Contractor to service (and provide related management, administration, debt cohesion and collection activities with respect to) any of the JDC Loans, in each case through a subcontract between, on the one hand, the Manager (in its individual capacity), the Servicer or such Subservicer, as applicable, and, on the other hand, such JDC Contractor (a "**<u>JDC Agreement</u>**").

4.2.    <u>Requirements for Engagement of JDC Contractors</u>.  Such JDC Contractor engaged pursuant to <u>Section 4.1</u> above will not be deemed a "Servicer" or "Subservicer" under the Transaction Documents, but any such servicing through a JDC Contractor must comply with the terms and conditions of the Transaction Documents and the Servicing Obligations and Servicing Standard which would otherwise be applicable to the Manager (in respect of Asset Management), the Servicer or such Subservicer in respect of such servicing, subject to the following deviations and additional requirements:

(a)    the JDC Contractor need not be a Qualified Servicer, but the Manager, the Servicer or such Subservicer will exercise the same due diligence and same degree of care that a prudent lender or servicer would customarily use in vetting, selecting, retaining and contracting with Persons to perform similar services;

(b)    the Manager may permit the JDC Contractor (x) to remit Asset Proceeds in respect of such JDC Loan for deposit in the Collection Account on up to a monthly basis, and (y) to deduct Servicing Expenses for a JDC Loan from Asset Proceeds of such JDC Loan, in each case to the extent expressly permitted in <u>Section 12.7</u>;

(c)    title to the applicable JDC Loan may not be transferred to such JDC Contractor without the prior written consent of the Initial Member (except in the event of an actual sale of such JDC Loan in compliance with the requirements and restrictions in the Transaction Documents, including <u>Sections 3.4(x)</u> and <u>3.4(xi)</u>);

(d)    the applicable JDC Agreement with such JDC Contractor must be subject to a fully executed Assignment of JDC Agreement in favor of the Initial Member; and the Manager will comply with, and will cause the JDC Contractor and, to the extent a party thereto, the Servicer and any Subservicer, to so comply with, all obligations under such Assignment of JDC Agreement;

IV-9

(e)    the Manager will provide prior written notice to the Initial Member of any such engagement, and, promptly following execution, deliver to the Initial Member a copy of the applicable JDC Agreement and related Assignment of JDC Agreement;

(f)    the Manager will (and, as applicable, will cause the Servicer or Subservicer having engaged such JDC Contractor to) promptly notify the Initial Member in writing of the occurrence of (A) any default under, or other termination of, such JDC Agreement, or (B) any breach (including any "Default" as defined in) the applicable Assignment of JDC Agreement;

(g)    the Manager, Servicer or Subservicer, as applicable, having engaged such JDC Contractor will cause all Servicing pursuant to such engagement to comply with the requirements set forth in the Reporting and Access Schedule (including as specified in Sections 1 and 3 thereof with respect to JDC Contractors), and the reporting provided by such Manager, Servicer or Subservicer will cover the Servicing by such JDC Contractor (including auditable detail of any Asset Proceeds received by such JDC Contractor and any netting or other use thereof); and in connection therewith the Manager, Servicer or Subservicer, as applicable, will cause any annual compliance certificate provided by it pursuant to Section 3(c) of the Reporting Access Schedule to cover (or otherwise be accompanied by separate such compliance certificates from) such JDC Contractor (including in respect of its applicable Assignment of JDC Agreement); provided such JDC Contractor will not be required to deliver (or be covered by) any annual compliance report required pursuant to Section 3(d) of the Reporting and Access Schedule; and

(h)    the Insurance Schedule will not apply directly to such JDC Contractor; provided, that such JDC Contractor must maintain insurance consistent with market standards for prudent JDC Contractors, with such engagement of the JDC Contractor, taking into account such insurance and any applicable insurance maintained by the Manager, the Servicer or any applicable Subservicer, collectively covering all risks and potential liabilities in connection with engagement of such JDC Contractor in a manner no less favorable to the Company (and applicable Ownership Entities) than would be applicable if the services of such JDC Contractor were performed directly by the Manager, Servicer or applicable Subservicer so engaging such JDC Contractor.

5.    Acquired Property and Ownership Entities.

5.1.    Use of Ownership Entities.

(a)    The Company will form Ownership Entities for purposes of taking and holding title to Collateral.  If title to any Collateral that constitutes real property is to be acquired by foreclosure, by deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, or otherwise, title to such Acquired REO Property must be taken and held in the name of one or more Ownership Entities; provided, however, that for any Acquired REO Property with respect to which there exists any Environmental Hazard, the Ownership Entity that holds such Acquired REO Property may hold title only to such Acquired REO Property (and no other Acquired REO Property).

(b)    Each Ownership Entity will be wholly owned by the Company. The purposes of each Ownership Entity will be to hold Acquired Property pending sale, to complete applicable permitted construction of any such Acquired Property, to operate the Acquired Property as efficiently as possible in order to minimize financial loss to the Company and the Initial Member, and to sell the Acquired REO Property as promptly as practicable in a way designed to minimize financial loss to the Company and the Initial Member.

(c)    The Manager will cause each Ownership Entity to remain in compliance with the requirements herein for Ownership Entities. As appropriate with respect to any Company Account (other than the Distribution Account) and related obligations with respect thereto, the Manager will cause each Ownership Entity to either (i) use a sub-account of such Company Account or (ii) open a separate account in the name of such Ownership Entity (an "**Ownership Entity Account**") with the Paying Agent. In addition, the Manager will (i) provide notice to the Initial Member of any such Ownership Entity Account prior to opening or otherwise causing such Ownership Entity to acquire the same, and (ii) cause each such Ownership Entity Account (or applicable sub-account), and all deposits and withdrawals with respect thereto, to at all times comply with all requirements in the Transaction Documents applicable to the Company Accounts (including as to reporting and timely deposits into the Collection Account and Distribution Account of all funds required to be deposited therein). Subject to the foregoing (and for purposes of determining compliance with the Transaction Documents), references to any Company Account will be deemed to include the applicable Ownership Entity Account (or sub-account) pursuant to the foregoing.

5.2.    Use of TRS Entities. With respect to any Acquired REO Property generating operating income, the Manager will, upon receipt of a specific written request from the Private Owner (with a copy having been delivered to the Initial Member), form an applicable Subsidiary of the Company intended to qualify as a taxable REIT subsidiary (a "**TRS Entity**"), for the sole purpose of leasing Acquired Property from an Ownership Entity and operating such property, subject to compliance with all of the following:

(a)    All obligations (including in respect of formation, authorizations, insurance, reporting, operation and dissolution) with respect to Ownership Entities will apply to such TRS Entity, and the Manager will cause such TRS Entity to be organized and operated in compliance with the terms of this Agreement and each other Transaction Document that relate to the Ownership Entities, except that each TRS Entity will (i) make a corporate tax election, and (ii) enter into a lease with an Ownership Entity, and (iii) be subject to any additional specific requirements for TRS Entities set forth in the Transaction Documents;

(b)    The Manager will provide written notice to the Initial Member at the time any TRS Entity is created that identifies the name of the TRS Entity and the Ownership Entity from which the TRS Entity will lease the Acquired Property, and encloses an organizational chart reflecting all the TRS Entities currently owned by the Company;

(c)    All costs and expenses (including without limitation legal, accounting, tax preparation, insurance and administrative costs and expenses and the federal, state and local taxes

IV-11

related to the creation, existence, operation and tax election related to, arising out of or resulting from any TRS Entity and the lease of any Acquired Property from an Ownership Entity to a TRS Entity (the "**TRS Costs**") will be paid by the applicable TRS Entity on or before the date such amounts are due; and as to any such TRS Costs:

(i)      the Private Owner will reimburse the Company (on account of the consolidated effect to the Company of such TRS Costs) for the full amount of such TRS Costs on or before the Distribution Date for the Due Period in which such TRS Costs were incurred (or in which the same where otherwise passed through to the Company taking into account any applicable permitted payment cycle or netting permitted pursuant to this Section 5 by (x) deducting such amounts from distributions to the Private Owner (in any capacity) on such Distribution Date (and such amounts so deducted will be deposited into the Collection Account by the Paying Agent), or (y) to the extent the amount of the distributions to be paid to the Private Owner are less than the amount due to be reimbursed, the Private Owner must make a payment to the Company to cover such shortfall (with deposit of such payment into the Collection Account) prior to the transfer of funds from the Collection Account to the Distribution Account for purposes of the distributions on such Distribution Date.  The Private Owner agrees that  neither the Company nor any Subsidiary thereof will have any obligation to return or repay any amounts paid by the Private Owner pursuant to the foregoing, and no such amounts paid by the Private Owner will constitute a Capital Contribution or otherwise affect the parties' respective Capital Accounts;

(ii)      the reimbursement of the TRS Costs will be shown on the Custodial and Paying Agent Report and the Cash Flow and Distribution Report covering such period (in a below the line adjustment to distributions to the Private Owner, as to any amounts so paid from such distributions) in a manner reasonable satisfactory to the Initial Member; and

(iii)      if any TRS Costs are shown on the Cash Flow and Distribution Report, the Manager will provide auditable detail on such TRS Costs to the Private Owner at the time the Manager submits such Cash Flow and Distribution Report;

(d)      The Manager will promptly deliver copies of all tax returns and filings submitted for each TRS Entity with a reconciliation of the returns to the general ledger to the Initial Member or any of its designees or representatives at such party's request;

(e)      The Private Owner and the Manager will, in addition to the information otherwise required pursuant to the Reporting and Access Schedule with respect to such TRS Entity (as an Ownership Entity), provide promptly any additional information reasonably requested by the Initial Member or any of its designees or representative related to the creation, use, status and costs of such TRS Entity, the lease and related organizational structure;

(f)      The Private Owner will indemnify and hold harmless the Company, each Ownership Entity and the Indemnified Parties from and against any costs or expenses, including without limitation, damages, suits, Liabilities, claims, administrative costs, attorney's fees, accountant fees, tax preparation fees, insurance premiums, taxes, assessments or penalties related to, arising out of or resulting from the creation, existence, operation and tax election of the TRS

IV-12

Entity and the lease of any Acquired Property from an Ownership Entity to a TRS Entity. The Private Owner will make any such indemnity payments (x) to the extent payable to the Company or any Ownership Entity, on or before the Distribution Date for the Due Period in which the applicable amounts were incurred or suffered by the Company or such Ownership Entity in the same manner (and with the same reporting) as the repayment of TRS Costs pursuant to Section 5.2(c) of this Annex IV, and (y) to the extent payable to any Indemnified Party, promptly upon demand;

(g)     Each such TRS Entity will maintain Ownership Entity Accounts with the Paying Agent in its name (separate from the Company or any other Ownership Entity) meeting the requirements of Section 5.1(c) of this Annex IV; and

(h)     If any third party has a direct or indirect right or interest in an Acquired REO Property or Asset Proceeds pursuant to a Loan Participation Agreement, the Manager will ensure, at the Private Owner's cost and expense, that no TRS Costs are inappropriately passed through to such third party and that the Company is complying with the Loan Participation Agreement.

5.3.     Acquisition of Collateral: Appraisals and Environmental Hazards.

(a)     In connection with any acquisition of title to Acquired Property by the Company (or any Ownership Entity) occurring after the Closing Date (by foreclosure, by deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, or otherwise), the Company must obtain (or have obtained), during the period commencing six months prior to such acquisition and ending on the earlier of (i) sixty days after such acquisition or (ii) such earlier date as may be required in connection with the relevant exercise of remedies so as to comply with applicable Law and preserve rights to collect any Deficiency Balance), an updated Appraisal for determination of the Appraised Value (to serve as the basis for the initial Net Fair Value) of such Acquired Property.

(b)     Nothing in this Annex IV or anything else in the Agreement will be deemed to affirmatively require the Manager to cause the Company to acquire all or any portion of any Acquired REO Property with respect to which there exists any Environmental Hazard. Prior to acquisition of title (whether by foreclosure, deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, or otherwise) to any Acquired REO Property, the Manager must (or, with respect to any Acquired REO Property included in the SFR Assets, may, but will not be required to) (i) cause a Site Assessment to be conducted with respect to such Acquired REO Property; provided, that the Company (and the applicable Ownership Entity) may rely on a third party Site Assessment conducted within one year prior to acquiring title so long as the Company (and the applicable Ownership Entity) has obtained all relevant updates within one hundred and eighty days prior to acquiring title, and taken applicable further action, so as to be deemed to have satisfied, and such prior third party Site Assessment otherwise is permitted to be relied upon to satisfy, the United States Environmental Protection Agency's "All Appropriate Inquiries" standards, set forth in 40 C.F.R. § 312, for meeting the "Bona Fide Prospective Purchaser" and "Innocent Purchaser" defenses under CERCLA, 42 U.S.C. §§ 9601, 9607, and (ii)

IV-13

if the actions taken by the Manager pursuant to clause (i) will not suffice for the applicable Ownership Entity to be deemed, at the time of such acquisition of title, to have satisfied such "All Appropriate Inquiries" standards, make a determination specifically with respect to such Acquired REO Property that refraining from taking such other or further action as would so suffice to meet such "All Appropriate Inquiries" standards is in accordance with the Servicing Standard. The costs of any Site Assessment (or relevant updates) conducted or obtained pursuant to the foregoing will be deemed to be Servicing Expenses (or Interim Servicing Expenses) as long as such costs were not paid to any Affiliate of the Manager, or any Affiliate of the Servicer or any Subservicer.

