# Exhibit I

**Execution Version**

**AGREEMENT OF COMMON TERMS AND DEFINITIONS**

**Dated as of December 15, 2023**

**TABLE OF CONTENTS**

Page

**Article I**      Certain Definitions ..................................................................2

Section 1.1.   Definitions ...........................................................2

Section 1.2.   Application of the Rules of Construction ...................72

**Article II**     Common Terms .....................................................................72

Section 2.1.   Common Terms ...................................................73

(a)    Counterparts .........................................................72

(b)    Signatures; Electronic Delivery .................................73

(c)    Expenses ..............................................................73

(d)    Binding Effect; Assignment .....................................73

(e)    Compliance with Law ..............................................73

(f)    Notices .................................................................73

(g)    Severability ...........................................................73

(h)    No Presumption .....................................................74

(i)    Entire Agreement ...................................................74

(j)    Headings ...............................................................74

(k)    Amendments and Waivers ........................................74

(l)    Jurisdiction and Venue ............................................75

(m)    Governing Law .......................................................77

(n)    Waiver of Jury Trial ................................................77

(o)    Affiliates ...............................................................77

(p)    Third Party Beneficiaries .........................................77

SIG RCRS C  MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

**Article III**     Miscellaneous ...................................................................................................78

     Section 3.1.     Application of the Common Terms ............................................................78

     Section 3.2.     Enforceability of this Agreement...............................................................78

     Section 3.3.     Waivers and Amendments .........................................................................78

     Section 3.4.     Successors and Assigns...............................................................................78

     Section 3.5.     Custodian and Paying Agent Special Acknowledgments.........................79

Schedules

**Schedule I**     Notice Schedule

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

## AGREEMENT OF COMMON TERMS AND DEFINITIONS

THIS AGREEMENT OF COMMON TERMS AND DEFINITIONS (as the same is amended, modified or supplemented in accordance with the terms of this agreement, this "**Agreement**"), is made and entered into as of the Closing Date, by and among: (i) the Federal Deposit Insurance Corporation in its capacity as the Receiver, as the "Transferor" as defined herein (in such capacity, the "**Transferor**"); (ii) the Federal Deposit Insurance Corporation in its capacity as the Receiver, as the "Initial Member" as defined herein (in such capacity, the "**Initial Member**"); (ii) SIG-23 Private Owner LLC, a Delaware limited liability company (the "**Private Owner**"); (iii) SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company (the "**Company**"); and Computershare Trust Company N.A., a national banking association organized under the laws of the United States (the "**Bank**").  All capitalized terms used in this Agreement and that are defined in this Agreement will have the meanings and definitions set forth in this Agreement.

WHEREAS, the Transferor and the Company have entered into, or are contemporaneously with the execution and delivery of this Agreement entering into, that certain Transfer Agreement;

WHEREAS, the Private Owner, the Initial Member and the Company have entered into, or are contemporaneously with the execution and delivery of this Agreement entering into, that certain Private Owner Interest Sale Agreement;

WHEREAS, the Company, the Initial Member, the Private Owner and the Bank have entered into, or are contemporaneously with the execution and delivery of this Agreement entering into, that certain Custodial and Paying Agency Agreement;

WHEREAS, the Company, the Initial Member and the Private Owner have entered into, or are contemporaneously with the execution and delivery of this Agreement entering into, that certain LLC Operating Agreement;

WHEREAS, each party to this Agreement is a party to, or contemporaneously with the execution and delivery of this Agreement is becoming a party to, one or more of the Core Agreements or Transaction Documents;

WHEREAS, the parties to this Agreement wish to adopt the definitions in this Agreement as the common definitions of capitalized terms used in the Core Agreements; and

WHEREAS, the parties to this Agreement wish to adopt the common terms set forth in this Agreement as common terms generally applicable to the Transaction Documents;

NOW, THEREFORE, in consideration of the premises and the other covenants and conditions contained in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, each party which has executed this Agreement agrees as follows:

# ARTICLE I

## Certain Definitions

Section 1.1.    <u>Definitions</u>.  Unless otherwise defined in the respective Core Agreement, the following terms in the Core Agreements will have the meanings and definitions respectively set forth in this <u>Section 1.1</u>.

"**A/B Note**" means, with respect to any Loan and related Note, two promissory notes originating from a single Note where the B promissory note (B Note) is related (subordinated) to a senior promissory A note (A Note) and both share the same collateral. The B Note represents the difference between the total Unpaid Principal Balance of the applicable originating single Note and Unpaid Principal Balance of the A Note (in each case with such Unpaid Principal Balance being determined solely by reference to the actual unpaid principal balance in accordance with the applicable Asset Documents).

"**Acceptable Investment Rating**" means any of the highest three rating categories that may be assigned to any security, obligation, or entity by the Rating Agencies.

"**Acceptable Rating**" means, in each case with respect to construction loan servicers or special loan servicers of commercial and/or residential mortgage loans (or the applicable ratings category that includes such loans), (a) a rating of "Average (Select Servicer List)" (or better) or other comparable rating by S&P Global Ratings, (b) a rating of Level 3 Servicer Rating (or better) or other comparable rating by Fitch Ratings Inc., (c) a rating of "MOR CS3" (or better) or other comparable rating by DBRS Morningstar, or (d) a rating of "Pass" or other comparable rating by Kroll Bond Rating Agency.

"**Accountants**" means the independent certified public accountants of the Company.

"**Accounting Records**" means the general ledger, supporting subsidiary ledgers and schedules, and loan servicing system records of the Receiver.

"**Accounts**" means the Company Accounts and the Private Owner Pledged Account.

"**Acquired Property**" means, collectively, Company Acquired Property and Receiver Acquired Property.  For the avoidance of doubt, Company Acquired Property and Receiver Acquired Property each include:  (a) all related rights, powers or Liens of any Ownership Entity in, to or under the Collateral Documents and or Asset Documents; (b) all rights of the Receiver, the Failed Bank, the Company or any Ownership Entity pursuant to any Contract for Deed or in or to the real property that is subject to any such Contract for Deed; (c) all rights of the Receiver, the Failed Bank, the Company or any Ownership Entity pursuant to any lease or in or to the related leased property; (d) all rights of the Receiver, the Failed Bank, the Company or any Ownership Entity under the Related Agreements (to the extent relating to such Company Acquired Property or Receiver Acquired Property and not otherwise relating to or included in a Loan); (e) all rights of the Receiver, the Failed Bank, the Company or any Ownership Entity to any Deficiency Balance or any Deficiency Judgment Claim with respect to such Deficiency Balance (in each case to the

extent relating to such Company Acquired Property or Receiver Acquired Property and not otherwise relating to or included in a Loan); (f) all rights of the Receiver, the Failed Bank, the Company or any Ownership Entity to any Underlying Loan; (g) all rights of the Company or any Ownership Entity to any Seller Financed Loan or other loan documents; (h) all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Receiver, the Failed Bank, the Company or any Ownership Entity with respect to any of the foregoing or the ownership, use, function, value of or other rights pertaining to any of the foregoing, whether arising by way of counterclaim or otherwise, other than any claims retained by the Receiver pursuant to <u>Section 2.7</u> of the Transfer Agreement; and (i) all guaranties, warranties, indemnities and similar rights in favor of the Receiver, the Failed Bank, the Company or any Ownership Entity with respect to any of the foregoing; <u>provided</u>, <u>however</u>, that, for purposes of any Transaction Document other than the Transfer Agreement, any such Receiver Acquired Property, and any of the foregoing rights, powers or Liens of (or in favor of) the Receiver or the Failed Bank, are to be included in (and considered part of) the Acquired Property only to the extent such Receiver Acquired Property, and rights, powers or Liens, are transferred to the Company pursuant to the Transfer Agreement (and not otherwise subsequently transferred back to the Receiver).

"**Acquired Property Deed**" means, with respect to any Acquired Property (other than a Receiver Acquired Property that is conveyed by the Transferor to an Ownership Entity pursuant to a Receiver's Deed or, in the case of any Potentially Defectively Foreclosed Receiver Acquired Property, a Receiver's Quitclaim Deed), the instrument or document required by the Law of the jurisdiction in which the Acquired Property is located to convey fee title.

"**Acquired Property Files**" means, with respect to each Acquired Property, to the extent applicable, the following:  (a) (i) if the related Acquired Property Deed, Receiver's Deed or Receiver's Quitclaim Deed has been delivered for recordation, a copy thereof (which may be electronic) file-stamped with evidence of recording thereon in the name of the Ownership Entity, together with a certificate of the related Servicer (or Subservicer) or the foreclosure attorney certifying that such Acquired Property Deed, Receiver's Deed or Receiver's Quitclaim Deed is a true, correct and complete copy of the original document, or (ii) if the related Acquired Property Deed, Receiver's Deed or Receiver's Quitclaim Deed has been delivered for recordation but not yet returned, a copy thereof (which may be electronic) together with a certificate of the related Servicer (or Subservicer) or the foreclosure attorney certifying that such Acquired Property Deed, Receiver's Deed or Receiver's Quitclaim Deed is a true, correct and complete copy of the original document, and that the original Acquired Property Deed, Receiver's Deed or Receiver's Quitclaim Deed has been delivered to the proper recording office for recordation; (b) as applicable, either (i) a copy of each Acquired Property Deed (which may be electronic) that is intervening between the lender that obtained title to such property assets as a result of foreclosure or deed in lieu of foreclosure of a mortgage or deed of trust and the Ownership Entity, with the same certification documentation required in <u>clause (a)(i)</u> above, or (ii) the original or a copy of the assignment of foreclosure bid between the foreclosing lender and the Ownership Entity with respect to the related Acquired Property, and in the case of a copy, together with a certificate of the related Servicer (or Subservicer) or the foreclosure attorney certifying that such assignment of foreclosure bid is a true, correct and complete copy of the original document, with the same certification documentation

required in <u>clause (a)(i)</u> above; (c) the original or copy of the policy of title insurance prior to foreclosure of the related mortgage loan accompanied by a title report procured upon foreclosure of the related mortgage loan, with respect to the Acquired Property; (d) with respect to each Receiver Acquired Property conveyed by the Transferor to an Ownership Entity pursuant to a Receiver's Deed, the policy of title insurance and survey for such Receiver Acquired Property as and to the extent required under <u>Section 3.1(d)(v)</u> of the Transfer Agreement; (e) with respect to each Receiver Acquired Property conveyed by the Transferor to an Ownership Entity pursuant to a Receiver's Deed, the original or a copy of the applicable Omnibus Property Assignment; (f) for any Acquired Property that is subject to a lease, a copy of the lease together with a certificate of the related Servicer (or Subservicer) certifying that such lease is a true, correct and complete copy of the original document; (g) with respect to any personal property Acquired Property with respect to which a document of assignment, conveyance of transfer is required to be filed or recorded pursuant to any applicable Law to evidence the transfer thereof, either the original or (if such original copy is retained by the relevant Recording Office) a copy thereof (which may be electronic) file-stamped with evidence of recording or filing thereon, together (in the case of a copy) with a certificate of the related Servicer (or Subservicer) or the foreclosure attorney certifying that such document of assignment, conveyance of transfer is a true, correct and complete copy of the original document; and (h) with respect to any personal property Acquired Property with respect to which a certificate of title is issued under any applicable Law, the original of such certificate of title.

"**<u>Acquired REO Property</u>**" means any real property (and related personal property) included in the Acquired Property.

"**<u>Act</u>**" means the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101 *et seq.*, as may be amended, supplemented, or modified from time to time.

"**<u>Action</u>**" means any (a) action, suit or proceeding (including the administrative claims process administered by the Receiver pursuant to 12 U.S.C. Section 1821(d)(3) through (13) and initiated by the filing of a "proof of claim" with the Receiver) by or before any Governmental Authority, whether civil, criminal, administrative or investigative, and whether at law or in equity, or (b) any arbitration proceeding.

"**<u>Additional Security</u>**" means collateral (securing the Private Owner Obligations) consisting of (a) Qualifying Cash Collateral or (b) undrawn (and available) amounts under a Qualifying Letter of Credit, together aggregating an amount at least equal (at all times) to the Private Owner Pledged Amount, it being understood and agreed that the Private Owner initially may meet the foregoing requirements through either <u>clause (a)</u> or <u>(b)</u> above (or a combination thereof; <u>provided</u> that, subject to the one-time substitution right set forth in Section 3.13(e) of the LLC Operating Agreement, at no time shall more than one Qualifying Letter of Credit be issued for such purpose), and that such determination with respect to <u>clause (a)</u> or <u>(b)</u> above will be as initially determined by the Private Owner on or prior to the Closing Date (including as might be set forth in the Bid submitted by or on behalf of the Private Owner, or as otherwise might be determined by the Private Owner in a manner acceptable to the Initial Member in connection with the Closing), and may not be altered after the Closing Date except as permitted pursuant to

-4-

Section 3.13(e) of the LLC Operating Agreement (including as contemplated by the definition of the term "LC Reissuance/Extension Failure"); provided, however, that it is further understood that, to the extent that the Private Owner used a Qualifying Letter of Credit, the composition of the Additional Security can change after the Closing Date as a result of draws on such Qualifying Letter of Credit.

"**Additional Security Substitution Fee**" means a fee in the amount of $10,000.00, payable by the Private Owner to the Initial Member in connection with any substitution of the form of the Additional Security, including any such substitution resulting from, or so as to avoid or cure the occurrence of, an LC Reissuance/Extension Failure.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and is to be interpreted consistently therewith.

"**Adjusted Equity Asset Value**" means, with respect to any Asset, (a) the Equity Asset Value of such Asset, *plus* (in the case of any Excess Principal) or *minus* (in the case of any Principal Deficiency) (b) the applicable Adjustment to Asset Value.

"**Adjusted Escrow Balance**" means, with respect to any Loan, the Escrow Balance adjusted higher or lower, as appropriate, to reflect the actual balance of the Escrow Account as reflected on the Accounting Records as of the Cut-Off Date and to correct errors reflected in the Escrow Balance due to (a) miscalculations, misapplied payments, unapplied payments, unrecorded disbursements or other accounting errors with respect to the period ending on the Cut-Off Date, (b) the effect of any final court decree, unappealable regulatory enforcement order or other similar action of a legal or regulatory nature effective on or before the Cut-Off Date, (c) a foreclosure sale that occurred on or before the Cut-Off Date and for which the Redemption Period, if any, expired on or before the Cut-Off Date, or (d) the portion of any Dishonored Check that was applied to (and reflected in) the Escrow Balance.

"**Adjusted Unpaid Principal Balance**" means, with respect to any Asset, the Cut-Off Date Unpaid Principal Balance adjusted higher or lower, as appropriate, to reflect the actual Unpaid Principal Balance of the Asset as of the Cut-Off Date on the Accounting Records and to correct errors reflected in the Cut-Off Date Unpaid Principal Balance due to (a) miscalculations, misapplied payments, unapplied payments, unrecorded advances of principal or other

disbursements, or other accounting errors with respect to the period ending on the Cut-Off Date, (b) the effect of any final court decree, unappealable regulatory enforcement order or other similar action of a legal or regulatory nature effective on or before the Cut-Off Date, (c) a foreclosure sale that occurred on or before the Cut-Off Date and for which the Redemption Period, if any, expired on or before the Cut-Off Date or (d) the portion of any Dishonored Check that was applied to (and reflected in) the Cut-Off Date Unpaid Principal Balance.

"**Adjustment Percentage**" means, with respect to any Asset, the quotient (expressed as a decimal) of the Private Owner Interest Asset Value for such Asset divided by the Cut-Off Date Unpaid Principal Balance of such Asset.

"**Adjustment to Asset Value**" means, in the event of any Excess Principal (or Principal Deficiency) with respect to any Asset, an amount equal to the product of (a) the amount of such Excess Principal (or Principal Deficiency), *multiplied* by (b) the quotient of the Equity Asset Value for such Asset divided by the Cut-Off Date Unpaid Principal Balance of such Asset.

"**Affected Asset**" has the meaning set forth in Section 4.5(d) of the Transfer Agreement.

"**Affidavit and Assignment of Claim**" means an Affidavit and Assignment of Claim in the form of Attachment D to the Transfer Agreement.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person directly or indirectly Controlling or Controlled by or under common Control with such specified Person, (b) any Person owning or Controlling 10.0% or more of the outstanding voting securities, voting equity interests, or beneficial interests of the Person specified, (c) any officer, director, general partner, managing member, trustee, employee or promoter of the Person specified or any Immediate Family Member of such officer, director, general partner, managing member, trustee, employee or promoter, (d) any corporation, partnership, limited liability company or trust for which any Person referred to in clause (b) or (c) acts in that capacity, or (e) any Person who is an officer, director, general partner, managing member, trustee or holder of 10.0% or more of the outstanding voting securities, voting equity interests or beneficial interests of any Person described in clauses (a) through (d); provided, however, that (x) none of the Initial Member, the Transferor, the FDIC or any Affiliate (for this purpose determined disregarding clauses (b), (c) and (d) of this definition (including in the context of clause (e) of this definition) and disregarding the Company and any Person Controlled by the Company) of any of the foregoing will be deemed to be an "Affiliate" of the Company or of any Person Controlled by the Company, and (y) for the purposes of (i) the definition of the term "Change of Control," (ii) Section 10.1(s) of the LLC Operating Agreement and (iii) any PO Owner Undertaking, clauses (b), (c), (d) and (e) above are to be disregarded.

"**Agreement of Common Terms and Definitions**" means this Agreement.

"**Allonge**" means an allonge, executed in blank, by the Company.

"**Applicable Agreements**" has the meaning set forth in the Reporting and Access Schedule.

"**Applicable Reporting**" has the meaning set forth in Section 6 of the Reporting and Access Schedule.

"**Appraisal**" means, as of any date of determination with respect to any Acquired Property (including any applicable Collateral for a Loan prior to the same becoming Acquired Property) or Mortgaged Property, a determination of the market value thereof pursuant to a commercially reasonable appraisal complying with USPAP (or other appraisal standards acceptable to the Initial Member) and conducted by a state certified appraiser (not an Affiliate of the Manager, Servicer or the Private Owner) or, if broker price opinions are customarily used for properties of a similar type and location as a reliable means for determination of value thereof, a commercially reasonable broker price opinion prepared by a real estate broker (not an Affiliate of the Manager, Servicer or the Private Owner); provided, however, that (a) in all events such form of determination of market value is to be selected and conducted in compliance with applicable Law, including, in respect of Acquired Property, as to the exercise of relevant remedies (resulting in acquisition of title to such Acquired Property) and preservation of rights to collect the Deficiency Balance, if any, and (b) if the market value for such Acquired Property or Mortgaged Property, as applicable, as so determined pursuant to the foregoing clause (a) is an amount equal to or in excess of $5,000,000.00, then such determination will be subject to completion of an appraisal review conducted in accordance with USPAP (or other appraisal standards acceptable to the Initial Member) by a state certified appraiser (or other qualified professional regularly performing valuation reviews) (not an Affiliate of the Manager, the Servicer, the Private Owner or the applicable Person having performed such valuation) which confirms that such valuation meets acceptable quality standards conforming to market practices in the relevant market, follows applicable requirements of Law, and concludes with a reasonable and reliable market value estimate (it being understood that such valuation will not be deemed a completed "Appraisal" until such review and confirmation is so obtained). Any appraisal included in the Asset Files and forming the basis for an initial Appraised Value set forth in the Loan Performance at Cut-Off Date Report will be deemed to be an "Appraisal" hereunder (having a date, and reflecting a value, as set forth in such appraisal).

"**Appraised Value**" means, as of any date of determination, the appraised value of an Acquired REO Property (or other Acquired Property) or Mortgaged Property, as applicable, based upon the most recent Appraisal obtained pursuant to Section 5.3(a) of Annex IV to the LLC Operating Agreement, the definition of "Net Fair Value" or any other applicable provision of the Transaction Documents permitting or requiring such Appraisal; provided, that for any Mortgaged Property for which an appraised value is set forth (whether by Loan or specific reference to such Mortgaged Property) in the Loan Performance at Cut-Off Date Report, the initial Appraised Value of such Mortgaged Property is as so set forth in the Loan Performance at Cut-Off Date Report.

"**Asset**" means an individual Loan or Acquired Property, and "Assets" means all of the Loans and Acquired Property collectively.

"**Asset Documents**" means (a) all documents, agreements, certificates, instruments and other writings (including all Collateral Documents) now or hereafter executed by or delivered or caused to be delivered by any Borrower, any Obligor or any other obligor evidencing, creating,

guaranteeing or securing, or otherwise executed or delivered in respect of, all or any part of an Asset or evidencing any transaction contemplated thereby (including, for this purpose, title insurance policies and endorsements thereto), and all Modifications thereto, and (b) without limiting the generality of clause (a), all documents, agreements, instruments and other writings pursuant to which the Failed Bank has any obligation to make a principal advance to any Borrower (which principal advance, if it had been made on or prior to the Cut-Off Date, would have been reflected in the calculation of the outstanding principal balance of a Loan).

"**Asset File**" means all documents pertaining to any Asset, either copies or originals (electronic or otherwise), that are in the possession of the Receiver or any of its employees or contractors responsible for the servicing of the Asset, other than (a) the original Notes, renewals of the Notes and other Collateral Documents and Custodial Documents and (b) confidential or privileged communications between the Receiver (or any predecessor-in-interest, including the Failed Bank) and its legal counsel; provided, however, that the Asset Files do not include files maintained by other employees or agents of the Receiver or attorney-client or work product privileged materials held by the Receiver's legal counsel unless, in the opinion of such counsel, the disclosure of the material is not likely to result in the waiver of the attorney-client or work product privilege.

"**Asset Management**" means the general oversight and management of Assets (including oversight and control of litigation or other proceedings or claims with respect to any Assets), the exercise of remedies (including institution and management of foreclosure proceedings or other actions to enforce upon any Collateral or rights against any Borrower or Obligor) with respect to Defaulted Loans (and exercise of applicable authority as described in Section 12.16 of, and Section 5 of Annex IV to, the LLC Operating Agreement with respect to all Loans), marketing and sale of Assets, and management (and all other Servicing) of Acquired Property; provided, however that Asset Management will in all events exclude day-to-day servicing of Loans (other than Defaulted Loans), disbursements to Borrowers, collections of payments from Borrowers with respect to Loans (other than in connection with exercise of remedies following applicable acceleration of any such Loan, or otherwise against any Collateral for such Loan), management of Escrow Accounts, and any other Servicing of a Loan that, pursuant to applicable Law, would require the Person conducting the same to meet licensing, certification or similar requirements of any Governmental Authority (other than general qualifications to do business in a particular jurisdiction).

"**Asset Proceeds**" means all of the following:  (a) any and all proceeds with respect to any or all of the Assets or any or all of the Collateral, including principal, interest, default interest, prepayment fees, premiums and charges, extension and exit fees, late fees, assumption fees, other fees and charges, insurance proceeds and condemnation payments (or any portion thereof) and, with respect to any Acquired Property, operating cash flow realized from such Acquired Property, whether paid directly to the Company or payable to an Ownership Entity and distributed to the Company, and, with respect to any Acquired Property leased by an Ownership Entity to a TRS Entity, the lease payment for such Acquired Property paid to an Ownership Entity and distributed to the Company; (b) any and all proceeds from sales or other dispositions or refinancings of any or all of the Assets (including Acquired Property) or any or all of the Ownership Entities, including any Repurchase Price payments pursuant to the Transfer Agreement; (c) any proceeds from

-8-

making a draw under any letter of credit or certificate of deposit held with respect to any Asset, if such draw is permitted by the terms of the Asset Documents; (d) any recoveries from Borrowers or Obligors of any kind or nature with respect to the Assets; (e) any deposits or down payments forfeited by prospective purchasers or lessees of apartments or other units for space at any Collateral; (f) indemnity payments or reimbursements (including for TRS Costs) received by the Company or any Ownership Entity pursuant to the Transaction Documents; and (g) any interest or other earnings accrued and paid on any of the amounts described in the foregoing clauses (a) through (f) while held in the Collection Account or any other account (other than the Working Capital Reserve Account, the Capital Improvement Account or the Private Owner Pledged Account); provided, however, that, with respect to proceeds of any Loan Participation (including as a result of any sale or other disposition of such Loan Participation or of Collateral relating thereto), the Asset Proceeds exclude any amounts payable to others under the applicable Loan Participation Agreement, and with respect to any Loan, the Asset Proceeds exclude all Escrow Payments and all other amounts required to be deposited in any Escrow Account pursuant to the applicable Asset Documents.

"**Asset Schedule**" means the Asset Schedule included in Attachment A to the Transfer Agreement (except as used in the Servicing Agreement, wherein such term is separately defined).

"**Asset Schedule and Exception List**" means a list of the Assets, identifying, with respect to each Asset, each Custodial Document delivered to the Custodian and each Exception (including identifying, with respect to any document or other item required to be provided by the Company to the Custodian pursuant to Sections 6.1(c)(ii), (iii), (vi) or (viii) of the Custodial and Paying Agency Agreement, which of the various alternatives with respect to originals or copies thereof specified in the relevant clause applies) and that details, with respect to any such Asset that has been released by the Custodian, the following:  (a) the Borrower name and any identification number assigned to the Asset, (b) the location to which the Custodial Documents with respect to such Asset were delivered by the Custodian, (c) the date on which such Custodial Documents were released by the Custodian, and (d) the Person to which such Custodial Documents were released.

"**Assignment and Acceptance of Limited Liability Company Interest**" means an Assignment and Acceptance of Limited Liability Company Interest in the form of Attachment I to the Transfer Agreement.

"**Assignment and Lost Instrument Affidavit**" means an Assignment and Lost Instrument Affidavit in the form of Attachment F to the Transfer Agreement.