(c)     With respect to any particular Acquired REO Property (to the extent consisting of real property), the Manager must, from and after the acquisition of title thereto by an Ownership Entity, take (or cause to be taken) such action as is necessary so that such Ownership Entity retains, with respect to such Acquired REO Property, the benefit of (i) the secured lender exemption under CERCLA, 42 U.S.C. § 9601, and (ii) to the extent that the Company or such Ownership Entity, as the case may be, had the benefit of either such defense at the time of such acquisition of title, the "Bona Fide Prospective Purchaser" or "Innocent Purchaser" defenses under CERCLA, 42 U.S.C. §§ 9601, 9607, in the case of each of (i) and (ii) unless and to the extent that the Manager makes a determination that refraining from taking such action is in accordance with the Servicing Standard, provided that this Section 5.3(c) will apply with respect to any Acquired REO Property included in the SFR Assets only if the Manager (or any Servicer or Subservicer) has reason to believe that an Environmental Hazard may exist with respect to such Acquired REO Property.

5.4.     Administration of Acquired REO Properties.  The following terms and conditions will be binding on the Company and the Ownership Entities (and on the Manager's performance of its obligations hereunder) with respect to any Acquired REO Properties, in addition to any other terms and conditions concerning the same subject matter set forth in this Agreement and any of the other Transaction Documents:

(a)     Insurance.  With respect to each Acquired REO Property, the Manager must cause the applicable Ownership Entity to maintain the applicable insurance required pursuant to (and the Manager must otherwise comply, and case the applicable Ownership Entity to comply, with the obligations set forth in) the Insurance Schedule.

(b)     Leasing Covenants.  With respect to each Acquired REO Property, the Manager must cause the applicable Ownership Entity to (i) perform the obligations that such Ownership Entity is required to perform under the leases to which it is a party in all material respects and (ii) enforce, in accordance with commercially reasonable practices for properties similar to the applicable Acquired REO Property, the material obligations to be performed by the tenants under such leases.

(c)     Zoning.  The Manager shall not permit any Ownership Entity to initiate or consent to any zoning reclassification of any portion of the Acquired REO Property owned by such Ownership Entity, or use or permit the use of any portion of an Acquired REO Property in any manner that could result in such use (taking into account any applicable variance obtained in

IV-14

accordance with the Servicing Standard) becoming a non-conforming use under any zoning ordinance or any other applicable land use Law, rule or regulation, without the prior consent of the Initial Member.

(d)    No Joint Assessment.  The Manager shall not permit any Ownership Entity to suffer, permit or initiate the joint assessment of Acquired REO Property (i) with any other real property constituting a Tax lot separate from such Acquired REO Property, and (ii) with any portion of an Acquired REO Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any Taxes which may be levied against such personal property could be assessed or levied or charged to such Acquired REO Property.

(e)    Maintenance, Repairs and Alterations.  From and after the completion of any buildings or other improvements at an Acquired REO Property, the Manager must cause the applicable Ownership Entity to maintain such Acquired REO Property in a good and safe condition and repair (subject to such alterations as the Manager may from time to time determine to be appropriate in accordance with the Servicing Standard and applicable requirements herein and in the other Transaction Documents) and in accordance with applicable Law.

(f)    Ground Leases.  With respect to any Acquired REO Property that is leased under a Ground Lease, the Manager must cause the applicable Ownership Entity to (i) pay all rents and other sums required to be paid by the tenant under and pursuant to the provisions of the applicable Ground Lease as and when such rent or other charge is payable, and (ii) diligently and timely perform and observe all of the terms, covenants and conditions binding on the tenant under the Ground Lease.  The Manager shall not permit the applicable Ownership Entity to subordinate or consent to the subordination of any Ground Lease to any mortgage, lease or other interest on or in the ground lessor's interest in the applicable Acquired REO Property without the prior consent of the Initial Member unless such subordination is required under the provisions of such Ground Lease.

(g)    Additional Construction Covenants.  In the event the Manager elects to cause the Company to fund any permitted construction with respect to Acquired REO Property, then the Manager must cause each applicable Ownership Entity to pursue with diligence the construction of the Acquired REO Property owned by such Ownership Entity (i) in accordance with the construction, construction management (if any) and all other material contracts relating to such construction, and all requirements of Law, all restrictions, covenants and easements affecting such Acquired REO Property, and all applicable governmental approvals, (ii) in accordance with all applicable requirements in the Permitted Capital Improvement Addendum, (iii) in a good and workmanlike manner and free of defects, (iv) in a manner such that such Acquired REO Property remains free from any Liens, claims or assessments (actual or contingent), in each case for any material, labor or other item furnished in connection therewith and (v) in conformance with the all other applicable requirements set forth herein and in the other Transaction Documents.

(h)    Acquired REO Property Generally.  In operating, managing, leasing or disposing of any Acquired REO Property, the Manager will act in accordance with the Servicing

IV-15

Standard and in the best interests of the Members and creditors of the Company (including the FDIC in its various capacities); and, in connection with its compliance with the foregoing, the Manager will not be required to act in accordance with Sections 5.4(b)-(f) above (or, subject to Section 5.4(i) below, an applicable Assumed Property Obligation) if such action (A) is not in the best interests of the Members and creditors of the Company (including the FDIC in its various capacities), as determined by the Manager in the exercise of its reasonable discretion or (B) otherwise violates the Servicing Standard; provided, the Manager will provide written notice to the Initial Member prior to any such permitted failure to act specifying the relevant requirements involved and reasons for the Manager so failing to act in accordance with the same.

(i)    Performance of Assumed Property Obligations and Resolution of Conflicts. The Manager will at all times cause the Company and each Ownership Entity to comply with all Assumed Property Obligations; provided, that, in the event compliance (by the Company or an applicable Ownership Entity) with any such Assumed Property Obligation would directly conflict with another requirement in the Transaction Documents (notwithstanding use of best efforts by the Private Owner, the Manager, the Servicer and any Subservicer, as applicable, to avoid such conflict and remain in compliance with the Transaction Documents):

(i)    the Manager will promptly notify the Initial Member of such conflict or potential conflict resulting from an Ownership Entity acquiring title to an Acquired Property;

(ii)    the Manager will not be required to comply with such Assumed Property Obligation if such non-compliance is permitted pursuant to the standard set forth in Section 5.4(h) above in this Annex IV; and

(iii)    if such conflict remains unresolved after application of the foregoing clause (ii), the following provisions will apply:

(A)    to the extent such Assumed Property Obligation requires Development not permitted by the Transaction Documents, the Manager will sell the Asset subject to the Assumed Property Obligations at issue or, if such a sale is not commercially feasible, (x) the Manager will provide to the Initial Member its recommended approach with respect to compliance with such Assumed Property Obligation, and (y) such Development will remain subject to the restrictions in the Transaction Documents (and to receipt of written consent of the Initial Member prior to the same being accomplished);

(B)    except as to any Development, so long as the Manager has timely provided such notice of the conflict, the Initial Member will be deemed to have provided its conditional consent to compliance by the Company and any such Ownership Entity with such Assumed Property Obligation (with waiver of such directly conflicting requirements);

(C)    any consent provided or deemed provided pursuant to this Section 5.4(i) is subject to the continuing right of the Initial Member to unilaterally modify the relevant conflicting requirements in the Transaction Documents or impose additional conditions with respect thereto in a manner consistent with the spirit and intent thereof (as determined by the

IV-16

Initial Member), and compliance with such requirements and conditions, and the terms and timing determined by the Initial Member, will be a condition to the effectiveness or continued effectiveness, as applicable, of such consent or deemed consent (and waiver), and

(D)     in addition to the foregoing requirements, in the event such Assumed Property Obligation involves such Ownership Entity (or the Manager, the Servicer, any Subservicer or any JDC Contractor) handling Asset Proceeds (without remittance of the same to the Collection Account in the applicable period pursuant to <u>Section 12.7</u>) in a manner not otherwise expressly permitted pursuant to this Agreement or permitted in writing by the Initial Member, the Manager will cause such Asset Proceeds to be held subject to a control agreement in form and substance satisfactory to the Initial Member (providing access rights, including for direction of funds, to the Initial Member, in a manner so as to collectively provide substantially the same rights, control and access as would be the case if such funds were timely deposited into the Collection Account).

(j)     <u>Reports</u>.  The Manager must furnish to the Initial Member such reports regarding the construction, leasing and sales efforts of or relating to the Acquired REO Property as the Initial Member may reasonably request.  Without limitation of the foregoing, the Monthly Reports will include applicable reporting, in form and substance satisfactory to the Initial Member, with respect to all permitted construction or development with respect to any Acquired REO Property, including, as applicable, a tracking of progress of any such construction or development and use of funds with a comparison thereof to the approved Capital Improvement Plan (in the case of Permitted Capital Improvements) and any then applicable (including as updated) Business Plan, Strategic Plan Report and Critical Strategy Resolution Business Plan (in the case of any other permitted construction or development).

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

**Annex V**

**Permitted Capital Improvement Addendum**

1.    <u>Permitted Capital Improvements</u>.  The Company may, from time to time, with respect to any Mortgaged Property or Acquired REO Property included in the Assets, cause or permit specific property improvements or preservation (and incur related Permitted Capital Improvement Expenses, including making Capital Improvement Advances), in each case to the extent expressly set forth in a Capital Improvement Plan approved by the Initial Member and funded in accordance with this <u>Annex V</u> (such approved improvements or preservation pursuant to such Capital Improvement Plan, "**Permitted Capital Improvements**"), subject to the following:

(a)    <u>Request and Approval of Capital Improvement Plans</u>.  So long as available funds remain in the Capital Improvement Account (which funds are not allocated to previously approved Permitted Capital Improvements) the Company may, based on determinations of the Manager and with the consent of the Private Owner, from time to time submit a request for approval by the Initial Member of proposed Permitted Capital Improvements of specific Assets. Any such request (a "**Capital Improvement Approval Request**") must be in writing signed by each of the Manager and the Private Owner delivered to the Initial Member specifying in reasonable detail, for such Asset, the proposed Permitted Capital Improvements (including for any proposed Capital Improvement Advances or other proposed Permitted Capital Improvement Expenses, and material terms of any proposed Modifications to Asset Documents taking into account the Loan Modification Program), including attached thereto (i) the applicable Capital Improvement Plan for such proposed Permitted Capital Improvements, (ii) an updated Appraisal for the relevant Acquired REO Property or Mortgaged Property (as applicable), dated as of a date (and reflecting an Appraised Value) not more than 1 year prior to the date of initial delivery of such Capital Improvement Approval Request, and (iii) documents evidencing the registration of the corresponding Acquired REO Property or Mortgaged Property (as applicable) with the HPD. Within forty-five Business Days after receipt of a Capital Improvement Approval Request and related Capital Improvement Plan, the Initial Member in its sole discretion, may (i) approve the submitted Capital Improvement Plan, (ii) provide the Manager and Private Owner with a description of the changes required to obtain such approval, or (iii) indicate to the Manager and the Private Owner that the plan will not be approved (and a failure of the Initial Member to provide one of the foregoing responses within forty-five Business Days after receipt of the applicable Capital Improvement Plan will be deemed as such indication that the Capital Improvement Plan will not be approved).  No Capital Improvement Plan may be modified without the approval of the Initial Member.

(b)    <u>Right to Conduct Permitted Capital Improvements</u>.  Once a Capital Improvement Plan has been approved, the Company will be permitted, to the extent that allocated Company funds in the Capital Improvement Account are available for such purpose and subject to the terms herein, to make Capital Improvement Advances, incur expenses and hire subcontractors, as applicable, as necessary for the applicable Permitted Capital Improvements, up to the approved

amount and based on the approved schedule in such Capital Improvement Plan (and an amount of funds in the Capital Improvement Account equal to the amount so included in the approved budget will be deemed allocated for purposes of the applicable Permitted Capital Improvements, with withdrawal of such funds being subject to Section 2 below).