"**Assignment of JDC Agreement**" means, with respect to any JDC Agreement, an assignment thereof substantially in the form of Exhibit E to the LLC Operating Agreement, executed and delivered by the JDC Contractor, the Manager and, to the extent applicable, the Servicer (if the Servicer or one of its Subservicers engages the JDC Contractor) and applicable Subservicer (if such Subservicer engages the JDC Contractor), in favor of the Initial Member.  Any such Assignment of JDC Agreement, once so executed and delivered, will be deemed a Transaction Document.

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

"**Assumed Closing Date Asset Litigation**" means any Closing Date Asset Litigation other than any Retained Closing Date Asset Litigation, including any appeal of any such Closing Date Asset Litigation after the Closing Date, and including, with respect to any such Closing Date Asset Litigation, any claim (including any assertion of a Liability) that might be asserted therein (including first asserted therein) on, or at any time after, the Closing Date (whether by amendment of a complaint, counterclaim or otherwise).

"**Assumed Property Obligations**" means, with respect to any Acquired Property, obligations that run with (or are otherwise imposed by operation of Law on the owner of) such Acquired Property and contractual obligations (in favor of Persons other than the Company, the Failed Bank or any other predecessor in interest to the Company) arising under agreements (to which the applicable Borrower or Obligor was a party) relating to or affecting such Acquired Property as in effect prior to the foreclosure or other event pursuant to which the applicable Ownership Entity acquired title to such Acquired Property, in each case to the extent such obligations rightfully (and with the Company having exercised applicable remedies in accordance with the Servicing Standard) remain binding on such Acquired Property or Ownership Entity.

"**Authorized Denomination**" has the meaning set forth in Section 2(b) of Annex I to the Custodial and Paying Agency Agreement.

"**Authorized Representative**" means, with respect to any Person, each individual designated in writing as required by Section 17.1 of the Custodial and Paying Agency Agreement by such Person to the Custodian to act as an authorized representative of such Person for purposes of the Custodial and Paying Agency Agreement.

"**Bank**" means Computershare Trust Company N.A., a national banking association organized under the laws of the United States.

"**Bankruptcy Rule**" means any of the rules set forth in the Federal Rules of Bankruptcy Procedure, as amended, supplemented, or modified from time to time.

"**Beneficiaries**" has the meaning set forth in the Reporting and Access Schedule.

"**Bid**" means the sealed offer of the Winning Bidder set forth in the Bid Form.

"**Bid Form**" has the meaning set forth in the Recitals of the Private Owner Interest Sale Agreement.

"**Bidder Qualification Application**" means that certain Bidder Qualification Application submitted by or on behalf of the Winning Bidder to, and approved by, the FDIC in connection with (and as a condition to submission of) the Bid.

"**Book Value**" means (a) with respect to property transferred pursuant to the Transfer Agreement, the Fair Market Value of such property at the time of such transfer and (b) with respect to any other Company asset, the adjusted basis of such asset for federal income tax purposes; provided, however, that the Book Values of all Company assets are to be adjusted to equal their

-10-

respective Fair Market Values in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, except as otherwise provided in this Agreement, immediately prior to: (x) the date of the acquisition of any additional LLC Interest by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (y) the date of the actual distribution of more than a *de minimis* amount of Company property (other than a pro rata distribution) to a Member in connection with the redemption of all or part of such Member's LLC Interest; or (z) the date of the actual liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; and provided further, however, that adjustments pursuant to clauses (x) and (y) above are to be made only if the Tax Representative reasonably determines, after consultation with the Initial Member, that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Book Value of any Company Property distributed to any Member are to be adjusted immediately prior to such distribution to equal its Fair Market Value as of such date.

"**Borrower**" means any borrower with respect to any Asset.

"**Borrower-Business Relationship Business Plan**" has the meaning set forth in Section 7.7 of the LLC Operating Agreement.

"**Business**" means the acquisition of the Assets pursuant to the Transfer Agreement and the ownership, servicing, administration, management, and liquidation of the Assets.

"**Business Day**" means any day except (a) a Saturday, Sunday or other day on which commercial banks in the State of New York or United States federal government offices are required or authorized by Law to close or (b) with respect to any day on which the Company owes an obligation to the Custodian or the Paying Agent or on which the Custodian or the Paying Agent owes an obligation to the Company, any such Business Day pursuant to the foregoing clause (a) other than a day on which the Bank's offices are closed.

"**Business Plan**" has the meaning set forth in Section 7.7 of the LLC Operating Agreement.

"**Call Event**" has the meaning set forth in Section 3.14(a) of the LLC Operating Agreement.

"**Capital Account**" means the capital account of a Member related to such Member's outstanding LLC Interests, as adjusted to account for allocations of Net Income (and items thereof) and Net Loss (and items thereof), and contributions and distributions relating to such LLC Interests, as provided in greater detail in Article VI of the LLC Operating Agreement and elsewhere in the LLC Operating Agreement.

"**Capital Contribution**" means a contribution to the capital of the Company made, deemed to be made, or to be made pursuant to the Original LLC Operating Agreement, the Transfer Agreement, or the LLC Operating Agreement.

"**Capital Improvement**" means, with respect to any Acquired Property or Mortgaged Property, as applicable, any Permitted Capital Improvement or other Development (including for

-11-

such purpose any improvement or preservation), in each case other than as may be determined to qualify for funding by way of Servicing Expenses (and exclusion from treatment as a Capital Improvement) pursuant to clause (x) of the proviso appearing as the last paragraph of the definition of such term.

"**Capital Improvement Account**" means the segregated trust or custodial account designated as the "Capital Improvement Account" pursuant to Section 3.5(a) of the Custodial and Paying Agency Agreement.

"**Capital Improvement Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Capital Improvement Advance**" or "**Capital Improvement Loan**" means, with respect to any Loan, any Funding Draw, other than a Required Funding Draw, for the funding of Permitted Capital Improvements of the real property securing such Loan pursuant to the funding provisions of the applicable Asset Documents (and related Modifications thereto), to the extent (including as to any such Modifications) in accordance with an applicable approved Capital Improvement Plan and the terms set forth in the Permitted Capital Improvement Addendum; provided, however, that in no event will any such costs and expenses payable pursuant to any such Permitted Capital Improvement Draw include any Excluded Expenses.

"**Capital Improvement Approval Request**" has the meaning set forth in Section 1(a) of the Permitted Capital Improvement Addendum.

"**Capital Improvement Contribution**" means each capital contribution made by the Initial Member or the Private Owner on the Closing Date to fund Capital Improvement Account (in the amount of the Initial Member Capital Improvement Account Deposit or Private Owner Capital Improvement Account Deposit, as applicable).

"**Capital Improvement Fund**" means a segregated fund for Permitted Capital Improvement Expenses to be (a) funded initially on the Closing Date (in an aggregate amount equal to the Capital Improvement Account Deposit) pursuant to the LLC Operating Agreement and the payments contemplated in the Private Owner Interest Sale Agreement, and (b) thereafter held in the Capital Improvement Account and used and replenished from time to time pursuant to the applicable provisions in the LLC Operating Agreement and the Custodial and Paying Agency Agreement.

"**Capital Improvement Fund Floor**" means $43,050,504.43, or with an applicable written approval from the Initial Member pursuant to Section 2(c) of the Permitted Capital Improvement Addendum, such lower amount as might be applicable pursuant to such written approval.

"**Capital Improvement Fund Target**" means the targeted amount of Capital Improved Fund as determined by the Manager with respect to each Distribution Date prior to (but excluding)

the occurrence of the Final Monthly Distribution, to be not less than the Capital Improvement Fund Floor.

"**Capital Improvement Plan**" means, with respect to any Acquired REO Property or Mortgaged Property securing a Loan, a specific plan for Permitted Capital Improvements of such Acquired REO Property or Mortgaged Property, including a detailed scope of proposed improvements or preservation, timeline, and budget (including, for any such Loan, the timing, amount and material terms for the intended Capital Improvement Advances, and material terms of any intended Modifications).

"**Cash Flow and Distribution Report**" has the meaning set forth in Section 11.3 of the Custodial and Paying Agency Agreement.

"**CERCLA**" means The United States Comprehensive Environmental Response, Compensation, and Liability Act, as amended, supplemented, or modified from time to time.

"**Certificate**" has the meaning set forth in Section 2.1(a) of the LLC Operating Agreement.

"**Certificated Note**" has the meaning set forth in Section 1(b) of Annex I to the Custodial and Paying Agency Agreement.

"**Change of Control**" means:

    (a)    with respect to the Private Owner:

        (i)    the Private Owner's Specified Parents for any reason (A) failing or ceasing to collectively Control the Private Owner or (B) failing or ceasing to collectively own, beneficially and of record, either directly or indirectly at least 50.1% in value of all of the Ownership Interests in the Private Owner;

        (ii)    any Person other than the Private Owner's Specified Parents (and their respective Affiliates) at any time, when considered together with all of such other Person's Affiliates, acquiring or holding, of record or beneficially, directly or indirectly through one or more intermediaries other than Affiliates, more than 25% in value of all of the Ownership Interests in the Private Owner;

        (iii)    (A) the individual, or any of the individuals, as the case may be, constituting the Key Decision Makers at any time failing or ceasing to be actively and meaningfully involved (directly or indirectly) in all non-ordinary course decision-making regarding (1) the conduct of the business and affairs of the Private Owner (including with respect to the Private Owner's obligations and powers in its capacity as the Manager) or (2) without limiting the generality of clause (1), the asset management/special servicing of the Assets, or (B) the individual or any of the individuals, as the case might be, constituting the Key Asset Managers at any time failing or ceasing to have the power (or, if multiple individuals constitute such Key Asset Managers, the collective power), directly or indirectly, to manage and control, or failing or ceasing to be actively and meaningfully involved (directly or indirectly) on a day-to-day basis in,

-13-

all ordinary course decision-making regarding the asset management/special servicing of the Assets; provided that a Change of Control will not be deemed to have occurred under the foregoing clause (A) or clause (B), as applicable, with respect to any Key Decision Maker or Key Asset Manager having so failed or ceased to be actively and meaningfully involved due to death, incapacitation or other reasonably unforeseeable circumstance (that is fully outside the control of all of the Private Owner, the Servicer, any Specified Parent or any Affiliate of any of the foregoing), in each case so long as both (x) the Private Owner promptly notifies the Initial Member of such occurrence, and (y) within 60 days of such occurrence, such Person is replaced (or the Initial Member otherwise consents to a designation of Key Decision Makers or Key Asset Managers, as applicable, omitting such Person) in accordance with the definition of "Key Decision Makers" or "Key Asset Managers", as applicable;

(iv)    the Lead Bidder failing or ceasing to retain, beneficially and of record, either directly or indirectly, a percentage Ownership Interest in the Private Owner (expressed in terms of relative fair market values of all outstanding Ownership Interests in the Private Owner) that is at least 75% of such direct or indirect percentage Ownership Interest of the Lead Bidder in the Private Owner (determined as described above) upon consummation of the Closing;

(v)    with respect to any Specified Parent of the Private Owner, (A) the Ultimate Parent Entity(ies) of such Specified Parent for any reason (1) failing or ceasing to Control such Specified Parent, or (2) failing or ceasing to retain, beneficially and of record, either directly or indirectly, a percentage Ownership Interest in such Specified Parent (expressed in terms of relative fair market values of all outstanding Ownership Interests in such Specified Parent) that is at least 75% of such direct or indirect percentage Ownership Interest of such Person in such Specified Parent (determined as described above) upon consummation of the Closing (or, in the case of any Person becoming a Specified Parent after the Closing pursuant to clause (A)(ii) of the definition of such term, as of the date such Person so became a Specified Parent), or (B) any Entity (considered together with its Affiliates), or any Entities acting together or that would constitute a "group" for the purposes of Section 13(d) of the Exchange Act (in the case of each such Entity, considered together with its Affiliates), in each case other than the Ultimate Parent Entities of such Specified Parent (and/or any Entities Controlled by such Ultimate Parent Entities), at any time will Control such Specified Parent, including by Controlling such Ultimate Parent Entities; or

(vi)    without limitation of any of the foregoing, with respect to The Community Preservation Corporation, in its capacity as the Lead Bidder or as a Specified Parent or Ultimate Parent Entity, such Person ceasing to maintain its status or eligibility for treatment as a not-for-profit corporation; and

(b)    with respect to the Servicer or any Rated Subservicer:

(i)    such Person's Specified Parent for any reason (A) failing or ceasing to Control such Person or (B) failing or ceasing to own, beneficially and of record, either directly or indirectly, at least 50.1% in value of all of the Ownership Interests in such Person (or, in the

-14-

case of The Community Preservation Corporation, in its capacity as the Servicer, such Person ceasing to maintain its status or eligibility for treatment as a not-for-profit corporation); or

(ii)    without limitation of <u>clause (i)</u>, in the event such Person is (or at the time it became the Servicer or an applicable Rated Subservicer, was) an Affiliate of the Private Owner, any Change of Control with respect to the Private Owner.

"**Clean-Up Call**" has the meaning set forth in <u>Section 12.20</u> of the LLC Operating Agreement.

"**Clean-Up Call Notice**" means a notice delivered by the Initial Member pursuant to <u>Section 12.20(b)</u> of the LLC Operating Agreement for an exercise of the Clean-Up Call, which may, at the Initial Member's option in its sole discretion, include applicable instructions for suspending or withholding, as directed by the Initial Member, any or all further distributions with respect to the LLC Interests pursuant to <u>Section 5.1(d)</u> of the Custodial and Paying Agency Agreement.

"**Clearing Agency**" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"**Closing**" means the consummation of the transactions contemplated in the Private Owner Interest Sale Agreement.

"**Closing Date**" means December 15, 2023.

"**Closing Date Asset Litigation**" means (a) any Action relating to any of the Assets and that is pending against the Receiver and/or the Failed Bank as of the Cut-Off Date and/or the Closing Date or (b) without limitation of <u>clause (a)</u>, any Action relating to any of the Assets and in which the Receiver or the Failed Bank is involved (including as a plaintiff) as of the Cut-Off Date or the Closing Date, to the extent that any Liability of the Receiver or the Failed Bank is asserted therein (including by way of counterclaim).

"**Code**" means the United States Internal Revenue Code of 1986, together with the regulations promulgated thereunder, as amended, supplemented, or modified from time to time.

"**Collateral**" means any and all real or personal property, whether tangible, intangible or mixed, securing or pledged to secure an Asset, including (a) any account, equipment, guarantee or contract right, equity, partnership or other interest that is the subject of any Collateral Document and (b) as the context requires, Acquired Property, whether or not expressly specified.

"**Collateral Certificate**" has the meaning set forth in <u>Section 6.1(b)</u> of the Custodial and Paying Agency Agreement.

"**Collateral Document**" means any deed of trust, deed, trust deed, deed to secure debt, mortgage, contract for the sale of real property, pledge agreement, security agreement, personal, corporate or other guaranty, assignment, collateral agreement, stock power or other agreement or

document of any kind, whether an original or a copy, whether similar to or different from those enumerated, (a) securing in any manner the performance or payment by any Borrower or any Obligor of its obligations or the obligations of any Borrower or any Obligor pursuant to any of the Assets or Notes evidencing the Assets, or (b) evidencing ownership of any Acquired Property.

"**Collection Account**" means the segregated trust or custodial account designated as the "Collection Account" pursuant to Section 3.1(a) of the Custodial and Paying Agency Agreement.

"**Common Terms**" means, in relation to this Agreement or any other Transaction Document that specifies that the "Common Terms" apply to such Transaction Document, the common terms and conditions set forth in Article II.

"**Company**" means SIG RCRS C MF 2023 Venture LLC, a Delaware limited liability company.

"**Company Accounts**" means the Collection Account, the Distribution Account, the Working Capital Reserve Account, the Capital Improvement Account and such other Company accounts (other than Escrow Accounts) as may be contemplated or permitted pursuant to the Transaction Documents, in each case including, as applicable pursuant to Section 5.1(c) of Annex IV to the LLC Operating Agreement, any Ownership Entity Account with respect thereto.

"**Company Acquired Property**" means (a) Collateral to which title is acquired by or on behalf of the Company or any Ownership Entity by foreclosure, by deed in lieu of foreclosure, by power of sale, pursuant to the Uniform Commercial Code or otherwise; (b) the equity interests in any Ownership Entity holding any such Collateral; and (c) the assets held directly or indirectly by any such Ownership Entity.

"**Company Property**" means any property contributed to, acquired by, or otherwise owned by the Company (including the Assets contributed or sold by the Transferor to the Company pursuant to the Transfer Agreement), whether real or personal, tangible or intangible property, including any legal or equitable interest in such property, ownership interests in entities owning real or personal property, and money.

"**Computer Security Incident**" means any unauthorized acquisition of, or access to, computerized or other electronic data, or any computer system, equipment or device storing such data, that compromises the security, confidentiality, or integrity of Customer Information. The term "Computer Security Incident" does not include the good faith acquisition of, or access to, Customer Information by an employee or agent of the person or entity that maintains the Customer Information as long as the Customer Information is not used improperly or subject to further unauthorized disclosure.

"**Confidentiality Agreement**" means each Confidentiality Agreement, dated as of the Closing Date or such earlier date as may have been applicable pursuant to the sealed bid process resulting in the submission of the Bid Form, by and between the FDIC and the Private Owner or any Affiliates of the Private Owner (including by way of joinder).

-16-

"**Consolidated Business Plan**" has the meaning set forth in Section 7.7 of the LLC Operating Agreement.

"**Contract for Deed**" means an executory contract with a third party to convey real property to such third party upon payment of the amounts set forth therein and/or the performance of any other obligations described therein, including any installment land sale contract.

"**Control**" (including the phrases "Controlled by" and "under common Control with") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Core Agreements**" means, collectively, the Transfer Agreement, the Private Owner Interest Sale Agreement, the LLC Operating Agreement, and the Custodial and Paying Agency Agreement.

"**Covered Persons**" has the meaning set forth in Section 4.6(f) of the LLC Operating Agreement.

"**Critical Strategy Resolution Business Plan**" has the meaning set forth in Section 7.8(b) of the LLC Operating Agreement.

"**Custodial and Paying Agency Agreement**" means the Custodial and Paying Agency Agreement dated as of the Closing Date, by and among the Company, the Bank, the Initial Member and the Private Owner, and thereafter any replacement Custodial and Paying Agency Agreement that is acceptable to the Initial Member.

"**Custodial Delivery Failure**" has the meaning set forth in Section 13.1(c) of the Custodial and Paying Agency Agreement.

"**Custodial Documents**" has the meaning set forth in Section 6.1(c) of the Custodial and Paying Agency Agreement.

"**Custodial Report**" means a report prepared by the Custodian, which shall be in a form acceptable to the Company detailing, with respect to any Asset that has been released by the Custodian, the following: (a) the Borrower name and any identification number assigned to the Asset, (b) the location to which the Custodial Documents with respect to such Asset were delivered by the Custodian, (c) the date on which such Custodial Documents were released by the Custodian, and (d) the Person to which such Custodial Documents were released.

"**Custodian**" means the Bank (as the initial document custodian appointed pursuant to the LLC Operating Agreement), and any successor custodian that is a Qualified Custodian and Paying Agent and is acceptable to and approved by the Initial Member, such approval not to be unreasonably withheld, delayed, or conditioned.

-17-

"**Custodian/Paying Agent**" means the Person from time to time serving as the Custodian and the Paying Agent.

"**Custodian and Paying Agent Report**" has the meaning set forth in Section 11.1(a) of the Custodial and Paying Agency Agreement.

"**Customer Information**" means all non-public information regarding any Borrower or Obligor, disclosure of which is regulated or restricted in any way by applicable Law.

"**Cut-Off Date**" means the close of business on October 13, 2023.

"**Cut-Off Date Unpaid Principal Balance**" means, with respect to any Asset, the estimate of the Unpaid Principal Balance of the Asset as of the Cut-Off Date as stated on the Asset Schedule.

"**Debt**" of any Person means (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (excluding non-Affiliated trade payables (or Affiliated trade payables incurred in a manner consistent with applicable requirements in the Transaction Documents that are expressly subordinated in writing to such Person's obligations under the Transaction Documents on terms satisfactory to the Initial Member) arising in the ordinary course of business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases; (f) all liabilities or obligations of any nature whatsoever secured by a consensual pledge, consensual security interest or other consensual Lien of, in or on any property or asset of such Person (other than (i) if such Person is the Private Owner, any such pledge, security interest or other Lien granted to the Initial Member under the LLC Operating Agreement and (ii) customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code of banks or other similar financial institutions where such Person maintains deposits); (g) all direct or contingent obligations of such Person arising under, or otherwise in respect of, letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments (including any Qualifying Letter of Credit); or (h) all indebtedness or obligations of others of the kinds referred to in clauses (a) through (g) above in respect of which such Person has entered into or issued any Guarantee.

"**Debtor Relief Laws**" means Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*), and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debt Service Coverage Ratio**" or "**DSCR**" means, for any Loan, as of any date of determination and determined for the 12 month period ending on such date, the quotient of (x) Net Operating Income for such period *divided by* (y) total debt service for such period, in each case

-18-

determined subject to the following, and in all events in a manner satisfactory to (and with such changes, including as to calculation methodology and components, as may be required from time to time by) the Initial Member:

        (a)      The Debt Service Coverage Ratio for each Loan will be determined:

        (i)      on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year, with the updated determination being reflected commencing with the Loan Performance Report for the Due Period ending on or about such date; and

        (ii)      based on information available to the Company, with the Manager being required to (A) generally use commercially reasonable efforts to obtain from the corresponding Obligors, and (B) as a condition to making any Capital Improvement Advance or entering into any Modification, specifically obtain from such corresponding Obligors, and require them to continue to provide, not less than on a quarterly basis, in each case (for <u>clauses (x)</u> and <u>(y)</u>) current relevant information for purposes of determining the Debt Service Coverage Ratio and all of its components.

        (b)      Total debt service will be determined based on principal and interest payments made by the applicable Obligors during such period on all indebtedness (including the applicable Loan) secured by any Mortgaged Property for such Loan, specifically (i) including, for any continuing failure to pay, as required to have been made, and (ii) excluding any payment in kind of interest or reduction, other than by payment in full, of interest or principal.

        (c)      In connection with any Loan for which a permitted Modification or Capital Improvement Advance is made, for any applicable portion of such 12 month period that precedes the effective date of such Modification or Capital Improvement Advance, as applicable, the Debt Service Coverage Ratio will be determined on a *pro forma* basis assuming, in respect of the principal and interest payments under such Loan, that such Modification had been in effect or such Capital Improvement Advance had been made, as applicable, at the commencement of such period.

        "**<u>Default</u>**" (a) for purposes of the LLC Operating Agreement (and any reference in any other Transaction Document to a Default under the LLC Operating Agreement), means any event or condition that constitutes an Event of Default (as such term is defined in the LLC Operating Agreement) or that, with the giving of any notice, the passage of time, or both, would be an Event of Default (as such term is defined in the LLC Operating Agreement) and (b) for purposes of any other Transaction Document in which it is used (other than in reference to a Default pursuant to the LLC Operating Agreement, has the meaning set forth in such Transaction Document.

        "**<u>Defaulted Loan</u>**" means any Loan (a) that is delinquent sixty days or more in respect to any scheduled payment of principal and/or interest thereunder or (b) as to which any principal or accrued interest remains unpaid for thirty days or more after the stated maturity date of such Loan.

        "**<u>Deficiency Balance</u>**" means the remaining unpaid principal balance of any Note or Loan sold or contributed pursuant to the Transfer Agreement (or, in the case of Receiver Acquired Property for which the foreclosure or other acquisition event occurred (with expiration of any

-19-

relevant Redemption Period) on or before the Cut-Off Date, the remaining balance of the applicable Underlying Loan) after crediting to it the proceeds of any foreclosure sale, deed in lieu of foreclosure or any other exercise of remedies with respect to Collateral (or, in the case of any Receiver Acquired Property described in the preceding parenthetical, the applicable collateral for such Underlying Loan, including such Receiver Acquired Property).

"**Deficiency Judgment Claim**" means any claim, right or demand in or to any deficiency judgment, or any similar claim, right, demand or other recourse.

"**Determination Date**" means the last day of each Due Period.

"**Development**" means any development or construction of any kind with respect to any Asset.

"**Direct Owner**" means, with respect to any Person, any other Person who has any direct ownership interest in such Person.

"**Dishonored Check**" means any check or similar instrument that has been returned due to insufficient funds or a stop payment order.

"**Disposition**" means, with respect to any particular property, equity interest or asset, (a) any sale, assignment, alienation, gift, exchange, conveyance, transfer, pledge or hypothecation of, any granting of a Lien or proxy with respect to, or any other disposition whatsoever of, such property, equity interest or asset (or of any interest therein), (b) without limitation of clause (a), effecting any transaction or entering into any arrangement (including any form of participation or other derivative transaction of any nature whatsoever) that in effect (and at any time) transfers or otherwise disposes of (or results in the transfer or disposition of), to any extent, the economic or other consequences of ownership of such property, equity interest or asset (including, in the case of the Private Owner Interest, voting and/or management participation rights associated therewith or rights to receive the Interim Management Fee or the Management Fee), including any agreement to make any payment to a third party based upon any amount received in respect of such property or asset, or (c) any other action or transaction similar to any of the foregoing, in the case of each of clauses (a), (b) and (c), whether any of the foregoing is voluntary or involuntary, direct or indirect or in whole or in part, and including any of the foregoing effected by operation of Law (including any merger into, or any consolidation with, any other Person). For the avoidance of doubt, a statutory conversion of a Person into another form of Person does not constitute a Disposition. The terms "**Dispose**" or "**Disposed**" mean to make, effect, or consummate a "Disposition."