(c)    Treatment of Capital Improvement Advances.  Each Capital Improvement Advance will, including for determinations of Unpaid Principal Balance, Loan Risk Category and Management Fees, be deemed a part of the specific Loan to which it relates (with such Loan being specifically referenced in the Capital Improvement Plan).  Accordingly, any sale or other disposition of a Loan must include any outstanding (and not otherwise then being repaid in full or cancelled) Capital Improvement Advance made in connection with such Loan, and any such outstanding Capital Improvement Advance may not be sold or otherwise disposed separately from such Loan.  Notwithstanding the foregoing, Capital Improvement Advances are subject to such separate reporting requirements as may apply from time to time pursuant to Section 4 below.

2.    Capital Improvement Account; Funding and uses of Capital Improvement Fund.

(a)    Establishment of Capital Improvement Account.  On the Closing Date, the Manager will cause the Company to establish the Capital Improvement Account with the Paying Agent for the exclusive purpose of holding the Capital Improvement Fund in accordance with the requirements herein and in the Custodial and Paying Agency Agreement.

(b)    Initial Funding of Capital Improvement Account.  On the Closing Date, the Initial Member and the Private Owner will fund, as Capital Contributions to the Company, the Capital Improvement Account in full amount of the Capital Improvement Account Deposit as follows: the Initial Member will deposit cash in the amount of the Initial Member Capital Improvement Account Deposit, and the Private Owner will deposit cash in the amount of the Private Owner Capital Improvement Account Deposit, which deposits will be made in accordance with the applicable provisions of the Private Owner Interest Sale Agreement.

(c)    Further Funding of Capital Improvement Account.  On each Distribution Date following the Closing Date, the Company will, subject to the terms hereof and of the Custodial and Paying Agency Agreement, fund (or replenish, as applicable) the Capital Improvement Fund to the extent of available Asset Proceeds (pursuant to the Priority of Payments and based on the then applicable Capital Improvement Fund Target) so as to maintain appropriate Capital Improvement Fund levels in accordance herewith.  The Manager, from time to time in the exercise of its reasonable discretion (taking into account projected Permitted Capital Improvement Expenses) and in accordance with the Servicing Standard and requirements in the Transaction Documents, (i) will determine the Capital Improvement Fund Target (to be not less than then then effective Capital Improvement Fund Floor), and (ii) may submit to the Initial Member a written request for a change (either as a  temporary or permanent increase or reduction) to the amount of the Capital Improvement Fund Floor.  In connection with any such determination of the Capital Improvement Fund Target or requested change to the Capital Improvement Fund Floor, the Initial Member will have the right to receive (and the Manager must promptly comply with any reasonable request for) any additional relevant information as it may deem necessary or advisable

V-2

for evaluating such request and related Capital Improvement Fund levels (and compliance thereof with the requirements herein). Any such requested change to the Capital Improvement Fund Floor will be effective upon, and subject to, receipt by the Manager of an applicable express approval in writing from the Initial Member. The Capital Improvement Fund Target will be specified in each Monthly Report. In the case of each Monthly Report for all Due Periods ending prior to or during the calendar month in which the final Servicing Transfer Date occurs, the Manager will inform the Initial Member, not later than the third Business Day prior to the Distribution Date in respect of such Due Period, of the Capital Improvement Fund Target that should be specified in such Monthly Report.

        (d)    <u>Use of Funds in the Capital Improvement Account</u>. Funds in the Capital Improvement Account will be used exclusively to fund, on an Asset specific basis, Permitted Capital Improvements. Disbursement of the funds (allocated pursuant to <u>Section 1(b)</u> above) from the Capital Improvement Account to pay the applicable Permitted Capital Improvement Expenses will be made by the Paying Agent, upon the direction of the Manager on a monthly basis (with one collective disbursement of funds from the Capital Improvement Account each month with respect to each Capital Improvement Plan), subject in each case and to the applicable requirements in this <u>Annex V</u> (including specific Verification Contractor approval pursuant to <u>Section 5</u> below) and in the Custodial and Paying Agency Agreement.

        (e)    <u>Release of Remaining Capital Improvement Fund</u>. At such time as may be requested or approved in writing by the Initial Member following a determination by the Private Owner that no further Permitted Capital Improvement Expenses will reasonably occur with respect to the Assets, and otherwise upon the winding-up of the Company pursuant to <u>Section 9.2</u> of the LLC Operating Agreement (whenever occurring) and prior to the Final Monthly Distribution, any remaining funds in the Capital Improvement Account will be released to the Distribution Account (or to the Collection Account for further transfer to the Distribution Account) for distribution pursuant to the Priority of Payments on the first occurring Distribution Date after such date, following which release the Manager will cause the Capital Improvement Account to be closed. In connection with, and to effect, such release, distribution and closing of the Capital Contribution Account, the Manager must provide timely instructions to the Paying Agent with respect thereto for distribution thereof in accordance with the foregoing and other applicable provisions in the Custodial and Paying Agency Agreement. Except as expressly permitted pursuant to the foregoing provisions of this <u>Section 2</u> (and applicable provisions in the Custodial and Paying Agency Agreement), the Manager shall not cause or permit withdrawals from the Capital Improvement Account.

        3.    <u>Capital Improvement Advances and Related Modifications</u>. In connection with, and for purposes of, any Permitted Capital Improvements with respect to a Loan, the Manager will determine, in accordance with the Servicing Standard (including in relation to the Loan Modification Program, where applicable), the terms of any Capital Improvement Advance to the Borrower and related Modifications to (including any applicable separate promissory notes or other new documents to form a part of) the Asset Documents for such Loan; <u>provided</u> that, in all events, the following will apply:

V-3

(a)     such terms and Modifications must be consistent with the applicable approved Capital Improvement Plan, and, subject to the foregoing, with the Servicing Standard (including in relation to the Loan Modification Program, where applicable), and any then-existing Business Plan and, if applicable, Strategic Plan Report and Critical Strategy Resolution Business Plan for or covering such Loan,

(b)     the Manager must (as to Acquired REO Property) register (and thereafter maintain such registration), or (as to Mortgaged Property) cause the applicable Borrower to register, the corresponding Acquired REO Property or Mortgaged Property, as applicable, with the HPD (using for such purposes the following site: https://www.nyc.gov/site/hpd/services-and-information/register-your-property.page); and, in respect of any Mortgaged Property, the corresponding Asset Documents must include a specific covenant from the applicable Obligors requiring such registration to be maintained so long as any portion of the applicable Loan (inclusive of any such Capital Improvement Advance) remains outstanding,

(c)     as a condition to the making of any Capital Improvement Advance, the Manager must include, or cause to be included in the corresponding Asset Documents, and thereafter enforce to the extent permissible under applicable law, specific representations, warranties and covenants from the applicable Obligors (including, if requested by the Initial Member, using specific representations, warranties, covenants and events of default required from time to time by the Initial Member) to the effect that no such Capital Improvement Advance (or related Permitted Capital Improvement) is intended to be used, whether by itself or in connection with other improvements or matters, to apply for or obtain an exemption from (or otherwise avoid applicability of), and no such Obligor will, for so long as any portion of the applicable Loan (inclusive of any such Capital Improvement Advance) remains outstanding, apply for or take any action, based in whole or in part on such Capital Improvement Advance (or related Permitted Capital Improvements), for the purpose of obtaining an exemption from (or otherwise avoiding applicability of), any Rent Stabilization or Rent Control regulation (including any such exemptions from, or removal from Rent Stabilization requirements of, the Emergency Tenant Protection Act as in effect from time to time) applicable to the Collateral securing the Loan, and

(d)     relevant decisions of the Manager with respect to use of the Capital Improvement Fund should take into account the purposes of such Capital Improvement Fund, which include (i) maximizing the value of the Assets and the Collateral, (ii) maximizing the preservation of the availability and affordability of residential real property for low-and-moderate-income individuals, and (iii) improving (or avoiding a deterioration in) the Risk Category classification of the Loans.

4.     <u>Reporting</u>.

(a)     Each Business Plan, Strategic Plan Report and Critical Strategy Resolution Business Plan prepared by the Manager is to include, in a manner consistent with the level of detail and type of information otherwise included therein, the Manager's applicable determinations and plans regarding proposed or approved Permitted Capital Improvements.

V-4

(b)    In each case to the extent requested by the Initial Member, reporting in respect of, or including specific balances, projections, performance or other information for, any Loan for which one or more Capital Improvement Advances have been made must separately track relevant information for (or report as though it were a separate Loan) each Capital Improvement Advance (or series of related Capital Improvement Advances pursuant to the same Capital Improvement Plan).

5.    <u>Verification Contractor</u>.  The Initial Member has the right, in its sole discretion and at its own expense (but without an obligation to reimburse the Company for any expenses incurred by the Company), to retain a Verification Contractor (as selected by the Initial Member in its sole discretion), for the performance by such Verification Contractor of the services set forth with respect thereto in the Transaction Documents (and such related services as the Initial Member may request from time to time), including:

(a)    assisting the Initial Member in review of Business Plans, Loan Performance Reports, Monthly Reports, Strategic Plan Reports and Critical Strategy Resolution Business Plans (in each case, including any updates thereto) and provision of recommendations to the Company or the Initial Member with respect thereto (including for purposes of confirming or determining the Risk Category of each Loan and Acquired REO Property); and

(b)    with respect to Permitted Capital Improvements,

(i)    assisting the Initial Member in its review of any Capital Improvement Approval Request, including the Capital Improvement Plan attached thereto, and recommending whether such Capital Improvement Approval Request and related Capital Improvement Plan should be approved (it being understood that no such recommendation will be binding on the Initial Member),

(ii)    assisting the Initial Member in its review of reporting in respect of, or covering, such Permitted Capital Improvements and any related Capital Improvement Advances,

(iii)    assisting in connection with administration of the Capital Improvement Account, and

(iv)    verifying that all funds released from the Capital Improvement Account are used exclusively for the purposes described in the relevant approved Capital Improvement Plan (which verification may, as determined by the Initial Member or such Verification Contractor, require physical inspections to confirm completion of applicable items and, in connection with any Capital Improvement Advance, confirmation of satisfaction of applicable conditions, in each case in accordance with such approved Capital Improvement Plan), it being agreed that disbursement of funds from the Capital Improvement Account to pay the applicable Permitted Capital Improvement Expenses pursuant to <u>Section 2(d)</u> of this <u>Annex V</u> (and applicable provisions of the Custodial and Paying Agency Agreement) will be made by the Paying Agent (and the Manager will expressly so instruct the Paying Agent to make the same) subject to,

V-5

and only following, (A) in connection with any Capital Improvement Advance, evidence (including a certification by the Manager) of satisfaction of all conditions and requirements for the making of such Capital Improvement Advance, including under the corresponding Asset Documents governing the same (taking into account any specified waivers, deferrals or other Modifications agreed by the Manager under its relevant authority in respect of such Capital Improvement Advance), (B) in connection with any applicable work (including as may be required for the making of a Capital Improvement Advance), submission of invoices and other relevant evidence (including evidence of completion of applicable work) to the Verification Contractor, (C) completion by the Verification Contractor of any applicable physical inspections pursuant to the foregoing, and (D) authorization by the Verification Contractor for release (by the Paying Agent) of applicable funds from the Capital Improvement Account following the Verification Contractor's review and verification with respect to the foregoing (including such further documents or evidence as may be requested by the Verification Contractor) and applicable compliance with the Capital Improvement Plan.

V-6

**EXHIBIT A**
**FORM OF CERTIFICATE OF FORMATION**
**OF**

**SIG RCRS C MF 2023 Venture LLC**

Pursuant to and in accordance with the provisions of § 18-201 of the Delaware Limited Liability Company Act, the undersigned hereby certifies that:

FIRST, the name of the limited liability company is SIG RCRS C MF 2023 Venture LLC (the "Company").

SECOND, the address of the registered office of the Company in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, in the City of Wilmington, County of New Castle.  The name of the registered agent at such address is Corporation Service Company.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of the Company on this 4th day of December, 2023.