"**Dissolution Event**" means, with respect to any specified Person, (a) in the case of a specified Person that is a partnership or limited partnership or a limited liability company, the dissolution and commencement of winding up of such partnership, limited partnership or limited liability company, (b) in the case of a specified Person that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter and the expiration of ninety days after the date of notice to the corporation of such revocation without a reinstatement of its charter, and (c) in the case of any other specified entity, the termination of

-20-

such entity.  For the avoidance of doubt, a statutory conversion of a Person into another form of Person does not constitute a "Dissolution Event."

"**Distributable Cash**" has the meaning set forth in <u>Section 6.5</u> of the LLC Operating Agreement.

"**Distribution Account**" means the segregated trust or custodial account designated as the "Distribution Account" pursuant to <u>Section 3.2(a)</u> of the Custodial and Paying Agency Agreement.

"**Distribution Date**" means (a) until occurrence of the Final Monthly Distribution, the twenty-fifth day of each month or, if such day is not a Business Day, the next succeeding day that is a Business Day, commencing January 25, 2024; and (b) following occurrence of the Final Monthly Distribution, such applicable dates as the Manager may determine in accordance with the LLC Operating Agreement for purposes of any distribution of funds from the Working Capital Reserve.

"**Dollar**" or "**$**" means lawful currency of the United States of America.

"**Due Period**" means (a) with respect to the first Distribution Date, the period from and including the day immediately following the Cut-Off Date to and including the last day of the calendar month prior to the month in which such first Distribution Date occurs, (b) with respect to each Distribution Date thereafter through and including the Final Monthly Distribution, the calendar month prior to the month in which such Distribution Date occurs, and (c) with respect to each Distribution Date following the Final Monthly Distribution, the period from the expiration of the most recent Due Period and continuing until the date that is five Business Days prior to such Distribution Date (or, for purposes of delivery of Monthly Reports, such shorter period as may apply pursuant to the last sentence of <u>Section 3(b)</u> of the Reporting and Access Schedule).

"**Earnest Money Deposit**" has the meaning set forth in the Recitals of the Private Owner Interest Sale Agreement.

"**Eligible Account**" means one or more segregated trust or custodial account or accounts established and maintained with an Eligible Institution, each of which is to be entitled for the benefit of the Company.

"**Eligible Institution**" means a Person that is not an Affiliate of the Private Owner (or the Manager) and that is a "well capitalized" federally insured depository institution (with the term "well capitalized" having the meaning provided in 12 U.S.C. Section 1831o(b)(1)(A)); <u>provided</u>, <u>however</u>, that an Affiliate of the Private Owner (or the Manager) may be deemed to be an Eligible Institution if the Initial Member provides a written consent (which may be withheld at the Initial Member's sole and absolute discretion), which consent may be withdrawn upon written notification to the Manager, in which case such Affiliate of the Private Owner (or of the Manager) shall no longer constitute an Eligible Institution as of the receipt of such notice.  Any accounts maintained pursuant to any Transaction Document at any institution that ceases to be an Eligible Institution are to be moved to an Eligible Institution within three Business Days after the receipt of such notice.

-21-

"**Embargoed Person**" means any Person (a) included on the Specially Designated Nationals list administered by the U.S. Treasury Department's Office of Foreign Assets Control; (b) owned or controlled by any Person on such Specially Designated Nationals list; or (c) otherwise subject to trade restrictions under United States Law, including, without limitation, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 *et seq.*, the Trading with the Enemy Act, 50 U.S.C. Section App. 1 *et seq.*, any foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended, supplemented or modified from time to time), or any enabling legislation or regulations promulgated thereunder or any executive order relating thereto (including Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)) or 31 C.F.R. Section 594.101 *et seq.*) with the result that a purchase of assets or any other transaction entered into with respect to any assets (including any investment in any joint venture transaction), whether directly or indirectly, is prohibited by or in violation of Law.

"**Entity**" means any Person other than a natural person.

"**Environmental Hazard**" means the presence at, in or under any real property Collateral or Acquired REO Property (whether held in fee simple or subject to a Ground Lease or otherwise, and including any improvements whether by buildings or facilities, and any personal property, fixtures, leases and other property or rights pertaining thereto), of any "hazardous substance," as such term is defined in Section 101(14) of CERCLA, or any petroleum (including crude oil or any fraction thereof that is liquid at standard conditions of temperature and pressure), at a level or in an amount that requires remediation or abatement pursuant to applicable Law.

"**Equity Asset Value**" means, with respect to any Asset, the product of (a) the Private Owner Interest Asset Value of such Asset *multiplied* by (b) the quotient of 1.0 divided by the percentage ownership interest of the Private Owner (expressed as a decimal, with 100% being equal to 1.0).

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, together with the regulations promulgated thereunder, as amended, supplemented, or modified from time to time.

"**ERISA Plan Assets**" means "plan assets" within the meaning of Section 3(42) of ERISA and the "plan asset" regulations set forth in 29 C.F.R. Section 2510.3-101 as promulgated under ERISA, modified to the extent applicable by Section 3(42) of ERISA.

"**Escrow Account**" means (a) for purposes of the Transfer Agreement, an account maintained by the Receiver (or, in the context of Article VI of the Transfer Agreement, the Company) or its servicer or other agent for the deposit of Escrow Payments received in respect of one or more Assets, and (b) for purposes of the Servicing Agreement and all other Transaction Documents, one or more segregated trust or custodial accounts maintained by the Servicer (or an applicable Subservicer) in trust for the benefit of the Company for deposit of Escrow Payments received in respect of one or more Assets, and in either case includes, but is not limited to, all so-called "lockbox" accounts maintained by the Failed Bank or the Company under the terms of any

-22-

Asset Documents and any other accounts maintained by the Failed Bank or the Company under the Asset Documents for amounts deposited or required to be deposited therein by the applicable Borrower.

"**Escrow Advance**" means any advance made to pay Taxes or insurance premiums or any other cost or expense that, but for a shortfall in an Escrow Account for an Asset, is payable using funds in an Escrow Account for an Asset.

"**Escrow Balance**" means, with respect to any Loan, the positive escrow balance (if any) in the Escrow Account with respect to that Loan.

"**Escrow Payments**" means the amounts for the purpose of paying ground rents, Taxes, assessments, water rates, common charges in condominiums and planned unit developments, mortgage insurance premiums, fire and hazard insurance premiums and other payments, or for the purpose of paying construction costs, tenant improvement costs and leasing commissions, debt service, furniture, fixture and equipment costs, capital improvement costs, environmental remediation costs or amounts held as in escrow or as reserves for any other purpose that have been deposited in escrow or a reserve account (or designated as such by the Borrower for such deposit) with the Failed Bank, the Receiver or the Company or (in each case) its servicer or other agent with respect to any Asset.

"**Event of Default**", as used in any Transaction Document, has the meaning set forth in such Transaction Document; provided, however, that, as used in the Servicing Agreement or the Private Owner Pledged Account Control Agreement, except as otherwise expressly provided therein, the term "Event of Default" has the meaning set forth in Section 3.13(k) of the LLC Operating Agreement.

"**Exception**" means, with respect to any Asset, any variance from the requirements of Section 6.1(c) of the Custodial and Paying Agency Agreement or the requirements set forth in the Review Criteria, including any missing Custodial Document and any document that does not meet the applicable requirements set forth in Section 6.1(c) of the Custodial and Paying Agency Agreement or in the Review Criteria.

"**Excess Damage Liability**" means, as of any date of determination in respect of an Affected Asset and related Excluded Liability Company Claim and in all events determined to the satisfaction of the Transferor, aggregate damages to Company (on account of such Excluded Liability Company Claim) to the extent in excess of the Total Asset Value of such Affected Asset, determined taking into account (and with such damages being reduced by) all net proceeds having been received by or on behalf of the Company with respect to such Affected Asset and the remaining Fair Market Value of such Affected Asset as reasonably determined by the Manager to the satisfaction of the Transferor (and with a right for the Transferor to require an applicable third party appraisal at the expense of the Company); provided, however, that if the Transferor exercises its right to repurchase such Affected Asset and completes such repurchase, the Fair Market Value for such Affected Asset will be set at the Repurchase Price.

"**Excess Principal**" has the meaning set forth in Section 2.4(c) of the Transfer Agreement.

-23-

"**Excess Working Capital Advance**" has the meaning set forth in <u>Section 5.5</u> of the LLC Operating Agreement.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended, supplemented, or modified from time to time.

"**Excluded Expenses**" means any of the following:

(a)    any expenses or costs that are not incurred in accordance with the Servicing Standard or, to the extent applicable, the Fannie Mae Guidelines;

(b)    any expenses or costs that are paid to any Affiliate of any of the Manager, the Company, the Servicer or any Subservicer; <u>provided,</u> <u>however,</u> that Excluded Expenses as described in this <u>clause (b)</u> do not include out-of-pocket expenses or costs incurred by the Manager, the Servicer or any Subservicer in accordance with the Transaction Documents, so long as such expenses or costs both (i) are paid (by the Manager, the Servicer or such Subservicer) to Persons that are not Affiliates of any of the Manager, the Company, the Servicer or any Subservicer and (ii) would otherwise constitute Servicing Expenses but for application of this <u>clause (b)</u>;

(c)    any fees or other compensation to or expenses of financial advisors or consultants (including any advisors or consultants engaged by the Manager, the Servicer, any Subservicer or any other Person to assist with preparation of any Business Plan, Capital Improvement Plan, Strategic Plan Report or Critical Strategy Resolution Business Plan, with any feasibility studies, or with any strategic determinations with respect to actual or potential Disposition of any or all Assets), except to the extent the same are incurred as brokerage fees or sales commissions incurred in connection with a permitted sale of any Acquired Property or any portion thereof;

(d)    any fine, Tax or other penalty, late fee, service charge, interest or similar charge, costs to release Liens or any other costs or expenses (including legal fees and expenses) incurred by or on behalf of the Company, the Manager (in its capacity as such or in its individual capacity), the Servicer or any Subservicer as a result of the Company's, the Manager's, the Servicer's, any Subservicer's or any JDC Contractor's failure to service any Asset or Collateral properly in accordance with the applicable Asset Documents, the LLC Operating Agreement, the Servicing Agreement, any Subservicing Agreement, any JDC Agreement (or Assignment of JDC Agreement), any other Transaction Document or otherwise, or failure to make a payment in a timely manner, or failure otherwise to act in a timely manner;

(e)    any interest on any amounts paid by any Person with respect to any Servicing Expenses, Interim Servicing Expenses or Pre-Approved Charges;

(f)    any overhead or administrative costs (whether or not attributable to Servicing) incurred by the Company, the Manager, the Servicer, any Subservicer or any other Person (including any (i) travel expenses; (ii) costs for office space, office equipment, supplies and related expenses, employee salaries, bonuses and other compensation and related expenses and similar internal costs and expenses, together with any other expenses incurred by the Manager

to comply with Section 3.3 of the LLC Operating Agreement (including any costs or expenses of engaging independent contractors to perform relevant services for the day-to-day operation of the Company in lieu of performance of the same by personnel required to be made available by the Manager pursuant to such Section 3.3); and (iii) expenses incurred by any of the Manager, the Tax Representative, the Company, the Servicer or any Subservicer to comply with Section 4.3, Section 7.2, Section 7.3, Section 7.4, Section 7.5, Section 7.6(a) and Section 7.7 of the LLC Operating Agreement and the Reporting and Access Schedule) (in each case other than applicable administrative (but not overhead) costs of the Company), which expenses are payable to Persons that are not Affiliates of any of the Manager, the Company, the Servicer or any Subservicer) and expressly qualify as Reimbursable Company Administrative Expenses;

(g)    any servicing, management (including property management) or similar fees paid to the Servicer, any Subservicer or any other Person; provided, however, that property management fees for on-site property managers (or other dedicated property managers to the extent such fees are directly attributable to such on-site property management) of specific Acquired REO Property and JDC Contractor fees pursuant to permitted engagements of JDC Contractors for servicing of JDC Loans, in each case that are payable to Persons that are not Affiliates of any of the Manager, the Company, the Servicer or any Subservicer, are not included in this clause (g);

(h)    [intentionally omitted];

(i)    any amounts subject to the indemnity obligations (i) of the Private Owner pursuant to Section 4.6 of the LLC Operating Agreement, (ii) of the Servicer pursuant to Section 8.2 of the Servicing Agreement, or (iii) equivalent indemnity obligations of any Subservicer as required to be included in its Subservicing Agreement pursuant to Section 4.2 of the Servicing Agreement or Section 3.1 of Annex IV to the LLC Operating Agreement;

(j)    any fees or other compensation to or expenses of lobbyists (or other political advisors or consultants) or any expenses or costs relating to any political contribution;

(k)    any expenses or costs relating to any charitable or other similar contribution; or

(l)    any other amounts expressly designated as "Excluded Expenses" (or otherwise expressly required to be borne by the Manager, the Servicer or any Subservicer without reimbursement) pursuant to the terms of the Transaction Documents.

**"Excluded Liabilities"** means any of the following:

(a)    solely with respect to clause (a) of the definition of the term "Obligations", all Liabilities of the Failed Bank and/or the Receiver under any Transferred Contract for damages or other remedies (at law or in equity), to the extent (and only to the extent) attributable to an act or omission or circumstance that occurred or existed prior to the Cut-Off Date and that constituted a breach by the Failed Bank and/or the Receiver under such Transferred Contract, or a tort, willful misconduct, fraud or a violation of Law by the Failed Bank and/or the Receiver; provided, however, that, this clause (a) does not exclude from clause (a) of the definition of the term

-25-

"Obligations" any Liability of the Receiver under any Transferred Contract that is overdue (but solely excludes any Liability of the Failed Bank and/or the Receiver for damages or other remedies (at law or in equity) for any breach of any such Liability occurring prior to the Cut-Off Date);

(b)    all Liabilities under any Transferor Loan-Servicing Contract; and

(c)    all Liabilities of the Failed Bank or the Receiver as of the Closing Date other than the Obligations.

"**Excluded Liability Company Action**" means any Action commenced against the Company at any time after the Closing Date in which an Excluded Liability is asserted against the Company; provided, however, that no Action against the Company in respect of a Liability asserted against the Receiver and/or the Failed Bank in any Assumed Closing Date Asset Litigation constitutes an Excluded Liability Company Action.

"**Excluded Liability Company Claim**" means any Excluded Liability that is asserted against the Company in an Excluded Liability Company Action; provided, however, that no claim against the Company in respect of a Liability asserted against the Receiver and/or the Failed Bank in any Assumed Closing Date Asset Litigation constitutes an Excluded Liability Company Claim.

"**Exempt Taxes**" means, in each case, with respect to any real property (and related personal property) Receiver Acquired Property, (a) any penalty accrued for any period prior to the Closing Date on any Tax with respect to any such Receiver Acquired Property in which the Receiver holds a fee interest that was not secured by a valid Lien against the Receiver Acquired Property in effect before the Receiver acquired an interest in such Receiver Acquired Property; (b) any Tax (including any special assessment) accrued for any period prior to the Closing Date that is not an ad valorem real property Tax, the amount of which was not fixed at the time the Receiver acquired a fee interest in such Receiver Acquired Property, regardless of the existence of any Lien purporting to secure the payment of any such Tax; and (c) any Tax (including any special assessment) accrued for any period prior to the Closing Date that is not an ad valorem real property Tax and that was not secured by a valid Lien against such Receiver Acquired Property in effect before the Receiver acquired an interest in such Receiver Acquired Property.

"**Existing Servicer**" means a Person (including the Receiver) acting as servicer for any Asset as of the Cut-Off Date.

"**Failed Bank**" means Signature Bridge Bank, N.A.

"**Fair Market Value**" means, with respect to any asset on a given date, the gross fair market value of such asset, unreduced by any liability, on such date as determined in good faith by the Manager after consultation with the Initial Member; provided, however, that (a) the initial Fair Market Value for each Asset will be the Total Asset Value for such Asset, and (b) as of the Closing Date, the Fair Market Value of the Capital Contribution made by the Initial Member will be based on the Private Owner Interest Sale Price, as set forth in the Private Owner Interest Sale Agreement, and such Fair Market Value will be utilized for determining the initial Capital Accounts of the Members as of the Closing Date.

-26-

"**Fannie Mae**" means the Federal National Mortgage Association of the United States, or any successor thereto.

"**Fannie Mae Guidelines**" means those guidelines governing reimbursement of costs and expenses by Fannie Mae with respect to loans owned or securitized by Fannie Mae, as in effect on the date on which an expense or cost is incurred, including as such guidelines might be set forth in the then-effective Fannie Mae Delegated Underwriting and Servicing Guide (or replacement thereto), including all applicable lender memos issued by Fannie Mae in connection therewith.

"**FDIA**" means the Federal Deposit Insurance Act, as amended, supplemented, or modified from time to time.

"**FDIC**" means the Federal Deposit Insurance Corporation, in any capacity, present or future.

"**FDIC Legal Powers**" means the powers, immunities, defenses, privileges and other rights granted to the Receiver pursuant to the provisions of the FDIA (including 12 U.S.C. Sections 1821(d), 1823(e) and 1825), the National Bank Act (including 12 U.S.C. Sections 91 and 191 *et seq.*), applicable state receivership laws (incorporated into the FDIA, for example, by 12 U.S.C. Section 1821(c)(3)(B)), and similar federal law and state law (including statutory and common law) doctrines which protect financial institution receivers and their assignees (for example, the so-called "D'Oench Doctrine," statutory bona fide purchaser status, involuntary assignee protection, etc.), regardless of whether any of the foregoing powers, immunities, defenses, privileges or other rights are (or are asserted, claimed or purported to be) available to an assignee of the Receiver (including a purchaser of assets from the Receiver).

"**FDIC Power of Attorney**" means (a) any Limited Power of Attorney or (b) any other power of attorney, or other authorization to act in the name of, or otherwise on behalf of, the Transferor, the Prior Transferor or the FDIC, that the Transferor or the FDIC might provide to the Company or representatives of the Company (including the Manager or representatives of the Manager) pursuant to, or otherwise in connection with the transactions contemplated by, any Transaction Document (including in the discretion of the Transferor or the FDIC).

"**Federal Reserve District**" means one of the twelve districts represented by a regional Federal Reserve Bank.

"**Final Distribution**" means the distribution of all remaining funds in the Working Capital Reserve in accordance with the applicable terms of the LLC Operating Agreement and the Custodial and Paying Agency Agreement after liquidation of all of the Assets and related Collateral (including Acquired REO Property) following the dissolution of the Company.

"**Final Monthly Distribution**" means the distribution of all remaining Asset Proceeds (other than applicable reserves in the Working Capital Reserve) in accordance with the applicable terms of the LLC Operating Agreement and the Custodial and Paying Agency Agreement after liquidation of all of the Assets and related Collateral (including Acquired REO Property) pursuant to Section 9.2 of the LLC Operating Agreement.

-27-

"**Fiscal Year**" means the fiscal year of the Company and its Subsidiaries, beginning on January 1 and ending on December 31 of each calendar year.

"**Foreign Asset**" means an Asset with respect to which the Borrower or any of the Collateral is located in any Foreign Jurisdiction.

"**Foreign Jurisdiction**" means any jurisdiction other than the United States, and any subdivision of or in such other jurisdiction.

"**Funding Draw**" means any principal advance made to a Borrower after the Closing Date under a Loan pursuant to the terms of the applicable Asset Documents.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" means (a) any United States or non-United States national, federal, state, local, municipal, provincial, or international government or any political subdivision of any thereof; or (b) any governmental, regulatory, or administrative authority, agency, or commission, or judicial or arbitral body of any of the foregoing described in clause (a).

"**Ground Lease**" means a ground lease or other lease.

"**Group of Assets**" means all Assets that, as of the Cut-Off Date, are serviced by the same Existing Servicer.

"**Guarantee**" means, with respect to any particular indebtedness or other obligation, (a) any direct or indirect guarantee thereof by a Person other than the obligor with respect to such indebtedness or other obligation or any transaction or arrangement intended to have the effect of directly or indirectly guaranteeing such indebtedness or other obligation, including without limitation any agreement by a Person other than the obligor with respect to such indebtedness or other obligation (i) to pay or purchase such indebtedness or other obligation or to advance or supply funds for the payment or purchase of such indebtedness or other obligation; (ii) to purchase, sell or lease (as lessee or lessor) property of, to purchase or sell services from or to, to supply funds to or in any other manner invest in, the obligor with respect to such indebtedness or other obligation (including any agreement to pay for property or services of the obligor irrespective of whether such property is received or such services are rendered), primarily for the purpose of enabling the obligor to make payment of such indebtedness or other obligation or to assure the holder or other obligee of such indebtedness or other obligation against loss; or (iii) otherwise to assure the obligee of such indebtedness or other obligation against loss with respect thereto, or (b) any grant (or agreement in favor of the obligee of such indebtedness or other obligation to grant such obligee, under any circumstances) by a Person other than the obligor with respect to such indebtedness or other obligation of a security interest in, or other Lien on, any property or other interest of such Person, whether or not such other Person has not assumed or become liable for the payment of such indebtedness or other obligation.

-28-

"**HFSH Act**" means the Helping Families Save Their Home Act of 2009, as amended, supplemented, or modified from time to time.

"**HPD**" means the New York City Department of Housing Preservation and Development (or any successor thereto).

"**Immediate Family Member**" means, with respect to any individual, his or her spouse, parents, parents-in-law, grandparents, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children (whether natural or adopted), children-in-law, stepchildren, grandchildren, and grandchildren-in-law.

"**Indemnified Parties**" has, (a) for purposes of the LLC Operating Agreement, the meaning given therein and (b) for purposes of the Transfer Agreement, the meaning given therein.

"**Initial Member**" means the Persons from time to time constituting the "Initial Member" pursuant to, and in accordance with, the LLC Operating Agreement (initially, the Receiver). For avoidance of doubt, references to the Initial Member will, as the context might require (with respect to any period (a) on or before the Closing Date or (b) during which the Receiver is the Initial Member), include the Receiver as a party to the Original LLC Operating Agreement and/or as the Transferor, as applicable.

"**Initial Member Capital Contribution**" has the meaning set forth in Section 2.3(a)(i) of the LLC Operating Agreement.

"**Initial Member Capital Improvement Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Initial Member Interest**" means (a) the limited liability company interest in the Company held by the Initial Member, including the rights to share in the income, gain, loss, deductions and credits of, and the right to receive distributions from, the Company; (b) all other rights, benefits and privileges enjoyed by the Initial Member (pursuant to the Act, the LLC Operating Agreement or otherwise) in its capacity as a Member, including rights to vote, consent and approve; and (c) all other rights, benefits, privileges and claims (whether known or unknown) of the Initial Member pursuant to, or arising pursuant to, the LLC Operating Agreement. For the avoidance of doubt, the "Initial Member Interest" does not include any right, title or interest of the Receiver in its capacity as the Transferor.

"**Initial Member Related Person**" means the Initial Member and any other Related Person with respect to the Initial Member.

"**Initial Member WCR Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Insolvency Event**" means, with respect to any specified Person, the occurrence of any of the following events:

(a)    the specified Person makes an assignment for the benefit of creditors;

(b)    the specified Person files a voluntary petition for relief in any Insolvency Proceeding;

(c)    the specified Person is adjudged bankrupt or insolvent or there is entered against the specified Person an order for relief in any Insolvency Proceeding;

(d)    the specified Person files a petition or answer seeking for the specified Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law;

(e)    the specified Person seeks, consents to, or acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer of the specified Person or of all or any substantial part of the specified Person's properties. or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer is appointed without the application or consent of such specified Person and the appointment continues undischarged and unstayed for forty-five calendar days;

(f)    the specified Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the specified Person in any proceeding described in clauses (a) through (e);

(g)    the specified Person becomes unable to pay its obligations as they become due, or the sum of such specified Person's debts is greater than all of such Person's property, at a fair valuation; or

(h)    (i) at least sixty days have passed following the commencement of any proceeding against the specified Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any Law and such proceeding has not been dismissed, or (ii) (A) at least sixty days have passed following the appointment of a trustee, receiver or liquidator for the specified Person or all or any substantial part of the specified Person's properties without the specified Person's agreement or acquiescence, and such appointment has not been vacated or stayed, or (B) if such appointment has been stayed, at least sixty days have passed following the expiration of the stay and such appointment has not been vacated.

"**Insolvency Proceeding**" means any proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*) or any proceeding under any other Debtor Relief Law.

"**Insurance Deficiency Notice**" has the meaning set forth in the Section 4(c) of the Insurance Schedule.

"**Insurance Modifications**" has the meaning set forth in the Section 4(c) of the Insurance Schedule.

"**Insurance Schedule**" means the Insurance Schedule attached as <u>Annex III</u> to the LLC Operating Agreement.

"**Intellectual Property**" means all United States or foreign intellectual and similar property of every kind and nature, including, without limitation, inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary and technical and business information, know-how, show-how or other data or information, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, and any license of any of the foregoing, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing and all rights to sue at law or in equity for any infringement or other violation thereof, including the right to receive all proceeds and damages therefrom.

"**Interim Management Fee**" means, with respect to each Due Period commencing during the Interim Servicing Period, a fee payable to the Manager (pursuant to, and for the purposes set forth in, <u>Section 12.5</u> of the LLC Operating Agreement, and as payable in accordance with the Custodial and Paying Agency Agreement) for each Group of Assets for which the Servicing Transfer Date has not yet occurred as of the first day of such Due Period, in an amount equal to (a) except as provided in <u>clause (b)</u>, the Interim Servicing Fee, or (b) with respect to any Due Period commencing prior to the Closing Date, (i) if such Due Period ends prior to or on the Closing Date, zero, or (ii) if such Due Period ends after the Closing Date, what the Interim Servicing Fee for such Due Period would have been if, for purposes of calculating the number of days in such Due Period, the portion of such Due Period prior to the Closing Date was disregarded.