By:_____
Name:  [_____]
Title:    Authorized Person

**EXHIBIT B**
**FORM OF MONTHLY REPORT**

The form of Monthly Report is based on information required pursuant to the FDIC's joint venture reporting requirements and, as of the Closing Date, is available at Venue's virtual data rooms website at the virtual data room titled "JVT – Community Preservation Corp", under the name "Form of Monthly Reports SIG RCRS C MF 2023", in the folder named "1 – SIG RCRS C MF 2023", subfolder "1.1 FDIC-MM", to which the Manager acknowledges to have received access prior the date hereof; provided, that the Initial Member reserves the right to, from time to time, designate in writing any other website and/or virtual data room for making such form available to the Manager.  Requests to add or remove access for individuals must be submitted to the Initial Member by providing a name and email address for the individuals to ███████████████ (or such other email address as may be specified by the Initial Member for such purposes pursuant to the Notice Schedule).

Such form of Monthly Report (as so available as of the Closing Date and as it may be further modified as provided herein) is deemed attached hereto and made a part hereof.

Such form of Monthly Report, and means of delivery thereof, may be adjusted from time to time after the Closing Date in accordance with Sections 3(b), 3(i), and 6 of the Reporting and Access Schedule, including pursuant to changes to the reporting information and forms as may from time to time be required pursuant to the foregoing website or otherwise in connection with any applicable use of a Reporting Service.

B-1

## EXHIBIT C
## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of _____, 20__ by and between [_____], a [_____] ("Transferor"), and _____, a _____ ("Transferee").

### RECITALS

WHEREAS, the Transferor is the owner of a limited liability company interest in SIG RCRS C MF 2023 Venture LLC a Delaware limited liability company (the "Company");

WHEREAS, such limited liability company interest represents a ___% "Percentage Interest" in the Company (as defined in that certain Amended and Restated Limited Liability Company Operating Agreement, effective as of December 15, 2023, by and among the Federal Deposit Insurance Corporation in its capacity as Receiver (as such term is defined in the Agreement of Common Terms and Definitions referred to therein) (the "Initial Member"), Transferor and the Company (the "LLC Operating Agreement"));

WHEREAS, the ownership and other rights associated with such limited liability company interest are set forth in the LLC Operating Agreement;

WHEREAS, pursuant to Section 3.13 of the LLC Operating Agreement, Transferor granted the Initial Member a first priority security interest in the Private Owner Interest (as such term is defined in the Agreement of Common Terms and Definitions referred to in the LLC Operating Agreement) in order to secure certain obligations of Transferor as more fully described in the LLC Operating Agreement;

WHEREAS, an Event of Default (as defined in the LLC Operating Agreement) has occurred and is continuing, and the Initial Member has elected, pursuant to the LLC Operating Agreement, to foreclose on its security interest in the Private Owner Interest and effect the assignment contemplated hereby;

NOW THEREFORE, in consideration of the mutual agreements contained herein and in the LLC Operating Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **Assignment and Assumption.**  Transferor hereby assigns and transfers the Private Owner Interest to Transferee, and Transferee hereby accepts and assumes the Private Owner Interest and agrees to be bound by the LLC Operating Agreement and the other Transaction Documents to which the Private Owner is a party, as amended from time to time, to the extent it relates to such Private Owner Interest.

C-1

      **2.**    **Counterparts.**  This Agreement may be executed in two or more counterparts, all of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered (including by telecopy) to the other party.

      **3.**    **No Third Party Beneficiaries.**  This Agreement will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended to confer upon any other person any rights or remedies hereunder.

      **4.**    **Governing Law.**  The laws of the State of Delaware will govern the validity, performance and enforcement of this Agreement, without giving effect to the principles of conflict of laws of the State of Delaware or any other jurisdiction.

      **IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the date first above written.

**TRANSFEROR:**

[_____]

[By:  [_____], its [_____]]

By: _____
Name:
Title:

TRANSFEREE:

_____

By: _____
Name:
Title:

C-2

**EXHIBIT D**
**FORM OF LETTER OF CREDIT**

(Bank Letterhead Stationary)

Federal Deposit Insurance Corporation, in its capacity as Initial Member (as defined below)
c/o Federal Deposit Insurance Corporation
Chief, Structured Transactions and Oversight
3501 N. Fairfax Drive
Room Number: 3701-10022
Arlington, VA 22226-3500
Attention: Mark L. Patterson
E-mail Address: ███████████████████
E-Mail Reference: ██████████████████████████████

RE: Irrevocable Transferable Letter of Credit No. _____ for
 U.S.$_____, Dated _____.

Gentlemen:

     We hereby issue our irrevocable transferable Letter of Credit No. _____
(this "**Letter of Credit**") in favor of Federal Deposit Insurance Corporation (in any capacity,
including as receiver for the failed [financial institution/financial institutions] referenced in or
pursuant to the LLC Operating Agreement defined below, in its corporate capacity or otherwise,
the "**FDIC**"), as the Initial Member under the LLC Operating Agreement defined below (including
its successors, and its assigns as provided herein, the "**Initial Member**") (such Initial Member
being the beneficiary of this Letter of Credit), for the account of Sig-23 Private Owner LLC (the
"**Private Owner**").

     We understand that this Letter of Credit is issued pursuant to the Amended and Restated
Limited Liability Company Operating Agreement dated as of December 15, 2023 (as amended or
otherwise modified from time to time, the "**LLC Operating Agreement**"), by and among [SIG
RCRS C MF 2023 Venture LLC] (the "**Company**"), the Private Owner and the Initial Member.

     We undertake to honor from time to time your draft or drafts presented to us in accordance
herewith not exceeding in the aggregate [_____] U.S. Dollars (U.S.$ [_____]).
All drafts hereunder (i) must be marked "Drawn under irrevocable transferable Letter of Credit
No. _____, dated _____", (ii) must be accompanied by a typewritten
statement signed by a purportedly authorized representative of the Initial Member stating that an
"Event of Default" or "LC Reissuance/Extension Failure" has occurred under (and as defined in)
the LLC Operating Agreement (a "**Drawing Request**"), and (iii) must, unless payment is to be

D-1

made at sight, include the wire transfer instructions for remittance by us of the amount of such draft.

Presentation of drafts drawn hereunder, together with the required statement and applicable wire transfer instructions, may be made at any time on or before the expiry date hereof [(i)] by physical presentation of such draft at, or overnight delivery of such draft to, our offices located at _____, Attention: [_____] [include contact name and address in either New York City or Washington, D.C.][1], [or] (ii) by facsimile  (at facsimile number (___) _____, Attention:_____)] [or] [(iii) by email at _____, Attention: _____]][2], without further need of documentation.  Each such drawing should be accompanied by contemporaneous telephonic notification to the Attention of [_____] at [_____].] If we receive such documents at such office, all in conformity with the terms and conditions of this Letter of Credit, we will honor your draft on the second Business Day (as defined below) after receipt of such Drawing Request.  [The original Letter of Credit, any amendments thereto and the originally signed Drawing Request on the Initial Member's letterhead must be included in the documents presented hereunder in connection with any draft, it being agreed that such original Letter of Credit and all such amendments thereto so presented will be promptly returned to you (or, if presented in person, will remain with you after we have made a copy thereof at such time of presentation) in connection with any partial draw hereunder.]

This Letter of Credit will expire at 5:00 p.m. (New York, New York time) on the date that occurs one year after the date hereof (or, if such date is not a Business Day, the immediately succeeding Business Day) (the "**Expiration Date**"); provided, however, that this Letter of Credit will be automatically extended without amendment for additional periods of one year each (in each case commencing from the expiry date hereof as then in effect), unless we elect not to extend this Letter of Credit and deliver to the Initial Member written notice of such election at least sixty days prior to any such Expiration Date.  Any such notice must be in writing and must be delivered in hand with receipt acknowledged, or by certified mail (return receipt requested), to the Initial Member at its address set forth above (or to such other address for any such notices which Initial Member may hereafter specify in a written notice delivered to the undersigned).  "**Business Day**" means any date other than a Saturday, Sunday or a day on which banks in the [State of New York] [District of Columbia][Other][3] are authorized or required by law to be closed, and a day on which payments can be effected on the Fedwire system (or any replacement thereto).

---

[1]    Note for Execution:  If applicable pursuant to clause (ii) of the definition of "Qualified Issuer" (and with the option for presentation by facsimile remaining in the Letter of Credit), a physical location in the United States outside of New York City or Washington, D.C. may be used. [This footnote should be deleted prior to execution.]

[2]    Note for Execution:  This sentence will be adjusted by the Initial Member based on whether fax or email (or other electronic) presentation of demand will be permitted.  If either is permitted, the further bracketed sentence at the end of this paragraph (requiring delivery of originals) will be removed or appropriately modified.  [This footnote should be deleted prior to execution.]

[3]    Note for Execution:  Select based on location of presentation.  [This footnote should be deleted prior to execution.]

D-2

Partial and multiple drafts are permitted, and the amount of this Letter of Credit will be reduced by each such draft honored.

All our charges (including wire transfer fees in connection with any payments by us hereunder and transfer charges in connection with a transfer of this Letter of Credit by the FDIC (in any capacity), as Initial Member, to a transferee thereof) are for the account of the Private Owner, and in no event will any such charges reduce the amount of any draft or payment hereunder[; provided, however, transfer charges in connection with a transfer of this Letter of Credit by any Initial Member other than the FDIC (in any capacity) to a transferee thereof will be for the account of such Initial Member or transferee].

We agree that we have no duty or right to inquire as to the basis upon which Initial Member has determined to present to us any draft under this Letter of Credit.

This Letter of Credit is transferable in whole but not in part to any transferee who has succeeded you as the Initial Member under the LLC Operating Agreement, and may be successively transferred. Any transfer request must be effected by presenting to us the attached form of Attachment I signed by the transferor and the transferee together with the original Letter of Credit. Upon our endorsement of such transfer, the transferee instead of the transferor will, without necessity of further action, be entitled to all the benefits of and rights under this Letter of Credit in the transferor's place; provided that, in such case, any drafts of the Initial Member to be provided hereunder must be signed by one who states therein that he is a duly authorized officer or agent of the transferee. For purposes of clarification, internal transfers within the FDIC (where following such transfer, the FDIC, in any capacity is to remain as the beneficiary of the Letter of Credit) will be effective without the need for notice or execution and delivery of any such request for transfer in the form of Attachment I hereto.

Except as otherwise expressly stated herein, this Letter of Credit is subject to the International Standby Practices, International Chamber of Commerce Publication No. 590, including any amendments, modifications or revisions thereof (the "**ISP 98**"). As to matters not covered by the ISP 98, and to the extent not inconsistent with the ISP 98, this Letter of Credit will be governed by and construed in accordance with the laws of the State of New York, including without limitation the Uniform Commercial Code as in effect in the State of New York, without regard to principles of conflict of laws.

All of the terms and conditions of this Letter of Credit are contained herein and may not be altered except by reduction in the amount of this Letter of Credit due to corresponding payments in like amount in compliance with the aforementioned terms. Except as otherwise expressly set forth herein, there are no conditions to this Letter of Credit.

Very truly yours,

D-3

By:    _____
Name:_____
Title: _____

D-4

ATTACHMENT I TO LETTER OF CREDIT

REQUEST FOR TRANSFER

[Insert Bank Name and Address]

RE:  Irrevocable Transferable Letter of Credit No. [_____] for
U.S.$[_____], Dated [_____].

Gentlemen:

Reference is made to that certain irrevocable transferable Letter of Credit No.
[_____], dated _____ (the "**Letter of Credit**"), issued by you in favor of
[_____] (the "**Transferor**"), for the account of Sig-23 Private Owner LLC, (the "**Private
Owner**").

The Transferor has transferred and assigned (and hereby confirms to you said transfer and
assignment) all of its rights in and under the Letter of Credit to [name of Transferee] (the
"**Transferee**") and confirms that the Transferor no longer has any rights under or interest in the
Letter of Credit.

The Letter of Credit is returned herewith and we request that you issue an irrevocable transferable
letter of credit in the name of the Transferee and providing for notices to be sent to the Transferee
at the address set forth below and in all other respects identical to the Letter of Credit.

Transferee hereby certifies that it is a duly authorized transferee under the terms of the Letter of
Credit and is accordingly entitled, upon presentation of the drafts (and applicable items) called for
therein, to receive payment thereunder.

Notices under the Letter of Credit should be sent to the Transferee as follows:  [Name], [Address],
[Attention:_____], E-mail Address: [_____], Fax: [_____], Tel: [_____].