"**Interim Servicing Expenses**" means all out-of-pocket fees, costs, expenses and indemnified amounts incurred by or on behalf of the Transferor (including as the Initial Member) or any Existing Servicer in connection with the Servicing and, to the extent expressly set forth in <u>clause (d)</u> below, the management of the Company and the Ownership Entities, incurred during, or in connection with the applicable exercise of rights or performance of applicable obligations with respect to, any Interim Servicing Period (or, for purposes of <u>clause (f)</u> below, as may otherwise be payable pursuant to such item), including, in each case to the extent so incurred during or in connection with any such Interim Servicing Period (or as may otherwise be payable pursuant to <u>clause (f)</u> below), (a) any and all out-of-pocket fees, costs, expenses and indemnified amounts which a Borrower is obligated to pay to any Person or to reimburse to the lender, in either case, pursuant to the applicable Note or any other Asset Documents, including Escrow Advances; (b) any and all out-of-pocket expenses deemed necessary by the Transferor or any Existing Servicer to protect or preserve the value of the Collateral or the priority of the Liens and security interests created by the Asset Documents relating thereto, including Taxes, insurance premiums (including forced place insurance premiums), payment of ground rent, the costs of prevention of waste, repairs and maintenance, foreclosure expenses and legal fees and expenses relating to foreclosure or other litigation with respect to the Assets; (c) any and all direct expenses related to the preservation, operation, management (including for engagement of on-site property managers for any specific Acquired REO Property), appraisal (including for any required Appraisal), leasing (including tenant improvements), and sale of the Collateral and/or Acquired Property (including real estate brokerage fees), and fees to Governmental Authorities to preserve or retain entitlements

-31-

granted to, and benefitting, such Collateral and/or Acquired Property; (d) costs and expenses in connection with the formation of the Company and other Reimbursable Company Administrative Expenses (but only to the extent incurred from and after the Closing Date or otherwise in connection with the formation of the Company); (e) to the extent not covered by any of <u>clauses (a)</u> through <u>(d)</u>, and subject only to any express exclusions set forth in the Transfer Agreement, expenses (including judgments, settlements and reasonable attorneys' fees of outside counsel) incurred by the Transferor (including to reimburse any applicable Existing Servicer) in connection with any litigation (including any bankruptcy action) with respect to the Assets, but only to the extent incurred from and after the Cut-Off Date; (f) amounts required for the Company to discharge (in accordance with the Transaction Documents) the Obligations as they become due, and to make applicable indemnification and/or reimbursement payments (other than for Pre-Approved Charges) owing by the Company to the Initial Member, the Transferor or any other Indemnified Party under the Transaction Documents; and (g) Required Funding Draws or other advances required or permitted to be made to any Borrower (and any advances to the Company for making the same).

"**<u>Interim Servicing Fee</u>**" means, with respect to each Due Period during the Interim Servicing Period (or commencing during such Interim Servicing Period), a fee payable by the Company to the Transferor (including as the Initial Member) (for the provision of interim Servicing on behalf of the Company) for each Group of Assets for which the Servicing Transfer Date has not yet occurred as of the first day of such Due Period, which fee shall be calculated and earned as of the first day of such Due Period (and payable on the applicable Distribution Date for such Due Period in accordance with the Custodial and Paying Agency Agreement), and be in the following amounts:

(a)    with respect to Loans (other than, for the avoidance of doubt, Acquired Property), in the amount determined by *multiplying* (i) the Unpaid Principal Balance of the Loans (other than, for the avoidance of doubt, Acquired Property) in such Group of Assets calculated as of the first day of such Due Period by (ii) ▮▮▮▮ and by (iii) a fraction, the numerator of which is the number of days in the respective Due Period and the denominator of which is three hundred and sixty, and

(b)    with respect to Acquired Property, in the amount determined by *multiplying* (i) the Net Fair Value of the Acquired Property in such Group of Assets calculated as of the first day of such Due Period by (ii) ▮▮▮▮ and by (iii) a fraction, the numerator of which is the number of days in the respective Due Period and the denominator of which is three hundred and sixty.

"**<u>Interim Servicing Period</u>**" means, with respect to each Group of Assets, the period beginning on the day after the Cut-Off Date and ending, with respect to such Group of Assets, on the Servicing Transfer Date for such Group of Assets.

"**<u>Interpretive Statement</u>**" means any written or oral statement with respect to an Asset or Obligation, whether in, or in any filing made in connection with, any Action or otherwise, that involves interpreting the FDIA or any FDIC Legal Power.

-32-

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, supplemented, or modified from time to time.

"**Issuing Bank**" means, with respect to any Qualifying Letter of Credit, the applicable issuing bank.

"**JDC Agreement**" has the meaning set forth in <u>Section 4.1</u> of <u>Annex IV</u> to the LLC Operating Agreement.

"**JDC Contractor**" means any Person not an Affiliate of the Private Owner, the Manager, the Servicer or any Subservicer retained by the Manager (in its individual capacity), or with the consent of the Manager, by the Servicer or an applicable Subservicer, to service, manage, administer, and provide debt collection services for any of the JDC Loans in accordance with the Transaction Documents and the Servicing Obligations and Servicing Standard applicable to Servicers.

"**JDC Loan**" means any Loan (including any related guaranty, but excluding Ownership Entities, all Acquired Property and all other assets which are not loans) and any Deficiency Balance which (a) is fully charged off and shown to have a zero value on the books and records of the Company, as determined in accordance with GAAP, (b) has been assigned a zero Unpaid Principal Balance pursuant to <u>clause (c)</u> of the definition of such term, and (c) is identified by the Manager (acting in accordance with the Transaction Documents and, for this purpose, acting in accordance with the Servicing Obligations and the Servicing Standard applicable to it and to the Servicers) as the type of loan that mortgage lenders (with respect to loans similar to the Loans) customarily refer to judgment and debt collectors for routine collection in the mortgage loan servicing industry for such loans. For purposes of clarity, a JDC Loan does not include any Collateral or other Collateral Document (other than guaranties of the JDC Loan) or any of the rights or remedies arising thereunder or incidental or ancillary thereto.

"**Key Asset Managers**" means the individuals designated as the "Key Asset Managers" in the Bidder Qualification Application, as such group of individuals might be modified from time to time pursuant to a written request for such modification submitted by the Private Owner and consented to in writing by the Initial Member (such consent not to be unreasonably withheld).

"**Key Decision Makers**" means the individuals designated as the "Key Decision Makers" in the Bidder Qualification Application, as such group of individuals might be modified from time to time pursuant to a written request for such modification submitted by the Private Owner and consented to in writing by the Initial Member (such consent not to be unreasonably withheld).

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree, or order (including any executive order) of any Governmental Authority.

"**LC Reissuance/Extension Failure**" means, with respect to any Qualifying Letter of Credit, (a) any failure of Issuing Bank to be and remain a Qualified Issuer, or (b) any failure of such Qualifying Letter of Credit to be automatically renewed (for an additional year) at least sixty days prior to the then-scheduled expiry of such Qualifying Letter of Credit, or the receipt by the

-33-

Initial Member of any notice to the effect that such Qualifying Letter of Credit will not be automatically renewed (for such additional one year period), in each case unless, within ten days of the occurrence of such failure or the Initial Member's receipt of such notice, as the case might be, the Private Owner has either (x) fully replaced such Qualifying Letter of Credit with a new Qualifying Letter of Credit issued by a Qualified Issuer (in conformance with all of the requirements set forth in the LLC Operating Agreement with respect to Qualifying Letters of Credit) or (y) completed an exercise of its right to substitute such Qualifying Letter of Credit with Qualifying Cash Collateral pursuant to <u>Section 3.13(e)</u> of the LLC Operating Agreement (and provided Qualifying Cash Collateral in the full undrawn face amount of such Qualifying Letter of Credit and paid to the Initial Member the Additional Security Substitution Fee), which right to substitute pursuant to <u>Section 3.13(e)</u> will be deemed to exist for substitution of such Qualifying Letter of Credit notwithstanding the occurrence, if any, of a prior substitution (of Qualifying Cash Collateral with such Qualifying Letter of Credit) pursuant to such Section.

"**<u>Lead Bidder</u>**" means The Community Preservation Corporation, a New York corporation.

"**<u>Liabilities</u>**" means, as to any Person, all liabilities, covenants and obligations of such Person of any nature whatsoever, whether direct or indirect, absolute or contingent, matured or unmatured, known or unknown, or material or immaterial, whether accrued, vested or otherwise, and whether or not actually reflected, or required by GAAP to be reflected, in such Person's balance sheets or other books and records, including any such liabilities, covenants or obligations based or founded upon negligence, gross negligence, recklessness, fault, strict liability, misrepresentation, fraud, quantum meruit, contract, tort (including toxic tort), breach of warranty (express or implied), theories of design defect or failure to warn, so-called "successor liability" doctrines, infringement or misappropriation of intellectual property rights, breach of fiduciary duty, violation of Law or any other legal or equitable theory.

"**<u>Lien</u>**" means any mortgage, deed of trust, pledge, deed to secure debt, trust deed, security interest, charge, restriction on or condition to transfer, voting or exercise or enjoyment of any right or beneficial interest, option, right of first refusal, easement, covenant, restriction, and any other lien, claim or encumbrance of any nature whatsoever.

"**<u>limited liability company interest</u>**" has the meaning ascribed to such term in the Act.

"**<u>Limited Power of Attorney</u>**" means any Limited Power of Attorney executed by the Transferor and/or Prior Transferor in (or based on) the form set forth in <u>Attachment K</u> to the Transfer Agreement.

"**<u>Litigation Substitution Deadline Date</u>**" means, with respect to any particular Closing Date Asset Litigation, or any particular claim or claims asserted in any Closing Date Asset Litigation, the earlier of (a) the sixtieth day after the last Servicing Transfer Date and (b) the thirtieth day after the date on which the Transferor notifies the Company in writing (after the Closing Date) that it irrevocably waives its right to designate such Closing Date Asset Litigation, or such particular claim or claims asserted in such Closing Date Asset Litigation, respectively, to

-34-

be a Retained Closing Date Asset Litigation, or such other date as may be agreed to in writing by the Transferor and the Company (each acting in their discretion).

"**LLC Interest**" means, with respect to any particular Member, (a) the entire limited liability company interest in the Company owned or held by such Member, including such Member's rights to share in the income, gain, loss, deductions and credits of, and the right to receive distributions from, the Company; (b) all other rights, benefits and privileges enjoyed by such Member (under the Act, the LLC Operating Agreement or otherwise) in its capacity as a Member, including rights to vote, consent and approve; and (c) all other rights, benefits, privileges and claims (whether known or unknown) of such Member pursuant to, or arising pursuant to, the LLC Operating Agreement (including, to the extent applicable, all rights, benefits, privileges and claims (whether known or unknown) of such Member (in its capacity as the Manager) pursuant to, or arising pursuant to, the LLC Operating Agreement (including rights to receive the Interim Management Fee or the Management Fee)).

"**LLC Operating Agreement**" means the Amended and Restated Limited Liability Company Operating Agreement dated as of the Closing Date, by and among the Initial Member, the Private Owner, and the Company.

"**Loan**" means any loan or Loan Participation set forth on the Asset Schedule, and any loan into which any such loan or Loan Participation is refinanced or modified, and includes with respect to each such loan or Loan Participation:  (a) any obligation evidenced by a Note; (b) all rights, powers or Liens of the Receiver, the Failed Bank, the Company or any Ownership Entity in or under the Collateral and Collateral Documents; (c) all rights of the Receiver, the Failed Bank or the Company pursuant to the Related Agreements and Asset Documents; (d) all rights of the Receiver, the Failed Bank or the Company to any Deficiency Balance (in each case to the extent relating to such Loan and not otherwise included in any Acquired Property, and in all events subject to any exclusions/inclusions as might be expressly set forth in the Asset Schedule or Ownership Entity and Receiver Acquired Property Schedule); (e) all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Receiver, the Failed Bank, or the Company with respect to any of the foregoing or the ownership, use, function, value of or other rights pertaining to any of the foregoing, whether arising by way of counterclaim or otherwise, other than any claims retained by the Receiver pursuant to Section 2.7 of the Transfer Agreement; and (f) all guaranties, warranties, indemnities and similar rights in favor of the Receiver, the Failed Bank or the Company with respect to any of the foregoing; provided, however, that, for purposes of any Transaction Document other than the Transfer Agreement, the foregoing rights, powers or Liens of (or in favor of) the Receiver or the Failed Bank will be included in (and considered part of) the Loans only the extent such rights, powers or Liens are transferred to the Company pursuant to the Transfer Agreement (and not otherwise subsequently transferred back to the Receiver).

"**Loan Criteria Matrix**" means the Loan Criteria Matrix attached as Exhibit I of the LLC Operating Agreement.

"**Loan Modification Program**" means the Signature Multifamily Mortgage Loan Modification Program described in Exhibit C of the Servicing Agreement, as it may be amended, supplemented or otherwise modified by the FDIC from time to time.

"**Loan Participation**" means any loan listed on the Asset Schedule subject to a shared credit, participation, co-lending or similar inter-creditor agreement pursuant to which the Failed Bank or the Receiver was, or the Company is, the lead or agent financial depository institution or otherwise managed or held the credit or sold participations, or under which the Failed Bank or the Receiver was, or the Company is, a participating financial depository institution or purchased participations in a credit managed by another Person.

"**Loan Participation Agreement**" means an agreement pursuant to which the Failed Bank or the Receiver was, or the Company is, the lead or agent financial depository institution or otherwise managed or held a shared credit or sold participations, or pursuant to which the Failed Bank or the Receiver was, or the Company is, a participating financial depository institution or purchased participations in a credit managed by another Person.

"**Loan Performance at Cut-Off Date Report**" means the Loan Performance at Cut-Off Date Report (prepared by the Receiver) included in Attachment A to the Transfer Agreement. Such Loan Performance at Cut-Off Date Report contains, as applicable, the initial application of the Loan Criteria Matrix with respect to each Loan, listing the applicable Risk Category of such Loan and the specific Risk Category classifications for each component of the Loan Criteria Matrix, and including also the initial Appraised Value, Debt Service Coverage Ratio, Net Operating Income and Loan to Value of the related Mortgaged Property, in each case as of the Cut-Off Date.

"**Loan Performance Report**" means each report in electronic format in the form set forth in Exhibit H to the LLC Operating Agreement (as such form may be updated or otherwise modified from time to time pursuant to such Exhibit H of the LLC Operating Agreement), to be prepared and distributed by the Manager in accordance with the Reporting and Access Schedule.

"**Loan to Value**" or "**LTV**" means, for any Loan and as of any date of determination, the quotient of (a) the Appraised Value for the Mortgaged Property securing such Loan, *divided by* (b) the current Unpaid Principal Balance of such Loan; provided that, if such Mortgaged Property secures more than one Loan, the LTV will be determined on a cumulative basis (as a single ratio) for all such Loans secured by such Mortgaged Property, and such single LTV will apply separately to each such Loan.

"**Losses**" means, collectively, losses, claims, damages, disbursements, suits, Liabilities, costs, and expenses (including attorneys' fees and litigation and similar costs, and other out-of-pocket expenses, actually incurred in investigating, defending, asserting, or preparing the defense or assertion of any of the foregoing), deficiencies, interest, awards, amounts paid in settlement, judgments, penalties, and fines.

"**Lost Instrument Affidavit**" means a Lost Instrument Affidavit, in the form of Exhibit L to the Custodial and Paying Agency Agreement, executed by the Custodian.

-36-

"**Management Fee**"



"**Management Fee Percentage**"

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)



"**Manager**" (a) for purposes of the LLC Operating Agreement has the meaning given therein, and (b) for purposes of any other Transaction Document means the Person from time to time constituting the "Manager" pursuant to, and in accordance with, the LLC Operating Agreement.

"**Member Schedule**" has the meaning set forth in Section 4.1 of the LLC Operating Agreement.

"**Members**" means (a) the Person from time to time constituting the "Initial Member" pursuant to and in accordance with the LLC Operating Agreement, and (b) from and after the Closing Date, the Person from time to time constituting the "Private Owner" pursuant to and in accordance with the LLC Operating Agreement (regardless of whether such Person is also the Manager), in each case so long as such Person remains a member of the Company. For purposes of clarification, references in the LLC Operating Agreement to the term "member" (lowercase) means a "member" as such term is defined in the Act.

"**Modification**" means any extension, renewal, substitution, replacement, supplement, amendment or modification of any agreement, certificate, document, instrument, or other writing, whether or not contemplated in the original agreement, document, or instrument.

"**Monthly Report**" means a report in electronic format in the form set forth in Exhibit B to the LLC Operating Agreement (as such form may be updated or otherwise modified from time to time pursuant to Section 3(b) of the Reporting and Access Schedule), to be prepared and distributed by the Manager in accordance with the Reporting and Access Schedule.

"**Mortgage**" means the mortgage, deed of trust or other instrument, including any Modifications thereto, creating a first or junior Lien on or ownership interest in a Mortgaged Property.

"**Mortgage Assignment**" means, with respect to any Mortgage, an assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the applicable Law of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment and pledge of the Mortgage.

"**Mortgaged Property**" means (a) the underlying real property or interest in real property, whether or not improved by buildings or facilities, and any personal property, fixtures, leases and other property or rights pertaining thereto, securing a mortgage loan, and (if applicable) any other Collateral securing such mortgage loan, or (b) with respect to any other type of loan, the Collateral securing such loan. The Collateral for a Loan may include one or more of the collateral types described in clause (a) or (b).

"**Net Fair Value**" means the fair market value of Acquired Property based on (a) the price that would be received to sell such Acquired Property (excluding any related Deficiency Balance or Deficiency Judgment Claim) in an orderly transaction between market participants on a measurement date, or (b) as determined by an Appraised Value, as provided in this definition. The Net Fair Value is to be initially determined in accordance with the requirements, and subject to the periodic adjustments and limitations as provided below. The Net Fair Value is to be set forth (and updated, as applicable, including for downward adjustments required pursuant to Section 7.7(c) of the LLC Operating Agreement), on an Acquired Property-by-Acquired Property basis, in each Consolidated Business Plan (and update thereto), and, for purposes of each Distribution Date, in the Monthly Report covering the Due Period with respect to such Distribution Date.

(w)    With respect to any Acquired Property that is included among the Assets on the Closing Date, the Net Fair Value is to be reasonably determined by the Manager (including on

-39-

the basis of an Appraisal, in the event the Manager elects to obtain the same) and set forth in the initial Consolidated Business Plan (and until such time the Manager delivers a Consolidated Business Plan setting forth the Net Fair Value of each Acquired Property, the Net Fair Value for each Acquired Property will be the book value set forth on the Asset Schedule (as the Unpaid Principal Balance of such Acquired Property as of the Cut-Off Date) as adjusted to its Adjusted Unpaid Principal Balance pursuant to the Transfer Agreement);

(x)    With respect to any Acquired Property that is not included among the Assets on the Closing Date, the Net Fair Value is to be initially determined at the time the relevant Collateral becomes Acquired Property, based on the Appraised Value as determined pursuant to Section 5.3(a) of Annex IV to the LLC Operating Agreement (and, until such determination of the Appraised Value, is to be based on the Unpaid Principal Balance of the applicable Loan immediately prior to the same being converted to such Acquired Property (where such Acquired Property represented, immediately prior to such conversion, all or substantially all of the value of the Collateral for such Loan), or otherwise on the applicable Release Price for such Collateral immediately prior to such conversion thereof to such Acquired Property);

(y)    In the event of any partial sale or other partial disposition of any Acquired Property, the Net Fair Value of the portion of the Acquired Property retained by the Company will be reduced by the Release Price of the portion so sold or otherwise disposed (or, until such Release Price has been established, by the net proceeds of such partial sale or other disposition); and

(z)    Following the initial determination with respect to any Acquired Property pursuant to clause (w) or clause (x) (including any specifically contemplated update or adjustment in such clause (w) or clause (x)), the Net Fair Value for such Acquired Property or any portion thereof will not increase (notwithstanding any increase in fair market value); provided, however, that, in the event of any Permitted Capital Improvements to such Acquired Property pursuant to an applicable approved Capital Improvement Plan, (i) the Net Fair Value with respect to such Acquired Property is to be increased by the amount of the funded Permitted Capital Improvement Expenses (as and when paid from the Capital Improvement Fund), in each case only to the extent such Permitted Capital Improvement Expenses are capitalized thereto in accordance with GAAP (and applicable Law), and (ii) at the election of the Manager on a one-time basis upon completion of all Capital Improvements set forth in such Capital Improvement Plan (and payment of all Permitted Capital Improvement Expenses with respect thereto), and subject to the Manager obtaining an updated Appraisal within 6 months after such completion, the Net Fair Value with respect to such Acquired Property is to be further increased by an amount, if positive (with no reduction if such amount is negative, but without limitation to such reductions as may be applicable in respect of any further changes in market value), equal to the difference of (x) the increase in the fair market value of such Acquired Property as a result of such Capital Improvements (determined based on such Appraisal), less (y) the aggregate amount of the Permitted Capital Improvement Expenses having been included in the Net Fair Value pursuant to clause (i) above.

"**Net Income**" or "**Net Loss**" means, for each Fiscal Year or other period, the taxable income or loss of the Company, or particular items thereof, determined in accordance with the accounting method used by the Company for federal income tax purposes with the following

-40-

adjustments: (a) all items of income, gain, loss, deduction or expense specially allocated pursuant to the LLC Operating Agreement (including pursuant to <u>Sections 6.2(b)(i)</u> through <u>(iv)</u> of the LLC Operating Agreement) are not to be taken into account in computing such taxable income or loss; (b) any income of the Company that is exempt from federal income taxation and not otherwise taken into account in computing the taxable income of the Company is to be added to such taxable income or loss; (c) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset is to be calculated with reference to such Book Value; (d) upon an adjustment to the Book Value of any asset pursuant to the definition of Book Value, the amount of the adjustment will be included as gain or loss in computing such Net Income or Net Loss; (e) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Net Income or Net Loss is to be an amount that bears the same ratio to such Book Value as the federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (<u>provided</u>, <u>however</u>, that if the federal income tax depreciation, amortization or other cost recovery deduction is zero, the Tax Representative may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income or Net Loss); and (f) except for items in <u>clause (a)</u> above, any expenditures of the Company not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition, are to be treated as deductible items.

"**<u>Net Operating Income</u>**" or "**<u>NOI</u>**" means, for any Loan and based solely on the Mortgaged Property(ies) securing such Loan, the net revenue from the cash flow of the relevant Mortgaged Property(ies) after operating expenses and before depreciation, capital expenses, and debt service, in each case determined in a manner satisfactory to the Initial Member.

"**<u>Note</u>**" means each note or promissory note, lost instrument affidavit, loan agreement, shared credit, or Loan Participation Agreement, intercreditor agreement, reimbursement agreement, any other evidence of indebtedness of any kind, or any other agreement, document, or instrument, in each case evidencing the indebtedness of a borrower under a Loan, and all Modifications to the foregoing.

"**<u>Notice of Event of Default</u>**" has, for purposes of the Private Owner Pledged Account Control Agreement, the meaning set forth in the Private Owner Pledged Account Control Agreement.

"**<u>Notice Schedule</u>**" means the Notice Schedule attached as <u>Schedule I</u> to this Agreement.

"**<u>NY UCC</u>**" means the Uniform Commercial Code as in effect on the Closing Date in the State of New York, as amended, supplemented, or modified from time to time, and any successor statute.

"**<u>Obligations</u>**" means all of the following (in each case, whether existing or accrued (or due, overdue, or not due) as of, or incurred, imposed, or arising on or after, the Cut-Off Date and/or the Closing Date):

(a)    all Liabilities (including any Liability to make an extension of credit (or other advance)) of the Receiver under any Transferred Contract, in each case to the extent the same are, in accordance with the FDIC Legal Powers (interpreted as set forth in the last sentence of Section 2.2 of the Transfer Agreement), legally binding on and valid against the Receiver;

(b)    all Liabilities (including (i) Liabilities for Taxes, (ii) homeowners association dues and other assessments, (iii) the obligation to prevent waste or allow the property to become a nuisance, and (iv) the obligation to comply with deed, zoning or other use restrictions) of the Receiver with respect to any Receiver Acquired Property (including with respect to the existence, acquisition, ownership, possession, operation, conduct or condition thereof), whether imposed by Law, order of any Governmental Authority, recorded instrument or deed, or otherwise, in each case to the extent the same are, in accordance with the FDIC Legal Powers (interpreted as set forth in the last sentence of Section 2.2 of the Transfer Agreement), legally binding on and valid against the Receiver;

(c)    without limitation of clause (ii) of the first sentence of Section 2.2 of the Transfer Agreement, all Liabilities (including any Liabilities for or in respect of any costs and expenses (including attorneys' fees and litigation and similar costs, and other out-of-pocket expenses, actually incurred in investigating, defending, asserting or preparing the defense of any Assumed Closing Date Asset Litigation), judgments, awards, fines, settlement amounts or penalties) of the Receiver (after giving effect to the FDIC Legal Powers) for or in respect of, or otherwise arising out of, any Assumed Closing Date Asset Litigation, in each case (i) to the extent the same are, in accordance with the FDIC Legal Powers (interpreted as set forth in the last sentence of Section 2.2 of the Transfer Agreement), legally binding on and valid against the Receiver and (ii) in the case of any such costs or expenses, to the extent the same were or are incurred after the Cut-Off Date; and

(d)    all Liabilities of the Receiver arising out of or in connection with, resulting from or related in any way to, any Asset (including with respect to the existence, acquisition, ownership, possession, operation, conduct or condition thereof), to the extent attributable to acts, omissions, events or circumstances (including (i) acts or omissions of, or on behalf of, the Company, the Private Owner, the Servicer, any subsidiary of the Company or any Ownership Entity, and (ii) without limitation of clause (i), any acts or omissions of the Transferor and/or any Existing Servicer in connection with the services (including in any event all Servicing) provided (or caused to be provided) or contemplated to be provided (or to be caused to be provided) by the Transferor and/or any Existing Servicer pursuant to, or as described in, Section 3.3 of the Transfer Agreement) occurring or initially arising at any time after the Cut-Off Date (including at any time after the Closing Date),

in each case (for clauses (a) through (d) inclusive) excluding, however, any Excluded Liability (disregarding for this purpose clause (c) of the definition of the term "Excluded Liabilities"). It is understood and agreed that any Liability of the Failed Bank or the Receiver that has been discharged or otherwise extinguished (whether by operation of Law, by settlement or payment (including payment by issuance of a receivership certificate), by contract or otherwise) prior to, on or as of a specified date does not constitute a Liability of the Receiver as of such specified date;

provided, however, that this sentence does not limit or qualify, and is subject to, clause (c) of the preceding sentence or the indemnity set forth in clause (ii) of the first sentence of Section 2.2 of the Transfer Agreement.