     [NAME OF TRANSFEROR]

     By_____
      [Name and Title of Authorized
      Representative of Transferor]

     [NAME OF TRANSFEREE]

     By_____
      [Name and Title of Authorized
      Representative of Transferee]

D-5

**EXHIBIT E**
**FORM OF ASSIGNMENT OF JDC AGREEMENT**


[see attached]


E-1

**Execution Version**

## ASSIGNMENT OF JDC AGREEMENT

This ASSIGNMENT OF JDC AGREEMENT (this "**Assignment**"), dated as of   [_____], 20[__], is executed by and among (i) [_____] ("**JDC Contractor**"); (ii) [_____], a [_____] (["**Subservicer**"]["**Servicer**"]["**Manager**"] [1] or "**Assignor**"); [([iii]) [_____], a [_____] ("**Servicer**");] [([iv]) [_____], a [_____] ("**Manager**");] and ([vi]) the Federal Deposit Insurance Corporation ("**FDIC**") as Initial Member ("**Initial Member**") .   Terms not otherwise defined in this Agreement have the meanings ascribed to such terms in that certain Agreement of Common Terms and Definitions dated as of December 15, 2023 among SIG RCRS C MF 2023 Venture LLC ("**Company**") and the other parties thereto, as amended or otherwise modified from time to time.

## RECITALS:

A.   WHEREAS, pursuant to the Amended and Restated Limited Liability Company Operating Agreement, dated as of December 15, 2023 (the "LLC Operating Agreement"), the Manager has agreed to service, administer, manage and dispose of the Assets (including the JDC Loans as defined below) for the Company; and

[B.   WHEREAS, pursuant to the Servicing Agreement, dated as of December 15, 2023 (the "Servicing Agreement"), between the Manager and the Servicer, the Servicer has agreed to service, administer, manage and dispose of certain of such Assets (including such JDC Loans) for the Company; and]

[C.   WHEREAS, pursuant to the Subservicing Agreement, dated as of [_____] (the "Subservicing Agreement"), between the Servicer and the Subservicer, the Subservicer has agreed to service, administer, manage and dispose of certain of such Assets (including such JDC Loans) for the Company; and]

D.   WHEREAS Assignor desires to subcontract certain of its duties with respect to certain Loans included in the Assets ("**JDC Loans**") to the JDC Contractor, as evidenced by that certain [_____ Agreement] dated as of [_____] (to be effective as of the date this Assignment is fully executed by all parties hereto) entered into by the Manager and JDC Contractor (the "**JDC Agreement**"); and

---

[1] DRAFTING NOTES:
- If Assignor is:
  - o   **Subservicer:** Select options for Subservicer; retain text highlighted in this color and this color.
  - o   **Servicer:** Select options for Servicer; delete all text highlighted in this color; retain text highlighted in this color; re-letter & number as necessary.
  - o   **Manager:** Select options for Manager; delete all text highlighted in this color and this color; re-letter & number as necessary.
- If Manager is Assignor, in addition to the above: select "intentionally omitted" for Section 3; use singular option for all references to "Instructing Party(ies)" (with the same being the Initial Member); and delete all text highlighted in this color.

E.   WHEREAS, pursuant to the Transaction Documents, the Assignor is required to enter into this Assignment to pledge the JDC Agreement to secure the performance by each of [the Subservicer,][the Servicer,] the Manager and the Company of its respective obligations under the Transaction Documents, and in furtherance thereof, the Assignor agrees to provide the [Servicer,][Manager,] [and the] Initial Member ([each an][the] "**Instructing Party**" [and collectively the "**Instructing Parties**"]) with this Assignment; and

F.   WHEREAS the JDC Contractor is willing (a) to consent to this Assignment, (b) to acknowledge the rights and authority of [the/each] Instructing Party upon a default by the Company or the Assignor under the Transaction Documents (or other "Default" as defined herein), (c) to perform its obligations under the JDC Agreement for [the/each] Instructing Party and (d) to permit [the/any] Instructing Party to terminate the JDC Agreement without liability.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, [Subservicer,] [Servicer,] Manager, Initial Member and JDC Contractor agree as follows:

## AGREEMENTS:

1.     **Recitals.**     The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Assignment.

2.     **Assignment.** Assignor hereby transfers, assigns and sets over to [the] [Servicer][Manager] [Initial Member][2] all right, title and interest of Assignor in and to the JDC Agreement. [Servicer further transfers, assigns and sets over to Manager such right, title and interest.] [Manager further transfers, assigns and sets over to the Initial Member such right, title and interest.] JDC Contractor hereby consents to [each of] the foregoing assignment[s]. [Each of] [t]he foregoing assignment[s] is being made as collateral security for the full payment and performance of Assignor's [and each other assigning party's] and the Company's respective obligations under [the Subservicing Agreement,] [the Servicing Agreement,] [and] the Transaction Documents. Although it is the intention of the parties that [the/each] assignment hereunder is a present assignment, until the occurrence of a Default (and for such purpose, notice from [the/any] Instructing Party as to occurrence of the same will be deemed, as to the JDC Contractor, as conclusive evidence of such occurrence), Assignor may exercise all rights under the JDC Agreement except as otherwise provided in this Assignment. The foregoing assignment[s] will remain in effect as long as the Transaction Documents, or any part thereof, remain in effect but will automatically terminate upon full and final termination of all Transaction Documents and the dissolution and winding-up of the Company.

3.     **[Priority of Interests.** In the event that the JDC Contractor receives conflicting instructions from Instructing Parties, the JDC Contractor must follow the relevant instructions from the Instructing Party having greater priority (the Initial Member having greatest priority, followed [in order of priority] by [the Manager] [and then the Servicer]), and any exercise of rights by the Instructing Parties will also be governed by this order of priority.]   As among the Instructing Parties, the security interest of each Instructing Party will also be ranked in the same priorities, such that the security interest of any Instructing Party is senior to that of each other Instructing Party having a lower priority and the

---

[2]  Include reference to Initial Member in this sentence only if Assignor is the Manager.

security interest of any Instructing Party is subordinate to that of any Instructing Party having a higher priority.] [intentionally omitted][3]

**4.      Representations and Warranties.**   Assignor and JDC Contractor represent and warrant to [the/each] Instructing Party that (a) the JDC Agreement is unmodified and is in full force and effect, (b) the JDC Agreement is a valid and binding agreement enforceable against the parties in accordance with its terms, (c) the JDC Agreement constitutes a personal services agreement between the Assignor (in its individual capacity) and the JDC Contractor, and (d) neither party is in default in performing any of its obligations under the JDC Agreement. Assignor further represents and warrants to [the/each] Instructing Party that it has not executed any prior assignment of the JDC Agreement, nor has it performed any acts or executed any other instrument which might prevent [the/any] Instructing Party from operating under any of the terms and conditions of this Assignment, or which would limit [the/any] Instructing Party in such operation. JDC Contractor further represents and warrants to [the/each] Instructing Party that JDC Contractor (1) has not assigned its interest in the JDC Agreement, (2) has no notice of any prior assignment, hypothecation or pledge of Assignor's interest in the JDC Agreement, (3) as of the date hereof, has no counterclaim, right of set-off, defense or like right against Assignor, and (4) as of the date hereof, has been paid all amounts due under the JDC Agreement.

**5.      Instructing Party Right to Cure.**   In the event of any default by Assignor under the JDC Agreement, [the/each] Instructing Party will have the right, but not the obligation, upon notice to JDC Contractor and Assignor (and each other Instructing Party) and until such default is cured, to cure any default and take any action under the JDC Agreement to preserve the same. Assignor hereby authorizes the JDC Contractor to accept the performance of [the/any] Instructing Party in such event, without question.  [In the event more than one Instructing Party so elects to exercise such right to cure, the priority of interests as set forth in Section 3 will apply (such that the Instructing Party with highest priority will have the right to control any such cure or other action under the JDC Agreement).]

**6.      Covenants.**

    **(a)      Assignor Covenants.** Assignor hereby covenants with [the/each] Instructing Party that, during the term of this Assignment:

            (1) Assignor will not assign Assignor's interest in the JDC Agreement or any portion thereof.

            (2) Assignor will perform all obligations of Assignor under the JDC Agreement in accordance with the provisions thereof.

            (3)  Assignor will promptly notify [the/each] Instructing Party of the occurrence of any Default.

    **(b)      JDC Contractor Covenants.** The JDC Contractor hereby covenants with [the/each] Instructing Party that, during the term of this Assignment:

            (1) [The/Each] Instructing Party is a third party beneficiary under the JDC Agreement to the extent of any rights or benefits expressly granted to the Assignor thereunder, and

---

[3] [This section is not necessary if Manager is the Assignor].

[the/each] Instructing Party is entitled to enforce the JDC Agreement with respect to such rights and benefits[, respecting the priority of interests as set forth in Section 3].

(2) [The/Each] Instructing Party will have access to and the right to review, copy and audit the books and records of the JDC Contractor, and the JDC Contractor must make available its officers, directors, employees, accountants and attorneys to answer questions from [the/each] Instructing Party and its representatives or to discuss any matter relating to the JDC Contractor's affairs, finances and accounts, as they relate to the JDC Loans or any matters relating to the JDC Agreement or the rights or obligations thereunder.

(3) The JDC Contractor will deposit all Asset Proceeds relating to the JDC Loans into the Collection Account no later than [the _____][4] day of the calendar month] which follows the receipt thereof [(as identified in Exhibit A hereto), excepting only that portion of the Asset Proceeds which the JDC Contractor is authorized to retain as payment for its services under the JDC Agreement][5].

(4) The JDC Contractor consents to the immediate termination by any Instructing Party of the JDC Agreement upon the occurrence of any Insolvency Event or Dissolution Event with respect to the JDC Contractor.

(5) The JDC Contractor will provide written notice to [the/each] Instructing Party of the occurrence of any default by Assignor under the JDC Agreement, concurrently with or immediately following its delivery of notice (whether written or verbal) of the same to Assignor.

**7.    Instructing Party Rights Upon a Default.**  Following the occurrence of any of (i) the removal of the Assignor as [Subservicer][Servicer][Manager][6], (ii) the occurrence of any "Default" or "Event of Default" (howsoever defined) under [any of] the Subservicing Agreement,] [the Servicing Agreement,] the LLC Operating Agreement, (iii) any misrepresentation in any material respect by Assignor or JDC Contractor hereunder, (iv) occurrence of any default by Assignor or JDC Contractor hereunder, or (iv) occurrence of any default by the JDC Contractor under the JDC Agreement (any of the foregoing, a "**Default**"), [the/each] Instructing Party [(respecting the priority of interests as set forth in Section 3)] and any successor to the Assignor as appointed by such Instructing Party pursuant to the Transaction Documents may exercise any one or more of the following remedies, in its sole discretion:

(1)    following delivery of written notice to Assignor or JDC Contractor, as applicable, exercise any or all of the rights of the Assignor under the JDC Agreement; and

(2)    by delivery of written notice to the JDC Contractor of its election to do so, further cause the termination or assignment of the JDC Agreement to any other person, in each case without cause or liability (or payment of any fee or penalty); provided, that [the/such] Instructing Party's notice in respect of any such termination (other than in connection with an Insolvency Event or Dissolution Event with respect to the JDC Contractor) must specify the date of termination, which shall not be

---

[4] Manager to select appropriate time period based on Section 12.7 of LLC Operating Agreement.
[5] Manager to determine any set-off (which may include Servicing Expenses) based on Section 12.7 of LLC Operating Agreement.
[6] Choose only the party that is the Assignor.

less than thirty (30) days after the date of such notice (or such shorter period as may be applicable pursuant to the JDC Agreement to the extent such termination is pursuant to the enforcement by [the/such] Instructing Party of applicable termination rights in the JDC Agreement).

As among Assignor and the Instructing Parties (and without creating any rights in favor of JDC Contractor) [the/each] Instructing Party may only exercise the foregoing rights as contemplated or permitted in the Transaction Documents.

**8.      Books and Records.**   On the effective date of termination of the JDC Agreement, the JDC Contractor will turn over to Assignor or, at the request of [any/the] Instructing Party, to the Instructing Party [with the highest priority among those so requesting the same, if more than one], in a form and format usable by Assignor or [the/such] Instructing Party all books and records (electronic and otherwise) relating in any manner to the JDC Loans (copies of which may be retained by JDC Contractor, at JDC Contractor's expense), together with such authorizations and letters of direction addressed to borrowers and other parties as Assignor or [the/such] Instructing Party may reasonably require. JDC Contractor must cooperate in the transfer of its responsibilities under the JDC Agreement to the Assignor or [the/such] Instructing Party or its designees. A final accounting of unpaid fees (if any) due to the JDC Contractor under the JDC Agreement will be made within sixty (60) days after the effective date of termination, but neither the Company nor [any/the] Instructing Party will have any liability or obligation to the JDC Contractor for any such unpaid fees or other amounts payable under the JDC Agreement (it being understood that payment of the same will remain solely as an applicable obligation only of the Assignor).