"**Obligor**" means (a) any guarantor of all or any portion of any Loan or all or any of any Borrower's obligations set forth and described in the Asset Documents or (b) any other Person (other than any Borrower, the lenders and any administrative or other agent) that is obligated pursuant to the Asset Documents with respect to an Asset, and includes the guarantor pursuant to any completion guaranty or similar document.

"**Office**" has the meaning set forth in Section 6.1(a) of the Custodial and Paying Agency Agreement.

"**Omnibus Loan Assignment**" means, with respect to any Loan included in the Assets, a general assignment and assumption, without representation, warranty, or covenant of any kind, of the applicable Asset Documents related to such Loan, in the form of Attachment G-3 to the Transfer Agreement.

"**Omnibus Property Assignment**" means, with respect to any Receiver Acquired Property (other than a Potentially Defectively Foreclosed Receiver Acquired Property), the title to which is held by the Receiver (rather than an Ownership Entity) as of the Closing Date, a general assignment and assumption, without representation, warranty or covenant of any kind, of any Related Agreements and tangible and intangible personal property related to such Receiver Acquired Property, in the form of Attachment J-2 to the Transfer Agreement.

"**Order**" has the meaning set forth in Section 6.1 of the Transfer Agreement.

"**Organizational Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and limited liability company or operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original LLC Operating Agreement**" means the initial "limited liability company agreement" (as such term is defined in the Act) of the Company dated as of a date prior to the Closing Date, pursuant to which the Initial Member held the entire limited liability company interest in the Company.

"**Ownership Entity**" means a Special Purpose Entity that is a direct, wholly owned subsidiary of the Company (or, for purposes of the Transfer Agreement, an entity that is identified as an Ownership Entity on the Ownership Entity and Receiver Acquired Property Schedule),

-43-

whether contributed by the Transferor on the Closing Date or formed or acquired by the Company thereafter; provided, however, that any entity transferred to the Company on the Closing Date pursuant to the Transfer Agreement (or otherwise identified as an Ownership Entity in the Ownership Entity and Receiver Acquired Property Schedule) that is not a Special Purpose Entity as of the Closing Date will be deemed to be an Ownership Entity, but the Company and the Manager are to take all necessary and appropriate actions to cause any such entity to become a Special Purpose Entity as promptly as possible after the Closing.

"**Ownership Entity and Receiver Acquired Property Schedule**" means Attachment C to the Transfer Agreement.

"**Ownership Entity Account**" has the meaning set forth in Section 5.1(c) of Annex IV to the LLC Operating Agreement.

"**Ownership Interest**" means, with respect to any Person, (a) any limited liability company interest in, any shares of capital stock of, or any other ownership or profit, or voting, interest in, such Person; (b) any rights or recourse against such Person under any stock appreciation, phantom stock, profit participation or similar rights or plan; (c) any rights of any nature whatsoever (including conversion rights, exchange rights or rights under warrants) to have such Person issue (or otherwise cause to become outstanding), sell, execute or deliver, or any liability or obligation of such Person to issue (or otherwise cause to become outstanding), sell, execute or deliver, (i) any Ownership Interest with respect to such Person described in clause (a) or (b), or (ii) any contract including any right or recourse described in clause (a) or (b) or above in this clause (c); or (d) any other "equity security" (as such term is defined in Rule 3a11-1 under the Exchange Act) of such Person.

"**Paying Agent**" means the Bank, and any successor paying agent that is a Qualified Custodian and Paying Agent and is acceptable to and approved by the Initial Member, such approval not to be unreasonably withheld, delayed, or conditioned.

"**Percentage Interest**" means, with respect to the limited liability company interest in the Company held by the Initial Member prior to the Closing Date, 100% and, with respect to the limited liability company interests in the Company held by the Initial Member and Private Owner, respectively, on and after the Closing Date, as set forth in Section 2.3(c) of the LLC Operating Agreement (pursuant to which Section 2.3(c) such Percentage Interest is 95.0% for the Initial Member and 5.0% for the Private Owner).

"**Permitted Buyer**" means, as of any date of determination, any person that is one or more of the following:

(a)    a Certified Community Development Financial Institution (CDFI) as defined and published by the US. Department of the Treasury Community Development Financial Institutions Fund.  See, for reference as of the date hereof, each of https://www.cdfifund.gov/ (for an overview) and   https://www.cdfifund.gov/sites/cdfi/files/2023-08/CDFI_Cert_List_08_22_2023_Final.xlsx (for a list of such Certified CDFIs).

(b)     a Pre-Qualified PACT Partner as defined and published by the New York City Housing Authority. See, for reference as of the date hereof, each of https://www.nyc.gov/site/nycha/about/pact/procurement.page (for an overview) and https://www.nyc.gov/assets/nycha/downloads/pdf/pactpreq-partnerlist.pdf (for the list of such Pre-Qualified PACT Partners).

(c)     a Qualified Preservation Buyer as defined and published by the HPD. See, for reference as of the date hereof, each of https://www.nyc.gov/site/hpd/about/about-hpd.page (for an overview) and https://www.nyc.gov/site/hpd/services-and-information/qualified-preservation-buyers.page (for a list of such Qualified Preservation Buyers).

"**Permitted Capital Improvements**" has the meaning set forth in Section 1 of the Permitted Capital Improvement Addendum.

"**Permitted Capital Improvement Addendum**" means the Permitted Capital Improvement Addendum attached as Annex V to the LLC Operating Agreement.

"**Permitted Dispositions**" has the meaning set forth in Section 8.1 of the LLC Operating Agreement.

"**Permitted Capital Improvement Expenses**" means, as the context might require, the specific approved budgeted amounts for (a) in connection with any Loan, Capital Improvement Advances, and/or (b) in connection with any Acquired REO Property, the costs and expenses for Permitted Capital Improvements to such Acquired REO Property, in each case (for both (a) and (b)) only to the extent set forth in the approved Capital Improvement Plan for such Asset; provided, however, that, in no event will any such costs and expenses include any Excluded Expenses or Working Capital Expenses.

"**Permitted Investments**" means any one or more of the following obligations or securities having at the time of purchase, or at such other time as might be specified, the required ratings, if any, provided for in this definition:

(a)     direct obligations of, or guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America, the obligations of which are backed by the full faith and credit of the United States of America (for the avoidance of doubt, this clause (a) will include any debt guaranteed by the FDIC in its corporate capacity);

(b)     demand and time deposits in or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank in the United States (provided, however, that, in the case of obligations that are not fully FDIC-insured deposits, the commercial paper and/or long-term unsecured debt obligations of such depository institution or trust company (or in the case of the principal depository institution in a holding company system, the commercial paper or long-term unsecured debt obligations of such holding company) have an Acceptable Investment Rating);

-45-

(c)     general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving ratings of not less than the highest rating of each Rating Agency rating such obligations;

(d)     mutual funds in which investments are limited to the obligations referred to in <u>clauses (a), (b)</u> or <u>(c)</u> of this definition; and

(e)     with the prior written consent of the Initial Member, any other demand, money market or time deposit or other obligation, instrument, security or investment.

"**Permitted Liens**" means (a) Liens on Collateral (other than Acquired Property) caused or permitted by the Manager as permitted under the Asset Documents where the applicable Borrower is not in default thereunder (so long as any such Lien caused by, or permitted pursuant to a discretionary consent or waiver of, the Manager is subordinated and junior to the security interest in favor of the Company in the applicable Collateral); (b) any Lien arising by operation of Law with respect to any Mortgaged Property as a result of the applicable Borrower's failure to pay ground rents, Taxes, assessments, water rates, sewer rents, and other similar charges with respect to such Mortgaged Property, if (i) the Manager determines in accordance with the Servicing Standard (and maintains applicable records of such determination pursuant to <u>Section 1</u> of the Reporting and Access Schedule) that the amount of such Lien (or applicable aggregate amount required to be paid by the Company so as to discharge the same) exceeds the net recoverable amount to the Company with respect to such Mortgaged Property and (ii) so long as such Lien remains in effect, the Company does not acquire title to such Mortgaged Property or otherwise have any liability with respect to such Lien; (c) inchoate Liens arising by operation of Law for Taxes not yet due, payable or delinquent; (d) leasehold interests of lessees and purchase rights of purchasers under leases and sales contracts otherwise permitted pursuant to the Transaction Documents (with respect to the Collateral or Acquired Property being so leased or purchased); (e) in the case of Acquired Property (and in addition to the foregoing), any Permitted Lien (and all title and survey exceptions based thereon as set forth in the applicable owner's title insurance) in existence at the time the Company or an applicable Ownership Entity acquired title to such Acquired Property (other than, in connection with any such title acquired by foreclosure or other applicable legal process, any such Lien as would be extinguishable in accordance with applicable Law in connection with such foreclosure or other legal process); and (f) such other Liens as the Initial Member approves in writing in its sole discretion.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, Governmental Authority, or other entity.

"**PO Owner**" means (a) any holder of an Ownership Interest in the Private Owner at any time prior to the Final Distribution and (b) if any such holder is a nominee for another Person or Persons, each such other Person or Persons.

"**PO Owner Undertaking**" has the meaning set forth in <u>Section 4(a)</u> of the Private Owner Interest Sale Agreement.

"**PO/Manager Distribution Instruction**" has the meaning set forth in Section 5.1(a) of the Custodial and Paying Agency Agreement.

"**PO/Manager Distribution Reinstatement Notice**" has the meaning set forth in Section 5.1(a) of the Custodial and Paying Agency Agreement.

"**Potentially Defectively Foreclosed Receiver Acquired Property**" means each real property (and related personal property) Receiver Acquired Property identified as "Potentially Defectively Foreclosed" or as a "Potentially Defectively Foreclosed Receiver Acquired Property" on the Ownership Entity and Receiver Acquired Property Schedule.

"**Pre-Approved Charges**" means the costs and expenses (including legal fees and costs incurred by the Company, the Manager, the Servicer or any Subservicer for the benefit of the Company) expressly designated as "Pre-Approved Charges" in the Custodial and Paying Agency Agreement (including Section 6.1(a)), in the Transfer Agreement (including Sections 2.8, 3.1(a), 3.1(b), 3.1(d)(i), 3.1(d)(v), 3.1(e), 3.2(b), 4.3, 4.10 and 5.6 of the Transfer Agreement), and no other costs or expenses.

"**Previously Approved Matters**" has the meaning set forth in Section 2.7 of the LLC Operating Agreement.

"**Principal Deficiency**" has the meaning set forth in Section 2.4(c) of the Transfer Agreement.

"**Prior Failed Bank**" means, Signature Bank, New York, New York.

"**Prior Servicers**" means, as of any date of determination, the Receiver, the Company, the Existing Servicers, the FDIC, the Failed Bank and any predecessor-in-interest thereof, any Ownership Entities existing (or having been in existence) on or before such date, and all of their respective Related Persons (but excluding, in all cases, the Manager (in its individual capacity)).

"**Prior Transferor**" means, the FDIC in its capacity as receiver for the Prior Failed Bank; provided, however, that, from and after the acquisition of the assets of such receivership by the FDIC in its corporate capacity, "Prior Transferor" will refer to the FDIC in its corporate capacity as successor to such receivership.

"**Priority of Payments**" has the meaning set forth in Section 5.1 of the Custodial and Paying Agency Agreement.

"**Private Owner**" means the Person from time to time constituting the "Private Owner" under, and in accordance with, the LLC Operating Agreement (initially, SIG-23 Private Owner LLC, a Delaware limited liability company).

"**Private Owner Capital Improvement Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Private Owner Interest**" (a) for purposes of the Private Owner Interest Sale Agreement, has the meaning set forth in the Recitals of the Private Owner Interest Sale Agreement, and (b) for purposes of each Transaction Document other than the Private Owner Interest Sale Agreement, means (i) the limited liability company interest in the Company held by the Private Owner, including the rights to share in the income, gain, loss, deductions and credits of, and the right to receive distributions from, the Company, (ii) all other rights, benefits and privileges enjoyed by the Private Owner (pursuant to the Act, the LLC Operating Agreement or otherwise) in its capacity as a Member, including rights to vote, consent and approve, and (iii) all other rights, benefits, privileges and claims (whether known or unknown) of the Private Owner (in any capacity, including as the Manager) pursuant to, or arising pursuant to, the LLC Operating Agreement or the Custodial and Paying Agency Agreement, including in any event (A) all rights of the Private Owner (in any capacity, including as the Manager) to receive the Interim Management Fee or the Management Fee and to receive any distributions or payments on account of any Excess Working Capital Advances made by or on behalf of the Private Owner (in any capacity, including as the Manager) and (B) all rights with respect to any funds in the Private Owner Pledged Account. For the avoidance of doubt, the "Private Owner Interest" does not include any right, title, or interest of the Manager (in its individual capacity) under the Servicing Agreement.

"**Private Owner Interest Asset Value**" means, with respect to any Asset, the portion of the Private Owner Interest Sale Price allocated to such Asset, as set forth on the Private Owner Interest Asset Value Schedule.

"**Private Owner Interest Asset Value Schedule**" means the "Private Owner Interest Asset Value Schedule" attached as Attachment B to the Transfer Agreement.

"**Private Owner Interest Sale Agreement**" means the Private Owner Interest Sale and Assignment Agreement between the Initial Member and the Private Owner dated as of the Closing Date.

"**Private Owner Interest Sale Price**" means the purchase price set forth in the Private Owner Interest Sale Agreement (as the "Private Owner Interest Sale Price" defined therein) for the limited liability company interest sold to the Private Owner.

"**Private Owner Obligations**" means all duties, liabilities, and obligations of the Private Owner under or with respect to the LLC Operating Agreement and the Transaction Documents.

"**Private Owner Pledged Account**" means the segregated trust or custodial account designated as the "Private Owner Pledged Account" pursuant to Section 3.9(a) of the Custodial and Paying Agency Agreement.

"**Private Owner Pledged Account Control Agreement**" means the Private Owner Pledged Account Control Agreement (in substantially the form set forth in Exhibit Q to the Custodial and Paying Agency Agreement), among the Private Owner, the Paying Agent, and the Initial Member, with respect to the Private Owner Pledged Account.

"**Private Owner Pledged Amount**" means $19,000,000.00.

"**Private Owner WCR Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Proceedings**" means any suit in equity, action at Law or other judicial or administrative proceeding.

"**Purchase Price Payment**" has the meaning set forth in Section 1(a) of the Private Owner Interest Sale Agreement.

"**Purchaser Eligibility Certification**" means, (a) with respect to the Private Owner, any Purchaser Eligibility Certification delivered by the Private Owner or any of its Affiliates to the Receiver in connection with the transactions contemplated in the LLC Operating Agreement and the other Transaction Documents, including the Purchaser Eligibility Certification delivered by the Private Owner to the Receiver on or about the Closing Date, and, (b) with respect to any Permitted Disposition (and the applicable transferee in connection therewith), a Purchaser Eligibility Certification in substantially the form of the Purchaser Eligibility Certification referenced in clause (a), with such changes as the Initial Member might require based on changes to such form of Purchaser Eligibility Certification as maintained by the FDIC.

"**Put/Call Closing**" has the meaning set forth in Section 3.14(b) of the LLC Operating Agreement.

"**Put/Call Closing Date**" has the meaning set forth in Section 3.14(b) of the LLC Operating Agreement.

"**Put/Call Notice**" has the meaning set forth in Section 3.14(a) of the LLC Operating Agreement.

"**Put Event**" has the meaning set forth in Section 3.14(a) of the LLC Operating Agreement.

"**Qualified Custodian and Paying Agent**" means any Person that (a) is a bank, trust company or title insurance company subject to supervision and examination by any federal or state regulatory authority, (b) is experienced in providing services of the type required to be performed by the Bank as the Custodian and Paying Agent under the Custodial and Paying Agency Agreement, (c) is qualified and licensed to do business in each jurisdiction in which the Custodial Documents will be held to the extent required unless and to the extent the failure to be so qualified or licensed will not have a material adverse effect on the Custodian or its ability to perform its obligations under the Custodial and Paying Agency Agreement, (d) is not prohibited from exercising custodial powers in any jurisdiction in which the Custodial Documents are or will be held, (e) has combined capital and surplus of at least $50,000,000 as reported in its most recent report of condition, (f) has the facilities to safeguard the funds deposited in the Accounts, the Asset Documents and the other Custodial Documents, and (g) is not an Affiliate of the Company, the Initial Member, the Private Owner, the Servicer or any Subservicer.

"**Qualified Institutional Buyer**" means a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act.

"**Qualified Issuer**" means any FDIC-insured depository institution that is at all times "well capitalized" (as such term is defined in 12 U.S.C. Section 1831o(b)(1)(A)), is in the business of issuing letters of credit and either (a) maintains offices in either or both of New York City, NY and Washington, D.C. where presentation and drawings on such letters of credit can be duly made, or (b) maintains a letter of credit department at its offices in another city and confirms to the Initial Member that its standard institutional practice is to permit presentation and drawing on such letters of credit by facsimile transmission of documents to such office.

"**Qualified Purchaser**" means a "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"**Qualified Servicer**" means any Person that (a) is properly licensed and qualified to conduct business in each jurisdiction in which such licenses and qualifications to conduct business are necessary for the Servicing to be conducted by or through such Person (taking into account any Servicing being conducted by any Subservicer engaged by such Person), (b) has the management capacity and experience to service Assets of the type held by the Company and to be serviced by such Person, especially performing and non-performing multifamily residential real estate loans (including acquisition, development and construction loans) secured by commercial properties subject to Rent Control or Rent Stabilization regulations including the number and types of Assets serviced, (c) has the ability itself, or through an applicable Subservicer engaged by such Person, to track, process and post payments, to furnish Tax reports to borrowers, and to monitor construction and approve and disburse construction draws, and (d) in the event such Person is to perform any Servicing other than Asset Management, such Person either (i) has an Acceptable Rating, (ii) has engaged a Rated Subservicer for all such Servicing other than Asset Management, or (iii) is approved by and continues to be acceptable to the Initial Member in its sole discretion.

"**Qualified Transferee**" has the meaning set forth in Section 10.1 of the LLC Operating Agreement.

"**Qualifying Cash Collateral**" means cash and any interest earned thereon (and Permitted Investments with respect thereto) in the Private Owner Pledged Account.

"**Qualifying Letter of Credit**" means an irrevocable standby letter of credit (a) delivered to (and naming as sole beneficiary thereunder) the Initial Member substantially in the form of Exhibit D to the LLC Operating Agreement (or in such other form as may be acceptable to, and approved in writing by, the Initial Member), duly issued by an Issuing Bank that is, as of the date of issuance thereof, a Qualified Issuer, (b) drawable either (i) at such Issuing Bank's offices in New York City, NY or Washington, D.C. or (ii) through a letter of credit department located at its offices in another city which permits presentation and drawing on such letters of credit by facsimile transmission of documents to such office (provided, however, that, with respect to this clause (ii), such Qualified Issuer must confirm to the Initial Member that such Qualified Issuer's standard institutional practice is to permit presentation and drawing on such letters of credit by facsimile transmission of documents to such office), and (c) having an initial term of one year with automatic renewals thereafter (without amendment except for extension of the then current expiry date by an

-50-

additional year) until the Initial Member has delivered written notice to the Issuing Bank to the effect that such Qualifying Letter of Credit is being released in its entirety.

"**Rated Subservicer**" means a Qualified Servicer (that, for purposes of clause (d) of such definition, either (a) has an Acceptable Rating, or (b) is approved by and continues to be acceptable to the Initial Member in its sole discretion) engaged as a Subservicer by the Servicer so that the Servicer qualifies as a Qualified Servicer (and without the engagement of which such Servicer would not, as to applicable Servicing being conducted by such Rated Subservicer, so qualify as a Qualified Servicer).

"**Rating Agencies**" means each of S&P Global Ratings, Fitch Ratings Inc., DBRS Morningstar, Kroll Bond Rating Agency, and such other rating agencies as are nationally recognized.

"**Receiver**" means the FDIC, in its capacity as receiver for Signature Bridge Bank, N.A., provided, however, that, from and after the acquisition of the assets of such receivership by the FDIC in its corporate capacity, "Receiver" will refer to the FDIC in its corporate capacity as successor to such receiver.

"**Receiver Acquired Property**" means (a) the equity interests in any Ownership Entity (or other special purpose entity holding applicable real and/or personal property) set forth on the Ownership Entity and Receiver Acquired Property Schedule (and the assets held directly or indirectly by any such Ownership Entity); (b) Collateral that is identified as "Owned Real Estate" on the Ownership Entity and Receiver Acquired Property Schedule, the title to which has been acquired by or on behalf of the Receiver or the Failed Bank by foreclosure, by deed in lieu of foreclosure, by power of sale or pursuant to the Uniform Commercial Code or otherwise (including where the foreclosure or other acquisition event occurs before the Cut-Off Date), but the title to which has not yet been transferred to an Ownership Entity by the Receiver (which will include each Potentially Defectively Foreclosed Receiver Acquired Property, except where the context provides otherwise); and (c) any other Collateral, the title to which has been acquired by or on behalf of the Receiver or the Failed Bank by foreclosure, by deed in lieu of foreclosure, by power of sale or pursuant to the Uniform Commercial Code or otherwise, if the foreclosure or other acquisition event occurs after the Cut-Off Date, or occurred on or before the Cut-Off Date but the Redemption Period had not expired on or before the Cut-Off Date, and the equity interests in any Ownership Entity (or other special purpose entity formed by or on behalf of the Receiver or the Failed Bank) holding any such Collateral.

"**Receiver's Deed**" means, with respect to any real property (and related personal property) Receiver Acquired Property (other than a Potentially Defectively Foreclosed Receiver Acquired Property), the title to which is held by the Receiver (rather than an Ownership Entity) as of the Closing Date, a special warranty deed in recordable form, in the form of Attachment J-1 to the Transfer Agreement.

"**Receiver's Quitclaim Deed**" means, with respect to any Potentially Defectively Foreclosed Receiver Acquired Property, the title (if any) to which is held by the Receiver (rather

than an Ownership Entity) as of the Closing Date, a quitclaim deed in recordable form, in the form attached as <u>Attachment J-3</u> to the Transfer Agreement.

"**Recording Office**" means (a) the appropriate recording office of the jurisdiction in which the Mortgaged Property is located with respect to any given Asset (if such Asset is not Acquired Property) or in which the Acquired Property is located, and (b) in the case of personal property (including, to the extent applicable to such personal property, of <u>clause (a)</u>) each appropriate recording or filing office for the recordation or filing of a notice of a Lien on, or Mortgage with respect to, or a document of assignment, conveyance or transfer of title to, such personal property.

"**Redemption Period**" means the statutory time period, if any, during which a foreclosed owner may buy back foreclosed real property from the foreclosure sale purchaser under the Law of the jurisdiction in which the property is located, which period (if the jurisdiction provides for the same) may vary among the jurisdictions that do provide for a Redemption Period.

"**Regulation AB**" means the regulations at 17 C.F.R. Section 229.1100 *et seq.*, as the same may be amended, supplemented, or modified from time to time.

"**Reimbursable Company Administrative Expenses**" means (a) reasonable fees of outside auditors in connection with annual audits of the Company (and the Ownership Entities); (b) [intentionally omitted]; (c) licensing, filing and similar fees paid to applicable authorities in connection with obtaining and maintaining applicable Company (or Ownership Entity) licenses or registrations, and reasonable attorneys' fees incurred in connection therewith, or with the preservation (and eventual dissolution) of the Company's (or any Ownership Entity's) existence in accordance with the LLC Operating Agreement (including for purposes of compliance with <u>Section 4.3</u> of the LLC Operating Agreement); and (d) reasonable fees of the Manager incurred in complying with the provisions of Section 704(c) of the Code with respect to contributed property and preparing reports setting forth information, on an Asset-by-Asset basis, to enable the Company (and the Members) to properly track any gain or loss as required by Section 704(c) of the Code pursuant to <u>Section 7.6(b)</u> of the LLC Operating Agreement; <u>provided</u>, <u>however</u>, that in no event will Reimbursable Company Administrative Expenses include (x) fees or costs in connection with audits, licenses or filings of or with respect to the Manager, the Servicer, any Subservicer or any other Person (other than the Company and the Ownership Entities), (y) any amounts qualifying as Excluded Expenses under <u>clauses (a) through (e)</u> or <u>(g) through (i)</u> of the definition thereof, or (z) any overhead costs of the Company, the Manager, the Servicer or any Subservicer (including any (i) travel expenses or (ii) costs for office space, office equipment, supplies and related expenses, employee salaries, bonuses and other compensation and related expenses and similar internal costs and expenses, together with any other expenses incurred by the Manager to comply with <u>Section 3.3</u> of the LLC Operating Agreement (including any costs or expenses of engaging independent contractors to perform relevant services for the day-to-day operation of the Company in lieu of performance of the same by personnel required to be made available by Manager pursuant to such <u>Section 3.3</u>)).