**9.      Notice.**   Subject to Section 11(d), all notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement must be in writing and must be delivered by electronic mail to the applicable electronic mail address specified for the relevant party in the signature pages hereto (or to such applicable updated electronic mail address as then in effect pursuant to this Section 9).   All such notices, requests, demands and other communications to any such relevant party pursuant to the foregoing are to be deemed delivered upon the earlier to occur of (A) actual receipt (or refusal thereof) by the relevant party hereto or (B) when delivered; provided, however, that any notice, request, demand or other communication that is delivered to any such electronic mail address other than during regular business hours of the recipient will be deemed to have been delivered at the opening of business on the next Business Day of the recipient.   In no event will a voice mail message or any electronic communication (other than as expressly provided pursuant to the foregoing) be effective as a notice, confirmation or other communication hereunder.   From time to time, any party may designate a new address or electronic mail address for purposes of notice to it hereunder by notice to such effect to the other parties hereto in the manner set forth in this Section 9. Any required notice under this Assignment which does not specify how notices are to be given must be given in accordance with this Section 9.

**10.      Counterparts.**   This Assignment may be executed in any number of counterparts, each of which will be considered an original for all purposes and all of which, when taken together, will constitute one and the same instrument.   Transmission by telecopier, facsimile, e-mail, or other form of electronic transmission (including electronic document execution platforms such as DocuSign and Adobe Sign) of an executed counterpart of this Assignment will be deemed to constitute due and sufficient delivery of such counterpart.   No signatory to this Assignment may raise the use of a telecopier machine, facsimile machine, e-mail, or other form of electronic transmission (including

5

electronic document execution platforms such as DocuSign and Adobe Sign) for delivery of any counterpart of this Assignment as a defense to the formation or enforceability of this Assignment, and each such Person forever waives any such defense.

**11.     Governing Law; Jurisdiction; Venue and Service.**

(a)     THIS ASSIGNMENT IS GOVERNED BY AND IS TO BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Assignment and any mandatory, non-waivable provision of the Act, such provision of the Act will control to the extent necessary to eliminate such direct conflict. Nothing in this Agreement requires or will require any unlawful action or inaction by any Person.

(b)     Each of the parties hereto hereby irrevocably and unconditionally:

(i)     consents to the jurisdiction of the United States District Court for the Southern District of New York and to the jurisdiction of the United States District Court for the District of Columbia for any suit, action or proceeding against it commenced by the Initial Member arising out of, or relating to, or in connection with this Assignment, and waives any right to:

(1)     remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum (other than the Court in which the Initial Member files the action, suit or proceeding) without the consent of the Initial Member;

(2)     assert that venue is improper in either the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia; or

(3)     assert that the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia is an inconvenient forum;

(ii)     consents to the jurisdiction of the Supreme Court of the State of New York for any suit, action or proceeding against it commenced by the Initial Member arising out of, relating to, or in connection with this Assignment and waives any right to:

(1)     remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of the Initial Member;

(2)     assert that venue is improper in the Supreme Court of the State of New York; or

(3)     assert that the Supreme Court of the State of New York is an inconvenient forum;

(iii)     agrees to bring any suit, action or proceeding by it against the Initial Member arising out of, relating to, or in connection with this Assignment in only the United States District Court for the Southern District of New York or the United States District Court for the District of

6

Columbia, and waives any right to remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of the Initial Member, and agrees to consent thereafter to transfer of the suit, action or proceeding to either the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia at the option of the Initial Member;

(iv)    agrees, if the United States District Court for the Southern District of New York and the United States District Court for the District of Columbia both lack jurisdiction to hear a suit, action or proceeding, to bring that suit, action or proceeding in only the Supreme Court of the State of New York, and waives any right to remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of the Initial Member; and

(v)    agrees, in any suit, action or proceeding that is brought in the Supreme Court of the State of New York for New York County in accordance with the above provisions, to request that such suit, action or proceeding be referred to the Commercial Division of such Court.

(c)    In connection with any enforcement hereof by the Initial Member (where such enforcement also includes enforcement of applicable provisions under the LLC Operating Agreement), the Manager further consents to the jurisdiction of the Chancery Court of the State of Delaware under the terms set forth in Section 13.10 of the LLC Operating Agreement.

(d)    Each of the Assignor [, the Servicer][, the Manager] and the JDC Contractor hereby further irrevocably and unconditionally agree that (i) any final judgment entered against it in any suit, action or proceeding may be enforced in any court of competent jurisdiction, (ii) except as provided below, service of all writs, process and summonses in any suit, action or proceeding may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address for notices pursuant to this Assignment (provided, however, that the foregoing shall not affect the right of any party to serve process in any other manner permitted by law), and (iii) any such service of writs, process or summonses in any suit, action or proceeding on FDIC (in any capacity) will be in accordance with requirements of applicable Law (including 12 CFR § 309.7(a)), with additional delivery of a copy of such writ, process or summons to the FDIC (in its applicable capacity(ies)) pursuant to the notice provisions in this Assignment.

(e)    Nothing in this Section 11 constitutes (i) consent to jurisdiction in any court by the FDIC (in any capacity), other than as expressly provided in Section 11(b)(iii) and Section 11(b)(iv), or (ii) a waiver or limitation of any provision in the Federal Deposit Insurance Act or other applicable law relating to commencement, jurisdiction, venue, limitations, administrative exhaustion, judicial review, removal, remand, continuation or enforcement (including as to limitations on attachment or execution upon assets in the possession of the FDIC) of actions by or against the FDIC (in any capacity), or in which the FDIC (in any capacity) is a party, including 12 U.S.C. § 1819(b), 1821(c), 1821(d), and 1821(j).

(f)    EACH OF THE PARTIES HERETO, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AND AGREES THAT ANY SUCH DISPUTE IS TO BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

**12.    Severability; Amendments.**  The invalidity or unenforceability of any provision of this Assignment shall not affect the validity or enforceability of any other provision of this Assignment, all of which will remain in full force and effect.  This Assignment contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Assignment.  This Assignment may not be amended or modified except by written agreement signed by the parties hereto.

**13.    Construction.**

(a)    The captions and headings of the sections of this Assignment are for convenience only and will be disregarded in construing this Assignment.

(b)    Any reference in this Assignment to an "Exhibit" or "Schedule" or a "Section" or an "Article" will, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Assignment or to a Section or Article of this Assignment. All exhibits and schedules attached to or referred to in this Assignment, if any, are incorporated by reference into this Assignment,

(c)    Reference in this Assignment to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time.

(d)    Use of the singular in this Assignment includes the plural, and use of the plural includes the singular.

(e)    As used in this Assignment, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

(f)    Unless otherwise provided in this Assignment, if the approval of any Instructing Party is required for any matter hereunder, such approval may be granted or withheld in such Instructing Party's sole and absolute discretion; however, any such granting or withholding of approval by any Instructing Party other than the Initial Member is subject to that Instructing Party's obligations under the Transaction Documents.

(g)    Unless otherwise provided in this Assignment, if the designation, determination, selection, estimate, action or decision of any Instructing Party is required, permitted or contemplated hereunder, such designation, determination, selection, estimate, action or decision will be made in such Instructing Party's sole and absolute discretion; however, any such designation, determination, selection, estimate, action or decision by any Instructing Party other than the Initial Member is subject to that Instructing Party's obligations under the Transaction Documents.

(h)    All references in this Assignment to a separate instrument or agreement will include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(i)    "Instructing Party may" means at Instructing Party's discretion, but not as an obligation.

**[Remainder of Page Intentionally Blank]**

8

**IN WITNESS WHEREOF**, [Manager][Servicer][Subservicer][7], the [Initial Member] and JDC Contractor have signed and delivered this Assignment or have caused this Assignment to be signed and delivered, each by its duly authorized representative.

**[Manager][Servicer][Subservicer][8] and Assignor:**

**[_____]**

By: _____
Name:_____
Title:_____

Address:

with copies to:

---

[7] Choose only the party that is the Assignor.
[8] Choose only the party that is the Assignor.

SIG RCRS C MF 2023 Venture LLC
Assignment of JDC Agreement
Version 08-2022

**[Servicer]:**

[_____]


By: _____
Name:_____
Title:_____


Address:




with copies to:


[Signature Page to Assignment of JDC Agreement - Page 2 of [_]]

**[Manager]:**

[                    ]

By: _____
Name:_____
Title: _____

Address:

with copies to:

[Signature Page to Assignment of JDC Agreement - Page 3 of [_]]

**Initial Member:**

FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR SIGNATURE BRIDGE BANK, N.A., as Initial Member

By: _____

Name: _____

Title: _____

Address:

Federal Deposit Insurance Corporation
Division of Resolutions and Receiverships
Chief, Structured Transactions and Oversight
3501 N. Fairfax Drive
Room No. 3701-9006
Arlington, VA 22226-3500
Attention: Mark L Patterson
E-mail Address: ██████████████████
E-Mail Reference: ████████████████████

with a copy to:

FDIC Legal Division
Attention:  Kathleen Russo
E-mail Address: ████████████████
E-mail Reference: ████████████████████

**JDC Contractor:**

[_____]


By: _____
Name:_____
Title:_____

Address:


With a copy to:

# Exhibit A

## Collection Account

[Insert Collection Account wire transfer information prior to execution]

**EXHIBIT F**
**FORM OF CASH FLOW PROJECTIONS**

The form of cash flow projections includes the required information pursuant to the Initial Member's joint venture reporting requirements and, as of the Closing Date, is available at Venue's virtual data rooms website at the virtual data room titled "JVT – COMMUNITY PRESERVATION CORP", under the name "Form of Semi-Annual Reports SIG RSRC MF C 2023", in the folder named "1 – SIG RCRS C MF 2023", subfolder "1.1 FDIC-MM", to which the Manager acknowledges to have received access prior to the date hereof; provided, that the Initial Member reserves the right to, from time to time, designate in writing any other website and/or virtual data room for making such form available to the Manager.  Requests to add or remove access for individuals must be submitted to the Initial Member by providing a name and email address for the individuals to ███████████████████ (or such other email address as may be specified by the Initial Member for such purposes pursuant to the Notice Schedule).

Such form of cash flow projections (as so available as of the Closing Date and as it may be further modified as provided herein) is deemed attached hereto and made a part hereof.

Such form of cash flow projections, and means of delivery thereof, may be adjusted from time to time after the Closing Date in accordance with Section 7.7(g) of the LLC Operating Agreement and Sections 6 of the Reporting and Access Schedule, including pursuant to changes to the reporting information and forms as may from time to time be required pursuant to the foregoing website or otherwise in connection with any applicable use of a Reporting Service.

F-1

**EXHIBIT G**
**FORM OF POST-TERMINATION LPOA**

**LIMITED POWER OF ATTORNEY**

Dated as of [_____], 20[__]

WHEREAS SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**Company**"), is subject to and is organized in accordance with the terms and conditions of that certain Amended and Restated Limited Liability Company Agreement dated as of the date of this Limited Power of Attorney by and among the Federal Deposit Insurance Corporation in its capacity as the Receiver (the "**Initial Member**"), Sig-23 Private Owner II LLC, a limited liability company organized under the laws of the State of Delaware (the "**Private Owner**"), and the Company (the "**LLC Operating Agreement**");

WHEREAS, in connection with the execution and delivery of the LLC Operating Agreement, the Private Owner is purchasing an equity interest in the Company pursuant to that certain Private Owner Interest Sale Agreement dated as of the date of this Limited Power of Attorney by and among the Private Owner, the Initial Member, and the Company;

WHEREAS, pursuant to Section 9.4 of the LLC Operating Agreement, the Company is required to and desires to appoint the Private Owner as Attorney-in-Fact for the Company to resolve any obligations of the Company or any subsidiary of the Company that might exist or arise following, and notwithstanding, the winding up and termination of the Company pursuant to the terms and conditions of the LLC Operating Agreement; and

WHEREAS the undersigned has full authority to execute this Limited Power of Attorney on behalf of the Company,

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Company makes, constitutes and appoints the Private Owner as its true and lawful Attorney-in-Fact, with full power and authority to act, as described in this Limited Power of Attorney, following the termination of the Company pursuant to the provisions of Article IX of the LLC Operating Agreement:

1.  To liquidate any remaining property contributed to, acquired by, or otherwise owned by the Company or any subsidiary of the Company, whether real or personal, tangible or intangible (including, without limitation, any legal or equitable interest in such property, ownership interests in entities owning real or personal property, and money), and including, without limitation, to resolve fully and finally all loans, including any loan (and rights to any related deficiency balance) that has not been so fully and finally resolved by way of a disposition or permitted distribution-in-kind;