"**Related Agreement**" means (a) any agreement, document or instrument (other than the Notes and Collateral Documents) relating to or evidencing any obligation to pay or securing any

-52-

Asset (including any equipment lease, letter of credit, bankers' acceptance, draft, system confirmation of transaction, loan history, affidavit, general collection information, and correspondence and comments relating to any obligation); (b) any agreement relating to real property or rights in or to any real property (including leases, tenancies, concessions, licenses or other rights of occupancy or use and security deposits related thereto) related to any Asset; (c) any collection, contingency fee, and Tax and other service agreements (including those referred to in Section 4.2 of the Transfer Agreement) that are specific to the Assets (or any of them) and that are assignable; (d) any letter of assurance, letter of credit or similar instrument evidencing an obligation of the Failed Bank, the Receiver, the Company or any Ownership Entity that was issued for the benefit of any Person and relates in any way to an Asset or the acquisition, development or construction of any project with respect to which the proceeds of such Asset were used or were intended to be used; and (e) any interest rate swap arrangement between the Borrower and the Failed Bank, the Receiver or the Company (in each case as the applicable lender, agent or other creditor under an Asset) that relates to any Asset; provided, however, that no contract or instrument that was disaffirmed or repudiated by the Receiver prior to the Cut-Off Date or no Transferor Loan-Servicing Contract will constitute, or be deemed to constitute, a Related Agreement.

"**Related Party**" means, with respect to any Person, any party related to such Person in the manner delineated in 26 U.S.C.A. Section 267(b) and the regulations promulgated thereunder, as such Law and regulations may be amended, supplemented, or modified from time to time.

"**Related Party Agreement**" means any current or future contract, agreement, commitment, arrangement, or transaction (including any agreement to sell Company Property, incur any Debt or become bound by any Guarantee of any obligations) with or for the benefit of (including to pay any fee to) the Private Owner or any Affiliate of the Company or the Private Owner.

"**Related Person**" means, with respect to any specified Person, any Affiliate of such specified Person, and any officer, director, stockholder, member, manager, partner, principal, employee, contractor, attorney, representative, agent, successor or assign of such specified Person or of any such Affiliate; provided, however, that the Servicer and any Subservicer will be deemed to constitute a "Related Person" of (a) the Company and (b) during any period during which the Private Owner serves or served as the Manager, the Private Owner.

"**Release Price**" means, with respect to any parcel (or other severable portion that, pursuant to any Business Plan, could potentially be separately sold by the Company or an applicable Borrower) of Acquired Property or Mortgaged Property securing a Loan, the applicable release price as designated by the Manager, which release price is:

(a)    with respect to any such parcel (or other severable portion) comprising Acquired Property, is to be determined (and updated) by the Manager together with each determination (and update) of the Net Fair Value of such Acquired Property (with the applicable release prices to be set forth for such Acquired Property in each applicable Business Plan or other report including the Net Fair Value of such Acquired Property); provided, however, that, the Manager at all times is to cause the aggregate amount of the release prices for each such parcel (or

-53-

other severable portion) comprising such Acquired Property to be in an amount not less than the Net Fair Value of such Acquired Property (including with applicable reasonable allocations by the Manager of any increases or reductions in such Net Fair Value); and

(b)    with respect to any such parcel (or other severable portion) comprising Mortgaged Property securing a Loan, is to be as set forth in the applicable Asset Documents with respect to such Loan as in effect as of the Closing Date, or, to the extent not so set forth therein, as reasonably determined (and updated) by the Manager (with all such release prices to be set forth in each Consolidated Business Plan and in each Borrower-Business-Relationship Business Plan, if any, for such Loan); provided, however, that, to the extent any such determination is made by the Manager (as a result of no such release price being set forth in the applicable Asset Documents), the Manager is to cause the aggregate amount of the release prices for each parcel (and other severable portions) comprising all Mortgaged Property securing a Loan, as so set forth in each applicable Business Plan, to be in an amount not less than the Unpaid Principal Balance of such Loan (including with reasonable allocations by the Manager with respect to any increase in the Unpaid Principal Balance of such Loan).

"**Relevant Account**" has the meaning set forth in Section 3.11(a) of the Custodial and Paying Agency Agreement.

"**Rent Control**" or "**RC**" means and refers to government policies that place a limit on the amount a landlord can demand for leasing and re-leasing a home or apartment; and any reference to "Rent Controlled" or "RC" properties or units means and refers to properties or units that are subject to these policies.

"**Rent Stabilization**" or "**RS**" means and refers to government policies that (i) regulate how often and by what amount a landlord may increase the rent of housing units, and (ii) provide tenants with services and eviction protections; and any reference to "Rent Stabilized" or "RS" properties or units means and refers to properties or units that are subject to these policies.

"**Reporting and Access Schedule**" means the Reporting and Access Schedule attached as Annex II to the LLC Operating Agreement.

"**Reporting Service**" means any Person retained by the Initial Member, pursuant to Section 6 of the Reporting and Access Schedule, to facilitate and assist with reporting required to be provided to the Initial Member (and, as applicable, each other Beneficiary) pursuant to the Transaction Documents.

"**Repurchase Price**" means, with respect to any Asset, an amount equal to the sum of (a) the Total Asset Value of such Asset, *plus* (b) unreimbursed (by the applicable Borrower or other Obligor, or otherwise from applicable Asset Proceeds not applied in reduction of the Unpaid Principal Balance of such Asset) Servicing Expenses that have been advanced by the Company with respect to such Asset as of the date of the repurchase, and *minus* (c) the result when the Unpaid Principal Balance of the Asset as of the date of repurchase is subtracted from the Adjusted Unpaid Principal Balance of the Asset (which result might be a negative number).

-54-

"**Required Funding Draw**" means a Funding Draw that the Company has an existing, affirmed obligation to fund (without regard to any waiver or amendment entered into after the Closing Date) subject to applicable limitations in the relevant Asset Documents.

"**RESPA**" means the Real Estate Settlement Procedures Act of 1974, as amended, supplemented, or modified from time to time.

"**Responsible Officer**" means, in relation to any specified Person, the chief executive officer, president, chief operating officer, chief financial officer or treasurer of such specified Person (or, if applicable, of the Person having general management authority with respect to the business and affairs of such specified Person).

"**Restricted Servicer Change of Control**" means any Change of Control with respect to the Servicer or any Rated Subservicer, which Change of Control has not been approved in writing by the Manager and the Initial Member (which approval may not be unreasonably withheld).

"**Retained Closing Date Asset Litigation**" means (a) any Closing Date Asset Litigation, or any particular claim or claims asserted in any Closing Date Asset Litigation, expressly designated in writing by the Receiver in its absolute discretion as constituting "Retained Closing Date Asset Litigation" either (i) in the applicable written litigation reports, if any, provided by the Receiver to the Winning Bidder (and other applicable qualified bidders having successfully submitted a Bidder Qualification Application) prior to its Bid submission, (ii) in the list of litigation prepared by the Initial Member and attached as Schedule I to the Transferee Acknowledgment and Certification delivered pursuant to Section 1(b)(vii) of the Private Owner Interest Sale Agreement, or (iii) in a separate written notice by the Receiver delivered to the Company no later than thirty days after the last Servicing Transfer Date; and (b) in any event, any Closing Date Asset Litigation, to the extent (and only to the extent) (i) asserting a claim for damages arising out of or resulting from a repudiation (effected pursuant to and in accordance with the FDIA and the internal policies and procedures of the FDIC) by the Receiver of a Liability, or challenging any prior decision with respect thereto, or (ii) asserting a claim against or Liability of the Receiver that, pursuant to and in accordance with applicable Law, was asserted through the receivership administrative claims processes administered by the Receiver pursuant to 12 U.S.C. Section 1821(d)(3) through (13).

"**Review Criteria**" means the matters specified in Exhibit F to the Custodial and Paying Agency Agreement.

"**Risk Category**" means, as of any date of determination and as the context may require, the applicable risk category, as an "A", "B", "C" or "D" classification, (a) in the case of a Loan, for such Loan as determined pursuant to the Loan Criteria Matrix and (b) in the case of a specific Acquired REO Property, for the applicable corresponding Loan immediately before such property (as prior Mortgaged Property) became Acquired REO Property, determined for this purpose based solely on the "Non-Financial Criteria" of the Loan Criteria Matrix as applicable to such property at such time, in each case with initial and subsequent such determinations being subject to the following:

(i)       The Risk Category for an Asset is determined based on the lowest (with D being lower than C, which is lower than B, which is lower than A) individual Risk Category for any specific "Financial Criteria" or "Non-Financial Criteria" (or, for Acquired REO Property, only "Non-Financial Criteria") pursuant to the Loan Criteria Matrix.

(ii)      The initial Risk Category for each Loan is set forth in the Loan Performance at Cut-Off Date Report, and, following the Closing Date, the Risk Category for each Loan, based on circumstances existing as of the end of each Due Period, will be set forth in the Loan Performance Report for such Due Period.

(iii)     Except as otherwise expressly provided, a change in Risk Category of a Loan will become effective upon any of (A) receipt by the Initial Member of the Loan Performance Report setting forth such change, and, in the case of any improvement in Risk Category (such as from B to A or C to B), further confirmation by the Initial Member as to such improved Risk Category based on the Loan Criteria Matrix, or (B) such date as may be set forth in a notice by the Initial Member to the Company of a separate determination by the Initial Member, based on the Loan Criteria Matrix, that a changed Risk Category applies (with the Initial Member having the right, in its sole discretion, to so deliver a notice changing the Risk Category of any Loan, including to assign a D Risk Category thereto, during any period of delay or failure of the Manager in delivery of any Loan Performance Report setting for the Risk Category for such Loan).

(iv)      The Risk Category for each Acquired REO Property (which must be determined to the satisfaction of the Initial Member, and once so determined will not change) will be determined by the Manager prior to the Company's acquisition of such Acquired REO Property and set forth in the Monthly Report for the Due Period in which such Acquired REO Property is so acquired.

(v)       For each Loan, and for purposes of any determination after the applicable Servicing Transfer Date of the Loan to Value "Financial Criteria" portion of the Loan Criteria Matrix, eligibility for a Risk Category A/B classification requires an Appraisal (for each Mortgaged Property securing such Loan) obtained (and reflecting an Appraised Value as of a date that is) not more than 3 years prior to the applicable determination date of such Loan to Value.

References to Risk Categories may be used alone or in combination, and may omit use the term "Risk Category".  By way of example, (x) reference to an "A Loan" or "Risk Category A Loan" refers to a Loan that, as of the applicable date of determination has such an "A" classification, (y) reference to an "A Asset" or "Risk Category A Asset" refers to any Asset, including separately any Loan or Acquired REO Property, that, as of the applicable date of determination, has such an "A" classification, and (z) reference to an "A/B Loan", "Risk Category A/B Loan" or "Risk Category A or B Loan" refers to any Loan, that as of the applicable date of determination, has either such an "A" classification or a "B" classification.

"**Rules of Construction**" means, in relation to any agreement (including this Agreement) (for this purpose, each a "specified agreement") that specifies that the "Rules of Construction" apply to such specified agreement, the following rules of construction and interpretation:

-56-

(a)    <u>Headings and Captions</u>.  The table of contents and the article, section or paragraph headings, titles or captions contained in such specified agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of such specified agreement or the intent of any provisions of such specified agreement.  All Section and paragraph references contained in such specified agreement will refer to such specified agreement unless otherwise specified.

(b)    <u>References to Persons Exclusive</u>.  References in such specified agreement to "Affiliates" or "Subsidiaries" of a specified Person refer to, and include, only other Persons which from time to time constitute "Affiliates" or "Subsidiaries," as the case might be, of such specified Person, and do not include, at any particular time, other Persons that might have been, but at such time have ceased to be, "Affiliates," or "Subsidiaries," as the case might be, of such specified Person, except to the extent that any such reference specifically provides otherwise.  A reference in such specified Agreement to a Member or other Person, in and of itself, does not, and will not be deemed to, refer to or include any other Person having an interest in a Member or other Person (such as, without limitation, any stockholder or member of or partner in a Member, or other Person).

(c)    <u>Use of "Or"</u>.  Unless the context indicates otherwise, any use of the term "or" in such specified agreement is not exclusive.

(d)    <u>References to Laws</u>.  Any reference in such specified agreement to a Law includes any amendment of, modification to, or replacement of, such Law.

(e)    <u>Use of Accounting Terms</u>.  Accounting terms used in such specified agreement will have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(f)    <u>References to Documents</u>.  References in such specified agreement to any other document, instrument or agreement will, in each case, except as might be set forth otherwise in such specified agreement, be deemed (i) to include all appendices, exhibits, schedules and other attachments to such other document, instrument or agreement (as originally executed), (ii) to include all documents, instruments or agreements issued or executed (if such other document, instrument or agreement is a Transaction Document, in accordance with the terms of such Transaction Document) in replacement of such other document, instrument or agreement, and (iii) to mean such other document, instrument or agreement, or replacement thereof as specified in <u>clause (ii)</u>, as amended, modified and supplemented from time to time in accordance with the terms of such other document, instrument or agreement; <u>provided</u>, <u>however</u>, that (I) any reference in such specified agreement to terms defined in the Agreement of Common Terms and Definitions will mean such terms as amended, modified, supplemented or replaced in accordance with the Agreement of Common Terms and Definitions, and (II) with respect to any terms in such other document, instrument or agreement that are expressly incorporated by reference into such specified agreement, any such amendment, modification, supplement or replacement pursuant to the foregoing, will for purposes of such incorporation by reference, be deemed effective only to the

-57-

extent such amendment, modification, supplement or replacement also complies with the terms of such specified agreement for the amendment of such specified agreement.

(g)     Use of "Herein."  Unless otherwise specified in such specified agreement, the words "hereof," "herein" and "hereunder" and words of similar import, as used in such specified agreement, will refer to such specified agreement as a whole and not to any particular provision of such specified agreement.

(h)     Use of "Including."  The words "include" and "including" and words of similar import, as used in such specified agreement, are not limiting, and are to be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(i)     Use of "During."  The word "during", as used in such specified agreement, when used with respect to a period of time is to be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(j)     Singular/Plural Usage.  Unless the context otherwise requires, singular nouns and pronouns when used in such specified agreement are to be deemed to include the plural and vice versa and impersonal pronouns are to be deemed to include the personal pronoun of the appropriate gender.

(k)     Servicer.  Unless the context otherwise requires, during any period during which there is more than one Servicer, references (other than in any Servicing Agreement or Subservicing Agreement) to "the Servicer" or "the Servicing Agreement" will refer to "the Servicers or any of them" and to "the Servicing Agreements or any of them", respectively.

(l)     References to Indirect Ownership.  With respect to any determination of any specified Person's (or Persons') indirect ownership in any other Person, unless otherwise specified as to any particular use, such indirect ownership is to be determined attributing to such specified Person (or Persons) its (or their) actual ultimate indirect ownership in such other Person (for example, after taking into account the dilutive effect of intervening Persons that directly or indirectly own any Ownership Interest in such other Person but that are not wholly-owned subsidiaries of such specified Person (or Persons)).

(m)     Predecessors-in-Interest.  Unless the context otherwise requires, (i) references in such specified agreement to any "predecessor-in-interest" or "predecessors-in-interest" (or any similar term) of the Transferor or of the Failed Bank shall be deemed to include each of the Prior Transferor and the Prior Failed Bank, and (ii) as used in relation to the Assets existing as of the Cut-Off Date (or the Closing Date) being transferred to the Company (and Obligations being assumed by the Company) and determinations with respect to Closing Date Asset Litigation (including obligations for transfer thereof), references in the Transfer Agreement and other applicable Transaction Documents (including relevant definitions in the Agreement of Common Terms and Definitions) to rights, obligations and liabilities of, and Actions by, against or involving, the Receiver or the Failed Bank will, except as otherwise determined by the Transferor (at any time) to not be applicable, be deemed to include (A) such rights, obligations or liabilities as successor or assignee of the Prior Receiver or Prior Failed Bank, as applicable, and

-58-

(B) such Actions by, against or in the name of the Prior Receiver or the Prior Failed Bank, including as may be separately administered by the Prior Receiver as of the Closing Date, in each case whether or not the applicable transfer or succession in respect of the Assets (as held by the Prior Failed Bank prior to the FDIC having been appointed as Prior Receiver) from the Prior Failed Bank (or Prior Receiver) was filed, perfected or otherwise further reflected under the terms of any documents or applicable administrative, judicial or legal requirements.

"**Secured Assets**" means all right, title and interest of the Private Owner in and to (a) the Private Owner Pledged Account (and all funds therein and related rights thereto as more specifically described in the Private Owner Pledged Account Control Agreement), (b) the Private Owner Interest, (c) the Servicing Agreement, each Subservicing Agreement, each other Transaction Document, and each other agreement or document from time to time entered into by (or otherwise including rights in favor of) the Private Owner in its capacity as the Manager, and (d) all proceeds of any of the foregoing at any time (including distributions thereon or other income in respect thereof).

"**Securities Act**" means the Securities Act of 1933, as amended, supplemented, or modified from time to time.

"**Seller Financed Loans**" has the meaning set forth in Section 12.22 of the LLC Operating Agreement.

"**Servicer**" means the Person retained by the Manager (in its individual capacity) to service, manage or administer any of the Assets or the Collateral in accordance with the LLC Operating Agreement. As of the Closing Date, the initial Servicer is The Community Preservation Corporation, a New York corporation.

"**Servicer Advances**" means advances made by or on behalf of the Servicer to fund Servicing Expenses.

"**Servicing**" means servicing, administering, managing, and disposing of the Assets and the Collateral.

"**Servicing Agreement**" means, initially, the Servicing Agreement dated as of the Closing Date, by and between the Manager (in its individual capacity) and the Servicer, and thereafter any replacement agreement entered into between the Manager (in its individual capacity) and the Person designated as the Servicer therein, which servicing agreement shall satisfy the requirements of Section 3 of Annex IV to the LLC Operating Agreement and shall be acceptable to the Initial Member in all respects.

"**Servicing Expenses**" means any of the following (in each case subject to the proviso set forth in the last full paragraph of this definition):

(a)    for an Asset which is a Loan, any and all customary, reasonable and necessary "out-of-pocket" costs and expenses incurred on or after the Closing Date by or on behalf of the Manager, the Servicer, or any Subservicer in connection with Servicing of such Asset (i)

-59-

incurred to protect, restore or preserve the value of the Collateral or the priority of the Liens and security interests created by the Asset Documents relating thereto (such as Taxes, home owners' association fees, insurance premiums (including "forced placed" insurance premiums), ground rent, fees to Governmental Authorities to preserve or retain entitlements granted to and benefitting the Asset, costs to prevent waste, routine repairs and maintenance, foreclosure expenses and reasonable, independent, outside counsel legal fees and expenses relating to foreclosure or other litigation with respect to the Asset, reasonable independent JDC Contractor fees and expenses under permitted JDC Agreements, and reasonable expenses (including reasonable outside counsel legal fees) in connection with the structuring and related Modifications for making a Capital Improvement Advance (it being understood that expenses for any Development in connection with a Capital Improvement Advance are limited to the applicable Permitted Capital Improvement Expenses)), or (ii) routinely incurred in connection with a permitted sale of such Loan or applicable Collateral with respect thereto (such as brokerage fees, appraisals, advertisement costs and closing costs);

(b)    for an Asset which is Acquired Property, any and all customary, reasonable and necessary "out-of-pocket" costs and expenses incurred on and after the Closing Date by or on behalf of the Manager, the Servicer, or any Subservicer in connection with Servicing of such Asset (i) incurred in connection with the direct, property level financial operation of such property (such as, for any specific Acquired Property, collection, deposit and remittance of rent and other property level receipts, implementation of financial controls on operating income and expenses, documentation of and record keeping for operating income and expenses, preparation of monthly operating statements, preparation of operating budgets, and verification that expenses do not exceed the approved line item limits of the annual operating budget with respect to such specific Acquired Property), in each case limited to such activities as performed by (or otherwise of such nature as would so be performed by) an on-site property manager for such Acquired Property (and in all events excluding any expenses incurred for oversight of any such financial operation, or for preparation of Business Plans, Capital Improvement Plans, Strategic Plan Reports, Critical Strategy Resolution Business Plans, Monthly Reports or other reports required to be provided by the Manager, the Servicer or any Subservicer pursuant to the Transaction Documents); (ii) routinely incurred in connection with the physical aspects of such property (such as insurance, security, utilities, fees to Governmental Authorities to preserve, restore, protect or retain entitlements granted to, and benefitting, such property, property level administration and services, home owners' association fees, enforcement of leases and property rules and regulations, emergency responses and routine daily upkeep, maintenance, repair and replacement of existing improvements) for maintenance, protection, preservation or restoration thereof; (iii) routinely incurred in connection with the sale of such Acquired Property (such as brokerage fees, appraisals, advertisement costs and closing costs); (iv) if the Asset is Acquired Property held for lease, routinely incurred in connection with leasing activity (such as brokerage fees and advertisement costs); (v) incurred in accordance with the Servicing Standard to obtain any insurance proceeds or any liquidation proceeds; (vi) incurred to obtain an appraisal (including any Appraisal as required pursuant to the Transaction Documents and the definition of Net Fair Value); or (vii) incurred to perform (in accordance with the Servicing Standard) Assumed Property Obligations;

(c)    Reimbursable Company Administrative Expenses;

-60-

(d)    subject to <u>Section 4.6</u> of the LLC Operating Agreement (and excluding any amounts or claims the Private Owner is required to bear or indemnify pursuant to such <u>Section 4.6</u> of the LLC Operating Agreement), to the extent not covered by any of <u>clauses (a)</u> through <u>(c)</u> above, legal fees and expenses (including judgments, settlements and reasonable attorneys' fees of independent outside counsel) incurred by the Company (including to directly or, through the Manager, the Servicer or any Subservicer, indirectly reimburse the Manager, the Servicer or any Subservicer) in its (or the Manager's, the Servicer's or any Subservicer's) defense of claims asserted against the Company or any Ownership Entity (or the Manager, the Servicer or any Subservicer) that relate to one or more Assets or the conduct of the Business, and allege, as the basis for such claims, any act or omission of the Company or any Ownership Entity (or the Manager, the Servicer or any Subservicer) or of the Failed Bank, the Receiver, any Existing Servicer or any other Person acting as servicer for any of the Assets at any time prior to the Cut-Off Date, but only if (i) such claims are not attributable to any act or omission of the Company, the Manager, the Servicer or any Subservicer in a manner inconsistent with, or in violation of, the Servicing Standard or any of the provisions of the LLC Operating Agreement or any Transaction Document, and (ii) (A) such claims are decided and there are final non appealable orders or judgments (unless the Initial Member has agreed in writing that no appeal needs to be taken) in favor of the Company or an Ownership Entity, as applicable (and the Manager, the Servicer and any Subservicer, to the extent any such claim has been asserted against the same), or if decided against the Company (or the Manager or the Servicer or any Subservicer) without any finding of bad faith, gross negligence or willful misconduct on the part of any of the foregoing or (B) there is entered into a final settlement of any such claim with the prior written consent of the Initial Member;

(e)    subject to <u>Section 4.6</u> of the LLC Operating Agreement (and excluding any amounts or claims the Private Owner is required to bear or indemnify pursuant to such <u>Section 4.6</u> of the LLC Operating Agreement), (i) expenses specified in <u>Sections 4.5</u> or <u>4.6</u> of the Transfer Agreement to constitute Servicing Expenses and (ii) expenses incurred in connection with any litigation (including any bankruptcy action) included in the Obligations and assumed pursuant to <u>Section 4.5(a)</u>, <u>Section 4.5(b)</u> or <u>Section 4.6</u> of the Transfer Agreement; and

(f)    amounts required for the Company to discharge (in accordance with the Transaction Documents) the Obligations as they become due, and to make applicable indemnification and/or reimbursement payments (other than for Pre-Approved Charges) owing by the Company to the Initial Member, the Transferor or any other Indemnified Party under the Transaction Documents,

<u>provided</u>, <u>however</u>, that Servicing Expenses will not include any (w) Excluded Expenses; (x) Development expenses or Capital Improvement expenses (and, for such purpose, if the Manager reasonably determines that an expense is rightfully classified as a Servicing Expense pursuant to the foregoing <u>clause (b)(ii)</u> (as to Acquired REO Property) or <u>clause (a)(i)</u> (as to Mortgaged Property) rather than as a Development or Capital Improvement expense, the Manager is to provide written notice to the Initial Member of such determination setting forth in reasonable detail such expense, in which case such expense so rightfully classified a Servicing Expense, and the specific uses thereof, will be deemed excluded from the definitions of Development and/or

-61-

Capital Improvement (and Permitted Capital Improvement Expense), as applicable); (y) any Funding Draws or other principal advances to a Borrower (<u>provided</u>, <u>however</u>, that this <u>clause (y)</u> is to be deemed not to exclude, with respect to any Loan, amounts otherwise constituting Servicing Expenses paid by the Company (and not advanced to or at the request of the Borrower), but that qualify as Funding Draws as a result of the right of the Company pursuant to the applicable Asset Documents to add the same to the principal amount of the Loan); or (z) any costs or expenses that are excluded pursuant to any of the foregoing <u>clauses (a)</u> through <u>(f)</u> (including any such costs or expenses of a type or nature generally described in any such clause that are so excluded as a result of a failure to satisfy any express condition, limitation or requirement set forth in such clause), except to the extent the same qualify as Servicing Expenses under another of such <u>clauses (a)</u> through <u>(f)</u>.

"<b><u>Servicing Obligations</u></b>" has the meaning set forth in the LLC Operating Agreement (except as used in the Servicing Agreement, wherein such term is separately defined).

"<b><u>Servicing Standard</u></b>" has the meaning set forth in the LLC Operating Agreement (except as used in the Servicing Agreement, wherein such term is separately defined).