G-1

2.    To close any remaining accounts of the Company or any subsidiary of the Company (after all remaining funds therein have been liquidated), all in a manner that avoids any further obligations or required actions of the Company or any subsidiary of the Company following the termination of the Company;

3.    To distribute any remaining assets or property of the Company or any subsidiary of the Company in accordance with the priorities set forth in Section 9.3 of the LLC Operating Agreement;

4.    To execute, acknowledge, seal and deliver on behalf of the Company or any subsidiary of the Company any and all deed of trust/mortgage note endorsements, assignments of deeds of trust/mortgages and other recorded instruments or documents, partial or total satisfactions/releases/reconveyances of deeds of trust/mortgages, UCC transfer or release documents, subordinations, tax authority notifications and declarations, deeds, bills of sale, and other instruments of sale, transfer, or conveyance, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits, and supporting documents or instruments as might be necessary or appropriate to resolve fully and finally (whether by sale, transfer, liquidation, release, reconveyance, or otherwise) all property contributed to, acquired by, or otherwise owned by the Company or any subsidiary of the Company that has not been so fully and finally resolved;

5.    To take any and all actions not otherwise expressly authorized pursuant to any other paragraph of this Limited Power of Attorney necessary or appropriate pursuant to applicable law to complete to resolve fully and finally all property contributed to, acquired by, or otherwise owned by the Company or any subsidiary of the Company that has not been so fully and resolved;

6.    To take any and all actions not otherwise expressly authorized pursuant to any other paragraph of this Limited Power of Attorney necessary or appropriate pursuant to applicable law to complete the termination of the Company and any subsidiary of the Company and to cancel any certificate of organization or any other organizational document or instrument with respect to the Company or any subsidiary of the Company; and

7.    To engage in any and all acts, things, and activities that are related to, incidental or conducive, directly or indirectly, to the attainment of the foregoing objectives, including, but not limited to, obtaining the notarization of any documents or instruments,

giving and granting unto said Attorney-in-Fact full power and authority to do and perform each and every act and thing whatsoever requisite, necessary and proper to be done in the performance of the above objectives to all intents and purposes as it might or could do if it were acting for itself with full power of substitution and revocation, hereby ratifying and confirming all that the named

G-2

Attorney-in-Fact lawfully does or causes to be done pursuant to or in accordance with this Limited Power of Attorney.

This Limited Power of Attorney, and the appointment of the Private Owner as Attorney-in-Fact for the Company, are irrevocable and coupled with an interest, in full force and effect, unless the Private Owner no longer acts or serves as the Manager of the Company in accordance with the terms and conditions of the LLC Operating Agreement at any time prior to the termination of the Company pursuant to the provisions of Article IX of the LLC Operating Agreement, in which event this Limited Power of Attorney, and the appointment of the Private Owner as Attorney-in-Fact for the Company, automatically will cease and terminate ("**LPOA Termination**"). Any third party may rely upon this Limited Power of Attorney as evidence of the named Attorney-in-Fact's authority to continue to exercise the powers granted pursuant to this Limited Power of Attorney unless a written instrument of LPOA Termination has been recorded in the public records of the State of Delaware, where this Limited Power of Attorney is to be recorded,[4] or unless a third party has received actual notice of LPOA Termination.

IN WITNESS WHEREOF, the Company by its duly authorized agent empowered to act on its behalf, has caused these presents to be executed and subscribed in its name this [__] day of [__], 20[__].

SIG RCRS C MF 2023 VENTURE LLC,
a Delaware Limited Liability Company[5]

By:  [_____],a [_____], as Manager


By:_____
Name:
Title:  [Authorized Signatory]

---

[4]    Note for Execution:  This Limited Power of Attorney is to be recorded in the Delaware public records promptly after execution, using the appropriate form (see footnote 3).  [This footnote to be deleted prior to execution.]

[5]    Note for Execution:  This Limited Power of Attorney is to be executed by the Manager on behalf of the Company.  [This footnote to be deleted prior to execution.]

G-3

[Signed, sealed and delivered
in the presence of


By:_____
Name:
Witness



By:_____
Name:
Witness][6]

---

[6]     Note for Execution:  If applicable based on FDIC determinations and intended use, this Limited Power of Attorney may be executed including the witnesses (in which case the bracketed witness signature blocks should be retained) and/or removing the witnesses (in which case the bracketed witness signature blocks should be removed). This Limited Power of Attorney may also be executed in any additional technical form that the FDIC believes to be appropriate at the time of execution.[This footnote should be deleted prior to execution.]

G-4

## ACKNOWLEDGMENT

STATE OF _____ )

                                              ) ss:

COUNTY OF _____ )


        The foregoing Limited Power of Attorney was acknowledged before me this [__] day of [__], 20[__], by [_____], in [his/her] capacity as [Authorized Signatory] of [_____],a [_____], in its capacity as Manager of SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company, as the free act and deed of the limited liability company.


                                     _____

                                     Notary Public

[SEAL]                                My commission expires:

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

**EXHIBIT H**
**FORM OF LOAN PERFORMANCE REPORT**

The form of Loan Performance Report includes the required information pursuant to the Initial Member's joint venture reporting requirements and, as of the Closing Date, is available at Venue's virtual data rooms website at the virtual data room titled "JVT – COMMUNITY PRESERVATION CORP", under the name "Form of Semi-Annual Reports SIG RCRS C MF 2023", in the folder named "1 – SIG RCRS C MF 2023", subfolder "1.1 FDIC-MM", to which the Manager acknowledges to have received access prior to the date hereof; provided, that the Initial Member reserves the right to, from time to time, designate in writing any other website and/or virtual data room for making such form available to the Manager.  Requests to add or remove access for individuals must be submitted to the Initial Member by providing a name and email address for the individuals to ███████████████████ (or such other email address as may be specified by the Initial Member for such purposes pursuant to the Notice Schedule).

Such form of cash flow projections (as so available as of the Closing Date and as it may be further modified as provided herein) is deemed attached hereto and made a part hereof.

Such form of Form of Loan Performance Report, and means of delivery thereof, may be adjusted from time to time after the Closing Date in accordance with Section 7.7(g) of the LLC Operating Agreement and Sections 6 of the Reporting and Access Schedule, including pursuant to changes to the reporting information and forms as may from time to time be required pursuant to the foregoing website or otherwise in connection with any applicable use of a Reporting Service.

H-1

**EXHIBIT I**
**LOAN CRITERIA MATRIX**

**Loan Criteria Matrix**



I-1



I-2



I-3

# EXHIBIT J
## FORM OF STRATEGIC PLAN REPORT

The form of Strategic Plan Report includes the required information pursuant to the Initial Member's joint venture reporting requirements and, as of the Closing Date, is available at Venue's virtual data rooms website at the virtual data room titled "JVT – Community Preservation Corp" in the folder named "SIG RCRS C 2023", to which the Manager acknowledges to have received access prior the date hereof; provided, that the Initial Member reserves the right to designate in writing and, from time to time, any other website and/or virtual data room to make such form available to the Manager.  Requests to add or remove access for individuals must be submitted to the Initial Member by providing a name and email address for the individuals to [REDACTED] (or such other email address as may be specified by the Initial Member for such purposes pursuant to the Notice Schedule).

Such form of Strategic Plan Report (as so available as of the Closing Date and as it may be further modified as provided herein) is deemed attached hereto and made a part hereof.

Such form of Strategic Plan Report, and means of delivery thereof, may be adjusted from time to time after the Closing Date in accordance with Section 7.9 of the LLC Operating Agreement and Section 6 of the Reporting and Access Schedule, including pursuant to changes to the reporting information and forms as may from time to time be required pursuant to the foregoing website or otherwise in connection with any applicable use of a Reporting Service.

SIG RCRS C MF 2023 Venture LLC
Amended and Restated LLC Operating Agreement
Version 08-2022 (Standard)

**Exhibit B**

**PRIVATE OWNER INTEREST ASSET VALUE SCHEDULE**

**Exhibit C**

**[FORM OF TRANSFEREE ACKNOWLEDGMENT AND CERTIFICATION]**

**<u>TRANSFEREE ACKNOWLEDGMENT AND CERTIFICATION</u>**

  Reference is made to the Private Owner Interest Sale and Assignment Agreement dated December 15, 2023 (the "**<u>Private Owner Interest Sale Agreement</u>**") by and among SIG-23 Private Owner LLC, a Delaware limited liability company (the "**<u>Private Owner</u>**"), the Federal Deposit Insurance Corporation in its capacity as Receiver (the "**<u>Initial Member</u>**"), and SIG RCRS C MF 2023 Venture LLC (the "**<u>Company</u>**"). Capitalized terms used, and not otherwise defined, in this Transferee Acknowledgment and Certification have the meanings given in the Private Owner Interest Sale Agreement (including without limitation in the Agreement of Common Terms and Definitions referred to therein).

  The undersigned, the Private Owner, hereby acknowledges and certifies to the Initial Member that it has read and understands, and is prepared to cause the Company to comply with, the obligations imposed upon the Company under the Transfer Agreement and the Transaction Documents. Without limiting the foregoing, and subject to the provisions of the Transfer Agreement and the Transaction Documents, the Private Owner is aware of and prepared to cause the Company to comply with the obligations as specified in the Transfer Agreement (i) to remove the Initial Member and the Failed Bank, and if applicable, any of their predecessors-in-interest (including, without limitation, the Prior Transferor and the Prior Failed Bank) as a party to any Assumed Closing Date Asset Litigation (including without limitation the actions on the List (as defined below) constituting Assumed Closing Date Asset Litigation), and to substitute the Company as the real party-in-interest in any such Assumed Closing Date Asset Litigation and (ii) to take all actions necessary to file (x) proofs of claims in pending bankruptcy cases involving any Assets for which the Initial Member or the Failed Bank, and if applicable, any of their predecessors-in-interest (including, without limitation, the Prior Transferor and the Prior Failed Bank) has not already filed a proof of claim, and (y) all documents required by Rule 3001 of the Federal Rules of Bankruptcy Procedure and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Assets in order to evidence and assert the Company's rights.

  Attached hereto as Schedule I is a list of litigation made available with respect to the Assets (the "**<u>List</u>**"). The undersigned acknowledges that the Initial Member makes no representation or warranty as to the completeness or accuracy of the List or the information contained or referred to therein and that (without limitation of the foregoing) there may be additional litigation or bankruptcy actions pending against the Failed Bank (or the Prior Failed Bank) or the Initial Member with respect to the Assets or with respect to other parties with respect to the Assets.

Date: [_____], 20[__]    [_____], a [_____]

           By:_____

           Name: [_____]

           Title:  Authorized Signatory

**SCHEDULE I TO TRANSFEREE ACKNOWLEDGMENT AND CERTIFICATION**

<u>**LIST OF LITIGATION**</u>

None.

**Exhibit D**

**[FORM OF JOINDER AND CONSENT AGREEMENT]**

**<u>JOINDER AND CONSENT AGREEMENT</u>**

THIS JOINDER AND CONSENT AGREEMENT, dated as of [_____], 2023, is delivered pursuant to <u>Section 1(b)</u> of the Private Owner Interest Sale and Assignment Agreement, dated as of December 15, 2023, by and among SIG-23 Private Owner LLC, a Delaware limited liability company (the "**<u>Private Owner</u>**"), the Federal Deposit Insurance Corporation, in its capacity as Receiver (the "**<u>Initial Member</u>**"), and SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**<u>Company</u>**") (the "**<u>Private Owner Interest Sale Agreement</u>**"). Capitalized terms used herein without definition are used as defined in the Private Owner Interest Sale Agreement (including without limitation in the Agreement of Common Terms and Definitions referred to therein).

By executing and delivering this Joinder and Consent Agreement, the Private Owner hereby becomes a party to the Asset Transfer Agreement, dated as of the date of this Joinder and Consent Agreement, by and between the Initial Member and the Company (the "**<u>Transfer Agreement</u>**") with the same force and effect as if originally named as a party to the Transfer Agreement and, without limiting the generality of the foregoing, consents to and assumes all obligations and liabilities imposed upon the Private Owner pursuant to the Transfer Agreement. The Private Owner hereby agrees to be bound for all intents and purposes as a party to the Transfer Agreement.

*(remainder of page intentionally left blank)*

IN WITNESS WHEREOF, the Private Owner has caused this Joinder and Consent Agreement to be duly executed and delivered as of the date first above written.