"<b><u>Servicing Transfer Date</u></b>" means, with respect to any Group of Assets, the date on which the transfer of the loan servicing records for such Group of Assets to the Servicer's system of records is completed and the Servicer (including through any applicable Subservicer) begins to service such Group of Assets, as determined in accordance with <u>Section 3.3</u> of the Transfer Agreement, it being understood and agreed that (a) the loan servicing records for each Group of Assets will be transferred to the Servicer's system of records at the same time, but not necessarily at the same time as the loan servicing records for any other Group of Assets are transferred to the Servicer's system of records, and (b) the Transferor (and the Initial Member) and the Company are to proceed (and the Manager is to cause the Servicer and any applicable Subservicer to proceed) with all commercially reasonable diligence to effect such transfer of loan servicing records as soon as is practicable after the Closing.

"<b><u>SFR Assets</u></b>" means any Assets included in the Asset Schedule to the extent consisting of (i) one to four family residential properties or (ii) Loans secured by one to four family residential properties (and no other real property) or otherwise subject to, or intended to be covered by, either of the HFSH Act or RESPA, and are to include, as to any such Loan, any Acquired REO Property resulting from any exercise of remedies against the applicable Collateral, but only to the extent such Acquired REO Property consists of one to four family residential properties.

"<b><u>SFR Loan</u></b>" means any Loan included in the SFR Assets.

"<b><u>Similar Law</u></b>" means any non-U.S., or any U.S. federal, state or local, Law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code.

"<b><u>Site Assessment</u></b>" means either (a) a Transaction Screen Process consistent with ASTM Standard E 1528-06, conducted by an environmental professional, or (b) a Phase I environmental site assessment consistent with ASTM Standard E 1527-05, and which is consistent with customary industry standards for such Phase I environmental site assessments, conducted by an

-62-

environmental professional, as would customarily be undertaken or obtained by a prudent lender in order to ascertain whether there are any actual or threatened Environmental Hazards.

"**Special Purpose Entity**" means:

(a)    with respect to an Ownership Entity, a corporation or limited liability company (i) that is organized under the Laws of any state of the United States or the District of Columbia, (ii) the equity of which is uncertificated (and, in the case of a limited liability company, does not by its terms expressly provide that such equity is to be governed by Article 8 of the UCC), (iii) that has no material assets other than Acquired Property, (iv) that is not engaged in any business operations except in connection with the Acquired Property and conducted pursuant to terms of the LLC Operating Agreement and the Transaction Documents, (v) that does or causes to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, (vi) that at all times holds itself out to the public as a legal entity separate from any other Person (including any Affiliate), (vii) that except as expressly contemplated by the LLC Operating Agreement or the Transaction Documents, does not commingle its assets with assets of any other Person, (viii) that conducts its business in its own name and strictly complies with all organizational formalities to maintain its separate existence, (ix) that maintains an arm's length relationship with any Affiliate upon terms that are commercially reasonable and on terms no less favorable to it than could be obtained in a comparable arm's length transaction with an unrelated Person, (x) that has no Debt other than as expressly permitted by the Transaction Documents, and (xi) except as otherwise consented to in writing by the Initial Member or expressly permitted with respect to TRS Entities pursuant to Section 5.2 of Annex IV to the LLC Operating Agreement, is a pass-through or disregarded entity for Tax purposes;

(b)    with respect to the Company, a limited liability company (i) that is organized under the Laws of Delaware, (ii) the equity of which is uncertificated, (iii) that has no material assets other than the Assets, including Collateral and Ownership Entities, and its rights, title and interest in, to, and under the LLC Operating Agreement and the Transaction Documents, (iv) that is not engaged in any significant business operations except in connection with the Assets, including the Collateral and Ownership Entities and conducted in accordance with the terms of the LLC Operating Agreement and the Transaction Documents, (v) that does or causes to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, (vi) that at all times holds itself out to the public as a legal entity separate from any other Person (including any Affiliate), (vii) that except as expressly contemplated by the LLC Operating Agreement or by any other Transaction Documents, does not commingle its assets with assets of any other Person, (viii) that conducts its business in its own name and strictly complies with all organizational formalities to maintain its separate existence, (ix) that maintains an arm's length relationship with any Affiliate upon terms that are commercially reasonable and on terms no less favorable to it than could be obtained in a comparable arm's length transaction with an unrelated Person other than as expressly provided by the LLC Operating Agreement and the Transaction Documents, (x) that has no Debt other than as provided in the LLC Operating Agreement and the Transaction Documents and (xi) that except as otherwise consented to in writing by the Initial Member, is a pass-through entity for Tax purposes; and

-63-

(c)     with respect to the Private Owner (or any Qualified Transferee thereof), a corporation or limited liability company (i) that is organized under the Laws of any state of the United States or the District of Columbia, (ii) the equity of which is uncertificated (and, in the case of a limited liability company, does not by its terms expressly provide that such equity shall be governed by Article 8 of the UCC), (iii) that has no material assets other than cash and cash equivalents and its rights, title and interest in, to, and under the LLC Operating Agreement and the Transaction Documents, (iv) that is not engaged in any significant business operations except in connection with the performance of its obligations under the LLC Operating Agreement and the Transaction Documents, (v) that does or causes to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, (vi) that at all times holds itself out to the public as a legal entity separate from any other Person (including any Affiliate), (vii) that except as expressly contemplated by the LLC Operating Agreement or the Transaction Documents, does not commingle its assets with assets of any other Person, (viii) that conducts its business in its own name and strictly complies with all organizational formalities to maintain its separate existence, (ix) that maintains an arm's length relationship with any Affiliate upon terms that are commercially reasonable and on terms no less favorable to it than could be obtained in a comparable arm's length transaction with an unrelated Person other than as otherwise expressly provided by the LLC Operating Agreement and the Transaction Documents, (x) that has no Debt and, except as expressly permitted or required pursuant to the Transaction Documents, does not make any loans or advances to any other Person, (xi) that except as otherwise consented to in writing by the Initial Member, is a pass-through or disregarded entity for Tax purposes, (xii) that maintains its own separate books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, (xiii) that maintains separate financial statements, (xiv) that allocates fairly and reasonably any shared expenses, including any overhead for shared office space, (xv) that uses separate stationary, invoices and checks in its own name, (xvi) that maintains adequate capital in light of its contemplated business operations, and (xvii) that includes in its Organizational Documents applicable provisions and limitations requiring compliance with all the foregoing requirements in this <u>clause (c)</u>, including an express requirement for the written consent of the Company (which consent of the Company in turn will require the written consent of the Initial Member) to any amendment or modification that would result in such Organizational Documents failing or ceasing to be in compliance with all such requirements in this <u>clause (c)</u>.

"**<u>Specified Date</u>**" means the 10th day of each month, or such other day as is agreed to by the Servicer and the Manager; <u>provided</u>, <u>however</u>, that, in any case, if such day is not a Business Day, the Specified Date will be the immediately preceding Business Day.

"**<u>Specified Parent</u>**" means (a) with respect to the Private Owner, (i) subject to <u>clause (a)(ii)</u>, each of The Community Preservation Corporation, a New York not-for-profit corporation, and Related Real Estate Fund III, L.P, a Delaware limited partnership, and/or (ii) any additional or substitute Person or Persons owning, directly or indirectly, more than 25% in value of all of the Ownership Interests in the Private Owner as the Initial Member may approve (in its sole discretion) in writing from time to time after the Closing Date as being designated a "Specified Parent" of the Private Owner for purposes of the LLC Operating Agreement; and (b) with respect to the Servicer, (i) subject to <u>clause (b)(ii)</u>, The Community Preservation Corporation itself (as an entity that does

not have a parent entity), and/or (ii) any additional or substitute Person or Persons that the Manager and the Initial Member might agree from time to time after the Closing Date will be designated as a "Specified Parent" with respect to the Servicer. For avoidance of doubt, in each case, any such Specified Parent will include any successor by operation of Law.

"**Specified Proceeding**" means (a) any Insolvency Proceeding with respect to the Company or the Private Owner or any of their respective Subsidiaries or (b) any proceeding for the appointment of a receiver, liquidator, conservator, custodian, trustee, sequestrator, rehabilitator or similar official for, or for any part of the property of, the Company or the Private Owner or any of their respective Subsidiaries, or for the ordering of the dissolution, winding-up or liquidation of the affairs of the Company or the Private Owner or any of their respective Subsidiaries.

"**Strategic Plan Report**" has the meaning set forth in Section 7.8(a) of the LLC Operating Agreement.

"**Subservicer**" means (a) any Person retained by the Servicer (in its individual capacity) to perform any of the Servicer's obligations (with respect to Servicing) under the Servicing Agreement, and (b) in the event the Servicer is not a Rated Servicer, any other Person retained by such Person so retained by the Servicer pursuant to the foregoing clause (a) to perform any of such obligations (with respect to Servicing), in each case (for clause (a) and clause (b)), which retention shall be subject to applicable provisions in the LLC Operating Agreement and the Servicing Agreement (and any applicable Subservicing Agreement).

"**Subservicing Agreement**" means any agreement whereby the Servicer or an applicable Subservicer (having been retained by a Servicer that is not a Rated Servicer) retains a Subservicer, which Subservicing Agreement is to be subject to applicable provisions in the LLC Operating Agreement and the Servicing Agreement and, if for engagement of a Rated Subservicer, further is to be acceptable to the Initial Member in all respects.

"**Subsidiary**" means, with respect to any specified Person, each of (a) any other Person not less than a majority of the overall economic equity in which is owned, directly or indirectly through one of more intermediaries, by such specified Person, and (b) without limitation of clause (a), any other Person who or which, directly or indirectly through one or more intermediaries, is Controlled by such specified Person (it being understood with respect to clause (a) that a pledge for collateral security purposes of an equity interest in a Person will not be deemed to affect the ownership of such equity interest by the pledgor so long as such pledgor continues to be entitled, in all material respects, to all the income with respect to such equity interest).

"**Successor**" means (a) with respect to a Member, any future Member which is a direct or indirect transferee (whether by Permitted Disposition, merger, consolidation or otherwise) of the LLC Interest of such Member; (b) with respect to any former Member, the current Member which is the direct or indirect transferee (whether by Permitted Disposition, merger, consolidation or otherwise) of the LLC Interest of such former Member and (c) with respect to the Initial Member, any Person that is a direct or indirect transferee (whether by Disposition, merger, consolidation or otherwise) of any of the Initial Member's rights or interests pursuant to the LLC Operating Agreement or any other Transaction Document.

-65-

"**Supplemental Delivery Certificate**" has the meaning set forth in Section 6.1(d) of the Custodial and Paying Agency Agreement.

"**Tax**" means any federal, state, county, local, or foreign tax, charge, fee, levy, duty, or other assessment, including any income, gross receipts, transfer, recording, capital, withholding, property, ad valorem, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Governmental Authority having jurisdiction over the assessment, determination, collection, or other imposition of any of the foregoing, including any interest, penalties and additions imposed thereon or with respect thereto.

"**Tax Representative**" has the meaning set forth in Section 7.5 of the LLC Operating Agreement.

"**Termination**" has the meaning set forth in Section 8.1 of the Custodial and Paying Agency Agreement.

"**Termination Notice**" means any written notice of termination required pursuant to Article VII of the Servicing Agreement.

"**Third Party Claim**" has (a) for purposes of the LLC Operating Agreement, the meaning given therein, (b) for purposes of the Transfer Agreement, the meaning given therein, and (c) for purposes of the Servicing Agreement, the meaning given therein.

"**Total Asset Value**" means, with respect to any Asset, an amount equal to the Equity Asset Value (or, in the event of any Excess Principal or Principal Deficiency, the Adjusted Equity Asset Value).

"**Transaction Documents**" means the Agreement of Common Terms and Definitions, LLC Operating Agreement, the Transfer Agreement, the Servicing Agreement, the Custodial and Paying Agency Agreement, the Private Owner Pledged Account Control Agreement, any Qualifying Letter of Credit, and the Private Owner Interest Sale Agreement, in each case once executed and delivered, and any and all other agreements and instruments executed and delivered by, or executed and delivered to, the FDIC in connection with the Closing or the transactions contemplated thereby as contemplated by any Core Agreement, including any additional documents and agreements required to be so executed and delivered following the Closing pursuant to any such Core Agreement in the applicable form as attached thereto.

"**Transfer Agreement**" means the Asset Transfer Agreement dated as of the Closing Date by and between the Transferor and the Company.

"**Transfer Documents**" means the endorsements and alonges to Notes, Assignment and Lost Instrument Affidavits (if applicable), Mortgage Assignments, Omnibus Loan Assignments, Receiver's Deeds, Omnibus Property Assignments, Receiver's Quitclaim Deeds, assignment of leases, assignments of Ownership Entity interests, UCC financing statements (and assignments) and other documents of assignment, conveyance or transfer required pursuant to any applicable Law to evidence the transfer to the Company (or, as applicable, to an Ownership Entity) of the

-66-

Assets, the Collateral and the Collateral Documents and the Transferor's rights with respect to the Assets and the Collateral (including, as applicable for purposes thereof, to evidence the transfer by Prior Transferor to the Failed Bank (or Transferor)). The form Allonge to be used in preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment E</u>, the form of Assignment and Lost Instrument Affidavit to be used in preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment F</u>, the forms of Assignment of Real Estate Mortgage and Assignment of Real Estate Deed of Trust to be used in the preparation of the Transfer Documents are attached to the Transfer Agreement as <u>Attachments G-1 and G-2</u>, respectively, the form of the Omnibus Loan Assignment to be used in the preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment G-3</u>, the form of the Assignment of Assignment of Leases and Rents and Other Loan Documents to be used in the preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment H</u>, the form of the Assignment and Acceptance of Limited Liability Company Interest to be used in the preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment I</u>, the form of the Receiver's Deed to be used in the preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment J-1</u>, the form of the Omnibus Property Assignment to be used in the preparation of the Transfer Documents is attached to the Transfer Agreement as <u>Attachment J-2</u>, and the form of the Receiver's Quitclaim Deed is attached to the Transfer Agreement as <u>Attachment J-3</u>.

"**Transfer Documents Preparation/Submission Deadline**" means the date twelve months after the Closing Date; <u>provided</u>, <u>however</u>, that such twelve-month period is to be extended with respect to any particular Transfer Document if the delay in meeting such twelve-month deadline is due to a matter (other than the absence of, or the failure properly to record, a Transfer Document) noted as an Exception on the initial Collateral Certificate, but only for so long as the Private Owner is working diligently to locate the missing information or otherwise take such steps as might be necessary or appropriate to complete the preparation, and submission for recordation or filing, of the Transfer Documents.

"**Transfer Taxes**" means any Taxes, assessments, levies, imposts, duties, deductions, fees, withholdings, or other charges of whatever nature (other than any taxes imposed on or measured by net income or any franchise Taxes), including interest and penalties thereon, required to be paid to any taxing authority with respect to the transfer of the Assets, the Collateral and the Collateral Documents or the rights in the Collateral or the assignment and assumption of the Obligations thereunder.

"**Transferor**" means the Receiver as the "Transferor" under the Transfer Agreement.

"**Transferor Loan-Servicing Contract**" means any contract between the Receiver and any third-party (including any Existing Servicer other than the Receiver) for the provision of loan-servicing services with respect to the Loans (or any portion thereof).

"**Transferred Contract**" means (a) any Note, any Asset Document, any Collateral Document, any Related Agreement or any other contract or instrument defined as included within any Loan or Acquired Property, or (b) any operating or similar agreement with respect to any

-67-

Entity formed by the Receiver or any predecessor in interest and transferred to the Company on the Closing Date pursuant to the Transfer Agreement; provided, however, that no contract or instrument that was disaffirmed or repudiated by the Receiver prior to the Cut-Off Date, and no Transferor Loan-Servicing Contract, will constitute a Transferred Contract.

"**Treasury Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code, and all references to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, substitute, proposed or final Treasury Regulations, as may be amended, supplemented, or modified from time to time.

"**TRS Costs**" has the meaning set forth in Section 5.2(c) of Annex IV to the LLC Operating Agreement.

"**TRS Entity**" has the meaning set forth in Section 5.2 of Annex IV to  the LLC Operating Agreement.

"**Ultimate Parent Entity**" means (a) (i) in relation to The Community Preservation Corporation, The Community Preservation Corporation itself (as an entity that does not have a parent entity) and (ii) in relation to Related Real Estate Fund III, L.P., Related Fund Management, LLC, a Delaware limited liability company, and (b) in relation to any Person becoming a "Specified Parent" pursuant to clause (a)(ii) of the definition of such term, the ultimate parent entities of such Person as agreed by the Private Owner and the Initial Member in connection with the consent to such Person becoming a "Specified Parent".

"**Underlying Loan**" means, with respect to any Receiver Acquired Property, any and all remaining right, title and interest of the Receiver, the Failed Bank or an Ownership Entity in and to the applicable Loan or Loan Participation (or other applicable loan, note and related documents) having been secured by such Receiver Acquired Property and with respect to which title to such Receiver Acquired Property has transferred to the Receiver, the Failed Bank or an Ownership Entity pursuant to a foreclosure sale, deed in lieu of foreclosure or any other exercise of remedies (in addition to any related Deficiency Balance).

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as in effect in any applicable jurisdiction, as may be amended, supplemented, or modified from time to time.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Person**" means a "United States person" as such term is defined in Section 7701(a) of the Code.

"**Unpaid Principal Balance**" or "**UPB**" means, as of any date of determination, (a) when used in connection with multiple Assets (or multiple Loans and/or Acquired Property), an amount equal to the sum of the aggregate then outstanding principal balance of each such Asset (or Loan and/or Acquired Property), (b) when used with respect to a single Asset (or Loan and/or Acquired

-68-

Property), an amount equal to the then outstanding principal balance of such Asset (or Loan and/or Acquired Property), and (c) when used with respect to one or more Assets including Loan and Acquired Property components, an amount equal to the sum of the Unpaid Principal Balance of such Loan and the Unpaid Principal Balance of such Acquired Property; provided, however, that:

(x)    with respect to any Loan Participation (and any related Acquired Property), the Unpaid Principal Balance of such Loan Participation will include only the Company's (or, with respect to any period prior to the effectiveness of the transfer of such Loan Participation to the Company on the Closing Date, the Receiver's, or the Failed Bank's, as applicable) allocable share thereof in accordance with the applicable Loan Participation Agreement;

(y)    for purposes of all determinations in connection with or relating to either a repurchase of an Asset pursuant to Article VI of the Transfer Agreement, any adjustment pursuant to Section 2.4 of the Transfer Agreement or the determination of an Excess Damage Liability:

(i)    with respect to any Acquired Property that is included among the Assets on the Closing Date, the Unpaid Principal Balance of such Acquired Property initially will be the book value set forth on the Asset Schedule, as adjusted to its Adjusted Unpaid Principal Balance pursuant to the Transfer Agreement, and thereafter as further adjusted pursuant to clause (y)(iii) below;

(ii)    in the case of an Asset (that was a Loan as of the Cut-Off Date) for which some or all the Collateral has been converted to Acquired Property, the unpaid principal balance of such Asset (including the resulting Loan and Acquired Property, which is to be considered as a single Asset for purposes of determination of the Unpaid Principal Balance pursuant to this clause (y)) is to be deemed, until such time as the Acquired Property is liquidated, to equal the amount of the unpaid principal balance of such Loan at the time at which such Asset was so converted (in whole or in part) to Acquired Property, as such unpaid principal balance with respect to such Loan might be adjusted in accordance with the applicable Asset Documents (but disregarding any credit on account of the applicable conversion of such Collateral to Acquired Property and any value (or Net Fair Value) of such Acquired Property, other than further adjustments pursuant to clause (y)(iii)) and, as to Acquired Property included in such Asset, as further adjusted pursuant to clause (y)(iii);

(iii)    in the case of clause (y)(i) (after the adjustment to the Adjusted Unpaid Principal Balance) or (y)(ii) (following any applicable conversion), the unpaid principal balance of any such Acquired Property or Asset including such Acquired Property is to be reduced by the net proceeds of any sales of any portions of such Acquired Property, and increased, without duplication, by the amount of (A) any advances or Interim Servicing Expenses by the Transferor (or the Initial Member) during the Interim Servicing Period under or as described in the Transfer Agreement (and applicable provisions of the LLC Operating Agreement) made with respect thereto and capitalized thereto in accordance with GAAP (and applicable Law), and (B) any expressly permitted expenditures for Development pursuant to Section 12.14 of the LLC Operating Agreement or Servicing Expenses for any construction or development (pursuant to clause (x) of

-69-

the proviso appearing as the last paragraph of the definition of "Servicing Expenses"), in each case paid with respect thereto and capitalized thereto in accordance with GAAP (and applicable Law);

(z)    for all purposes other than determinations in connection with or relating to either a repurchase of an Asset pursuant to Article VI of the Transfer Agreement, any adjustments pursuant to Section 2.4 of the Transfer Agreement or the determination of an Excess Damage Liability:

(i)    the Unpaid Principal Balance of Acquired Property will be the Net Fair Value of such Acquired Property; and

(ii)    the Unpaid Principal Balance of any Loan (including any such Loan as to which the Collateral has been converted in part to Acquired Property, it being understood that the Unpaid Principal Balance of any Loan converted in whole to Acquired Property will be zero) will be the unpaid principal balance of such Loan, as adjusted from time to time in accordance with the applicable Asset Documents (including as initially adjusted to the Adjusted Unpaid Principal Balance), subject to the following limitations and other applicable provisions of the Transaction Documents:

(A)    in connection with any partial release or sale of the Mortgaged Property securing such Loan, the Unpaid Principal Balance of such Loan is to be permanently reduced by the Release Price for such Mortgaged Property (notwithstanding that the net proceeds received and applied to such Loan in respect of such release or sale may be in a different amount);

(B)    in connection with any partial conversion of such Loan to Acquired Property, the Unpaid Principal Balance of such Loan is to be permanently reduced by the applicable Release Price for such Mortgaged Property (notwithstanding that the applicable amount credited to or otherwise deducted from the Loan balance owing by the applicable Borrower in respect of such partial conversion may be in a different amount); provided, however, that, in all instances, the sum of the Unpaid Principal Balance of such Loan and the Net Fair Value of such Acquired Property, as determined immediately after such conversion, will be in an amount not in excess of the Unpaid Principal Balance of such Loan immediately prior to giving effect to such conversion (and the Unpaid Principal Balance of the Loan is to be deemed permanently reduced by the amount of any such excess);

(C)    the Unpaid Principal Balance (or applicable outstanding principal amount for purposes of determination of such Unpaid Principal Balance) of any Loan or of any portion of such Loan constituting a charge-off (including as to amounts having been charged off by the Failed Bank or the Receiver prior to the Cut-Off Date), a Deficiency Balance or a Deficiency Judgment Claim, or of any Loan following (1) the conversion or disposition of all or substantially all in value of the Mortgaged Property (or other applicable Collateral) securing the same, or (2) a determination by the Manager, the Servicer or any Subservicer (including any such determination for purposes of financial statements of the Company, or in connection with any audit thereof) that no further payments or recoveries (other than purely *de minimis* payments or

recoveries) will be ultimately recoverable by the Company with respect to such Loan, in each case will be deemed to be zero;

(D)      in no event is the Unpaid Principal Balance of such Loan (as calculated subject to the foregoing provisions) to exceed the actual outstanding principal amount owing by the Borrower under the Loan in accordance with the applicable Asset Documents (and the Unpaid Principal Balance of such Loan is to be deemed permanently reduced by the amount of any such excess);

(E)



(F)      for purposes of the Loan Criteria Matrix (and related determinations of Loan to Value), the Unpaid Principal Balance will be determined solely by reference to the actual unpaid principal balance in accordance with the applicable Asset Documents, but with application of the limitation set forth in <u>clause (E)</u> above.

"**Unreimbursable Expenses**" has the meaning set forth in Section 4.6(e) of the LLC Operating Agreement.

"**USPAP**" means the Uniform Standards of Professional Appraisal Practices promulgated by the Appraisal Standards Board of the Appraisal Foundation.

"**Valuation Procedure**" means the procedure pursuant to which the Initial Member selects an independent appraiser to appraise the fair market value of the Private Owner Interest and the Initial Member Interest as of the date of the valuation report.  The fair market values provided by the independent appraiser for each of the Private Owner Interest and the Initial Member Interest are to be deemed the applicable fair market values for purposes of the LLC Operating Agreement. The fees of the independent appraiser are to be paid in the manner provided in the LLC Operating Agreement.

"**Verification Contractor**" means any Person retained by the Initial Member to provide the administrative and verification functions described in the Capital Improvement Addendum to the LLC Operating Agreement.

"**WCR Account Deposit**" has the meaning set forth in the Private Owner Interest Sale Agreement.

"**Winning Bidder**" has the meaning set forth in the Recitals of the Private Owner Interest Sale Agreement.

"**Working Capital Expenses**" means any Servicing Expenses, Interim Servicing Expenses, Pre-Approved Charges, Required Funding Draws, Interim Servicing Fees, fees of the Custodian and Paying Agent, and all costs and expenses relating to or in connection with the dissolution of the Company, including any reserves established in connection with dissolution of the Company.

"**Working Capital Reserve**" means a working capital reserve to be (a) funded initially on the Closing Date (in an aggregate amount equal to the WCR Account Deposit) pursuant to the LLC Operating Agreement and the payments contemplated in the Private Owner Interest Sale Agreement, and (b) thereafter held in the Working Capital Reserve Account and used and replenished from time to time pursuant to the applicable provisions in the LLC Operating Agreement and the Custodial and Paying Agency Agreement.

"**Working Capital Reserve Account**" means the segregated trust or custodial account designated as the "Working Capital Reserve Account" pursuant to Section 3.6(a) of the Custodial and Paying Agency Agreement.

"**Working Capital Reserve Floor**" means $86,101,008.85, or, with an applicable written approval from the Initial Member pursuant to Section 12.11(b) of the LLC Operating Agreement, such other amount as might be applicable pursuant to such written approval.