**PRIVATE OWNER:**

**SIG-23 PRIVATE OWNER LLC**

By:_____
Name: David Rothberg
Title: Authorized Signatory

ACKNOWLEDGED AND AGREED as of the date
first above written:

**INITIAL MEMBER**:

**FEDERAL DEPOSIT INSURANCE CORPORATION**, in its capacity as Receiver for Signature Bridge Bank, N.A.

By:_____
Name: [_____]
Title:  [_____]

**COMPANY:**

**SIG RCRS C MF 2023 VENTURE LLC**
By: Federal Deposit Insurance Corporation, in its capacity as Receiver for Signature Bridge Bank, N.A., as Sole Member and Manager

By:_____
Name: [_____]
Title:  [_____]

**Exhibit E**

**[FORM OF PO OWNER UNDERTAKING]**

**PO OWNER UNDERTAKING**

This PO OWNER UNDERTAKING (this "Undertaking"), dated as of December 15, 2023[2] is made by [_____], a [_____] (the "Promisor"), for the severable benefit of each of the Company and the Initial Member[3] (as such terms are defined hereinbelow) (collectively, the "Beneficiaries").

W I T N E S S E T H:

WHEREAS, Promisor and/or Affiliates of the Promisor, either alone or together with one or more other Persons, Control and/or hold an Ownership Interest in, SIG-23 Private Owner LLC (the "Private Owner"), a Delaware limited liability company;

[WHEREAS, it is contemplated that contemporaneously with the execution and delivery hereof, (i) the Transferor and the Company will execute and deliver the Transfer Agreement, pursuant to which, inter alia, the Assets will be contributed to the Company, and (ii) the Federal Deposit Insurance Corporation in its capacity as Receiver, the Company and the Private Owner will execute and deliver that certain Private Owner Interest Sale and Assignment Agreement dated of even date herewith (the "Private Owner Interest Sale Agreement"), pursuant to which, inter alia, the Private Owner will acquire the Private Owner Interest and become a member of the Company;

WHEREAS, the parties to the Transfer Agreement and the Private Owner Interest Sale Agreement (other than the Private Owner) are not willing to proceed with the execution and delivery thereof unless the Promisor, contemporaneously therewith, executes and delivers this Undertaking (and the Private Owner is required to cause the Promisor to execute and deliver this Undertaking pursuant to the Private Owner Interest Sale Agreement);][4]

[WHEREAS, prior to the date hereof, (i) the Transferor and the Company executed and delivered the Transfer Agreement, pursuant to which, inter alia, the Assets were contributed to the Company, and (ii) the Federal Deposit Insurance Corporation in its capacity as Receiver, the Company and the Private Owner executed and delivered that certain Private Owner Interest Sale and Assignment Agreement dated December 15, 2023 (the "Private Owner Interest Sale Agreement"), pursuant to which, inter alia, the Private Owner acquired the Private Owner Interest and become a member of the Company; and

---

2.  To be dated as of the Closing Date in the case of any Undertaking delivered on the Closing Date.  To be dated as of the date of delivery in the case of any Undertaking delivered after the Closing Date.

3.  If this Undertaking is being executed after the Closing Date, the bracketed language may be omitted if the Secured Obligations have, prior to execution, been indefeasibly paid in full.

4.  This "Whereas" clause, and the immediately preceding "Whereas" clause, are to be included in an Undertaking executed on the Closing Date.

WHEREAS, pursuant to one or more undertakings executed and delivered pursuant to the Private Owner Interest Sale Agreement, one or more other Persons covenanted that the Promisor would execute and deliver this Undertaking (and in any event the failure of the Promisor to execute and deliver this Undertaking would constitute an "Event of Default" under the LLC Operating Agreement to the detriment of the Private Owner and the Promisor);][5]

NOW, THEREFORE, [in order to induce the parties to the Transfer Agreement and the Private Owner Interest Sale Agreement (other than the Private Owner) to proceed with the execution and delivery thereof, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged,][6] [in order to fulfill the requirements of the prior undertaking(s), and to avoid the Event of Default, described above,][7] the Promisor hereby irrevocably and unconditionally undertakes and covenants, for the several benefit of each of the Beneficiaries, as follows:

1.    Certain Definitions.  Capitalized terms used, but not otherwise defined, in this Undertaking (including in the preamble and recitals hereto) have the respective meanings ascribed to such terms in the Private Owner Interest Sale Agreement (including in the Agreement of Common Terms and Definitions referenced therein).

2.    Representations and Warranties.  The Promisor hereby represents and warrants to each of the Beneficiaries that:

(a)    The Promisor has all power and authority necessary to enter into this Undertaking and to perform its obligations hereunder;

(b)    This Undertaking has been duly executed and delivered by the Promisor, and constitutes the valid and legally binding agreement of the Promisor, enforceable in accordance with its terms against the Promisor subject to the effect of bankruptcy, insolvency, moratorium and other similar laws relating to creditors' rights generally;

(c)    The execution, delivery and performance of (including compliance by the Promisor with) this Undertaking will not result in any violation or breach of, or default under, any contract, agreement or other instrument to which the Promisor or any of its Affiliates is a party or by which the Promisor or any of its Affiliates is bound, any fiduciary duty owed by the Promisor or any of its Affiliates to any third party, or any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Promisor or any of its Affiliates or to the properties of the Promisor or any of its Affiliates; and

(d)    No consent, approval, order, or authorization of, or registration, declaration or filing with, any governmental authority remains to be obtained or made by the Promisor or any

---

5.    This "Whereas" clause, and the immediately preceding "Whereas" clause, are to be included in an Undertaking executed after the Closing Date.

6.    Bracketed language to be included in an Undertaking executed on the Closing Date.

7.    Bracketed language to be included in an Undertaking executed after the Closing Date.

of its Affiliates in connection with the execution and delivery of this Undertaking by the Promisor or the performance of its obligations hereunder.

3.    <u>Undertakings</u>.

(a)    The Promisor (i) must not, and it must procure that none of its Affiliates, and no other PO Owner, at any time prior to the first day after the sixth anniversary of the Final Distribution, institute or join, or join or assist any other Person in instituting or joining, or (individually or together with others) cause the Private Owner or the Company to institute, a Specified Proceeding, and (ii) without limitation of <u>clause (i)</u>, must procure that (x) the Private Owner does not, at any time prior to the first day after the sixth anniversary of the Final Distribution, institute or join, or join or assist any other Person in instituting or joining, or cause the Company to institute, a Specified Proceeding (for this purpose disregarding references in the definition of the term "Specified Proceeding" to the Private Owner), in each case without the consent of the Initial Member, (y) the Private Owner does not, prior to the Final Distribution, institute any Specified Proceeding (for this purpose disregarding references in the definition of the term "Specified Proceeding" to the Company), and (z) without limiting the generality of <u>clause (ii)(y)</u>, no Dissolution Event occurs with respect to the Private Owner prior to the Final Distribution.

(b)    The Promisor must procure that each other PO Owner, contemporaneously with its first becoming a PO Owner, executes and delivers to the Beneficiaries an instrument in the form of this Undertaking.

(c)    [The Promisor hereby irrevocably designates, appoints and empowers [_____] with offices at [_____], as its authorized agent for service of process in the United States in any suit, action or proceeding with respect to this Undertaking and the Transaction Documents, and shall provide to the Beneficiaries a letter from such process agent, dated on or about the date hereof, accepting its irrevocable appointment as process agent for the Promisor and confirming that any and all fees due for such appointment have been paid, for a term extending not less than [six months after the tenth anniversary of the Closing Date]. Such process agent (or another process agent acceptable to the Initial Member) will remain in place through the first day after the sixth anniversary of the Final Distribution. At least six months prior to the expiration (or potential date of termination) of any process agent appointment pursuant to this <u>Section 3(a)</u>, where such expiration (or termination) may occur prior to the first day after the sixth anniversary of the Final Distribution, the Promisor will deliver an updated confirmation from such process agent (or replacement process agent) evidencing a continuing irrevocable appointment and acceptance extending for not less than one year after the date of delivery of such confirmation to the Initial Member.][8]

4.    <u>Binding Effect; Beneficiaries; Assignment</u>.  This Undertaking will be binding upon the successors and assigns of the Promisor.  This Undertaking is for the benefit of (but solely for the benefit of) each of the Beneficiaries and their respective successors or assigns (each of whom, subject to <u>Section 7</u> below (and the incorporation pursuant thereto of <u>Section 2.1(p)</u>

---

[8]    If the Promisor is not a United States Person, an acceptable process agent in the United States must be included.

4

of the Common Terms) is hereby constituted an express third party beneficiary of this Undertaking) and no other Person will be deemed to have any rights or remedies hereunder or by reason of the existence of this Undertaking or any term hereof.

5.    Waivers and Amendments.  This Undertaking may not be amended, and no waiver of any provision of this Undertaking will be effective, in each case except by an instrument in writing and executed by the Promisor and, subject to Section 7 below (and the incorporation pursuant thereto of Section 2.1(p) of the Common Terms), each Beneficiary.

6.    Specific Enforcement.  The Promisor agrees that there can be no adequate remedy at law for any failure by it to comply with the terms hereof and, accordingly, (i) each Beneficiary will be entitled to equitable relief, including but not limited to injunction, in the event of any such failure (or any threat thereof), in addition to whatever remedies such Beneficiary might have at law, and (ii) the Promisor will not oppose the granting of such relief and hereby irrevocably waives any requirement for the security or posting of any bond in connection with such relief.  The Promisor agrees to indemnify and hold harmless each Beneficiary from and against any Losses incurred by such Beneficiary in connection with or arising out of any breach of this Undertaking by the Promisor.

7.    Common Terms.  The Common Terms apply to this Agreement, except that (a) Sections 2.1(d) (Binding Effect; Assignment), 2.1(i) (Entire Agreement) and 2.1(k) (Amendments and Waivers) of such Common Terms do not apply to this Agreement, and (b) in the event of a conflict between any provision of the Common Terms and any provision in this Agreement, the terms of this Agreement will prevail.

8.    Notices.  For purposes of Section 2.1(f) (Notices) of the Common Terms (as applicable hereto) and the Notice Schedule, (i) the initial notice address for the Promisor is as set forth below, and (ii) the Promisor will send a copy of any notice by it of any change of address or electronic mail address for purpose of this Undertaking (and the Notice Schedule) to each of the Beneficiaries in the manner set forth in the Notice Schedule.

Address for notices or communications to the Promisor:

[PROMISOR]

[_____]
[_____]
Attention:  [_____]
Email Address: [_____]

with copies to:

[_____]
[_____]
Attention:  [_____]
Email Address: [_____]

[The rest of this page intentionally has been left blank.]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Undertaking as of the date first above written.

[NAME OF SIGNATORY]


By: _____
Name: [_____]
Title: [_____]

**Exhibit F**

**[FORM OF LETTER DESIGNATING INDIVIDUALS FOR
LIMITED POWER OF ATTORNEY]**

December, 15, 2023

Federal Deposit Insurance Corporation,
  as Receiver (as such term is defined
  in the Agreement of Common Terms and Definitions
  referred to herein)
550 17th Street, NW (Room F-7014)
Washington, D.C. 20429-0002
Attention: Kathleen Russo


Re:   Designation of Individuals for Limited Power of Attorney

Ladies and Gentlemen:

We refer to (i) that certain Private Owner Interest Sale and Assignment Agreement dated as of the date hereof, by and among  SIG-23 Private Owner LLC, a Delaware limited liability company, the Federal Deposit Insurance Corporation in its capacity as Receiver, and SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**Private Owner Interest Sale Agreement**") and (ii) the Transfer Agreement (as defined in the Agreement of Common Terms and Definitions referred to herein).  For purposes of this letter, all terms used in this letter that are defined in, or by reference in, that certain Agreement of Common Terms and Definitions dated as of the date hereof among the parties to the Private Owner Interest Sale Agreement and certain others (the "**Agreement of Common Terms and Definitions**"), and are not otherwise defined herein, have the meanings and definitions given, or referred to, in the Agreement of Common Terms and Definitions.  This letter is being delivered pursuant to Section 4(b) of the Private Owner Interest Sale Agreement.
We hereby designate the following individuals as the individuals that should be listed in Exhibit A to each Limited Power of Attorney:

David Rothberg
Andrea Gladstone
Robert Riggs
Stephanie Canzani
Joya Cohen

We hereby certify that we have complied with the requirements of Section 3.1(d)(iv) of the Transfer Agreement in relation to the designation set forth in the preceding sentence.
This letter is deemed to be a Transaction Document.  This letter may be executed and delivered by electronic transmission (including electronic document execution platforms such as DocuSign and

Adobe Sign), and in any number of counterparts, each of which will be deemed to be an original and all of which together constitute one instrument.

Very truly yours,

**PRIVATE OWNER:**

**SIG-23 PRIVATE OWNER LLC**

By:_____
Name: Rafael Cestero
Title: Authorized Signatory