"**Working Capital Reserve Target**" means the targeted amount of Working Capital Reserve as determined by the Manager with respect to each Distribution Date, to be not less than the Working Capital Reserve Floor; provided, however, that from and after the Final Monthly Distribution, the Working Capital Reserve Target will be as determined by the Manager in accordance with Sections 9.2 and 12.11(d) of the LLC Operating Agreement.

Section 1.2.    Application of the Rules of Construction.  Except as provided in the next succeeding sentence, the Rules of Construction apply to this Agreement.  Clauses (a) and (g) of the definition of the term "Rules of Construction" do not apply with respect to the definitions set forth in Section 1.1.

## ARTICLE II

## Common Terms

Section 2.1.    Common Terms.    With respect to this Agreement and each other Transaction Document, unless and to the extent provided otherwise in any Transaction Document, the following common terms and conditions apply to such Transaction Document:

(a)    Counterparts.  Such Transaction Document may be executed in any number of counterparts, each of which will be deemed to be an original copy of such Transaction Document and all of which, when taken together, will constitute one and the same instrument.  It is not necessary for the counterparts to any Transaction Document other than this Agreement to bear the signature of all parties to this Agreement.

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

(b)      Signatures; Electronic Delivery.  Transmission by telecopier, facsimile, e-mail, or other form of electronic transmission (including electronic document execution platforms such as DocuSign and Adobe Sign) of an executed counterpart of any Transaction Document will be deemed to constitute due and sufficient delivery of such counterpart.  No signatory to such Transaction Document may raise the use of a telecopier machine, facsimile machine, e-mail, or other form of electronic transmission (including electronic document execution platforms such as DocuSign and Adobe Sign) for delivery of any counterpart of a Transaction Document as a defense to the formation or enforceability of such Transaction Document, and each such Person forever waives any such defense.

(c)      Expenses.  Each party to such Transaction Document will be liable for and pay its own expenses (including legal, accounting investment banker, broker, or finder's fees) incident to the negotiation and execution of such Transaction Document and (except as may otherwise be expressly provided in such Transaction Document) the performance of its obligations pursuant to such Transaction Document.

(d)      Binding Effect; Assignment.  Such Transaction Document will be binding upon and inure to the benefit of the parties thereto and their respective permitted successors and permitted assigns.  The FDIC, acting in any capacity as a party to such Transaction Document, may assign, transfer and delegate its rights and obligations (in whole or in part) pursuant to such Transaction Document without the consent of any other party thereto.  No other party to such Transaction Document may assign, transfer or delegate any of its rights or obligations thereunder, including by merger (whether or not such party is the surviving entity), Change of Control, operation of law or any other manner, without the prior written consent of the FDIC, in any capacity to which the FDIC is a party to such Transaction Document, and any attempted assignment or delegation without such consent will be void *ab initio*.  References to a party in such Transaction Document also refer to such party's permitted successors and permitted assigns.

(e)      Compliance with Law.  Each party to such Transaction Document, at its own expense unless otherwise specifically provided in such Transaction Document, is to obey and comply with all applicable Laws, as they might pertain to such party's performance of its obligations pursuant to such Transaction Document.

(f)      Notices.  All notices and other communications with respect to or in connection with such Transaction Document must be delivered in accordance with the provisions of the Notice Schedule; provided, however, that, service of any writ, process or summons in any suit, action or proceeding arising out of, relating to, or in connection with such Transaction Document will be subject to the applicable provisions in Section 2.1(l)(vii).

(g)      Severability.  If any provision of such Transaction Document is determined to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not render such provision invalid, illegal, or unenforceable in any other jurisdiction or, as long as the essential terms and conditions of such Transaction Document for each party remain valid, affect any other term or provision of such Transaction Document.  If any provision held to be invalid, illegal, or unenforceable is invalid, illegal, or unenforceable only as

-73-

to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision will be ineffective only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be. Without limitation of the preceding sentence, in the event a court determines that any provision of such Transaction Document is invalid, illegal or unenforceable (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court will have the power and be entitled to (i) modify such provision (including without limitation, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision will be effective in such jurisdiction for purposes of such court proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (ii) enforce such provision, as so modified pursuant to <u>clause (i)</u>, in such proceeding. Nothing in this <u>Section 2.1(g)</u> is intended to, or will, limit (I) the ability of any party to such Transaction Document to appeal any court ruling or the effect of any favorable ruling on appeal or (II) the intended effect of <u>Section 2.1(m)</u>.

(h)     <u>No Presumption</u>. Such Transaction Document is to be construed fairly as to each party thereto and, if at any time any term or condition thereof is desired or required to be interpreted or construed, no consideration is to be given to the issue of, and no presumption or burden of proof is to arise favoring or disfavoring any party as a result of, who actually prepared, drafted, or requested any term or condition of such Transaction Document or any agreement or instrument subject thereto. Such Transaction Document will be deemed conclusively to have been reviewed by the parties thereto and their respective legal counsel.

(i)     <u>Entire Agreement</u>. Such Transaction Document, together with the exhibits, schedules and annexes thereto and the other Transaction Documents (and any other agreements or instruments expressly contemplated by or executed in connection with the execution of such Transaction Document), constitute the entire agreement and understanding, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, among the parties to and with respect to the subject matter of such Transaction Document; <u>provided</u>, <u>however</u>, that any confidentiality agreement between the FDIC and the Private Owner or any Affiliates of the Private Owner (including by way of joinder) with respect to the transaction that is the subject of the Transaction Documents (including each Confidentiality Agreement) will remain in full force and effect to the extent provided therein.

(j)     <u>Headings</u>. The table of contents and the article, section or paragraph titles or captions contained in such Transaction Document are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of such Transaction Document or the intent of any provisions thereof.

(k)     <u>Amendments and Waivers</u>.

(i)     Such Transaction Document may be amended or modified only by a written instrument signed by all parties thereto and the consent of any third-party beneficiaries that, pursuant to such Transaction Document, have the express right to consent to amendments thereof.

-74-

(ii)    A party may, by written instrument signed by such party, extend the time for performance of any obligation or other act of another party due to it, waive any inaccuracies in the representations and warranties made to it, and waive compliance with any covenants, obligations, or conditions in its favor in such Transaction Document.  No claim or right arising out of such Transaction Document can be waived by a party, in whole or in part, unless made in writing signed by such party.  No course of conduct or dealing and no failure or delay by any party in exercising any right, power or privilege under such Transaction Document will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or any other right, power or privilege.  A waiver given by a party is applicable only to the specific instance in which it is given.

(l)    <u>Jurisdiction and Venue</u>.  With respect to such Transaction Document, each of the parties thereto irrevocably and unconditionally:

(i)    consents to the jurisdiction of the United States District Court for the Southern District of New York and to the jurisdiction of the United States District Court for the District of Columbia for any suit, action or proceeding against it commenced by the FDIC (in any capacity) arising out of, relating to, or in connection with such Transaction Document, and waives any right to:

(A)    remove or transfer such suit, action or proceeding to any court or dispute-resolution forum other than the court in which the FDIC (in any capacity) files the suit, action or proceeding without the consent of such FDIC party;

(B)    assert that venue is improper in either the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia; or

(C)    assert that the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia is an inconvenient forum;

(ii)    consents to the jurisdiction of the Supreme Court of the State of New York for any suit, action or proceeding against it commenced by the FDIC (in any capacity) arising out of, relating to, or in connection with such Transaction Document, and waives any right to:

(A)    remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of such FDIC party;

(B)    assert that venue is improper in the Supreme Court of the State of New York, County of New York; or

(C)    assert that the Supreme Court of the State of New York, County of New York, is an inconvenient forum;

-75-

(iii)    agrees to bring any suit, action or proceeding by it against the FDIC, in any capacity to which the FDIC is a party to such Transaction Document, in only either the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia, and waives any right to remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of such FDIC party and agrees to consent thereafter to transfer of the suit, action or proceeding to either the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia at the option of such FDIC party;

(iv)    agrees, if the United States District Court for the Southern District of New York and the United States District Court for the District of Columbia both lack jurisdiction to hear a suit, action or proceeding falling within Section 2.1(l)(iii), to bring that suit, action or proceeding in only the Supreme Court of the State of New York, County of New York, and waives any right to remove or transfer such suit, action or proceeding to any other court or dispute-resolution forum without the consent of such FDIC party;

(v)    agrees, in any suit, action or proceeding that is brought in the Supreme Court of the State of New York for New York County in accordance with the above provisions of this Section 2.1(l), to request that such suit, action or proceeding be referred to the Commercial Division of such Court;

(vi)    agrees that any final judgment entered against it in any suit, action or proceeding falling within this Section 2.1(l) may be enforced in any court of competent jurisdiction; and

(vii)    agrees that (A) service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 2.1(l) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address for notices pursuant to Section 2.1(f) (and the Notice Requirements) with copies to such other Persons as specified therein; provided, however, that the foregoing will not affect the right of any party to serve process in any other manner permitted by Law; and (B) any such service of writs, process or summonses in any suit, action or proceeding on the FDIC (in any capacity) must be made in accordance with requirements of applicable Law (including 12 CFR section 309.7(a)), with additional delivery of a copy of such writ, process or summons to the FDIC in each capacity to which it is a party to such Transaction Document pursuant to the notice provisions in Section 2.1(f) and the Notice Schedule); and

(viii)    agrees that nothing in this Section 2.1(l) constitutes (A) consent to jurisdiction in any court by the FDIC (in any capacity), other than as expressly provided in Section 2.1(l)(iii) and Section 2.1(l)(iv), or (B) a waiver or limitation of any provision in the Federal Deposit Insurance Act or other applicable law relating to commencement, jurisdiction, venue, limitations, administrative exhaustion, judicial review, removal, remand, continuation or enforcement (including as to limitations on attachment or execution upon assets in the possession of the FDIC) of actions by or against the FDIC (in any capacity), or in which the FDIC (in any capacity) is a party, including 12 U.S.C. Sections 1819(b), 1821(c), 1821(d), and 1821(j).

(m)    <u>Governing Law</u>.  EXCEPT AS MIGHT BE SPECIFICALLY PROVIDED OTHERWISE IN SUCH TRANSACTION DOCUMENT, EACH PARTY TO SUCH TRANSACTION DOCUMENT AGREES AND ELECTS THAT, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, SUCH TRANSACTION DOCUMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF SUCH TRANSACTION DOCUMENT TO THE LAWS OF ANOTHER JURISDICTION, AND EACH PARTY THERETO UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAWS OF ANY OTHER JURISDICTION GOVERN SUCH TRANSACTION DOCUMENT.  NOTHING IN THIS AGREEMENT REQUIRES. OR WILL REQUIRE, ANY UNLAWFUL ACTION OR INACTION BY ANY PARTY TO THIS AGREEMENT.

(n)    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO SUCH TRANSACTION DOCUMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MIGHT HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO SUCH TRANSACTION DOCUMENT AND AGREES THAT ANY SUCH DISPUTE IS TO BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

(o)    <u>Affiliates</u>.    Each of the parties to such Transaction Document, other than the FDIC, in any capacity to which the FDIC is a party to such Transaction Document, will cause each of its Affiliates over which it has the right to exercise control to comply with the provisions of <u>Section 2.1(l)</u>.

(p)    <u>Third Party Beneficiaries</u>.  Each of the FDIC and the Receiver, (each a "**<u>Specified Third Party Beneficiary</u>**"), and, as applicable, each Related Person in respect of such Specified Third Party Beneficiary, is constituted an express third party beneficiary of any Transaction Document (to which it is not, in such specific capacity, otherwise a signatory) with respect to any provisions of such Transaction Document that expressly grant rights or benefits to such Specified Third Party Beneficiary or, as applicable, to any Related Person in respect of such Specified Third Party Beneficiary.  In connection with the foregoing, (i) each Specified Third Party Beneficiary, for itself and on behalf of any Related Person in respect of such Specified Third Party Beneficiary, is entitled to enforce such provisions as to which it or such Related Person is a third party beneficiary as if it were a party to the respective Transaction Documents, and (ii) no amendment, modification or waiver of any such provisions to which a Specified Third Party Beneficiary, or any Related Person in respect of such Specified Third Party Beneficiary, is a third party beneficiary (or of any other provision, including defined terms, to the extent relevant to the rights or benefits granted in, or enforcement of, such provisions to which it or such Related Person is a third party beneficiary) will be effective against, or otherwise limit or affect any rights, benefits or remedies of, such Specified Third Party Beneficiary, or any Related Person in respect of such Specified Third Party Beneficiary, without such Specified Third Party Beneficiary's express written consent.

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

# ARTICLE III

## Miscellaneous

Section 3.1.    <u>Application of the Common Terms</u>.  The Common Terms apply to this Agreement.

Section 3.2.    <u>Enforceability of this Agreement</u>.  Notwithstanding that this Agreement has not been executed by all parties described in this Agreement, this Agreement is enforceable against each party that has executed this Agreement.  The parties that execute this Agreement acknowledge that the Transaction Documents are being (or were) executed by certain Persons, including, but not limited to, the parties to this Agreement, simultaneously or otherwise in connection with the execution of this Agreement, and that notwithstanding any failure by any party to this Agreement to execute this Agreement, such agreements will be effective and binding on the parties thereto in accordance with the terms thereof.

Section 3.3.    <u>Waivers and Amendments</u>.  Except as otherwise provided in <u>Section 2.1(p)</u> of the Common Terms or <u>Section 3.5</u>, this Agreement may be amended or modified, and the terms of this Agreement may be waived, only by a written instrument signed by all parties signatories to this Agreement.  Notwithstanding anything contained in this Agreement to the contrary, but subject specifically to the provisions of <u>Section 3.5</u>, (x) nothing in this Agreement governs, or modifies in any respect, the requirements for amending any Core Agreement (or other Transaction Document that includes definitions by reference to this Agreement), including with respect to any of the definitions included therein by reference to this Agreement, and (y) with respect to any Transaction Document, any capitalized terms defined in this Agreement may be amended (solely for purposes of usage of such capitalized terms in such Transaction Document) pursuant to an amendment to such Transaction Document that complies with the requirements for amendments of such Transaction Document).

Section 3.4.    <u>Successors and Assigns</u>.  Without limiting the generality of <u>Sections 2.1(d)</u> and <u>2.1(p)</u> of the Common Terms, this Agreement will be binding on and inure to the benefit of (a) any successor "Initial Member" pursuant to, and in accordance with, the LLC Operating Agreement, and (b) any successor "Private Owner" pursuant to, and in accordance with, the LLC Operating Agreement.  Furthermore, in each case subject to, and without modifying rights or obligations pursuant to, <u>Sections 3.1</u> (including any rights or benefits of applicable express third party beneficiaries pursuant to <u>Section 2.1(p)</u> of the Common Terms) and <u>3.3</u>, to the extent that this Agreement (including as a result of terms defined in this Agreement being used in applicable Transaction Documents) confers directly any rights, remedies or other benefits upon or any other Person not a party to this Agreement, but otherwise a party to, or express third party beneficiary of, any Transaction Document, this Agreement (subject to <u>Sections 2.1(l)</u>, <u>(m)</u> and <u>(n)</u> of the Common Terms as if such other Person were a party to this Agreement) also will inure to the benefit of, and may, in respect of such rights, remedies or other benefits, be enforced by, such Person.

Section 3.5.   <u>Custodian and Paying Agent Special Acknowledgments</u>.  The Custodian and Paying Agent acknowledges that, notwithstanding anything in any Transaction Document to the contrary, (a) it is not a party to, and is not to be deemed to be a party to, any Transaction Document other than the Custodial and Paying Agreement and, but only for the limited purposes set forth and described in this Agreement, this Agreement; (b) all Transaction Documents other than the Custodial and Paying Agency Agreement, and any exhibits, annexes, schedules or other attachments to such Transaction Documents, may be modified, amended, restated or supplemented by the parties to such Transaction Documents without the consent of or joinder by the Custodian and Paying Agent; and (c) that the parties to this Agreement may modify, amend, restate or supplement any provision of (including the Common Terms) or definition in this Agreement without the consent of or joinder by the Custodian and Paying Agent.  Once any such modification, amendment, restatement, or supplement of this Agreement not requiring the consent of or joinder by the Custodian and Paying Agent (an "**<u>Agreement of Common Terms and Definitions Amendment</u>**") becomes effective in accordance with the provisions of this Agreement, the Company will deliver to the Custodian and Paying Agent a written notice of such Agreement of Common Terms and Definitions Amendment.  Upon the Custodian and Paying Agent's receipt of any such notice from the Company, the terms used in the Custodial and Paying Agency Agreement that are defined in, or by reference in, this Agreement will have for all intents and purposes of this Agreement the definitions as so modified, amended, restated or supplemented by an Agreement of Common Definitions and Common Terms Amendment; <u>provided</u>, <u>however</u>, that if and to the extent that any such modification, amendment, restatement or supplement of this Agreement of Common Terms and Definitions has a materially adverse impact on the rights and benefits of the Bank in its individual capacity, or imposes any additional obligation or liability on the Custodian and Paying Agent, such modification, amendment, restatement or supplement of this Agreement will not be binding on the Custodian and Paying Agent unless the Custodian and Paying Agent consents in writing to such modification, amendment, restatement or supplement of this Agreement, such consent not to be withheld, delayed or conditioned unreasonably.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their respective officers or agents thereunto duly authorized on the date first above written.

**Transferor**

**FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR SIGNATURE BRIDGE BANK, N.A., as Transferor**

By: _____
Name: Colette Campagna
Title: Senior Asset Marketing Specialist

**Initial Member**

**FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR SIGNATURE BRIDGE BANK, N.A., as Initial Member**

By: _____
Name: Colette Campagna
Title: Senior Asset Marketing Specialist

**Company**

**SIG RCRS C MF 2023 VENTURE LLC, as Company**

By:    Federal Deposit Insurance Corporation in its capacity as Receiver for Signature Bridge Bank, N.A., as Sole Member and Manager

By: _____
Name: Colette Campagna
Title: Senior Asset Marketing Specialist

[Signature Pages to Agreement of Common Terms and Definitions – Page 1 of 2]

**Private Owner**

**SIG-23 PRIVATE OWNER LLC**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Name: Rafael E. Cestero
Title:   Authorized Signatory

**Paying Agent and Custodian**

**COMPUTERSHARE TRUST COMPANY,
N.A.,** as Paying Agent and Custodian

By: _____
Name:  William Wood
Title:  Vice President

[Signature Pages to Agreement of Common Terms and Definitions – Page 2 of 2]

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

**<u>Private Owner</u>**

**SIG-23 PRIVATE OWNER LLC**


By: _____
Name: Rafael E. Cestero
Title:   Authorized Signatory


**<u>Paying Agent and Custodian</u>**

**COMPUTERSHARE TRUST COMPANY,
N.A.,** as Paying Agent and Custodian


By: ███████_____
Name:  William Wood
Title:  Vice President


[Signature Pages to Agreement of Common Terms and Definitions – Page 2 of 2]

**Schedule I**

**SIG RCRS C MF 2023 Venture LLC**

**Notice Schedule**

For purposes of each Transaction Document and any reference to (or incorporation of) all or any portion of this Notice Schedule therein, references in this Notice Schedule to this "Agreement" will mean and refer to such Transaction Document.

<u>Notices</u>.

(a)     Subject to <u>Sections (d)</u> (as to reports to be uploaded) and <u>(e)</u> (as to service of writs, process and summonses) below, all notices, requests, demands and other communications required or permitted to be given or delivered to any Person listed (or otherwise referenced) in <u>Section (b)</u> below under or by reason of the provisions of this Agreement (and each other applicable Transaction Document, except as otherwise provided therein) are to be in writing and are to be delivered by electronic mail, directed to the applicable electronic mail address specified in (or updated pursuant to) this Notice Schedule.  All such notices, requests, demands and other communications to any such Person pursuant to the foregoing are to be deemed delivered upon the earlier to occur of (i) actual receipt (or refusal thereof) by such Person or (ii) when delivered; <u>provided</u>, <u>however</u>, that any notice, request, demand or other communication that is delivered to any such electronic mail address other than during regular business hours of the recipient will be deemed to have been delivered at the opening of business on the next Business Day.  In no event will a voice mail message or any electronic communication other than as expressly provided pursuant to the foregoing or pursuant to <u>Section (d)</u> below be effective as a notice, confirmation, or other communication pursuant to this Agreement.

(b)     For purposes of the foregoing, such notices, requests, demands and other communications should, as to each Person listed below, be sent to its respective address as follows:

Schedule I-1

**If to the Company after the Closing, to:**

SIG RCRS C MF 2023 Venture LLC
c/o CPC, 220 East 42nd St. 16th Fl, New York, New York 10017
Attention:  David Rothberg
E-mail Address:  ███████████████████

with a copy to:

Andrea Gladstone
c/o CPC, 220 East 42nd St. 16th Fl, New York, New York 10017
E-mail Address:  ████████████████

**If to the Private Owner, to:**

Sig-23 Private Owner LLC
c/o CPC, 220 East 42nd St. 16th Fl, New York, New York 10017
Attention:  David Rothberg
E-mail Address:  ███████████████████

with a copy to:

Andrea Gladstone
c/o CPC, 220 East 42nd St. 16th Fl, New York, New York 10017
E-mail Address:  ████████████████

and

Sullivan & Cromwell LLP
125 Broad Street, New York, New York 10004
Attention:  Jared Fishman; Robert Schlein
E-mail Address:  ████████████████████████████

Schedule I-2

**If to the Company before Closing, the Transferor, or the Initial Member, to:**

> Federal Deposit Insurance Corporation
> Division of Resolutions and Receiverships
> Chief, Structured Transactions and Oversight
> 3501 N. Fairfax Drive
> Room No. 3701-9006
> Arlington, VA 22226-3500
> Attention: Mark L Patterson
> E-mail Address: ███████████████
> E-Mail Reference: █████████████████

> with a copy to:

> FDIC Legal Division
> Attention: Kathleen Russo
> E-mail Address: █████████
> E-mail Reference: ██████████████████

**If to the Bank (including as Custodian and/or as Paying Agent):**

> **For purposes of designating the Custodian as the return addressee on Transfer Documents:**
> 1505 Energy Park Drive
> St. Paul, MN 55108
> Ref: Transfer Agent Team – SIG RCRS C MF 2023 Venture LLC

> **For all other purposes:**

> Computershare Trust Company, N.A.
> 9062 Old Annapolis Road
> Columbia, MD 21045
> Attention:  William Wood
> E-mail Address: ████████████████
> Reference: ███████████████

**If to the Servicer:**

> To the address set forth for the Servicer in the Servicing Agreement.

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)

**If to any PO Owner:**

To the address set forth for such PO Owner in its PO Owner Undertaking.

**If to any other party to this Agreement (for purposes of any Transaction Document not otherwise specified above):**

To the address set forth for such party in this Agreement.

(c)     From time to time any Person listed (or referenced) above may revise its address for delivery pursuant to this Notice Schedule by providing notice to such effect to the other applicable parties in the manner set forth in this Notice Schedule.  Each party to this Agreement agrees that, as to all Transaction Documents to which it is a party (and except as may be expressly set forth otherwise therein), (i) any Person listed above may revise its applicable notice address (or, as to any applicable report to be delivered to the FDIC (in any capacity), the recipient may provide applicable instructions pursuant to Section (d) below) as to any or all Transaction Documents (or applicable reports) by means of a single notice delivered (in accordance with the foregoing) to any or all other applicable parties to such Transaction Documents (and such address or changes to report delivery instructions, as applicable, as revised will be effective as to each such party to whom such notice is so delivered in accordance with this provision), and (ii) subject to the foregoing, as to any Person listed above, the address or other means of delivery herein for such Person (as the same might be updated pursuant to the foregoing) will apply with respect to  all Transaction Documents to which such Person is a party (or express third-party beneficiary).

(d)     Notwithstanding anything in the foregoing to the contrary (and in each case unless otherwise directed by the applicable recipient by written notice delivered pursuant to the foregoing provisions of this Notice Schedule), each of (i) each Monthly Report and other periodic report required to be delivered by the Manager pursuant to the Reporting and Access Schedule, (ii) such other reports required to be uploaded pursuant to the applicable instructions made available by the FDIC through Venue's virtual data room indicated below or otherwise through a Reporting Service, and (iii) such other reports to the FDIC (in any capacity) as the recipient from time to time might request (by written notice delivered pursuant to the foregoing provisions of this Notice Schedule) to receive via such uploading, in each case is to be delivered exclusively by uploading the same to the following electronic portal maintained on behalf of the FDIC (through its Asset Management Division) at Venue's virtual data room indicated below (or via such other method of transmission as may be directed by the FDIC (in any capacity) in connection with use of a Reporting Service).

**Initial Virtual Data Room Portal**: "JVT – Community Preservation Corp", which is found at Venue's virtual data room website, in the folder named "1 - SIG RCRS C MF 2023", subfolder 1.3 FDIC-MM-CMC", and to which the Manager hereby acknowledges to have received access prior to the date hereof (or such successor virtual data room, website, online address or Reporting Service as the FDIC might designate from time to time for such reporting requirements).

Any such report to be uploaded pursuant to the foregoing will be deemed delivered when so uploaded (in accordance with the applicable instructions available through the above-referenced website), with applicable online confirmation of successful completion of such upload (or as may otherwise be applicable in connection with transmission or delivery through a Reporting Service pursuant to Section 6 of the Reporting and Access Schedule).

(e)    Notwithstanding anything in the foregoing to the contrary, service of writs, process and summonses in any suit, action or proceeding arising out of, relating to, or in connection with this Agreement or any other Transaction Document is subject to any express provisions set forth in this Agreement or such other Transaction Document.

SIG RCRS C MF 2023 Venture LLC
Agreement of Common Terms and Definitions
Version 08-2022 (Standard)